Richard M. Cieri (RC 6062)
KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

and

Marc Kieselstein, P.C. (*pro hac vice* pending*)*
Adam C. Paul (*pro hac vice* pending)
Scott R. Zemnick (*pro hac vice* pending)
Jeffrey W. Gettleman (*pro hac vice* pending)
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, Illinois 60601
Telephone: (312) 861-2000
Facsimile: (312) 861-2200

Proposed Counsel for the Debtors and Debtors in
Possession

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | Case No. 08-_____(___) |
| DJK Residential LLC, et al.,[1] | ) | Jointly Administered |
| | ) | |
| Debtors. | ) | |
| | ) | |

## MOTION OF THE DEBTORS FOR AN ORDER AUTHORIZING PAYMENT OF
## PREPETITION CLAIMS OF CERTAIN FOREIGN VENDORS

---

[1] The Debtors in these cases include: DJK Residential LLC; A Five Star Forwarding, Inc.; A Relocation Solutions Management Company; A Three Rivers Forwarding, Inc.; A.V.L. Transportation, Inc.; Alaska USA Van Lines, Inc.; Allied Alliance Forwarding, Inc.; Allied Continental Forwarding, Inc.; Allied Domestic Forwarding, Inc.; Allied Freight Forwarding, Inc.; Allied Intermodal Forwarding, Inc.; Allied International, N.A. Inc.; Allied Interstate Transportation, Inc.; Allied Transcontinental Forwarding, Inc.; Allied Transportation Forwarding, Inc.; Allied Van Lines Terminal Company; Allied Van Lines, Inc.; Allied Van Lines, Inc. of Indiana; Americas Quality Van Lines, Inc.; Anaheim Moving Systems, Inc.; Cartwright Moving & Storage Co., Inc.; Cartwright Van Lines, Inc.; City Storage & Transfer, Inc.; CMS Holding, LLC; Executive Relocation Corporation; Federal Traffic Service, Inc.; Fleet Insurance Management, Inc.; FrontRunner Worldwide, Inc.; Global Van Lines, Inc.; Global Worldwide, Inc.; Great Falls North American, Inc.; Lyon Van Lines, Inc.; Lyon Worldwide Shipping, Inc.; Manufacturing Support Services, LLC; Meridian Mobility Resources, Inc.; Move Management Services, Inc.; NA (UK) GP Corporation; NACAL, Inc.; NAVL LLC; NorAm Forwarding, Inc.; North American Forwarding, Inc.; North American International Holding Corporation; North American International N.A., Inc.; North American Logistics, Ltd.; North American Van Lines of Texas, Inc.; North American Van Lines, Inc.; Relocation Risk Solutions, LLC; RS Acquisition Holding, LLC; RS Acquisition, LLC; SIRVA Container Lines, Inc.; SIRVA Freight Forwarding, Inc.; SIRVA Global Relocation, Inc.; SIRVA Imaging Solutions, Inc.; SIRVA MLS, Inc.; SIRVA Relocation LLC; SIRVA Settlement of Alabama, LLC; SIRVA Settlement, Inc.; SIRVA Worldwide, Inc.; SIRVA, Inc.; Trident Transport International, Inc.

The above-captioned debtors (collectively, the "Debtors") hereby move the Court (this "Motion") for the entry of an order, substantially in the form attached hereto as <u>Exhibit A</u>, authorizing, but not directing, the Debtors to pay prepetition claims of Foreign Vendors (as defined herein). In support of this Motion, the Debtors respectfully state as follows:[2]

## Jurisdiction

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157 (b)(2).

2.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory bases for the relief requested herein are sections 105(a) and 363 of the Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), and Rule 6003 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## Background

4.      On the date hereof (the "Petition Date"), each of the Debtors filed a petition with the Court under chapter 11 of the Bankruptcy Code. The Debtors are operating their businesses and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated. Concurrently with the filing of this Motion, the Debtors have sought procedural consolidation and joint administration of these chapter 11 cases.

5.      The Debtors are a leading provider of relocation and moving services to corporations, government agencies, and individual customers around the world. The Debtors' relocation services businesses (collectively, "Relocation Services") provide employee relocation

---

[2]    The facts and circumstances supporting this Motion are set forth in the Affidavit of Douglas V. Gathany, Senior Vice President and Treasurer of DJK Residential LLC in Support of First Day Motions (the "First Day Affidavit"), filed contemporaneously herewith.

K&E 12297332.

services to over one thousand corporate clients and governmental units. Relocation Services operates under the SIRVA Relocation brand and offers comprehensive relocation and moving services through the Debtors' worldwide operations. Relocation Services provides fully integrated outsourcing of relocation management, reduces real estate market risk, minimizes incidental costs, and optimizes the tax treatment of relocation expenses for its clients and their employees.

6.     A typical Relocation Services transaction occurs where a large, multinational employer/client transfers an employee to a different geographic region. The Debtors facilitate this transfer by, among other things, arranging for the sale of the employee's home. In many cases, the Debtors provide the employee with an advance on the employee's home equity, enabling the employee to purchase a new home in the employee's new location before the employee's existing home is sold. And, under certain programs, the Debtors will purchase the employee's existing home based on a third party appraisal if the employee's property is not otherwise within a defined time period.

7.     The Debtors provide their Relocation Services through two distinct product offerings: a "traditional" model and a "fixed-fee" model. Under the traditional model, the Debtors provide their Relocation Services, including the purchase of the employee's home, on a cost-plus basis. The Debtors pass through to the employer/client any loss (or gain) on the home sale and all carrying costs incurred before the home is sold. For example, if the Debtors acquire the employee's existing home for $100,000 and then re-sell the home to a third party buyer for $80,000, the Debtors will be reimbursed by the traditional employer/client for the $20,000 loss resulting from the third party sale. Additional services the Debtors may provide include city orientation, school selection, visa and immigration management, and language and cultural

training.  The Debtors provide these services through a combination of third-party contractors and SIRVA employees, depending, in part, upon the custom for such services in the local market.

8.      Under the fixed-fee model, the Debtors provide their Relocation Services for a fixed-fee, set as a percentage of the price paid by the Debtors to acquire the employee's home. The Debtors will then bear all risk and responsibility for costs in the home sale process, including any loss (or gain) on the ultimate sale of the employee's home to a third party.  Using the example provided above, a "fixed-fee" employer/client would not reimburse the Debtors for the loss resulting from the third party sale, and the Debtors would incur a $20,000 loss.  If the Debtors sold the home for $150,000, the Debtors would retain the $50,000 gain.  For the year ended December 31, 2006, the Debtors' fixed-fee product represented approximately 46 percent of their total relocations.

9.      The Debtors are also a world leader in moving household and other goods directly on behalf of individual customers through their moving services business (collectively, "Moving Services").  Moving Services is divided between (a) Moving Services North America and (b) Moving Services Europe and Asia Pacific.[3]  Collectively, Moving Services operates in approximately forty-five countries through a portfolio of trademarked brands, including Allied, northAmerican, and Global in North America; Pickfords, Hoults, and Allied Pickfords in the United Kingdom; and Allied Pickfords in the Asia Pacific region.  The Debtors' Allied and northAmerican trademarks, which are fully owned assets of the Debtors, are considered two of the most widely recognized and respected brand names in the moving services industry.

---

[3]     The Debtors' foreign affiliates are not debtors in these chapter 11 cases, and the Debtors have not sought to initiate insolvency or similar proceedings with respect to their foreign affiliates in any non-U.S. jurisdiction.  However, the Debtors may seek to initiate such foreign proceedings as the facts and circumstances of their reorganization continue to develop.

K&E 12297332.

10.     In the twelve months ended September 30, 2007, the aggregate annual revenues of the Debtors' continuing operations, including their non-Debtor affiliates, exceeded $4.0 billion. Of this amount, approximately 60 percent was attributed to Relocation Services, 31 percent to Moving Services North America, and 9 percent to Moving Services Europe and Asia Pacific. A significant portion of the Debtors' revenue effectively requires the Debtors to incur substantial expenses corresponding to transportation purchased or services provided by the Debtors, thereby reducing the Debtors' operating cash flow. However, the Debtors are, in many cases, able to subsequently pass through these costs to their clients as reimbursable expenses. As of January 2008, the Debtors and their non-Debtor affiliates employed approximately 3,200 employees worldwide with 1,760 employees in the United States.

11.     Several factors led to the filing of these chapter 11 cases. By their very nature, the Debtors' businesses are directly impacted by general trends in the residential real estate market. The rapid decline in home sale prices across the United States has significantly increased losses incurred by the Debtors on home sale transactions, including the Debtors' fixed-fee Relocation Services product.[4] Declining home prices have increased the number of homes the Debtors have been required to purchase and subsequently sell for a loss. Further declines in the residential real estate market may increase the number or magnitude of losses sustained by the Debtors with respect to their fixed-fee home inventory. The increased marketing time necessary to sell these properties also has increased the Debtors' carrying costs on their acquired homes, such as mortgage payments, insurance, taxes, and maintenance.

---

[4]     According to statistics compiled by the National Association of Realtors, sales of existing homes declined 12.8 percent between 2006 and 2007, and declined 8.5 percent between 2005 and 2006. Sales of new homes declined by 26.5 percent between 2006 and 2007 and 18.1 percent between 2005 and 2006. Median sale prices for existing homes declined by 1.9 percent between 2006 and 2007, and median sale prices for new homes declined 2.1 percent in the same period.

K&E 12297332.

12.     In addition, the weakening U.S. economy has reduced volumes in the Debtors' Moving Services operations. Individual consumers have either been unable to sell their homes (and are thereby prevented from moving) or have postponed a planned sale and relocation as a result of depressed home prices. According to the U.S. Census Bureau, the number of household moves in each of the years 2005, 2006, and 2007 was approximately 6 percent less than the average number of household moves between 1984 and 2002. Difficulties in the residential real estate market may continue through the near term, further increasing the negative trend in Moving Services volumes. The Debtors' highly leveraged balance sheet and significant debt service obligations have also exacerbated the Debtors' financial results.

13.     The Debtors have filed these chapter 11 cases to implement a plan to match the Debtors' capital structure with the Debtors' present operations and prospects. The de-leveraging contemplated by the plan is the result of arduous and productive negotiations among the Debtors and their lenders and will provide the Debtors with significant flexibility to maximize their present and future operations. Within the coming days, the Debtors contemplate filing a plan of reorganization and seeking approval of a disclosure statement to accompany the plan. Immediately upon approval of the disclosure statement, the Debtors intend to commence solicitation and seek confirmation of the plan shortly thereafter.

**Foreign Claims**

14.     The Debtors have identified that, as of the Petition Date, they have prepetition obligations (the "Foreign Claims")[5] in the approximate total amount of $19.5 million to certain vendors, service providers, regulatory agencies, and governments located in foreign jurisdictions

---

[5]     "Foreign Claims" also include any foreign tax, import/export fees, customs fees or duties related to such claims. If the Debtors do not pay these ancillary costs, the Debtors would be unable to obtain the underlying goods being purchased.

K&E 12297332.

(collectively, the "Foreign Vendors"),[6] including claims for payment for: portage fees, custom duties, packing materials and services, land, air, and sea transportation, and sea container fees that facilitate the Moving Services and Relocation Services business in foreign locations, as well as import or tax obligations. Currently the Debtors have received invoices for approximately $6.9 million in Foreign Claims. The Debtors estimate that a further $11.6 million in Foreign Claims currently exist, but have not been invoiced. This is due to the nature of the Debtors international moving services business, where the third party intermediaries only issue invoices after their services have been completed.

15.     Although the majority of these claims are covered under the *Motion of the Debtors for an Order Authorizing Them to Pay the Prepetition Transportation Expenses and Directing Banks and Other Financial Institutions to Honor Related Checks and Electronic Payment Requests* (the "Transportation Expenses Motion"), the Debtors seek the relief requested here to pay certain third parties, such as governmental and regulatory authorities, that are not covered in the Transportation Expenses Motion. The Debtors believe that, in order to preserve the smooth transition with minimal interruptions of their business operations and to consummate the prepackaged plan of reorganization, it will be necessary to pay all or some of the Foreign Claims owed to the Foreign Vendors.

## Relief Requested

16.     The Debtors seek entry of an order pursuant to Sections 105 and 363 of the Bankruptcy Code: (a) authorizing but not directing the Debtors to pay, in their sole discretion,

---

[6]     The term "Foreign Vendors" as used in this Motion is not intended to include foreign vendors, service providers, and other non-governmental entities if such entities are known to have assets within the United States that would be subject to the jurisdiction of this Court and that would be available to satisfy a judgment entered by this Court if such entities were to violate the automatic stay provisions of Section 362 of the Bankruptcy Code or otherwise take any action contrary to an order of this Court or the provisions of the Bankruptcy Code.

K&E 12297332.

and in the ordinary course of business, the Foreign Claims owed to Foreign Vendors as described above, including claims for payment for direct and indirect materials and services provided to the Debtors, as well as import or tax obligations, and (b) authorizing the Debtors' banks to receive, process, honor, and pay checks or electronic transfers used by the Debtors to pay prepetition obligations to Foreign Vendors.

17.     Finally, the Debtors request that the satisfaction of the Foreign Claims shall not be deemed to be an assumption or adoption of any agreements that relate to the Debtors' business operations.

## **Basis for Relief**

18.     In connection with commencing these chapter 11 cases, the Debtors are making every effort to avoid interruptions to the timely delivery of goods and services to their customers and the adverse effects that even a temporary delay in prompt delivery could have on their businesses.[7]  Indeed, any sort of significant delays in delivering customers' possessions would result in a devastating loss of confidence in the Debtors' ability to perform under their moving and relocation contracts.  Since the Debtors operate on a worldwide basis, at any given time a significant portion of their Moving Services and Relocation Services business involve either moving a customers' employee from the U.S. to a foreign nation or from a foreign nation to the U.S.  Additionally, the Debtors rely heavily on third party intermediaries to arrange for shipping and transportation of the customers' goods.  Thus, the Debtors deal with foreign agents, shippers and regulatory officials who may refuse to recognize the Bankruptcy Court's jurisdiction or the automatic stay.  If a foreign vendor refuses to deliver, pick up or ship the relevant materials, the

---

[7]    A more detailed explanation of the Debtors' supply chain can be found in the Transportation Expenses Motion, filed contemporaneously herewith and incorporated herein by reference.

Debtors could be compelled to compensate the customer for any delay or expense in recovering or storing the goods. Additionally, in immediately preceding the Petition Date, the Debtors have had to negotiate with various Foreign Vendors in order to ensure the timely delivery of the customers' possessions.

19.     Accordingly, the Debtors have taken carefully formulated measures to avoid any logistical interruptions during the opening days of their bankruptcy cases. Because of the nature of the Debtors' businesses, they believe that many vendors will make credible (and actionable) threats that, unless paid on account of their prepetition debt, they will cease to provide the transportation services necessary to maintain the smooth operation of the Debtors' businesses.

20.     In light of the size, sophistication and global nature of their businesses, the Debtors regularly transact business with vendors, agents, and regulatory authorities located outside of the United States and its territories. Many of these foreign businesses supply transportation and shipping services to the Debtors that are crucial to the Debtors' ongoing U.S. operations. Moreover, especially where customers' materials are already in transit, it would be difficult to impossible to obtain alternative arrangements to deliver the moved materials. The Debtors regularly transact business with Foreign Vendors of this type throughout Europe and Asia. As such, if these moving services are not obtained from Foreign Vendors without interruption, the Debtors likely would not be able to fulfill their obligations to their customers.

21.     Foreign agents and suppliers often have confused and guarded reactions to the U.S. bankruptcy process. For example, many of these entities are unfamiliar (or uncomfortable) with the unique debtor-in-possession mechanism that is at the heart of chapter 11. A debtor seeking to explain the chapter 11 process to a foreign vendor and convince that foreign vendor, particularly an unsophisticated one, to continue shipments post-petition is often greeted with a

high degree of skepticism and mistrust. Indeed, there is a significant risk that the nonpayment of even a single invoice could cause a Foreign Vendor to seize customers' goods in transit, stop shipping on a timely basis or completely sever its business relationship with the Debtors. The Debtors have already experienced difficulty with Foreign Vendors prior to the Petition Date and have had to negotiate settlements or make payments in order to ensure goods were delivered appropriately. Nonpayment of prepetition claims may cause Foreign Vendors to utilize extreme caution and adopt a wait-and-see attitude in approaching the unfamiliar territory of chapter 11, resulting in costly delays in the shipment of additional goods after disruption of the Debtors Moving Services and Relocation Services businesses.

22.     If the Foreign Claims are not paid, the Foreign Vendors may take precipitous action against the Debtors based upon an erroneous belief that they are not subject to the jurisdiction of this Court and, thus, not subject to the automatic stay provisions of Section 362(a) of the Bankruptcy Code. Although the automatic stay applies to protect the Debtors' assets wherever they are located in the world, attempting to enforce the Bankruptcy Code in foreign countries can be a fruitless exercise, especially when foreign governments and regulatory agencies are involved.

23.     In the absence of enforcement of the stay, the Foreign Vendors, among other things, could: (a) initiate a lawsuit in a foreign court and obtain a judgment against the Debtors to collect prepetition amounts owed to them, or (b) immediately seek to attach or seize the Debtors' or their affiliates' foreign assets even prior to obtaining a judgment. In addition, there is a risk that foreign governmental authorities might either: (x) seize the such assets in foreign countries, including, without limitation, goods destined for the Debtors' customers in the United States, or (y) seek civil penalties against the Debtors and their non-Debtor affiliates.

K&E 12297332.

24.     Indeed, pursuant to the prepackaged plan of reorganization, all unsecured trade claims will be paid in full, including virtually all of the Foreign Claims. Further, some of the Foreign Claims may be priority claims under Section 507(a)(8) of the Bankruptcy Code, which provides that certain governmental claims are entitled to priority. Thus, payments to Foreign Vendors merely alter the timing of payment, not the amount of consideration ultimately received. Therefore, the significant risks associated with non-payment of Foreign Vendors justify the payment of the Foreign Claims in the ordinary course of business on the terms described herein.

25.     Ultimately, the Debtors will only seek to pay these Foreign Claims to the extent that, in the exercise of their business judgment, the Debtors determine that such payment will serve to avoid disruptions to their business and subject to all of the other terms and conditions applicable to the payment of Foreign Claims.

### Conditions on Payment of Foreign Claims

26.     The Debtors propose to condition the payment of Foreign Claims on the agreement of the individual foreign vendor to continue supplying goods and services to the Debtors on terms that are consistent with the historical trade terms between the parties (the "Customary Trade Terms"). The Debtors propose that the Customary Trade Terms apply for the remaining term of the Foreign Vendor's agreement with the Debtors, as long as the Debtors agree to pay for such goods in accordance with such terms.

27.     If a Foreign Vendor accepts a payment on account of a prepetition obligation of the Debtors (the "Foreign Payment") and thereafter fails to provide the Debtors with the requisite Customary Trade Terms, then: (a) any Foreign Payment received by the Foreign Vendor will be deemed an unauthorized postpetition transfer under Section 549 of the Bankruptcy Code that the Debtors may either: (i) recover from the Foreign Vendor in cash or goods, or (ii) at the Debtors' option, apply against any outstanding administrative claim held by such Foreign Vendor; and (b)

upon recovery of any Foreign Payment, the corresponding prepetition claim of the Foreign Vendor will be reinstated in the amount recovered by the Debtors, less the Debtors' reasonable costs to recover such amounts.

28.　　The Debtors also seek authorization, but not direction, to obtain written verification before issuing payment to a Foreign Vendor that such Foreign Vendor will continue to provide goods and services to the Debtors on Customary Trade Terms for the remaining term of the Foreign Vendor's agreement with the Debtors; provided, however, that the absence of such written verification will not limit the Debtors' rights sought hereunder.

29.　　Finally, to facilitate the payment of Foreign Vendors and, thus, the avoidance of foreign actions against the Debtors and their assets, the Debtors respectfully request that the banks that provide banking services to the Debtors be authorized and required to:　(a) honor any checks drawn against their accounts, but not cleared prior to the Petition Date, and (b) complete any fund transfer requests made but not completed prior to the Petition Date.　In addition, the Debtors respectfully request authorization to issue postpetition checks and to make postpetition fund transfer requests to replace any prepetition checks and prepetition transfers to Foreign Creditors that may be dishonored by the banks.

## Applicable Authority

**A.　This Court May Authorize Payment of the Foreign Claims Pursuant to Section 363 of the Bankruptcy Code**

30.　　The relief requested in this Motion is authorized pursuant to Section 363 of the Bankruptcy Code.　See, e.g., In re Aerovias Nacionales de Colombia S.A., 303 B.R. 1, 5-6 (Bankr S.D.N.Y. 2003) (discussing the authorization of $35.7 million in payments to foreign vendors on account of prepetition claim); In re UAL Corp., Case No. 02-48191 (Bankr. N.D. Ill. December 11, 2002) (same); In re Conseco, Inc., Case No. 02-49672 (Bankr. N.D. Ill. Jan. 14,

K&E 12297332.

2003); <u>Armstrong World Indus., Inc. v. James A. Phillips, Inc.</u> (<u>In re James A. Phillips, Inc.</u>), 29

B.R. 391, 397 (S.D.N.Y. 1983) (under Section 363, court authorized contractor to pay prepetition

claims of some suppliers who were potential lien claimants, because payments were necessary

for general contractors to release funds owed to debtors, thus benefiting estate).  Here, because

the relief requested in this Motion contemplates payments to be made only to Foreign Vendors

who agree to provide goods or services on Customary Trade Terms, and thus, is beneficial to the

estate, the transaction between the Debtors and such Foreign Vendors is authorized by Section

363 of the Bankruptcy Code.

**B.** **The Court Should Authorize Payment of the Foreign Claims as a Valid Exercise of the Debtors' Fiduciary Duties**

31.     The Debtors, operating their businesses as debtors-in-possession, are fiduciaries

"holding the bankruptcy estate[s] and operating the business[es] for the benefit of [their]

creditors and (if the value justifies) equity owners."  <u>In re CoServ, L.L.C.</u>, 273 B.R. 487, 497

(Bankr. N.D. Tex. 2002).  Implicit in the duties of a chapter 11 debtor-in-possession is the duty

"to protect and preserve the estate, including an operating business's going-concern value."  <u>Id</u>.

32.     Courts have noted that there are instances in which a debtor-in-possession can

fulfill its fiduciary duty "only…by the preplan satisfaction of a prepetition claim."  <u>Id</u>.  The

<u>CoServ</u> court specifically noted that pre-plan satisfaction of prepetition claims would be a valid

exercise of a debtor's fiduciary duty when the payment "is the only means to effect a substantial

enhancement of the estate" and also when the payment was to "sole suppliers of a given

product."  <u>Id</u>. at 497-98.  The court provided a three-pronged test for determining whether a

preplan payment on account of a prepetition claim was a valid exercise of a debtor's fiduciary

duty:

> First, it must be critical that the debtor deal with the claimant.  Second, unless it
> deals with the claimant, the debtor risks the probability of harm, or, alternatively,

loss of economic advantage to the estate or the debtor's going concern value, which is disproportionate to the amount of the claimant's prepetition claim. Third, there is no practical or legal alternative by which the debtor can deal with the claimant other than by payment of the claim.

Id. at 498.

33.     Payment of the Foreign Claims undeniably meets each element of the CoServ court's standard.  As described above, the Debtors have narrowly tailored the definition of "Foreign Vendors" to encompass only those suppliers most likely to strenuously assert that the automatic stay is inapplicable to them and thereby risk interruption of the Debtors' moving service and relocation operations.  The shutdown of the Debtors' operations would cost the Debtors' estates millions of dollars in lost revenues and potential customer claims for delayed or seized possessions.  The harm and economic disadvantage that would stem from the failure of any of the Foreign Vendors ceasing services related to the shipment of the customers' possessions is grossly disproportionate to the amount of the prepetition claim that would have to be paid in order to ensure the continued supply of critical goods and services to the Debtors.  Finally, with respect to each Foreign Vendor, the Debtors have examined other legal options short of payment of such vendor's prepetition claims and have determined that to avoid significant disruption of the Debtors' business operations there exists no practical or legal alternative to payment of the Foreign Claims.  Therefore, the Debtors can only meet their fiduciary duties as debtors-in-possession by payment of the Foreign Claims.

## C.     The Court May Rely on the "Necessity of Payment" Doctrine and Its General Equitable Powers to Grant the Motion

34.     The traditional source of authority for pre-plan payments of prepetition debts is the "doctrine of necessity" or "necessity of payment" rule first recognized by the Supreme Court more than 120 years ago in Miltenberger v. Logansport, C. & S. Ry., Co., 106 U.S. 286 (1882). In Miltenberger, the Supreme Court acknowledged the basic duty of an equity receiver "to

protect and preserve the trust funds in his hands." Id. at 310 (quoting Wallace v. Loomis, 97 U.S. 146, 162-63 (1878)).  The Supreme Court held that, consistent with this duty, "[m]any circumstances may exist which may make it necessary and indispensable to the business…and the preservation of the property, for the receiver to pay preexisting debts…out of the earnings of the [debtor]…under the order of the court…" Id. at 311-12.

35.     This doctrine "recognizes the existence of the judicial power to authorize a debtor in a reorganization case to pay prepetition claims where such payment is essential to the continued operation of the debtor." In re Ionosphere Clubs, 98 B.R. 174, 176 (Bankr. S.D.N.Y. 1989); In re Cenargo Intern., PLC, 294 B.R. 571, 580-81 (Bankr. S.D.N.Y. 2003) (approving payments to foreign creditors on the "doctrine of necessity"); In re CAF Bindery, Inc., 199 B.R. 828 (Bankr. S.D.N.Y. 1996) (payment of prepetition claims warranted when critical to debtor's reorganization); see also In re Lehigh & N.E. Ry. Co., 657 F.2d 570, 581 (3d Cir. 1981) (payment of creditors' claims authorized under "necessity of payment" doctrine).  This doctrine is consistent with the paramount goal of Chapter 11 — "facilitating the continued operation and rehabilitation of the debtor." In re Ionosphere Clubs, 98 B.R. at 176.

36.     Bankruptcy courts routinely grant authorization for chapter 11 debtors to pay claims owing to foreign entities against which the automatic stay cannot be readily enforced in the United States and as to which it would be unduly time-consuming and expensive to seek to enforce an order of the bankruptcy court in the creditor's home country. See, e.g., In re Dana Corp., No. 06-10354 (Bankr. S.D.N.Y. Mar. 3, 2006) (order authorizing the debtors to pay prepetition obligations to foreign creditors); In re Delphi Corp., No. 05-44481 (Bankr. S.D.N.Y. Oct. 14, 2005) (same); In re Delta Air Lines, Inc., No. 05-17923 (Bankr. S.D.N.Y. Sept. 16, 2005) (same); In re Northwest Airlines Corp., No. 05-17930 (Bankr. S.D.N.Y. Sept. 15, 2005)

K&E 12297332.

(same); <u>In re Loral Space & Comm'cns Ltd.</u>, No. 03-41710 (Bankr. S.D.N.Y. July 16, 2003) (same); <u>In re Dura Automotive Systems, Inc.</u>, No. 06-11202 (Bankr. D. Del. Oct. 31, 2006) (order authorizing debtors to pay prepetition claims of certain foreign vendors); <u>In re J.L. French Automotive Castings, Inc.</u>, No. 06-10119 (Bankr. D. Del. Feb. 14, 2006) (same). The payment of the Foreign Claims is essential to assure that the Debtors continue their moving services business line in the ordinary course of business. This Court should therefore exercise its equitable powers to grant the relief requested in this Motion.

## Memorandum of Law

37.     This Motion includes citations to the applicable authorities and a discussion of their application to this Motion. Accordingly, the Debtors respectfully submit that such citations and discussion satisfy the requirement that the Debtors submit a separate memorandum of law in support of this Motion pursuant to Rule 9013-1 of the Local Bankruptcy Rules for the Southern District of New York.

## Notice

38.     The Debtors have provided notice of this Motion to: (a) the Office of the United States Trustee for the Southern District of New York; (b) the entities listed on the Consolidated List of Creditors Holding the 30 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (c) counsel to the agent for the Debtors' proposed postpetition secured lenders; (d) counsel to the agent for the Debtors' senior secured prepetition lenders; (e) Washington Mutual Bank and Colonial Bank, N.A., lenders to the Debtors' non-debtor affiliate, SIRVA Mortgage, Inc.; (f) counsel to LaSalle Bank, N.A., as agent for the Debtors' receivables purchase program maintained through SIRVA Relocation Credit, LLC, the Debtors' non-debtor affiliate; (g) the Internal Revenue Service; and (h) the Securities and Exchange Commission. In light of

the nature of the relief requested, the Debtors respectfully submit that no further notice is necessary.

## **No Prior Request**

39.     No prior motion for the relief requested herein has been made to this or any other court.

WHEREFORE, for the reasons set forth herein and in the First Day Affidavit, the Debtors respectfully request that the Court enter the order, substantially in the forms attached hereto as <u>Exhibit A</u> (a) authorizing, but not directing, the Debtors to pay or honor prepetition claims of Foreign Vendors, and (b) granting such other and further relief as is just and proper.

Dated: February 5, 2008
New York, New York

*/s/ Richard M. Cieri*

Richard M. Cieri (RC 6062)
KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, New York  10022
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900

and

Marc Kieselstein, P.C. (*pro hac vice* pending*)*
Adam C. Paul (*pro hac vice* pending*)*
Scott R. Zemnick (*pro hac vice* pending*)*
Jeffrey W. Gettleman (*pro hac vice* pending)
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, Illinois  60601
Telephone:  (312) 861-2000
Facsimile:   (312) 861-2200

Proposed Counsel for the Debtors and Debtors in Possession

K&E 12297332.

# EXHIBIT A

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) Case No. 08-_____(___) |
| DJK Residential LLC, et al.,[1] | ) Jointly Administered |
| | ) |
| Debtors. | ) |
| | ) |

## ORDER AUTHORIZING THE DEBTORS TO PAY PREPETITION CLAIMS OF CERTAIN FOREIGN VENDORS

Upon the motion (the "Motion")[2] of the above-captioned debtors (collectively, the "Debtors") for the entry of an order (this "Order") authorizing (a) the Debtors to pay, in the ordinary course of business, as and when due, any prepetition claims owing to certain vendors, service providers, regulatory agencies, and governments located in foreign jurisdictions (the "Foreign Vendors") and (b) financial institutions to honor any prepetition checks drawn or fund transfer requests made for payment of claims owing to Foreign Vendors and upon the First Day Affidavit; it appearing that the relief requested is in the best interests of the Debtors' estates, their creditors and other parties in interest; the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; consideration of the

---

[1] The Debtors in these cases include: DJK Residential LLC; A Five Star Forwarding, Inc.; A Relocation Solutions Management Company; A Three Rivers Forwarding, Inc.; A.V.L. Transportation, Inc.; Alaska USA Van Lines, Inc.; Allied Alliance Forwarding, Inc.; Allied Continental Forwarding, Inc.; Allied Domestic Forwarding, Inc.; Allied Freight Forwarding, Inc.; Allied Intermodal Forwarding, Inc.; Allied International, N.A. Inc.; Allied Interstate Transportation, Inc.; Allied Transcontinental Forwarding, Inc.; Allied Transportation Forwarding, Inc.; Allied Van Lines Terminal Company; Allied Van Lines, Inc.; Allied Van Lines, Inc. of Indiana; Americas Quality Van Lines, Inc.; Anaheim Moving Systems, Inc.; Cartwright Moving & Storage Co., Inc.; Cartwright Van Lines, Inc.; City Storage & Transfer, Inc.; CMS Holding, LLC; Executive Relocation Corporation; Federal Traffic Service, Inc.; Fleet Insurance Management, Inc.; FrontRunner Worldwide, Inc.; Global Van Lines, Inc.; Global Worldwide, Inc.; Great Falls North American, Inc.; Lyon Van Lines, Inc.; Lyon Worldwide Shipping, Inc.; Manufacturing Support Services, LLC; Meridian Mobility Resources, Inc.; Move Management Services, Inc.; NA (UK) GP Corporation; NACAL, Inc.; NAVL LLC; NorAm Forwarding, Inc.; North American Forwarding, Inc.; North American International Holding Corporation; North American International N.A., Inc.; North American Logistics, Ltd.; North American Van Lines of Texas, Inc.; North American Van Lines, Inc.; Relocation Risk Solutions, LLC; RS Acquisition Holding, LLC; RS Acquisition, LLC; SIRVA Container Lines, Inc.; SIRVA Freight Forwarding, Inc.; SIRVA Global Relocation, Inc.; SIRVA Imaging Solutions, Inc.; SIRVA MLS, Inc.; SIRVA Relocation LLC; SIRVA Settlement of Alabama, LLC; SIRVA Settlement, Inc.; SIRVA Worldwide, Inc.; SIRVA, Inc.; Trident Transport International, Inc.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Motion.

Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); venue being proper before this court pursuant to 28 U.S.C. §§ 1408 and 1409; and after due deliberation and sufficient cause appearing therefor, it is hereby ORDERED

1.      The Motion is granted as provided herein.

2.      The Debtors are hereby authorized but not required to pay, in their discretion and in the ordinary course of business, as and when due, any claim held by a Foreign Creditor (the "Foreign Claims"); provided, however, that the terms "Foreign Creditor" and "Foreign Vendors" shall not include foreign vendors, service providers, or other nongovernmental entities if such entities are known to have assets within the United States that would be subject to the jurisdiction of this Court and that would be available to satisfy a judgment entered by this Court if such entities were to violate the automatic stay provisions of Section 362 of the Bankruptcy Code or otherwise take any action contrary to an order of this Court or the provisions of the Bankruptcy Code; provided further, however, that, notwithstanding the foregoing clause, the terms "Foreign Creditor" and "Foreign Vendors" shall include foreign vendors, service providers, or other entities that are located in jurisdictions, including without limitation, a variety of countries in Europe and Asia, where the Debtors' failure to pay such entities' prepetition claims could cause such entity to lose its legal ability to export goods or provide services to the Debtors.

3.      In return for payment of the Foreign Claims in the ordinary course of business, unless otherwise waived by the Debtors in their sole discretion, the Foreign Vendors within this Court's jurisdiction are hereby required to continue to provide goods and services to the Debtors on the most favorable terms in effect between such supplier and the Debtors in the twelve months prior to the Petition Date or on such other favorable terms as the Debtors and the Foreign

Creditor may otherwise agree ("Customary Trade Terms").  The Customary Trade Terms shall apply for the remaining term of the Foreign Creditor's agreement with the Debtors, as long as the Debtors agree to pay for such goods in accordance with such terms.

4.       If any Foreign Creditor accepts payment on account of a prepetition obligation of the Debtors and thereafter does not continue to provide services to the Debtors on Customary Trade Terms, any payments made shall be deemed an avoidable postpetition transfer under Section 549 of the Bankruptcy Code and shall be recoverable by the Debtors in cash upon written request.  Upon recovery by the Debtors, the claim shall be reinstated as a prepetition claim in the amount so recovered.  The Debtors are hereby authorized but not directed to obtain written verification, before issuing payment to a Foreign Creditor, that such Foreign Creditor will, if relevant, continue to provide goods and services to the Debtors on Customary Trade Terms for the remaining term of the Foreign Creditor's agreement with the Debtors; provided, however, that the absence of such written verification will not limit the Debtors' rights hereunder.

5.       All applicable banks and other financial institutions are hereby authorized and required to receive, process, honor, and pay any and all checks and transfer requests evidencing amounts paid by the Debtors under this Order whether presented prior to or after the Petition Date.  Such banks and financial institutions are authorized to rely on the representations of the Debtors as to which checks are issued or authorized to be paid pursuant to this Order.

6.       Notwithstanding the relief granted herein and any actions taken hereunder, nothing contained herein shall constitute, nor is it intended to constitute, the assumption or adoption of any contract or agreement under Section 365 of the Bankruptcy Code.

3

7.      Notwithstanding the relief granted herein and any actions taken hereunder, nothing contained herein shall create, nor is it intended to create, any rights in favor of, or enhance the status of any claim held by, any person.

8.      Notwithstanding any provision in the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") to the contrary, the Debtors are not subject to any stay in the implementation, enforcement, or realization of the relief granted in this Order, and the Debtors may, in their discretion and without further delay, take any action and perform any act authorized under this Order.

9.      The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

10.     The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

11.     The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Date:  **[DATE],** 2008          _____
New York, New York                    United States Bankruptcy Judge

K&E 12297332.