WOLFF & SAMSON PC
THE OFFICES AT CRYSTAL LAKE
ONE BOLAND DRIVE
WEST ORANGE, NEW JERSEY 07052
973-325-1500
Attorneys for Triple Net Investments IX, LP
(REN-3034)

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE:<br><br>DJK RESIDENTIAL LLC, <u>et al</u>.,<br><br>                Debtors. | Chapter 11<br><br>Bankruptcy Case No. 08-10375<br><br>(Jointly Administered) |

**NOTICE OF OBJECTIONS BY TRIPLE NET INVESTMENTS IX, LP TO ADEQUACY OF DISCLOSURE AND CONFIRMATION OF DEBTORS' CHAPTER 11 PLAN**

**TO:    HONORABLE JAMES M. PECK**
         **UNITED STATES BANKRUPTCY JUDGE**

Triple Net Investments IX, LP ("Triple Net"), a party-in-interest and creditor of Debtor North American Van Lines ("North American" or "Debtor"), through its undersigned counsel, respectfully objects (the "Objection") to (i) the adequacy of the disclosure set forth in the Disclosure Statement for Debtor's Prepackaged Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code (the "Disclosure Statement") (Docket No. 32); and (ii) confirmation of the Debtors' Prepackaged Plan of Reorganization (the "Plan") (Docket No. 31), and, in support of the Objection, respectfully states and represents[1]:

---

[1] Triple Net's objections will be supplemented by an Objection Supplement to be filed on or before April 11, 2008, in accordance with the Notice of Rescheduled Combined Hearing on the Adequacy of the Debtors' Disclosure Statement and Confirmation of the Debtors' Prepackaged Plan of Reorganization (the "Notice") (Docket No. 225). Capitalized terms, unless otherwise stated or clear from the context, shall have the meaning ascribed in the Notice or the Plan.

.
1119300.1

**PRELIMINARY STATEMENT**

1. The Plan purports at once to be both a "prepackaged" and a "gift" plan, whereby the Pre Petition Lenders overwhelming voted in its favor pre-petition and have agreed to "gift" from their recovery, from their pre-petition collateral, the funds necessary to pay in full Class 4 general unsecured creditors. At the same time, the Plan proposes to pay nothing to Class 5 members, a class which is indistinguishable from Class 4 and, by Debtors' estimate, may total $100 Million in claims. Despite the tremendous economic interests at stake in Class 5, the Plan has been fast-tracked for confirmation in two and a half months since its filing and has proceeded in virtual secrecy, with almost no disclosure to date concerning a public company with over 61 affiliated debtors.

2. The Plan in fact is neither a prepackaged plan (as the Court has recognized on several occasions) nor is it a gift plan. It cannot be confirmed, as proposed. The Plan violates, circumvents, and otherwise eviscerates the spirit and letter of the Bankruptcy Code, and it should be rejected outright on public policy grounds. On those grounds, a secured creditor should not be permitted to use the plan process to accomplish results inconsistent with or prohibited by the Bankruptcy Code (the "Code"). Given that the Pre Petition Lenders are paying for their own counsel, Debtors' counsel, and the Official Committee of Unsecured Creditors' counsel, it is plausible that with reasonable time and disclosure of basic facts any interested party in this case may establish the Pre Petition Lenders lack of <u>bona fides</u> and insider status.

3. As will be shown, the Plan is unconfirmable as a matter of law on multiple legal grounds, not just public policy. For example, a number of Class 4 members already have been paid in full their pre-petition unsecured claims from estate assets - - post-petition operating revenue and proceeds of post-petition DIP loans - - not from the pre-petition collateral of the

Pre Petition Lenders, as provided for in the Plan. This disparate and unfairly discriminatory use of estate property is expressly prohibited by the Code and cannot be rectified by the fiction that it is a permissible "gift" from pre-petition collateral, when factually and legally it is not.

4. Similarly, the Plan's requirement for substantive consolidation - - the total absence of meaningful disclosure of financial information from which an informed decision might be made as to its viability - - conflicts with other provisions of the Plan, most notably the treatment of Classes 6 and 8. Debtors cannot have it both ways and substantive consolidation at the parent level, SIRVA, is logically and legally inconsistent with retention and preservation of intercompany debts and equity interests.

5. No financial or operational or debtor-centric disclosure has been made whatsoever concerning the merits of substantive consolidation. Absent that kind of disclosure well in advance of the April 18, 2008, confirmation hearing date, no party-in-interest, including Triple Net, can go forward with confirmation. That holds true as well for Debtors' failure to file the Schedules of Assets and Liabilities and Statements of Financial Affairs for each of the 61 Debtors, as required by 11 U.S.C. § 521. Absent a reasonable timeframe to receive and analyze that statutorily required disclosure, neither Triple Net nor any other party-in-interest can proceed to confirmation on April 18, 2008.

6. Accordingly, for each of the reasons that follow, Triple Net respectfully requests entry of an order: (i) denying the Disclosure Statement as inadequate; (ii) denying confirmation of the Plan; and (iii) for such further and additional relief, as the Court deems just and appropriate.

## BACKGROUND

**A. Triple Net's Claim.**

7. Triple Net is a typical unsecured creditor representing a typical landlord whose lease has been rejected and whose claim is readily calculated under 11 U.S.C. § 365. Triple Net

holds a claim against one of the Debtors, North American, for at least $2,021,545.65, a portion of which ($10,217.61) is an allowed administrative claim for February, 2008, rent under a non-residential real property lease between Triple Net and North American (the "Lease").[2]

8. Triple Net and North American entered into the Lease on March 22, 1999, the Commencement Date for which Lease was November 10, 1999. The leased premises were "built to suit" for North American and are commonly known as the NAVL-Boston Facility, and are located in Devens, Massachusetts (the "Leased Premises"). The Lease has a fifteen year term that runs to November 30, 2014.

9. In negotiating and entering into the Lease, Triple Net dealt exclusively with North American as a stand alone entity, which never offered its parent or other affiliates as guarantors of North American's obligations under the Lease. Based upon the financials submitted by North American to induce Triple Net to enter into the Lease, North American's representations and documentation of its financial health resulted in Triple Net signing the Lease without guaranties or security deposit.

10. The terms of the Lease reflect North American's knowledge that Triple Net would and did finance the building based upon North American's credit and the revenue stream generated by its tenancy under the Lease. Substantially all of the rent has been paid to service the mortgage. For the past six months to a year, the parties have worked together to sublease the premises to preserve the financial structure recognized at the outset of this relationship.

---

[2] Triple Net reserves the right to argue that the damages from North American's default under the Lease should be in the amount of $13,476,971.00, unrestricted by the cap of 11 U.S.C. §502(b)(6), since unsecured creditors are being paid in full under the Plan. Triple Net also reserves the right to amend the amount of its claim to include attorneys fees recoverable pursuant to the Lease.

11. North American vacated, but continued to maintain, the Leased Premises sometime in and around 2004. In and around January, 2005, North American entered into an internal sublease with Sterling Corporation for a limited use of a portion of the Leased Premises. Notwithstanding having vacated the Leased Premises, North American continued to timely make all rent payments under the Lease through and including the rent payment for January, 2008.

**B. Pertinent Plan Provisions.**

12. The Plan provides for the division of claims into eight classes. Class 1 is comprised of the Prepetition Facility Claims of the Pre Petition Lenders. The pre-petition claim of Class 1 has been reduced by several hundred million dollars, the exact amount of which is unknown.

13. Under the Plan, each holder of a Prepetition Facility Claim agrees that, in full and final satisfaction of its claim, it will receive (i) its pro rata share of an obligation under the Second Lien Facility governed by an agreement entered into by the debtors and certain lenders; and (ii) its pro rata share of distribution shares of not less than 75% of the new common stock of SIRVA upon its reorganization. Each holder of a Class 1 claim is deemed to consent to the distribution of up to 25% of the common stock as a fee to the DIP Lenders (a subset of the Pre Petition Lenders) in connection with the conversion of the DIP Facility into the New Credit Facility. Thus, Class 1 members will effectively hold - - in exchange for a reduction of their Pre Petition debt - - all of the common stock of the reorganized entity and be granted a replacement lien on the reorganized Debtors' assets. The circle is complete.

14. A key provision of the Plan requires each member of Class 1 to authorize and consent to the distribution provided to Class 4 general unsecured creditors under the Plan to be made "out of the proceeds of the collateral securing the Prepetition Facility". This provision purports to

create the quintessential "gift" plan. However, in fact, Class 4 creditors were and have been paid in the usual course by the Debtors from operating revenues as if there was no Chapter 11.

15. The Plan states that Class 4 consists of Unsecured Ongoing Operations Claims. That description is fundamentally misleading, as it appears that general unsecured creditors are included in Class 4 who no longer have an ongoing relationship with the Debtors. Without Debtors having filed Schedules and Statements of Financial Affairs for each of the 61 Debtors, however, it is impossible to tell exactly which (and how many) Class 4 members in fact have no on-going operational relationship with Debtors. Thus, it is not clear at this time, without Debtors meeting their disclosure requirements and obligations, which unsecured creditors are appropriately in Class 4 or the criteria used to so classify them. To the extent Debtors insist they are and were free to pay any pre-petition unsecured creditors, which they or the Pre Petition Lenders choose to pay in their sole, unfettered discretion, the Plan is fundamentally misleading as written and cannot be confirmed. The potential objectors to the Plan, as well as the Court, have been blindfolded. Neither Triple Net, the Creditors Committee or the Court know what was due creditors in Class 4 and 5 on February 5, 2008 or today and what has been paid in the interim by the Debtors.

16. Under the Plan, Class 4 is ostensibly entitled to be paid in full in cash from the proceeds of the collateral of the Pre Petition Lenders who hold Class 1 Prepetition Facility Claims. However, some members of Class 4 already have been paid out of the Debtors' post-petition general operating revenue and with proceeds of post petition DIP funding and revenue, not from any direct payments from the Class 1 holders or their prepetition collateral. To the extent the Plan fails to make this legal distinction it is both fundamentally misleading and not a confirmable "gift" plan.

17. Class 5 consists of General Unsecured Claims, claims which appear legally and factually indistinguishable from those held by members of Class 4. Unlike the Class 4 claim holders, however, those creditors in Class 5 are not entitled to receive any payment for their claims. Triple Net has been placed in Class 5 and will receive nothing under the Plan. As a Class 5 claim holder, which is impaired by the Plan, Triple Net is not entitled to vote on the Plan and is deemed to have rejected the Plan.

18. The Plan also provides for Class 6, which consists of intercompany claims, and Class 8, which consists of intercompany interests. Both of these Classes are entitled to the preservation of their Claims and Interests. Class 7, which consists of the equity interests of the Debtors' public shareholders of SIRVA, Inc., under the Plan, are not entitled to any recovery and their equity interests are extinguished. Thus, Class 7 Equity Interests are extinguished, while Class 8 Equity Interests are left unimpaired. Triple Net submits that the proposed disparate treatment of equity interests is legally and logically incomprehensible. It also is incompatible with the concept of substantive consolidation at the SIRVA level. To that extent, the Plan is both fundamentally misleading and unconfirmable.

19. Finally, the Plan also provides for the substantive consolidation of the 61 Debtors' assets and liabilities, such that "on and after the Effective Date, all assets and liabilities of the Debtors shall be treated as though they were merged into the Estate of SIRVA (an unidentified term in the Plan) for all purposes associated with confirmation and consummation . . ." No factual basis or rational, let alone adequate disclosure, is provided to warrant approval of this important Plan provision. Debtors cannot be permitted to disclose their evidence in support of this Plan provision for the first time at the confirmation hearing. That kind of manipulation of

the plan process violates Triple Net's due process rights, as well as the letter and spirit of the Code, and should not be permitted.

## OBJECTIONS TO ADEQUACY OF THE DISCLOSURE STATEMENT

### FIRST OBJECTION

Debtor fails to provide in the Disclosure Statement any factual information whatsoever in support of the Plan's proposed substantive consolidation, or any other provision of the Plan, let alone "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records . . . that would enable . . . a hypothetical investor of the relevant class [like Triple Net] to make an informed judgment about the plan . . ." 11 U.S.C. § 1125(a)(1). Accordingly, the disclosure is inadequate, under 11 U.S.C. § 1125, for this Court and Triple Net even to consider the merits of the Plan.

### SECOND OBJECTION

No schedules of Assets and Liabilities and Statements of Financial Affairs have been filed as required by 11 U.S.C. § 521. Accordingly, the disclosure is inadequate, under 11 U.S.C. § 1125, for this Court and Triple Net even to consider the merits of the Plan.

### THIRD OBJECTION

Once Debtors have (i) amended their Disclosure Statement to provide adequate disclosure; and (ii) filed their Schedules and Statements of Financial Affairs, Triple Net requires adequate time to analyze the information provided to prepare and file additional objections to Debtors' inadequate disclosure.

### FOURTH OBJECTION

Triple Net reserves the right to incorporate by reference any and all objections to the Disclosure Statement filed by other parties-in-interest. Triple Net joins in such objections and reserves its right to more fully brief those objections in the Objection Supplement.

### OBJECTIONS TO CONFIRMATION OF THE PLAN

### FIRST OBJECTION

The Plan fails to meet and comply with the statutory requirements of 11 U.S.C. § 1129(a), except for § 1129(a)(8) which the Plan need not comply with.

### SECOND OBJECTION

The Plan fails to the meet and comply with the statutory requirements of 11 U.S.C. § 1129(b).

### THIRD OBJECTION

The Plan was not proposed in good faith and has been proposed by means forbidden by law, in particular the Plan violates state corporate governance statutes.

### FOURTH OBJECTION

The Plan does not comport with the requirement that it be "fair and equitable," because, inter alia, it discriminates unfairly in its classification of similarly situated creditors and in its distribution of estate property.

### FIFTH OBJECTION

The Plan unlawfully gerrymanders classification of claims to obtain confirmation and otherwise fails to identify legally relevant criteria by which creditors were placed in classes. Thus, creditors have been improperly and arbitrarily classified.

### SIXTH OBJECTION

The Plan violates the absolute priority rule, as codified in 11 U.S.C. § 1129.

**SEVENTH OBJECTION**

The Plan provides for the improper substantive consolidation of the Debtors' assets and liabilities.

**EIGHTH OBJECTION**

The Plan, as proposed, is not feasible and is not in the best interests of creditors.

**NINTH OBJECTION**

The Plan unlawfully requires Class 5 members, and others, to discharge, relinquish or otherwise waive or release claims against non-debtor third parties.

**TENTH OBJECTION**

The Plan violates other provisions of Title 11.

**ELEVENTH OBJECTION**

The Plan violates applicable state and federal law, including without limitation, due process accorded by state and Federal Constitutions and state corporate governance provisions.

**TWELFTH OBJECTION**

The Plan is proposed for the sole benefit of Class 1 and should be denied as not being filed in good faith pursuant to § 1129(a)(3).

**THIRTEENTH OBJECTION**

The Plan fails to have a single impaired class that has accepted the Plan, excluding a class of insiders, pursuant to 11 U.S.C. § 1129(a)(10).

**FOURTEENTH OBJECTION**

Confirmation of the Plan will be hotly contested, particularly because Debtors estimate Class 5 claims to be as high as $100 Million and the Plan provides no recovery for Class 5

claims. The fast track and lack of disclosure, for a contested plan, denies Triple Net any reasonable and meaningful opportunity to protect its valuable claim and property rights.

### FIFTEENTH OBJECTION

Triple Net reserves the right to incorporate by reference any and all objections to the Plan filed by other parties-in-interest. Triple Net joins in such objections and reserves its right to more fully brief those objections in the Objection Supplement.

**WOLFF & SAMSON PC**
Attorneys for Triple Net Investments IX, LP

By: /s/ Robert E. Nies
     Robert E. Nies

Dated: March 11, 2008