PACHULSKI STANG ZIEHL &
 JONES LLP
780 Third Avenue, 36th Floor
New York, NY 10017
Telephone: 212/561-7700
Facsimile: 212/561-7777
Laura Davis Jones (admitted pro hac vice)
Brad R. Godshall (admitted pro hac vice)
Alan J. Kornfeld (AK 5647)

Counsel for Official Committee of Unsecured Creditors

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| DJK Residential LLC, et al., | Case No. 08-10375 (JMP) |
| Debtors. | Jointly Administered |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
TO DEBTORS' PROPOSED JOINT PLAN OF REORGANIZATION
PURSUANT TO CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE**

# TABLE OF CONTENTS

I. INTRODUCTION ........................................................................................................1

II. STATEMENT OF FACTS...........................................................................................5

    A.     Background .................................................................................................. 5

    B.     The Pre-Petition Lender Debt ..................................................................... 6

    C.     The Pre-Petition Collateral ......................................................................... 7

    D.     The 2008 Loans........................................................................................... 9

    E.     The DIP Financing....................................................................................... 9

    F.     Representations and Circumstances Concerning the Treatment of the 2008 Loans ................................................................................................................. 11

    G.     The Proposed Plan .................................................................................... 13

    H.     Debtors' Disclosure Statement Liquidation Analysis.............................. 15

    I.     The New Liquidation Analysis ................................................................. 16

    J.     BDO's Difficulties Developing an Avoidance Analysis ......................... 18

    K.     Additional Facts Relating to the Best Interests of Creditors Test......................... 19

    L.     Facts Relating to Class 4/Class 5 Distinctions........................................ 20

    M.    Facts Concerning Notice to the Holders of Class 5 Claims.................... 23

    N.     Facts Relating to Substantive Consolidation ......................................... 25

III. THE COURT SHOULD DENY CONFIRMATION TO THE PROPOSED PLAN .............27

    A.     The Separate Classification of Class 5 in the Proposed Plan is Improper ............ 27

          1.     The Articulated Basis for the Separate Classification of Class 4 Claims and Class 5 Claims is Improper ................................................................. 27

          2.     Even if It was Permissible to Classify "Ongoing Trade Claims" Apart From all Other Trade Claims, the Proposed Plan Fails Because Class 4 and Class 5 Claims are Not So Populated ..................................................... 32

    B.     The Proposed Plan Discriminates Unfairly Against Class 5 ................................ 35

    C.     The Unfair Discrimination Cannot Be Justified as a "Gift" to Class 4 From the Secured Lenders................................................................................................. 42

    D.     The Proposed Plan Is Not Confirmable Because It Violates the Absolute Priority Rule ............................................................................................................... 47

    E.     The Proposed Plan Is Not Confirmable Because Debtors Cannot Carry Their Burden of Demonstrating the Satisfaction of the BIC Test in Respect of Class 5 Claims ................................................................................................................. 48

          1.     The Standards For A Proper BIC Analysis................................. 48

          2.     The New Liquidation Analysis Is Inadequate............................ 50

          3.     No More Than $58 Million of the DIP Loan Can Be Assumed to Be Properly Payable From Unencumbered Assets........................................ 52

    F.     The Proposed Plan is Not Fair and Equitable to Class 5 Creditors Because the Pre-Petition Lenders Are Receiving Distributions On A Claim Which Is Not Currently Allowable Under Code Section 502(d)................................................................ 58

    G.     The Proposed Plan is Not Confirmable to the Extent it Seeks to Discharge the Unnamed Customer Illegal Pricing Claims ......................................................... 59

          1.     Known Creditors Are Entitled to Actual Notice of Confirmation............ 59

　　　2.　　The Unnamed Creditors Are "Known Creditors" – Debtors Obviously
　　　　　Know the Identity of Their Customers .................................................. 61

H.　Substantive Consolidation is Not Appropriate As It Is Potentially Inequitable to
　　the Unnamed Customers and Other Class 5 Creditors and Has No Purpose Except
　　to Gerrymander ................................................................................................ 62

　　　1.　　Due Process and Notice Concerns ......................................................... 63

　　　2.　　Because Substantive Consolidation is an Extraordinary Equitable Remedy,
　　　　　the Second Circuit Has Adopted an Exacting Test, and the Debtors Have a
　　　　　Heavy Burden in Satisfying Such Test .................................................. 64

　　　3.　　There is No Factual Justification For Substantive Consolidation Under
　　　　　Either Prong of the Second Circuit's Test ............................................. 66

IV. CONCLUSION ...................................................................................................... 73

# TABLE OF AUTHORITIES

## Cases

*Barash Public Finance Corp.*,
  658 F.2d 504 (7th Cir. 1981) ......................................................................... 79
*Barnes v. Whelan*,
  689 F.2d 193 (D.C. Cir. 1982) ....................................................................... 39
*Berman v. Green (In re Jack Green's Fashions for Men Big and Tall, Inc.)*,
  597 F.2d 130 (8th Cir. 1979) ..................................................................... 54, 55
*Brandt v. Repco Printers & Lithographics, Inc. (In re Healthco Int'l, Inc.)*,
  132 F.3d 104 (1st Cir. 1997) ......................................................................... 83
*Chemetron Corp. v. Jones*,
  72 F.3d 341 (3d Cir. 1995) ............................................................................ 60
*Chemical Bank New York Trust Co. v. Kheel*,
  369 F.2d 845 (2d Cir. 1966) .......................................................................... 64
*Chittenden Trust Co. v. Sebert Lumber Co. (In re Vermont Toy Works, Inc.)*,
  135 B.R. 762 (D. Vt. 1991) ....................................................................... 53, 54
*City of New York v. N.Y., New Haven & Hartford R.R. Co.*,
  344 U.S. 293, 73 S. Ct. 299 (1953) .............................................................. 60
*Craner v. Marine Midland Bank, N.A. (In re Craner)*,
  110 B.R. 111 (Bankr. N.D.N.Y. 1988) ......................................................... 53
*Dominion Bank, N.A. v. Wilson*,
  867 F.2d 203 (4th Cir. 1989) ......................................................................... 75
*Drabkin v. A.I. Credit Corp.*,
  800 F.2d 1153 (D.C. Cir. 1986) ..................................................................... 80
*Elliott v. Frontier Properties/LP (In re Lewis W. Shurtleff, Inc.)*,
  778 F.2d 1416 (9th Cir. 1985) ....................................................................... 79
*FDIC v. Colonial Realty Co.*,
  966 F.2d 57 (2d Cir. 1992) ............................................................................ 63
*General Electric Credit Corp. v. Nardulli & Sons, Inc.*,
  836 F.2d 184 (3d Cir. 1988) .......................................................................... 52
*Herkimer County Trust Co. v. Swimelar (In re Prichard)*,
  170 B.R. 41 (Bankr. N.D.N.Y. 1994) ....................................................... 53, 54
*In re 599 Consumer Electronics, Inc.*,
  195 B.R. 244 (S.D.N.Y. 1996) ...................................................................... 67
*In re Adelphia Communications Corp.*,
  368 B.R. 140 (Bankr. S.D.N.Y. 2007) ...................................................... 28, 65
*In re Affiliated Foods, Inc.*,
  249 B.R. 770 (Bankr. W.D. Mo. 2000) ...................................................... 49, 64
*In re Ambanc La Mesa Limited Partnership*,
  115 F.3d 650 (9th Cir. 1997) ......................................................................... 37
*In re Armstrong World Industries, Inc.*,
  348 B.R. 111 (D. Del. 2006) .................................................................... passim
*In re Arn Ltd., L.P.*,
  140 B.R. 5 (Bankr. D.D.C. 1992) .................................................................. 41

*In re Augie/Restivo Baking Co., Ltd.,*
  860 F.2d 515 (2d Cir. 1988)................................................................................ passim

*In re Avery,*
  377 B.R. 264 (Bankr. D. Alaska 2007) ........................................................................ 65

*In re Aztec Company,*
  107 B.R. 585 (Bankr. M.D. Tenn. 1989) ..................................................................... 39

*In re Barakat,*
  99 F.3d 1520 (9th Cir. 1996) ................................................................................ 30, 31

*In re Barney & Carey Co.,*
  170 B.R. 17 (Bankr. D. Mass. 1994) ........................................................................... 38

*In re Blackwell,*
  43 B.R. 398 (Bankr. N.D. Ala. 1984) .......................................................................... 74

*In re Borges,*
  184 B.R. 874 (Bankr. D. Conn. 1995) ......................................................................... 54

*In re Boston Post Road Ltd. Partnership,*
  21 F.3d 477 (2d Cir. 1994)............................................................................. 28, 29, 31

*In re Brunswick Hospital Center, Inc.,*
  1997 WL 836684 (Bankr. E.D.N.Y. 1997).................................................................. 61

*In re Buttonwood Partners, Ltd.,*
  111 B.R. 57 (Bankr. S.D.N.Y. 1990) ........................................................................... 37

*In re Caldwell,*
  76 B.R. 643 (Bankr. E.D. Tenn. 1987) ........................................................................ 38

*In re Cassirer v. Herskowitz (In re Schick),*
  234 B.R. 337 (Bankr. S.D.N.Y.1999) .......................................................................... 82

*In re Castletons,*
  990 F.2d 551 (10th Cir. 1993) .................................................................................... 80

*In re Central European Industrial Development Co. LLC,*
  288 B.R. 572 (Bankr. N.D. Cal. 2003) ........................................................................ 71

*In re Congoleum Corp.,*
  362 B.R. 198 (Bankr. D.N.J.  2007) ........................................................................... 29

*In re Convalescent Center of Roanoke Rapids, Inc.,*
  2006 Bankr. LEXIS 4484 (Bankr. E.D.N.C. Aug. 7, 2006) ...................................... 68

*In re Cranberry Hill Assocs. L.P.,*
  150 B.R. 289 (Bankr. D. Mass. 1993) ......................................................................... 39

*In re Creekside Landing, Ltd.,*
  140 B.R. 713 (Bankr. M.D. Tenn. 1992) ..................................................................... 39

*In re Dow Corning Corp.,*
  244 B.R. 696 (Bankr. E.D. Mich. 1999)...................................................................... 37

*In re Empire Laundry, Inc. of Lynn,*
  1995 Bankr. LEXIS 1416 (Bankr. D. Mass. 1995)...................................................... 8

*In re Fishell,*
  1995 U.S. Dist. LEXIS 7461 (W.D. Mich. 1995)................................................. 65, 66

*In re Fur Creations By Varriale, Ltd.,*
  188 B.R. 754 (Bankr. S.D.N.Y. 1995)......................................................................... 48

*In re Future Energy Corp.,*
  83 B.R. 470 (Bankr. S.D. Ohio 1998).......................................................................... 49

*In re General Oil Distributors, Inc.*,
   68 B.R. 603 (Bankr. E.D.N.Y. 1986) ........................................................ 61
*In re Global Ocean Carriers Ltd.*,
   251 B.R. 31 (Bankr. D. Del. 2000) ............................................................ 49
*In re Gunn*,
   37 B.R. 432 (Bankr. D. Or. 1984) ............................................................ 39
*In re Harris*,
   62 B.R. 391 (Bankr. E.D. Mich. 1986) ..................................................... 39
*In re Hazen*,
   96 B.R. 924 (Bankr. W.D. Mo. 1988) ....................................................... 55
*In re Intercontinental Polymers, Inc.*,
   359 B.R. 868 (Bankr. E.D. Tenn. 2005) ................................................... 79
*In re Iridium Operating LLC*,
   478 F.3d 452 (2d Cir. 2007) ................................................... 43, 45, 46, 48
*In re JKJ Chevrolet, Inc.*,
   412 F.3d 545 (4th Cir. 2005) .................................................................... 81
*In re Johnson*,
   69 B.R. 726 (Bankr. W.D.N.Y. 1987) ....................................................... 39
*In re Jones*,
   186 B.R. 71 (Bankr. W.D. Ky. 1995) ....................................................... 75
*In re Kavolchyck*,
   154 B.R. 793 (Bankr. S.D. Fla. 1993) ...................................................... 76
*In re Keck, Mahin & Cate*,
   241 B.R. 583 (N.D. Ill. 1999) .................................................................. 50
*In re McCormick*,
   5 B.R. 726 (Bankr. N.D. Ohio 1980) .................................................. 79, 80
*In re NETtel Corporation, Inc.*,
   364 B.R. 433 (Bankr. D.C. 2006) ............................................................ 84
*In re One Times Square Assoc. Ltd. P'ship*,
   159 B.R. 695 (Bankr. S.D.N.Y. 1993) ...................................................... 28
*In re Orfa Corp. of Philadelphia*,
   129 B.R. 404 (Bankr. E.D. Pa. 1991) ....................................................... 71
*In re Pan Trading Corp.*,
   125 B.R. 869 (Bankr. S.D.N.Y. 1991) ...................................................... 83
*In re Paolini*,
   312 B.R. 295 (Bankr. E.D. Va. 2004) ....................................................... 29
*In re Pine Lake Village Apartment Co.*,
   19 B.R. 819 (Bankr. S.D.N.Y. 1982) ........................................................ 36
*In re Porcelli*,
   319 B.R. 8 (Bankr. M.D. Fla. 2004) ......................................................... 29
*In re R.H. Macy & Co., Inc.*,
   161 B.R. 355  (Bankr. S.D.N.Y. 1993) ..................................................... 60
*In re Reider*,
   31 F.3d 1102 (11th Cir. 1994) ................................................................. 65
*In re Roblin Industries,  Inc.*,
   78 F.3d 30 (2d Cir. 1996) ........................................................................ 83

*In re Rusty Jones, Inc.*,
  110 B.R. 362 (Bankr. N.D. Ill. 1990) ........................................................................ 49

*In re Santoro Excavating, Inc.*,
  32 B.R. 947 (Bankr. S.D.N.Y. 1983) ......................................................................... 78

*In re Sentry Operating Co. of Texas, Inc.*,
  264 B.R. 850 (Bankr. S.D. Tex. 2001) ................................................................ passim

*In re Sierra-Cal*,
  210 B.R. 168 (Bankr. E.D. Cal. 1997) ...................................................................... 49

*In re Smith's Home Furnishings, Inc.*,
  265 F.3d 959 (9th Cir. 2001) ............................................................................. 78, 80

*In re Snider Bros., Inc.*,
  18 B.R. 230 (Bankr. D. Mass. 1982) ......................................................................... 65

*In re Snyders Drug Stores, Inc.*
  307 B.R. 889 (Bankr. N.D. Ohio 2004) ........................................................ 39, 40, 44

*In re Southworth*,
  22 B.R. 376 (Bankr. D. Kan. 1982) .......................................................................... 75

*In re SPM Manufacturing Corp.*,
  984 F.2d 1305 (1st Cir. 1993) .................................................................................. 43

*In re Sunset Hollow Properties, LLC v. Bank of Western Massachusetts (In re Sunset Hollow Properties, LLC)*,
  359 B.R. 366 (Bankr. D. Mass. 2007) ....................................................................... 54

*In re Tampa Chain Co., Inc.*,
  53 B.R. 772 (Bankr. S.D.N.Y. 1985) ..................................................................... 52, 53

*In re Tax Reduction Institute*,
  148 B.R. 63 (Bankr. D. Col. 1992) ........................................................................... 80

*In re Teligent, Inc.*,
  380 B.R. 324 (Bankr. S.D.N.Y. 2008) .................................................................. 79, 82

*In re Texas Extrusion Corp.*,
  844 F.2d 1142 (5th Cir. 1988) ................................................................................. 49

*In re Trevarrow Lanes, Inc.*,
  183 B.R. 475 (Bankr. E.D. Mich. 1995) .................................................................... 49

*In re Tucson Self-Storage, Inc.*,
  166 B.R. 892 (9th Cir. BAP 1994) ............................................................................ 38

*In re Turning Point Lounge, Ltd.*,
  111 B.R. 44 (Bankr. W.D.N.Y. 1990) ....................................................................... 59

*In re U.S.H. Corp.*,
  223 B.R. 654 (Bankr. S.D.N.Y. 1998) ....................................................................... 60

*In re Valley Liquors, Inc.*,
  103 B.R. 961 (Bankr. N.D. Ill. 1989) ....................................................................... 75

*In re Voluntary Purchasing Groups*,
  222 B.R. 105 (Bankr. E.D. Tex. 1998) ...................................................................... 50

*In re Williams Communications Group, Inc.*,
  337 B.R. 490 (Bankr. S.D.N.Y. 2005) ....................................................................... 54

*In re Worldcom, Inc.*,
  2003 WL 23861928, (Bankr. S.D.N.Y. 2003) ........................................................... 36

*In re XO Communications, Inc.*,
  301 B.R. 782 (Bankr. S.D.N.Y. 2003) ............................................................... 60
*In re Zaleha*,
  162 B.R. 309 (Bankr. D. Idaho 1993) ............................................................... 49
*In the Matter of Greate Bay Hotel & Casino, Inc.*,
  251 B.R. 213 (Bankr. D. N.J. 2000) ............................................................ 38, 39
*In the Matter of Johns-Manville Corp.*,
  68 B.R. 618 (Bankr. S.D.N.Y. 1986) ............................................................... 36
*In the Matter of Lernout & Hauspie Speech Products, N.V.*,
  301 B.R. 651 (Bankr. D. Del. 2003) ........................................................... 36, 38
*Kane v. Johns-Manville Corp.*
  843 F.2d 636 (2d Cir. 1988) ............................................................................. 36
*Kittay v. Atlantic Bank of N.Y. (In re Global Service Group LLC)*,
  316 B.R. 451 (Bankr. S.D.N.Y. 2004) ............................................................. 54
*Krafsur v. Shurlock Permian Corp. (In the Matter of El Paso Refinery, L.P.)*,
  171 F.3d 249 (5th Cir. 1999) ............................................................... 79, 80, 81
*Meyer v. U.S.*,
  375 U.S. 233, 84 S.Ct. 318 (1963) ................................................................... 53
*Mullane v. Central Hanover Bank & Trust Co.*,
  339 U.S. 306, 70 S.Ct. 652 (1950) ................................................................... 60
*Oppenheimer Fund, Inc. v. Sanders*,
  437 U.S. 340, 98 S. Ct. 2380 (1978) ................................................................ 62
*Phoenix Mut. Life Ins. Co. v. Greystone III Joint Venture (In re Greystone III)*,
  995 F.2d 1274 (5th Cir. 1991) ......................................................................... 28
*Rush v. Anestos*,
  661 P.2d 1229 (Idaho 1983) ............................................................................ 76
*Sloan v. Zions First National Bank (In re Castleton's Inc.)*,
  990 F.2d 551 (10th Cir. 1993) ......................................................................... 78
*Solow Building Co., LLC v. ATC Associates, Inc.*,
  175 F. Supp. 2d 465 (E.D.N.Y. 2001) ............................................................. 59
*Waterman Steamship Corp. v. Aguiar (In re Waterman Steamship Corp.)*,
  157 B.R. 220 (Bankr. S.D.N.Y. 1993) ......................................................... 59, 61

**Statutes**

11 U.S.C. § 1122 ............................................................................... 3, 27, 28, 35
11 U.S.C. § 1129 ...................................................................................... passim
11 U.S.C. § 1129(a) ............................................................................... 4, 48, 49
11 U.S.C. § 1129(b)(1) .................................................................................... 47
11 U.S.C. § 1129(b)(2)(1) ............................................................................... 47
11 U.S.C. § 1129(b)(2)(B)(ii) ......................................................................... 47
11 U.S.C. § 1141(a) ........................................................................................ 59
11 U.S.C. § 544(a) .......................................................................................... 52
11 U.S.C. § 547(c) .......................................................................................... 19
U.C.C. § 9-102(a)(64) ...................................................................................... 8
U.C.C. § 9-306(4) ........................................................................................... 81
U.C.C. § 9-312 ................................................................................................. 8

**Other Authorities**

5 *Collier on Bankruptcy* at ¶ 547.03[7] (15th Ed. Rev'd) ............................................................. 80

Clark, *The Law of Secured Transactions Under the Uniform Commercial Code* ...................... 75

H.R.Rep. No. 95-595 (1977)............................................................................................................. 82

*Making the Test for Unfair Discrimination More "Fair": A Proposal*, 58 Business Lawyer 83,
106-07 (2002)................................................................................................................................ 38

Markell, Bruce A., *A New Perspective on Unfair Discrimination in Chapter 11*, 72 Am.
Bankr.L.J. 227 (1998) ............................................................................................................. 37, 41

S.Rep. No. 95-989 (1977) ................................................................................................................ 82

The Official Committee of Unsecured Creditors (the "Committee") of DJK Residential,

LLC and its affiliated debtors (the "Debtors") in the above-captioned cases (the "Cases") hereby

files its objection (the "Objection") to confirmation of the Debtors' Proposed Joint Prepackaged

Plan of Reorganization ("Proposed Plan").  In support of the Objection, the Committee

represents as follows:

## I.

## <u>INTRODUCTION</u>

The primary purpose of these bankruptcy cases (the "Cases") is to effectuate the

conversion of the majority of the Debtors' pre-petition funded debt (the "Pre-Petition Lender

Debt") into equity in the reorganized Debtors.  The Proposed Plan is uncontroversial in this

regard and resembles many other pre-packaged plans.

What is controversial (and fatal) is the Proposed Plan's treatment of general unsecured

claims.  The principal benefit of a "pre-pack" is minimizing the potential business disruption of a

bankruptcy while a quick deleveraging/equity conversion is effectuated.  The need for speed and

minimal disruption generally necessitates leaving trade claims unimpaired.  Such unimpairment

unavoidably results in some trade claims being paid that the old lenders/new owners might

otherwise prefer not to pay.  Such payments are simply the price paid in return for the substantial

benefits of a pre-packaged case.

The Pre-Petition Lenders (as defined below) here, however, decided to make this a test

case for a more aggressive approach.  The Pre-Petition Lenders instructed the Debtors to attempt

to identify at least some unsecured claims which might be discharged at no distribution "in order

to save some money."  The Debtors then picked some otherwise unrelated claims (now

denominated in the Proposed Plan as Class 5 Claims) to be sacrificed, while other general

unsecured claims (Class 4 Claims) are paid in full.  This discrimination violates the most basic

chapter 11 principle of equality of plan treatment of similarly situated claims.[1]  The Proposed

Plan therefore is unconfirmable.

This cram-down of Class 5 Claims was a late inclusion in the Proposed Plan.  The

Debtors and Pre-Petition Lenders thereafter acted and drafted the Proposed Plan as a normal

"pre-pack," except for the attempted extinguishment of Class 5 Claims.  The Proposed Plan (and

this confirmation process) therefore has a host of provisions or characteristics which would be

permissible (or perhaps go unnoticed) in a "normal" pre-packaged case, but which are fatal in the

context of an impaired group of trade claims.  (These defects include a baseless substantive

consolidation, unrecompensed preferential payments to professionals and lenders, a meaningless

liquidation analysis, and a lack of actual notice to adversely impacted trade creditors.)

In sum, as hastily slapped together, the Proposed Plan and this confirmation process are

improper attempts to maximize the Pre-Petition Lenders' returns at the expense of an unfortunate

group of otherwise-unrelated creditors.  As set forth in detail below, the Proposed Plan is

unconfirmable because:

- The Proposed Plan's classification system, and the Debtors' attempts to shuffle
  similarly situated creditors back and forth between the classes, borders on
  farcical.  The Debtors' stated class distinctions have no legal basis, and the
  Debtors give only lip service to the stated classification criteria in terms of the

---

[1] Counsel for the Lenders herein acknowledged as much in a pre-petition e-mail to the Debtors' counsel, in which he stated that:  "P.S.  They [the lenders] understand the whole [G]enesis, [W]orldCom issue and know we might have to deal with, i.e., settle, some [POR] objections from some who are now set to get nothing."  Exhibit 12 to Declaration of Ilan D. Scharf in Support of the Objection of the Official Committee of Unsecured Creditors to Debtors' Proposed Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code (the "Scharf Declaration"), which is being submitted contemporaneously herewith.  Citations to exhibits attached to the Scharf Declaration shall be referred to hereinafter as "Committee Exhibit __."

  The Committee is presently continuing to conduct discovery in accordance with procedures established by the Court.  Accordingly, the Committee intends to introduce additional exhibits as evidence prior to the Confirmation hearing.

actual designation of creditors within classes. The only common distinguishing characteristic of Class 5 Claims is that the Pre-Petition Lenders would prefer not to pay them. The classification scheme therefore violates Bankruptcy Code (the "Code") 11 U.S.C. § 1122 ("§ 1122").

- Even if the classification system in the Proposed Plan was permissible (it isn't), the discrimination in treatment between the claims of identically situated general unsecured creditors runs afoul of the equality of treatment principles fundamental to the chapter 11 process. The Proposed Plan therefore violates §§ 1122 and 1129 for this reason as well.

- The Pre-Petition Lenders cannot cure these classification defects based on the argument that there is a "gifting" exception to the Plan confirmation requirements of § 1129. The Code contains no such "gifting" exception. Any judicially created exception would do violence to the Congressionally intended balance of rights between secured and unsecured creditors embedded in the Code confirmation provisions. The Pre-Petition Lenders elected to use the equitable power of this Court and the rights created by chapter 11 to effectuate an orderly ownership transfer. Having elected to seek the benefits of the chapter 11 process, the Pre-Petition Lenders must be held to all of the § 1129 provisions, rather than only those provisions that maximize their own returns.

- The Proposed Plan violates the best interests of creditors test (the "BIC Test"), because there are unencumbered assets with substantial value that would be available to the holders of at least some Class 5 Claims ("Class 5 Creditors"). These unencumbered assets include potential preference recoveries, real estate

proceeds, a minority interest in foreign subsidiaries and unencumbered cash. The Proposed Plan therefore violates Code § 1129(a)(7).

- The Proposed Plan violates the absolute priority rule – various Debtors retain their equity interests in other Debtors, while nothing is paid on Class 5 Claims.

- Because the Pre-Petition Lenders have preference liability, they do not yet have allowed claims under Code § 502(d). The Proposed Plan therefore is not fair and equitable to Class 5 Creditors (in distributing property on account of claims that are not yet allowed) for this reason as well.

- The Debtors/Pre-Petition Lenders are attempting through the Proposed Plan to discharge illegal pricing claims held by potentially tens of thousands of the Debtors' customers (the "Unnamed Customers"). The Debtors, however, have given no actual notice of these Cases to the Unnamed Customers. Any attempted discharge of such claims is therefore violative of the due process rights of the Unnamed Customers.

- The Debtors seek a substantive consolidation in the Proposed Plan which has no legitimate justification. The Debtors contend that substantive consolidation is required because the Debtors' intercompany accounts are "hopelessly commingled" and cannot be reconstructed. This contention is a pretext – the condition of the Debtors' intercompany accounts is an irrelevancy under the Proposal Plan. (Intercompany claims are left unimpaired.) The real purpose of the substantive consolidation appears to be (a) to assist the Debtors in addressing absolute priority rule problems and (b) to create a consenting impaired class (the Pre-Petition Lenders) as to those Debtors that were not obligated on the pre-

petition credit facility (the "Non-Obligor Debtors"). These are an impermissible grounds for substantive consolidation.

The Committee therefore respectfully requests that the Court deny confirmation to the Proposed Plan.

## II.

## STATEMENT OF FACTS

The following facts concerning the circumstances of these Cases and the Proposed Plan are relevant to this Objection:

### A. Background

There are sixty individual Debtors, each of which commenced a chapter 11 case on February 5, 2005 (the "Petition Date").

The Debtors are leading providers of relocation and moving services to corporations, government agencies, and individual customers around the world. The Debtors' relocation services businesses (collectively, "Relocation Services") provide employee relocation services to over one thousand corporate clients and government units. *See Affidavit of Douglas V. Gathany, Senior Vice President and Treasurer of DJK Residential LLC, In Support of First Day Motions and Pursuant to Local Bankruptcy Rule 1007-2* (the "Gathany Affidavit") [Docket No. 2] at ¶ 8.

The Debtors are also world leaders in moving household and other goods directly on behalf of individual customers through their moving services business (collectively, "Moving Services"). Moving Services is divided between (a) Moving Services North America and (b) Moving Services Europe and Asia Pacific.[2] Collectively, Moving Services operates in approximately forty-five countries. *See id.* at ¶ 9.

---

[2] The Debtors' foreign affiliates are not debtors in these chapter 11 Cases.

The Debtors have book liabilities exceeding $1.2 billion, and assets having a book value in excess of $900 million. *See id.* at Schedule (A)(6).

In the twelve months ended September 30, 2007, the aggregate annual revenues of the Debtors' continuing operations, including their non-Debtor international affiliates, exceeded $4.0 billion. The Debtors' international operations are significant – Debtors have over 1,400 employees working outside of the United States. *See id.* at ¶ 10.

## B.      The Pre-Petition Lender Debt

Of the sixty Debtors, thirty-seven "Obligor Debtors" are parties to a $511.0 million senior credit facility (the "Pre-Petition Credit Facility") through SIRVA Worldwide, Inc. ("SIRVA Worldwide"), one of the Debtors herein. The related credit agreement with JPMorgan Chase Bank, N.A. and the other pre-petition lenders (the "Pre-Petition Lenders") consists of a $175.0 million revolving credit facility and a $336.0 million term loan obligation (*i.e.*, the "Pre-Petition Lender Debt"). *See id.* at ¶ 10 and Exhibit A thereto (corporate chart reflecting Obligor Debtors).

There are twenty-three Debtors that were not obligated to the Pre-Petition Lenders (*i.e.*, the "Non-Obligor Debtors"). The Non-Obligor Debtors are "smaller companies" in the Debtors' corporate enterprise. The Debtors, however, do not maintain profit and loss statements on a Debtor-by-Debtor basis. It is therefore impossible for any party (including the Debtors) to articulate with any certainty the financial contribution of the Non-Obligor Debtors to the Debtors' overall enterprise.

## C.      The Pre-Petition Collateral

The Debtors asserted on the first day of the Cases that the Pre-Petition Lender Debt was collateralized by "substantially all of the assets" of SIRVA Worldwide, SIRVA, Inc. and "certain" of SIRVA's "direct and indirect domestic subsidiaries." Gathany Affidavit at ¶ 36.

This oblique description of the Pre-Petition Lenders' collateral position suggested that unencumbered assets exist. There were/are unencumbered assets having substantial value as of the Petition Date (collectively, the "Unencumbered Assets"). Specifically:

- In conjunction with the Debtors' relocation business, the Debtors acquire an equitable ownership interest in the homes of the individuals that are being relocated (the "Home Inventory"). *See* Gathany Affidavit at ¶ 15. As such, any "equity" in such Home Inventory (value above and beyond the amount of the existing home mortgage) is equitably owned by the Debtors (the "Home Equity"). The Pre-Petition Lenders did not take or perfect any liens on the Debtors' Home Inventory. The liquidation value of the Debtors' Home Equity, (net of carrying costs and costs of sale) is approximately $40 million. *See* Committee Exhibit 5, BDO Seidman, LLP Relocation Properties Held for Resale Expert Valuation Report Dated April 5, 2008 (the "BDO Real Estate Report").[3]

- The Debtors also had cash on deposit as of the Petition Date in various deposit accounts (the "Deposit Accounts") aggregating approximately $21 million (the "Cash"). The Pre-Petition Lenders had no control agreements necessary under the

---

[3] Debtors concede in their most recent liquidation analysis that the Pre-Petition Lenders' security interests in personal property do not extend to the Home Equity. The Pre-Petition Lenders have not yet made such a contention, but have also made no admissions. The Lenders, however, made no pre-petition real estate filings in respect of the Debtors' home inventory. The Uniform Commercial Code has never extended to interests in real property. *See Uniform Commercial Code* § 9-109(d)(11). As such, the Debtors' various UCC filings could not have created perfected security interest in the Debtors' real property interests. While the Debtors did not take record title to the homes in question, the Debtors' contracts entitling the Debtors to all the value of the underlying homes provides the Debtors with an equitable ownership interest in such homes. Such equitable ownership interest though constitutes an ownership interest in real property. *See* Annex A hereto for a more complete legal discussion.

Uniform Commercial Code to perfect a security interest in such Deposit Accounts.[4]

- One of Debtors' most valuable assets appears to be their equity interests in certain foreign subsidiaries. 35% of such equity is free and clear of the liens of the Pre-Petition Lenders (the "Excluded Equity"). *See* Gathany Affidavit at Exhibit A thereto. (The Debtors and the Committee have stipulated that the liquidation value of this Excluded Equity is $28 million for the purposes of this hearing.)

- As indicated, the Non-Obligor Debtors were not even liable on the Pre-Petition Lender Debt. (The Debtors did not disclose the existence of the Non-Obligor Debtors to the Court at the First Day Hearing (as defined below).) The Debtors' schedules of assets and liabilities and statements of financial affairs (the "Schedules") reflect the aggregate value of the assets of the Non-Obligor Debtors at approximately $1 million (excluding the value of equity interests in other Debtors).

---

[4] Neither the Debtors not the Pre-Petition Lenders have provided the Committee with any analyses attempting to comply with the tracing requirements set forth in the Uniform Commercial Code (see U.C.C. §9-315(b)) in order to establish such a perfected security interest as proceeds. There are also a number of possible sources of the Deposit Account Cash which would not be subject to the Lenders' liens: proceeds of the Excluded Equity, proceeds of the assets of the Non-Obligor Debtors, proceeds of the Home Inventory, and loan proceeds. The Lenders advanced $20 million loans to the Debtors within fourteen days of the Petition Date. There is therefore a high likelihood that a substantial portion of the cash on hand simply constituted borrowed funds. The Debtors' borrowed funds do not constitute the proceeds of any Lender collateral. The UCC sets forth a definition of "proceeds" comprised of certain specific categories of property, none of which are applicable to the Lenders' advances. Among other things, these advances were not acquired by the Debtors upon the sale or disposition of collateral, or collected on or distributed on account of collateral, and were not the Debtors' "rights arising out of collateral." *See* U.C.C. § 9-102(a)(64). *See also, e.g.,Empire Laundry, Inc. of Lynn v. FDIC (In re Empire Laundry, Inc. of Lynn),* 1995 Bankr. LEXIS 1416 (Bankr. D. Mass. Sept. 29, 1995) (bank, which had been granted security interest in all of debtor's assets, and its subsequently appointed receiver did not have perfected security interest in a deposit that had been posted by debtor, using funds advanced by bank, with a third party; "The starting point is the loan [made by bank to debtor]. At the time that BNE [the bank] loaned the money to the Debtor, it would have enjoyed a security interest in the loan proceeds *only* by taking possession of the money – that is, if the money was deposited in a BNE account [citing Massachusetts' version of former U.C.C. § 9-304, a predecessor to current § 9-312]") (emphasis added).

The Pre-Petition Lenders acknowledge that the Pre-Petition Debt is undersecured – the Proposed Plan is based on this assumption. *See* Disclosure Statement at *passim*.

## D.    The 2008 Loans

The Pre-Petition Credit Facility was amended twice within the preference period (and as late as two weeks before the Petition Date). Gathany Affidavit at ¶¶ 36-40; Committee Exhibits 6 and 7. The Amendments to the Pre-Petition Credit Facility during the preference period relate to what Debtors referred to in their motion for approval of DIP financing as the "2008 Loans."[5] According to the Financing Motion, the 2008 Loans were made by the Lenders in anticipation of the bankruptcy after delays arose in negotiating and obtaining Pre-Petition Lender approval of the Proposed Plan. *See* Financing Motion at ¶ 15.

## E.    The DIP Financing

The Debtors filed their Financing Motion on the Petition Date, seeking approval of $150 million in debtor in possession financing (the "DIP Financing"). The Interim Financing Order approving the DIP Financing,[6] contained the following provisions of relevance to the confirmation of the Proposed Plan:

- The Pre-Petition Lenders were authorized to receive (as adequate protection) accruing interest and expenses on the undersecured Pre-Petition Lender Debt, as well as their expenses. *See* Interim Financing Order at ¶ 14(c). Through the confirmation hearing date of April 18, these adequate protection payments would

---

[5] *See Motion of the Debtors For Interim and Final Orders (A) Authorizing Debtors to Obtain postpetition Secured Financing and Utilize Cash Collateral; (B) Granting Adequate Protection to Pre-Petition Secured Lenders; and (C) Scheduling Final Hearing* [Docket No. 28] (the "Financing Motion") at ¶ 15.

[6] *See Interim Order Under 11 U.S.C. §§ 105, 361, 362, 363(C), 364(C)(1), 364(C)(2), 364(C)(3), 364(D)(1) and 364(e) and Fed. R. Bankr. P. 2002, 4001 and 9014 (I) Authorizing Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral (III) Granting Adequate Protection to Prepetition Secured Parties and (IV) Scheduling Final Hearing Pursuant to Bankruptcy Rules 4001(B) and (C)* (the "Interim Financing Order") [Docket No. 52].

aggregate approximately $10 million. *See* Committee Exhibit 2. SIRVA, Inc. Consolidated Liquidation Analysis Expert Report dated April 5, 2008 (the "New Liquidation Analysis") at p.35.

- The Pre-Petition Lenders were also permitted to be paid approximately $5 million in interest and fees outstanding on the Pre-Petition Debt. Interim Financing Order at ¶ 14(c).

- The DIP Financing was secured by all of the assets of all of the Debtors (including the Non-Obligor Debtors and the Excluded Equity) other than avoidance actions pending a final hearing. *See id.* at ¶ 7.

- A marshalling waiver (the "Marshalling Waiver") was included. *See id.* at ¶ 8.

- The repayment of claims concerning the DIP Loans (the "DIP Claims") and the adequate protection claims of the Pre-Petition Lenders (the "Adequate Protection Claims") were granted super-priority status, payable out of the proceeds of avoidance actions (the "Avoidance Action Recoveries"). *See id.* at ¶ 6(a).

At the Final Hearing approving the DIP Financing, the DIP Lenders, Pre-Petition Lenders (collectively, the "Lenders") and Committee reached an agreed upon final order.[7] There were numerous agreed-upon amendments to the Interim Financing Order included in the Final Financing Order relevant to this Objection:

- The DIP Lenders and Pre-Petition Lenders agreed to strike the Marshalling Waiver. *See Final Financing Order* at ¶ 8.

---

[7] *See Final Order Under 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and Fed. R. Bankr. P. 2002, 4001 and 9014 (I) Authorizing Debtors to Obtain Postpetition Financing, (II) Authorizing Debtors to Use Cash Collateral, and (III) Granting Adequate Protection to Prepetition Secured Parties* (the "Final Financing Order") [Docket No. 188].

- The Lenders agreed that (a) they would have no lien on avoidance actions or the proceeds thereof and (b) the DIP Claims and Adequate Protection Claims also would not be payable out of Avoidance Action Recoveries. *See id*. at ¶¶ 6(a), 7(b) and 14(b).[8]

## F.    Representations and Circumstances Concerning the Treatment of the 2008 Loans

At the first day hearing (the "First Day Hearing"), the also Court authorized the Debtors to use $65 million of DIP Financing to repay the 2008 Loans. Interim Financing Order at ¶ 5(a). The Debtors' principal basis for requesting such approval was the contention that the 2008 Loans were over-secured and accruing substantial interest. The Debtors specifically represented as follows:

> Specifically, $65 million in proceeds from the DIP Financing, at an interest rate of LIBOR plus 6.5%, will be used to refinance the 2008 Loans, which were accruing interest at a rate of LIBOR plus 8.5%. The Debtors will save approximately $108,000 per month in interest expense by refinancing the 2008 Loans.

Financing Motion at ¶ 19 (emphasis supplied).

At the final hearing on the Financing Motion (the "Final DIP Hearing") (heard five days after Committee counsel was appointed), the Debtors attempted again to justify the prepayment of the 2008 Loans (which had already occurred). Part of the Gathany proffer at the Final DIP

---

[8] The Final Financing Order specifically provides that the repayment of the DIP Loans constitutes a "superpriority claim" which "shall be payable from recourse to all pre-petition and post-petition property of the Debtors and all proceeds thereof other than Avoidance Actions and the proceeds thereof." *Id*. at ¶ 6(a). Repayment of the DIP Loans is secured by the "Collateral." The Collateral includes all "Unencumbered Property," defined as essentially all assets of the estate "provided that, the Unencumbered Property shall not include the Avoidance Actions and any assets upon which security may not be lawfully granted, nor shall it include any proceeds or property recovered in respect of any Avoidance Actions . . . ." (emphasis in original). The Pre-Petition Lenders are granted a lien on the same "Collateral" to secure the Adequate Protection Claims. As such, no lien on Avoidance Action Recoveries is included in favor of the Pre-Petition Lenders. *See id*. at ¶ 14(a). Finally, the adequate protection claims of the Pre-Petition Lenders are also expressly limited in respect of avoidance actions: "the 507(b) Claim shall not extend to Avoidance Actions or the proceeds thereof." *Id*. at ¶ 14(c). Avoidance Action Recoveries therefore are free and clear of any interest of the Lenders under the terms of the Final Order.

Hearing again was that the 2008 Loans were "senior in the collateral waterfall" and would accrue interest at a higher rate than the interest rate under the DIP Financing. *See* Committee Exhibit 13, Transcript of Hearing on February 28, 2008 (the "Feb. 28 Hrg. Tr.") at 32-33.[9]  As stated by the Debtors:

> [T]he lenders in respect of the 2008 Loans] put the money in at the top and we believe that that was perfectly appropriate and that that further justifies the rollup in the sense that that was a money-good loan under any reckoning.  And I wouldn't expect the committee or Triple Net to get up and argue that this company's value was less than that sixty-five million dollar number.
>
> Your Honor, so, again, the 2008 loans conferred a benefit and no burden and there was <u>no prejudice done to any creditor by rolling those loans</u> and having them paid pursuant to the interim DIP financing. And, Your Honor, so I think that issues is a bit of a red herring.
>
> … One, with regard to their argument that the 2008 loans were unsecured, I think my prior comments covered that.  The 2008 loans were at the top of the food chain, not at the bottom, and thus there was no payment or improvement in position by paying those fully collateralized, <u>fully secured</u> money-good claims in the rollup, number one.

---

[9] The specific proffer in this regard was as follows:

> Those 2008 loans were structured as last in first out loans, under the pre-petition credit agreement.  As a result, <u>these loans are senior in the collateral waterfall</u> to all other pre-petition facility claims. …
>
> There were obvious valid economic reasons to refinance these loans.  First, if unpaid, <u>the 2008 loans would have accrued cash interest at a rate of LIBOR plus 725, plus a default rate of two percent.  This rate is significantly higher than the DIP financing rate of LIBOR plus 650.  By refinancing these loans, the debtors reduced their cost of capital.</u>  Second, the 2008 loans would have been entitled to a further, fully secured fee of equal to four percent of the 2008 loans in the event that those loans were not repaid prior to February 29 of 2008.  By refinancing these loans, the debtors avoided that fee.
>
> Moreover, Mr. Gathany would note that the range of the valuation of the debtors based on the Proposed Plan of 284 million to 340 million, with a midpoint of 314 million is significantly higher than the sixty-five million of the 2008 loans. So the repayment of the loans was a good money repayment of those loans.

Committee Exhibit 13, Feb. 28, 2008 Hrg. Tr. at 32-33 (emphasis supplied).

(*See id.* at 72:23-73:8 and 74:21-76:1) (emphasis supplied).

The pre-petition agreements in respect of the 2008 Loans do not reflect that the 2008 Loans are at the top of any "collateral waterfall" or "fully secured." *See* Committee Exhibit 6, Tenth Amendment to the Credit Agreement dated January 1, 2008 (the "Tenth Amendment") at § 7; Committee Exhibit 7, Eleventh Amendment to the Credit Agreement dated January 22, 2008 (the "Eleventh Amendment") § 14. The Pre-Petition Debt is secured by only one lien and there is only one definition of "Obligations." The 2008 Loans are simply the first subset of the undersecured Obligations to be repaid when payments are made on the Obligations.[10]

## G.  The Proposed Plan

The Debtors' claim that the Proposed Plan was the product of "arduous and productive negotiations" between the Debtors and their secured lenders and has received the overwhelming support of all participants in these negotiations. Gathany Affidavit at ¶ 3. The Proposed Plan has the following provisions of relevance to this Objection:

- Claims relating to the DIP Loan are converted into the "New Credit Facility." Proposed Plan at § IIA.

- The unsecured claim of the Lenders (the "Lender Unsecured Claims") is classified with the secured claim of the Pre-Petition Lenders, collectively defined as the "Pre-Petition Facility Claims." *See id.* at § I(A)(78). The Pre-Petition Facility Claims are stated to be "allowed in full" and are converted into (a) an interest in the "Second Lien Facility" and (b) the equity of the Reorganized SIRVA (the ultimate parent in the Debtors' corporate tree). *See id.* at § III(B)(1).

---

[10] The fact that the Debtors and the Lenders may have agreed amongst themselves that payments by the Debtors would be applied first against that portion of the Obligations designated as 2008 Loans doesn't change the fact that the 2008 Loans were simply a portion of the undersecured Obligations under the pre-petition loan documents.

- Intercompany Claims are left unimpaired. *Id.* at § III(B)(6)

- Non-Pre-Petition Lender, non-intercompany unsecured claims are divided into two classes – 4 and 5. *See id.* at § III(B)(4)-(5).

- Class 5 is defined to include all unsecured claims held by unsecured creditors "with whom the Debtors have ceased ongoing business relationships." Class 5 Claims are discharged with no distribution. *See id.* at § III(b)(5).

- Class 4 is generally defined as the claims of those creditors holding general unsecured claims (other than the Pre-Petition Lenders) that are not relegated into Class 5 ("Class 4 Claims" and the "Class 4 Creditors"). Class 4 Claims are paid in full. *See id.* at § III(b)(4).

- The Proposed Plan provides, with no proffered justification, for the substantive consolidation of all sixty Debtors. *See id.* at § IV(A). According to the Proposed Plan, "on and after the Effective Date, all assets and liabilities of the Debtors shall be treated as though they were merged into the Estate of SIRVA for all purposes associated with Confirmation and Consummation, and all guarantees by any Debtor of the obligations of any other Debtor shall be eliminated so that any Claim and any guarantee thereof by any other Debtor, as well as any joint and several liability of any Debtor with respect to any other Debtor shall be treated as one collective obligation of the Debtors." *Id.* at IVA.

- Notwithstanding the substantive consolidation, however, intercompany equity interests (as well as intercompany claims) are left unimpaired. *Id.* at § III(b)(8).

- The Debtors filed a "Supplement to Debtors' Prepackaged Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code

[Docket No. 387] (the "Plan Supplement") on April 4, 2008. According to the Intercreditor Agreement contained in the Plan Supplement, the New Credit Facility will be in the amount of $215 million and the Second Lien Facility will be in the face amount of $200 -- $415 million in the aggregate.

**H.**     <u>Debtors' Disclosure Statement Liquidation Analysis</u>

According to the Disclosure Statement, the going concern value of the Debtors' entire enterprise (including foreign operations) is between $284 and $344 million. *See* Disclosure Statement at Article VI. The face amount of the New Credit Facility ($215 million) and the Second Lien Facility ($200 million) therefore far exceed the amount that the Debtors' claim they are worth.

The Disclosure Statement includes a "liquidation analysis" (the "Disclosure Statement Liquidation Analysis"). *See* Disclosure Statement at Exhibit C. The Disclosure Statement Liquidation Analysis has the following characteristics of note:

- The Disclosure Statement Liquidation Analysis is done on a consolidated basis – there is no liquidation analysis on an individual Debtor-by-Debtor basis. *See id.* at *passim*.

- The Disclosure Statement Liquidation Analysis is cast solely as an effort to determine whether the Pre-Petition Lenders receive more value under the Proposed Plan than in a liquidation – Class 5 Claims are not even referenced. *See id*.

- The Disclosure Statement Liquidation Analysis assumes that the Lenders are entitled to the entire recovery of the Debtors' assets. *See id*. at *passim*.

- There is no preference or other avoidance action analysis. *See id*.

## I.    <u>The New Liquidation Analysis</u>

On April 5, 2008, the Debtors delivered a new liquidation analysis to the Committee intending to establish that no chapter 11 recovery would be available to the holders of Class 5 Claims (<u>i.e.</u>, the "New Liquidation Analysis" – Committee Exhibit 2).  The New Liquidation Analysis contains a multitude of incorrect assumptions/contentions, all of which were intended to depress any possible recovery on Class 5 Claims.[11]  As discussed in more detail in the BDO Liquidation Rebuttal, among the most obvious problems are as follows:

- The New Liquidation Analysis is again presented on a consolidated basis – there is no attempt made to perform a liquidation analysis on a Debtor-by-Debtor basis.

- The cost of the chapter 7 liquidation is estimated to be $27 million, incurred almost entirely in liquidating the Lenders' collateral (rather than the Unencumbered Assets, which will cost very little to administer).  *See id.* at 33. The New Liquidation Analysis, however, also assumes no Code § 506 surcharge claim imposed on the Lenders as an offsetting asset - - the Debtors apparently assume that a chapter 7 trustee will simply use the value of all of the Unencumbered Assets of the estate for the purpose of maximizing the Lenders' recovery of their secured claim (as opposed to simply abandoning the Lenders' collateral to the Lenders unless they agreed to pay for the costs of collateral liquidation).

- On the Petition Date, the Court approved a securitization in favor of LaSalle Bank ("LaSalle" and the "LaSalle Securitization").  This LaSalle Securitization is fully

---

[11] Each of these contentions is discussed in the BDO Seidman, LLP Expert Rebuttal Report Regarding Liquidation Analysis (the "BDO Liquidation Rebuttal") (Committee Exhibit 1).

secured. The order approving the securitization, however, provides that LaSalle has a contingent $19.5 million priority claim to the extent of any deficiency (the "Contingent LaSalle Priority Claim"). There is no evidence that the Contingent LaSalle Priority Claim will ever mature -- the New Liquidation Analysis in fact projects that Debtors have $9 million <u>in</u> <u>equity</u> in the LaSalle Securitization. The New Liquidation Analysis nonetheless assumes that this entire Contingent LaSalle Priority Claim will ripen and be payable from Unencumbered Assets.

- The preference analysis consists of essentially one page. *See* Committee Exhibit 2, New Liquidation Analysis at 31. This one page contains essentially no analysis whatsoever and comes to a conclusion that only $10 million in preferences might exist. *See id.*

- Home Equity recoveries are reduced by approximately $20 million, principally based on the assumption that home values will decline during the course of the liquidation. *See id*. at 24.

- It is assumed that the entire DIP Loan will be first repaid out of Unencumbered Assets. (As discussed in section III.E.3, *infra*, this is an incorrect assumption.)

- It is assumed that the Pre-Petition Lenders will have an adequate protection claim of $19.3 million. *See id.* at 37.

- It is assumed that there will be chapter 11 trade administrative claims of $28.7 million remaining unpaid when these Cases are liquidated. *See id.* at 40. Although the Debtors are assumed to have $27 million in cash on hand at the time of the chapter 7 conversion, it is apparently assumed that this cash will simply be

distributed to the Pre-Petition Lenders while chapter 11 administrative trade creditors are left "holding the bag."

**J.      BDO's Difficulties Developing an Avoidance Analysis**

The Debtors acknowledge that they made $717 million of payments during the 90 days immediately preceding the Petition Date.  The majority of these payments were made by NAVL – the most commonly identified Debtor in respect of Class 5 Claims.  The Committee has attempted to perform a preference analysis.  It has been impossible, however, to prepare a proper preference analysis on a Debtor-by-Debtor basis, because the Debtors have either been unable to provide or simply do not have the information necessary to perform the task.  *See* Committee Exhibit 8, BDO Seidman, LLP Analyses of Preferences and Other Avoidance Actions Non-Pre-Petition Lenders Expert report Dated April 6, 2008 (the "BDO Trade Preference Analysis") at 21.  Among other problems, the Debtors had data system limitations and incomplete documentation.  *See id.* at pp. 17, 22.  Debtors also had extreme difficulty delivering what information they did have on a timely basis.  *See id*. at Appendix B (timeline of document production).  In addition, the Debtors were unable to provide details of intercompany balances among various legal entities, thereby limiting the Committee's ability to analyze potential fraudulent transfers.  *See id.* at p. 15.

Notwithstanding the Committee's inability to do a complete preference analysis, the following appears clear on the issue of preferences:

- It is reasonable to presume that trade preferences of between $33 million and $55.8 million exist. *See* Committee Exhibit 8, BDO Trade Preference Analysis at p. 5.[12]

- The Pre-Petition Lenders received preferential payments of between $5.7 million and $70.3 million, upon whether the 2008 Loans were fully secured (as the Debtors represented to the Court) (the "Lender Preferences"). *See* Committee Exhibit 9, BDO Seidman, LLP Expert Valuation Report Regarding Preference Analysis of Transfers to Pre-Petition Lenders Dated April 5, 2008 (the "BDO Lender Preference Analysis") at 25.[13]

## K.   Additional Facts Relating to the Best Interests of Creditors Test

The DIP Loan balance as of April 11, 2008 was approximately $115 million.

---

[12] Professionals were significant preference beneficiaries. Among other things, between January 10 and January 22, 2008, the Debtors borrowed over $38 million pursuant to the Tenth Amendment, when the contemplated bankruptcy filing was delayed. $8,797,817 was used to make payments to nine professionals just prior to the filing date. Among these payments are over $4 million in payments to professionals on the eve of the bankruptcy filing. One such payment was $3.8 million paid to Debtors' investment banker (which has not been retained in these Cases). The payment was made pursuant to an August 2007 engagement letter which provided that the banker was entitled to be paid "upon receipt of votes from the Company's creditors necessary to confirm such Prepackaged Plan." Of course, we do not know whether the Proposed Plan will be confirmed. Debtors' nonetheless paid their banker just before filing.

Perhaps indicative of the casual nature of Debtors' "preference analysis," Debtors assert that none of their transfers to professionals were preferential, as all such transfers were "ordinary course." *See* Committee Exhibit 2, New Liquidation Analysis at p. 60. The $3.8 million banker payment could not be in the ordinary course of business between the parties, because it was a one time, non-recurring transaction and was not pursuant to ordinary business terms**.** "Section 547(c) is intended to protect recurring, customary credit transactions that are incurred and paid in the ordinary course of business..." Alan N. Resnick and Henry J. Sommer, *Collier on Bankruptcy, (15th ed. Rev.)(2007),* § 547.04[2], p. 547-54. *See also Official Comm. Of Unsecured Creditors v. Martin (In re Enron Creditors Recovery Corp.),* 376 B.R. 442, 459 (Bankr. S.D.N.Y. 2007) (holding that one-time payment made pursuant to severance agreement that was not intended to be a recurring series of transactions was not an ordinary course payment, and noting that "section 547(c) is intended to protect recurring, customary trade transactions"). This payment was a one-time transfer under a contract that was not intended to – and did not – establish recurring transactions between the Debtors and its banker. Thus, the payment can not qualify as a payment in "ordinary course of business" under section 547(c).

[13] If the 2008 Loans were, as represented, fully secured, such advances would not be available to the Lenders as a "subsequent new value" defense to the previously received preferential payments. *See* 11 U.S.C. § 547(c)(4) (limiting a subsequent new value defense to "new value not secured by an otherwise unavoidable security interest"). Other legal issues in respect of Lender Preferences are discussed in Appendix B hereto.

The DIP Loan balance as of the date of the Confirmation hearing (April 18, 2008) is projected to be $133 million.

**L.     Facts Relating to Class 4/Class 5 Distinctions**

The Debtors' Disclosure Statement contains no articulated justification for the distinction between Class 4 Claims and Class 5 Claims.  In discovery, the Debtors advised that the distinction was based on a general mandate by the Pre-Petition Lenders that the Debtors identify and exclude at least some unsecured creditors who were not "important" from a recovery in order to "share the pain."  Committee Exhibit 15, Transcript of April 3, 2008 Deposition of Eryk Spytek (Debtors' General Counsel) ("Spytek Dep. Tr.") at 155:10, 166:13.  As mentioned, however, counsel for the Pre-Petition Lenders also advised the Debtors that "They [the Lenders] understand the whole [G]enesis, [W]orldCom issue and know we might have to deal with, i.e., settle, some [POR] objections from some who are now set to get nothing."[14]

As indicated, Class 5 is defined as including creditors with whom the Debtors have "ceased to have an ongoing business relationship."  The Debtors advised the Court on the first day of these Cases, however, that they considered the claims of former customers to be Class 4 Claims.[15]

On March 3, 2008, the Debtors filed a Declaration with the Court purporting to identify with specificity what claims constituted Class 5 Claims (the "Class 5 Claims List").[16]

---

[14] Committee Exhibit 12, E-mail from Peter Pantaleo to Marc Kieselstein dated January 23, 2008.

[15] *See Motion of the Debtors for Entry of an Order (A) Scheduling a Combined Hearing on the Adequacy of the Disclosure Statement and Confirmation of the Prepackaged Proposed Plan of Reorganization, (B) Approving Procedures for Filing Objections Thereto, (C) Approving the Form and Manner of Notice of the Combined Hearing, and (D) Granting Related Relief* (the "Notice Motion") [Docket No. 30] at ¶ 27 ("Pursuant to the Plan, each of these Individual Customers' Claims, if any, are unimpaired.")

[16] *See Declaration of Adam Paul In Support Of Schedule Of Certain Claims Filed With The Court* (the "Paul Declaration") [Docket No. 198] attaching list of Class 5 Claims (the "Class 5 Claims List").  A revised list has now been filed.  *See* Committee Exhibit 17, *First Supplemental Affidavit of Adam C. Paul in Support of Amended*

(continued)

Notwithstanding the statements to the contrary in the Notice Motion, the Class 5 Claims List includes four customer claims as Class 5 Claims:

- The claim of Joseph and Anne Pike, who are customers seeking damages against the Debtors relative to destroyed goods (the "Pike Claim").

- Three entries on the Class 5 Claims List reference "Donald Beach, et al." ("Beach" and the "Beach Claim"), Gary Moad and Laurel Moad (collectively, "Moad" and the "Moad Claim") and Robert E. Boone Jr. ("Boone" and the "Boone Claim") (Beach, Moad and Boone are referred to hereinafter as the "Named Customers").  The Committee has determined that the Named Customers are simply named plaintiffs in three separate complaints seeking class relief on behalf of potentially <u>thousands</u> of the Debtors' former customers, alleging illegal pricing by the Debtors in respect of fuel surcharges imposed on customers (the "Illegal Pricing Claims" and the "Class Actions").[17]

The Class 5 Claims List contains no clear statement as to whether the Debtors are intending to include in Class 5 only the individual claims of the Named Customers or are attempting to include and discharge the claims of other Unnamed Customers (as defined in the Paul Declaration) (who might eventually become class members or bring individual claims).

On the first day of these Cases, the Debtors also filed a motion which sought, *inter alia*, authority for the Debtors to pay severance obligations to employees that the Debtors had

---

(continued)

*Schedule of Certain Claims Filed With the Court* [Docket No. 389] (the "Revised Class 5 Claims List").  The Class 5 Claims discussed herein remain on the Revised Class 5 Claims List.

[17] *See, e.g.,* Committee Exhibit 4, Complaint, *Donald J. Beach et al. v. Atlas Van Lines, Inc., et al.*, Case No. 07-00764 (CWH) (D.S.C. March 19, 2007) (the "Beach Complaint").

terminated prior to the Petition Date (the "Terminated Employees").[18]  In support of this motion,

the Debtors' counsel argued at the First Day Hearing that such terminated employees should be

paid immediately because, among other reasons, the Debtors intended to treat the Terminated

Employees as holding unimpaired Class 4 Claims in any event.[19]  Counsel for the U.S. Trustee

immediately made the observation that the Debtors could not reasonably contend that they had a

"continuing business relationship" with Terminated Employees.[20]  The Terminated Employees

are now included on the Class 5 Claims List.  *See* Class 5 Claims List at 8-9.

Noticeably missing from the Class 5 Claims List is even a single non-litigation trade

vendor claim.  The Debtors made no effort to identify any such creditors.  *See* Committee

Exhibit 15, Spytek Dep. Tr. at 42:21- 45:9.  Notwithstanding the clear language of their own

Proposed Plan, the Debtors made no effort to review their accounts payable registers and

---

[18] *See Motion of the Debtors for an Order (A) Authorizing, but not Directing, the Debtors to Pay Certain Prepetition (I) Wages, Salaries, Bonuses, and Other Compensation, (II) Reimbursable Employee Expenses, and (III) Employee Medical and Similar Benefits and (B) Authorizing and Directing Banks and Other Financial Institutions to Honor All Related Checks and Electronic Payment Requests* [Docket No. 18].

[19] THE COURT:  Where do the claims of these 11 employees fit within the plan itself?  Were they claims that would be paid in full assuming the plan has solicited and attached to the various scheduling motions that I've seen later should be confirmed, will they be paid in full?

MR. PAUL:  Yes.  They would actually be within the Class 4 claimants.  Or to the extent that we would simply assume their prepetition contracts to the extent that we could we would actually do that so they would at that point be paid in full.

THE COURT:  But these are employee contracts for employees --

MR. PAUL:  Correct.

THE COURT:   -- who have already left the employment of the company.

MR. PAUL:  Correct.  I haven't actually examined the contract.  I don't think that we could actually assume it, but to the extent that we could and to the extent that they have any claims whatsoever they would be in Class 4.

THE COURT:  It would probably be questionable business judgment to assume them, but I'm not second guessing that judgment now.

*See* Committee Exhibit 3, Feb. 5, 2008 Hrg. Trat 28:17-29:13.

[20] *See id.* at 30:6-7.

determine which trade payables were owing to creditors engaged in a "continuing business relationship" with the Debtors, and which payables were not. *Id.* The Debtors' justification for this lack of effort is "time constraints." *Id.*

The Debtors have also placed on the Class 5 Claims List creditors with whom the Debtors <u>do</u> have an ongoing business relationship. For example, the Class 5 Claims List references the claim of the "Owner Operator Independent Drivers Association" ("OOIDA" and the "OOIDA Claim"). OOIDA is a trade organization. As relevant here, however, OOIDA is simply a payment agent that collects and distributes money owed by the Debtors pursuant to a class action settlement with 4,000 truckers. The Debtors pay OOIDA. OOIDA then forwards the monies received to the trucker participants. The evidence at confirmation will be that <u>more than 1,100 of these truckers continue to provide services to the Debtors on a regular basis</u>.

Similarly, another creditor on the Class 5 Claims List – Specialty Transportation Agent Group, Inc. ("STAG") – also is a current provider of services to the Debtors. *See* Committee Exhibit 3, Spytek Dep. Tran. at 110:3-6. The Debtors nonetheless have included on the Class 5 Claims List a claim of STAG which is the subject of a litigation dispute (the "STAG Claim").

The Class 5 Claims List also includes a litigation claim for $2,000 asserted by Aaro Moving Systems, Inc. ("Aaro"), a current agent of the Debtors. *See id.* at pp. 70:9-10, 71:21.

The Class 5 Claims List reflects the Debtors' belief as to which Debtor is obligated on each of the Class 5 Claims. The most commonly referenced Debtor is North American Van Lines, Inc. ("NAVL"). *See* Committee Exhibit 17, Revised Class 5 Claims List at *passim*.

**M.      Facts Concerning Notice to the Holders of Class 5 Claims**

At the First Day Hearing, the Debtors sought and obtained authority to give only publication notice of confirmation to all parties other than "Class 5 Creditors." With respect to the possible customer claims, in particular, the following colloquy took place:

[MR. KIESELSTEIN:] We would also ask the Court to authorize the debtors to provide publication notice of the commencement and have that be sufficient under the facts and circumstances of these cases with respect to our 740,000 individual moving customers and relo customers over the last three years, Your Honor . . . .

THE COURT: And to the extent that there's some individual whose moving experience was not pleasant and who has already put the debtors on notice that there's mental anguish, loss of heirlooms or god knows what other claims that are associated with this tragic move --

MR. KIESELSTEIN: Contortion.

THE COURT: I assume you know who these individuals are and that such individuals for your protection will probably get actual notice.

MR. KIESELSTEIN: Yeah. And I would also note that those individuals because, you know, customer satisfaction is key to our business, those would be within Class 4 actually, Your Honor, and the claim would ride through in essence. And if it turned out ultimately they were right and we were wrong they would get paid in full.

THE COURT: Okay.

Committee Exhibit 3, Feb. 5, 2008 Hrg. Tr. at 70-71.

The only customers to whom Debtors provided actual notice of these Cases were the Named Customers -- Beach, Moad and Boone, and their counsel. No Unnamed Customers received actual notice. *See Affidavit of Service of Summary of the Plan Of Reorganization and Notice of Combined Hearing on the Adequacy of the Disclosure Statement and Confirmation of the Prepackaged Plan of Reorganization Proof of Service* [Docket No. 88] at Exhibit C.

No class has been certified in the Class Actions.

The Unnamed Customers are as likely as the Named Customers to hold Illegal Pricing Claims. The Debtors presumably have in their records the names of all of these Unnamed Customers.

The Debtors have advised the Committee that they intend by reference to the Named Customers on the Class 5 Claims List to discharge the Illegal Pricing Claims of the Unnamed Customers.

**N.    Facts Relating to Substantive Consolidation**

The Pre-Petition Lenders did not deal with the Debtors as a single economic unit.  Rather, as indicated, at least 23 Debtors are Non-Obligor Debtors.  There are also affiliated non-Debtors involved in the LaSalle Securitization that are not obligated on the Pre-Petition Credit Facility. *See* Gathany Affidavit at ¶ 46.  These were obviously conscious decisions.

The Debtors also filed their Schedules herein on a Debtor-by-Debtor basis, identifying assets and liabilities.  (The Debtors did not request permission to file their schedules on a consolidated basis.)

The Debtors have regularly made SEC Filings with their assets and affairs broken out by business unit. *See, e.g.,* Committee Exhibit 10, Form 10-Q of SIRVA, Inc. for quarterly period ended September 30, 2007 ("SIRVA 10-Q") at 13, 21-23, 25-27 (separate financial results reported for following segments: Global Relocation Services, Moving Services North America, Moving Services Europe and Asia Pacific, and Corporate).[21]

The Debtors have acknowledged to the Court that they were not collectively operated as a single unit.  *See, e.g.,* Gathany Affidavit at ¶¶ 42-46 (describing securitization program involving SIRVA Relocation LLC and only certain Debtors and nondebtor affiliates); ¶¶ 127-132 (descriptions of the respective cash flow systems used by moving services operating segment, relocation business segment (including Debtor, SIRVA Relocation LLC, which has separate

---

[21] As discussed below, the Debtors' view of whether it functioned as a single unit is not the focus of the inquiry; it is the creditors' perspective that is paramount.

accounts), and Debtor, Executive Relocation Corporation ("All ERC cash management transactions are through accounts at LaSalle."); Schedule (A)(9) (listing sites owned or leased by specific Debtor, including SIRVA Relocation LLC).

The Debtors advised the Court on the Petition Date that the Debtors "maintain records of all fund transfers and can ascertain, trace, and account for Intercompany Transactions."[22]

Debtors have now served the Committee with an "Expert Report of Philip E. Kruse" (the "Kruse Report") (Committee Exhibit 14) on the issue of substantive consolidation. The Kruse Report now asserts that "the [Debtors] intercompany balances cannot be presumed to be valid" and that "reconciliation of SIRVA's pre-petition intercompany accounts cannot be performed in a time or cost effective manner." Kruse Report at 3.

Pursuant to the Proposed Plan, all "Intercompany Claims" are deemed allowed and paid in full, even as the Debtors' estates are substantively consolidated.

It is not currently possible to know whether Class 5 Creditors hold claims against the Non-Obligor Debtors. No bar date has passed by which Class 5 Creditors must file their claims. The Debtors have filed the Class 5 Claims List, but such list is obviously not binding on the Class 5 Creditors in terms of who their claims might be against. Additionally, to the extent Unnamed Customers are Class 5 Creditors, no one can know what Debtors such Creditors might assert claims against, as the Unnamed Customers have received no notice of the Cases.

---

[22] *See, e.g., Motion of the Debtors for an Order (A) Authorizing the Debtors to Continue Using Their Existing Cash Management System, Bank Accounts and Business Forms, (B) Granting Postpetition Intercompany Claims Administrative Expense Priority, and (C) Authorizing Continued Intercompany Transactions* [Docket No. 17] (the "Cash Management Motion") at ¶ 32.

# III.

## THE COURT SHOULD DENY CONFIRMATION TO THE PROPOSED PLAN

**A.**     **The Separate Classification of Class 5 in the Proposed Plan is Improper**

      1.     The Articulated Basis for the Separate Classification of Class 4 Claims and Class 5 Claims is Improper

    As indicated, the Proposed Plan divides non-Lender, non-intercompany general unsecured claims into two classes:  Class 4 Claims that are to be paid in full and Class 5 Claims that are to be discharged with no distribution.  Although Class 5 Creditors have the same legal rights against the estates as Class 4 Creditors, the Debtors have hand-picked some claims to populate Class 5.[23]  There is little rhyme or reason to the identity of Class 5 Creditors:  As indicated, the Creditors consist of four Named Customers (Pike, Beach, Moad and Boone) and possibly thousands of Unnamed Customers (while other customer claims are classified in Class 4), a pension fund, certain truckers who continue to do business with Debtors, *i.e.* the OOIDA members and STAG (while other truckers are classified in Class 4), one current agent ("Aaro") lessors under rejected leases (while other trade creditors with no ongoing business relationship with the Debtors are treated in Class 4), some Terminated Employees, and a mix of other debts that the Debtors/Lenders simply would prefer not to pay.  The separate classification of these Class 5 Creditors is impermissible under § 1122.

    Section 1122 generally governs classification of claims and provides:

> § 1122. Classification of claims or interests.
>
> (a) Except as provided in subsection (b) of this section, a proposed plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.

---

[23] Of course, those 39 Class 5 Creditors actually represent perhaps thousands of claims held by Unnamed Customers.

> (b) A proposed plan may designate a separate class of claims
> consisting only of every unsecured claim that is less than or
> reduced to an amount that the court approves as reasonable and
> necessary for administrative convenience.

11 U.S.C. § 1122.

While § 1122 bars aggregating dissimilar claims in the same class, the section does not explicitly address whether similar claims must be placed in the same class. "Although section 1122(a), by its terms, doesn't require that all similarly-situated claims be classified together, case law has made clear that separate classification of substantially similar unsecured claims is permissible only when there is a *reasonable basis for doing so* or when the decision to separately classify "*does not offend one's sensibility of due process and fair play*." *In re Adelphia Communications Corp*., 368 B.R. 140, 246-47 (Bankr. S.D.N.Y. 2007) (quoting *In re One Times Square Assoc. Ltd. P'ship*, 159 B.R. 695, 703 (Bankr. S.D.N.Y. 1993) *aff'd w/o opinion*, 41 F.3d 1502 (2nd Cir. 1994)) (emphasis supplied). As the Second Circuit noted: "a wholly permissive reading of the statute would render subsection (b) of § 1122, which specifically allows separate classification of small claims, superfluous." *In re Boston Post Road Ltd. Partnership*, 21 F.3d 477, 482 (2d Cir. 1994) ("*Boston Post Road Ltd. Partnership*") (citing *Phoenix Mut. Life Ins. Co. v. Greystone III Joint Venture (In re Greystone III)*, 995 F.2d 1274, 1279 (5th Cir. 1991), *cert. denied*, 113 S.Ct. 72, 121 L.Ed. 2d 37 (1992)).

As implied by the labels that the Debtors attached to Classes 4 and 5, the "reasonable basis" to which the Debtors give lip service is that Class 4 Creditors are creditors with which the Debtors wish to continue doing business, while Class 5 Creditors are those with whom the Debtors are not engaged in a continuing business relationship.[24] Even if the Debtors' purported

---

[24] While many of the Class 5 Claims are disputed, Class 5 does not consist solely of disputed claims, and the segregation of claims on that basis would be impermissible in any part. *See In re Congoleum Corp*., 362 B.R. 198,

(continued)

justification withstood factual scrutiny (it doesn't, as discussed below), this is not a valid legal basis for separate classification. The Second Circuit has suggested only that separate classification of "*essential*" trade vendors might be justified. *Id*. at 483. In *Boston Post Road Ltd. Partnership*, the Second Circuit rejected a proffered rationale – even stronger than that which is suggested by the Debtors here – that the "future viability" of the debtor required treating trade creditors more favorably than a lender's unsecured claim. The Second Circuit rejected the debtor's basis for separate classification, holding as follows:

> Debtor was unable and failed to adduce credible proof of any legitimate reason for segregating the FDIC's unsecured claim from the unsecured claims of BPR's trade creditors. Debtor's reasons for why it should have been permitted to separately classify the FDIC's unsecured claim were: (1) the FDIC's and the trade creditors' unsecured claims were created from different circumstances and arise under different Code sections; and (2) BPR's future viability as a business depends on treating its trade creditors more favorably than the FDIC. Neither is availing. The different origins of the FDIC's unsecured deficiency claim and general unsecured trade claims, claims which enjoy similar rights and privileges within the Code, do not alone justify separate segregation. [citation] More importantly, BPR has failed to present any evidence of a legitimate business reason for the separate classification of similarly situated unsecured creditor claimants. The trade creditors in Class 4 were few and consisted of a landscaper, property appraisers, rubbish removers, and accountants. <u>None were essential to BPR's future</u>. Both lower courts accordingly found an absence of a valid justification for the isolation of the FDIC deficiency claim. No evidence to the contrary was adduced.

---

(continued)
203 (Bankr. D.N.J. 2007) ("if disputed claims could be classified separately on that basis alone, debtors would always put difficult creditors in a separate class to obtain the consent of the class of undisputed creditors and seek confirmation under 1129(b). The claims objection process in bankruptcy is something entirely separate from plan classification."); *In re Porcelli*, 319 B.R. 8, 10-11 (Bankr. M.D. Fla. 2004) ("Since the legal status of the claim and not its disputed status is the appropriate focus of classification, the segregation of unsecured claims that are disputed is improper"); *In re Paolini*, 312 B.R. 295, 315 (Bankr. E.D. Va. 2004) ("There is no cognizable basis to permit separate classification of the claim of [the creditor]; the existence of the dispute over the validity of the [creditor's] claim is not sufficient to distinguish it from the other unsecured pre-petition claims of [the debtor]").

21 F.3d at 483 (emphasis supplied).

The Ninth Circuit has also rejected over-inclusive classes of favored "non-essential" trade creditors. *See In re Barakat*, 99 F.3d 1520, 1528 -1529 (9th Cir. 1996) ("literally thousands of companies are available to provide the [ ] services" of the trade creditors, thus none of the trade creditors were essential to Debtor's continued maintenance of the apartment building. . . . [T]here is no legal distinction between the trade creditor claims and the general unsecured claims that would justify separate classification.")

Similarly, in *In re Sentry Operating Co. of Texas, Inc*., 264 B.R. 850 (Bankr. S.D. Tex. 2001) ("*Sentry*") the bankruptcy court rejected an over-inclusive trade creditor class, coupled with grossly disparate treatment, that is almost identical to what the Debtors propose here. The *Sentry* plan, filed jointly by the debtor and a secured lender, proposed to pay a class of trade claims in full, while paying one percent of the amount of other unsecured claims, on the basis that the preferred class contained some small creditors whose continued work with the debtor's funeral homes would provide value to the reorganized debtor. The court found that separate classification was improper:

> Even assuming that the evidence were adequate to show that it is essential to pay organists, ministers, flower shops, and other small-town businesses, the classification of creditors under the plan is simply not limited to that purpose. Although it appears that the permissible purpose of preserving value would be served, it also appears that proscribed purpose of gerrymandering (or paying creditors for the benefit of SCI-L's parent) would also be nominally served. Therefore, the Court concludes that the plan proponents have not met their burden to prove that Class 3 is appropriately designed to implement the announced purpose of enhancing the value of the assets.

*Id*. at 861.

In addition, courts will not tolerate disguised attempts to provide disparate treatment to like claims whether by separate classification or payment terms. For example, in *In re Weiss-*

*Wolf, Inc.*, 59 B.R. 653 (Bankr. S.D.N.Y. 1986), the debtor classified all non-priority unsecured claims together but made separate payment provisions for such claims. Undisputed claims were to receive an immediate distribution, while disputed claims – mainly claims arising from litigation brought by the debtor's banks – would be paid at some later date from monies the debtor did not and perhaps never would possess. The court rejected the proposed classification, stating that "[t]he plan must treat claims in the same class alike, just as like claims must be classified together." *Id.* at 655. The debtor's proposed scheme was "merely separate classification of like claims in the guise of payment terms." The court found further that such disparate treatment could not be justified on the ground that the debtor disputed the bank's claims. *See id.*

Here, as in *Boston Post Road Ltd. Partnership, Barakat* and *Sentry*, the Debtors have not defined a class to include only essential vendors, and cannot possibly adduce evidence that (a) the thousands of creditors it has placed in Class 4 are all essential vendors, or (b) any irreplaceable vendor would require full payment in order to continue doing business with the Debtors. There is no legitimate basis for separately classifying the hodge-podge of claims held by Class 5 Creditors. The Proposed Plan therefore fails to satisfy sections 1122 and 1129(a)(1) of the Code, and thus cannot be confirmed.

>   2.   <u>Even if It was Permissible to Classify "Ongoing Trade Claims" Apart From all Other Trade Claims, the Proposed Plan Fails Because Class 4 and Class 5 Claims are Not So Populated</u>

Even if it was permissible to classify the claims of creditors with whom the Debtors continue to do business separately from the claims of other holders (it is not, as discussed above), the Debtors do no more than give lip service to this purported justification. The Proposed Plan therefore must fail for this reason as well.

Any plan classification structure based on the existence or non-existence of a "continuing business relationship" is inherently difficult to analyze critically – the existence of a "relationship" could be simply a function of the Debtors' subjective state of mind. (The Debtors could presumably look at two identically situated creditors and decide that they have a "continuing business relationship" with one, but not the other.) Discovery has made clear, however, that the Debtors have not even attempted to implement a meaningful standard in terms of whether a "continuing business relationship" exists. It is clear that: (a) no such attempt was made; (b) no such standards exist; and (c) to the contrary, the Debtors do not take their Proposed Plan classification language seriously. These conclusions are inescapable, given the Debtors' incoherent and irreconcilable positions concerning what claims properly belong in what class. As alluded to above:

- The Debtors advised the Court at the First Day Hearing that they considered the claims of former customers (for poor service, property damage, etc.) to be Class 4 Claims in order to assure "customer satisfaction". *See* Committee Exhibit 3, Feb. 5, 2008 Hrg. Tr. at 70-71. Obviously, however, the Debtors have no "ongoing business relationship" with customers where the move or relocation in question has already been completed. In taking such a blanket position that all customer claims constitute Class 4 Claims, the Debtors ignore the plain language of their own Proposed Plan.

- Moreover, the Debtors have now decided to pick and choose which customer claims are included in which class. The Debtors now seek to extinguish in Class 5 the Pike Claim and apparently all of the Illegal Pricing Claims held by perhaps

thousands of customers. (The desire for customer satisfaction apparently has its limits.)

- As indicated, the Debtors also initially sought to include severance obligations to Terminated Employees in Class 4. *See* Committee Exhibit 3, Feb. 5, 2008 Hrg. Tr. at 29. Of course, Class 4 treatment for Terminated Employees is absurd under a plain reading of the Proposed Plan – the Debtors could not seriously contend that they have a "continuing business relationship" with Terminated Employees. The Debtors have now relented and added the Terminated Employees to the Class 5 Claims List. Notwithstanding the Debtors' forced re-evaluation, the Debtors' initial position that the claims of Terminated Employees constituted Class 4 "ongoing business relationship" Claims again makes obvious that the Debtors did not intend to take their own Proposed Plan classification language seriously.

- The Debtors pay over $200 million in trade payments monthly to thousands of creditors. It strains credibility to believe that, as of the Petition Date, the Debtors did not owe money on a single trade payable based on something other than a "continuing business relationship." (Given the size of the Debtors' business, there must have been dozens or hundreds of creditors owed money as of the Petition Date based on the one-time provision of goods or services.) Despite this, no normal course trade payables are included in the Class 5 Claims List. Notwithstanding the clear language of their own Proposed Plan, the Debtors made no effort to review their accounts payable registers and determine which trade payables were owing to creditors engaged in a "continuing business relationship" with the Debtors, and which payables were not.

- As discussed above, the Debtors have also placed on the Class 5 Claims List creditors with whom the Debtors <u>do</u> have an ongoing business relationship – 1000+ OOIDA truckers, STAG and Aaro.

- The Debtors apparently now take the position that the affected OOIDA truckers, STAG and Aaro have one claim in Class 4 (for ongoing services rendered) and another claim in Class 5. *See* Committee Exhibit 15, Spytek Dep. Tr. at 40-41. The Proposed Plan classification system, however, renders any such bifurcation impossible – given that a trucker/agent/creditor either does or does not have an "ongoing business relationship" with the Debtors, it is impossible for a single trucker/agent/creditor to have both a Class 4 and Class 5 Claim under the clear language of the Debtors' Proposed Plan. The Debtors' position is incomprehensible.

As the foregoing makes clear, attempting to articulate a consistent standard concerning the Debtors' classification methodology is impossible. Notwithstanding their own Proposed Plan language, the Debtors (a) have attempted to and are placing creditors in Class 4 with whom they have no ongoing business relationship, (b) are now designating in Class 5 certain claims of creditors which whom the Debtors do have an ongoing business relationship, and (c) have silently included some customer claims in Class 4 while aggressively attempting to extinguish other customer claims in Class 5. The Debtors have made no serious attempt even to identify the creditors who would correctly populate the two classes based upon the classification definitions that the Debtors themselves delineated.

The Proposed Plan classification system therefore is revealed as a pretext. The only unifying characteristic of Class 5 Claims is that the Debtors and the Lenders would prefer not to

pay them.  This is not a proper ground for separate classification under the authority cited above.  The Proposed Plan therefore cannot be confirmed because it violates Code §§ 1122 and 1129.

**B.**     **The Proposed Plan Discriminates Unfairly Against Class 5**

Even if the separate classification of Class 5 Claims from Class 4 Claims was permissible, the disparate proposed treatment under the Proposed Plan is not.  The Proposed Plan proposes to pay nearly all of the Debtors' general unsecured creditors in full, while paying nothing to a handpicked group of other general unsecured creditors, all of which have claims with equal priority and identical legal attributes.  Of the 4 classes of unsecured creditors in the Proposed Plan -- Class 1 (Pre-Petition Facility Claims), Class 4, Class 5, and Class 8 (Intercompany Interests) -- Class 5 is the sole class singled out to received nothing.  Such disparate treatment epitomizes unfair discrimination under the Code.

Section 1129(b)(1) permits confirmation of a plan notwithstanding its rejection by an impaired class only if, *inter alia*, "the plan does not discriminate unfairly."  11 U.S.C. § 1129(b)(1).  "Generally speaking, this standard ensures that a dissenting class will receive relative value equal to the value given to all other similarly situated classes.  [citation omitted] Thus a plan proponent may not segregate two similar claims or groups of claims into separate classes and provide disparate treatment for those classes."  *In the Matter of Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986) *aff'd in part, rev'd in part on other grounds*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd, Kane v. Johns-Manville Corp.* 843 F.2d 636 (2d Cir. 1988) (*citing In re Pine Lake Village Apartment Co.*, 19 B.R. 819 (Bankr. S.D.N.Y. 1982)).  The burden is upon the Debtors to prove that the Proposed Plan does not discriminate unfairly.  *In re Armstrong World Industries, Inc.*, 348 B.R. 111, 122 (D. Del. 2006) ("*Armstrong World Industries*"); *Sentry, supra,* 264 B.R. 850 at 853.

Courts have developed two methods to determine whether a plan unfairly discriminates against a dissenting class. "The hallmarks of the various tests have been whether there is a reasonable basis for the discrimination, and whether the debtor can confirm and consummate a plan without the proposed discrimination." *In the Matter of Lernout & Hauspie Speech Products, N.V.*, 301 B.R. 651, 660 (Bankr. D. Del. 2003).

Traditionally, Courts applied a four-factor test to determine unfair discrimination (the "Four Factor Test"). *See generally Armstrong World Industries*, 348 B.R. at 121. The factors considered are:

> (1)  whether the discrimination is supported by a reasonable basis;
>
> (2)  whether the debtor could consummate the plan without the discrimination;
>
> (3)  whether the discrimination is proposed in good faith; and
>
> (4)  whether the degree of discrimination is in direct proportion to its rationale.

*In re Worldcom, Inc.*, 2003 WL 23861928, *60 (Bankr. S.D.N.Y. 2003); *In re Buttonwood Partners, Ltd.*, 111 B.R. 57, 63 (Bankr. S.D.N.Y. 1990). *See also In re Ambanc La Mesa Limited Partnership*, 115 F.3d 650, 656 (9th Cir. 1997); *In re Dow Corning Corp.*, 244 B.R. 696, 700 n. 3 (Bankr. E.D. Mich. 1999) (listing cases applying Four-Factor Test).

More recently, many courts have replaced the Four-Factor Test with a rebuttable presumption test, first proposed in an article by Professor Bruce A. Markell in the American Bankruptcy Law Journal (the "Markell Test"). *See Dow Corning*, 244 B.R. at 701 (*citing* Bruce A. Markell, *A New Perspective on Unfair Discrimination in Chapter 11*, 72 Am. Bankr. L.J. 227

(1998)).  Under the Markell Test, a rebuttable presumption of unfair discrimination arises when there is:

> (1) a dissenting class; (2) another class of the same priority; and (3) a difference in the plan's treatment of the two classes that results in either (a) a materially lower percentage recovery for the dissenting class (measured in terms of the net present value of all payments), or (b) regardless of percentage recovery, an allocation under the plan of materially greater risk to the dissenting class in connection with its proposed distribution.

*Dow Corning*, 244 B.R. at 702; *Armstrong World Industries*, 348 B.R. at 121.

If there is an allegation of a materially lower percentage recovery, the presumption can be rebutted only "by showing that, outside of bankruptcy, the dissenting class would similarly receive less than the class receiving a greater recovery, or that the alleged preferred class had infused new value into the reorganization which offset its gain."  *Id.*  The Markell Test was adopted in *Dow Corning*, in which the court found that it more effectively targets unfair discrimination than does the Four-Factor Test.  *Dow Corning*, 244 B.R. at 702.[25]  The Markell Test was also adopted in 2006 by the Delaware bankruptcy court in *Armstrong World Industries*, 348 B.R. at 122.  *See also In the Matter of Lernout & Hauspie*, 301 B.R. at 661 (applying Markell Test); *In the Matter of Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 231 (Bankr. D. N.J. 2000) (same).[26]

---

[25] "The presumption-based analysis he proposes, unlike the four-part test or modifications of it, effectively targets the kind of discrimination or disparate treatment that is commonly understood as being "unfair," namely that which causes injury or that unjustly favors one creditor over another.  It also provides more concrete limits on the plan proponent's ability to discriminate among classes than the four-part test, thereby offering a greater assurance that all classes of the same priority level will be treated equally."  *Id.*

[26] The Committee on Bankruptcy and Corporate Reorganization of the Association of the Bar of the City of New York has proposed a further refinement of the test, which would require that "[a]ny material discrimination in the present value of recovery must be justified by evidence that the favored class is making a specific contribution in money or money's worth reasonably equivalent to the amount by which is favored."  *Making the Test for Unfair Discrimination More "Fair": A Proposal*, 58 Business Lawyer 83, 106-07 (2002).

Under either test, relatively minor differences in the recovery of different classes may be upheld, if reasonable. "Those [cases] that have upheld different payment have done so only in cases in which the ultimate percentage recovery is close, and if no feasibility concerns are involved." 7 Collier on Bankruptcy at ¶ 1129.04[3][b][iii] (15th ed. Rev'd). Thus in *WorldCom*, small differences in treatment were upheld because "based primarily upon the relative prejudice and reliance arguments of pre-Merger creditors, it [slightly different treatment] is not only warranted, but necessary to achieve fundamental fairness." *WorldCom*, at *60.

In contrast, courts have consistently rejected "grossly disparate" discrepancies in the treatment of equal classes of the sort proposed in this case. As the court discussed in *Greate Bay Hotel & Casino, Inc.*:

> "There is no bright line test which establishes whether a given difference in percentage recovery results in unfair discrimination. . . . Courts which have rejected confirmation on the basis of unfair discrimination have confronted plans proposing grossly disparate treatment (50% or more) to similarly situated creditors. *See, e.g., In re Tucson Self-Storage, Inc.*, 166 B.R. 892 (9th Cir. BAP 1994) (providing for 100% for unsecured trade creditor and 10% to deficiency claim was unfair discrimination); *In re Barney & Carey Co.*, 170 B.R. 17 (Bankr. D. Mass. 1994) (denying confirmation where deficiency claim was to receive 100% and general unsecured 15%); *In re Caldwell*, 76 B.R. 643, 646 (Bankr. E.D. Tenn. 1987) (confirmation denied where 100% of credit card debt was proposed to be paid but only 22.7% of all other unsecured debt would be paid).

*Greate Bay Hotel & Casino, Inc.*, 251 B.R. at 231 (emphasis added).[27] *See also In re Aztec Company*, 107 B.R. 585, 591-92 (Bankr. M.D. Tenn. 1989) (unfair discrimination where

---

[27] Decisions interpreting unfair discrimination in chapter 13 cases under section 1322(b)(1) are equally uniform in rejecting plans with material disparities. *See Barnes v. Whelan*, 689 F.2d 193 (D.C. Cir. 1982) (rejects 100% payment of co-signed claim and 1% to other unsecured claims); *In re Gunn*, 37 B.R. 432 (Bankr. D. Or. 1984) (rejects 100% payment of partially secured debt and 3% to other unsecured claimholders); *In re Blackwell*, 5 B.R. 748 (Bankr. W.D. Mich. 1980) (rejects 100% payment to landlord with 5% payment to other unsecured claimholders); *In re Johnson*, 69 B.R. 726 (Bankr. W.D.N.Y. 1987) (rejects 100% payment of claim that would be nondischargeable in a chapter 7 case and 15% payment to other unsecured claimholders); *In re Harris*, 62 B.R. 391

(continued)

deficiency claim received 3% and class dominated by insiders received 100%); *In re Creekside Landing, Ltd*., 140 B.R. 713 (Bankr. M.D. Tenn. 1992) (40% distribution on deficiency claim and 75% to other general unsecured claims deemed unfair discrimination because the debtor failed to articulate a reasonable basis for the discrimination and failed to demonstrate why the consummation of the plan could not be accomplished without discriminatory treatment); *In re Cranberry Hill Assocs. L.P*., 150 B.R. 289, 291 (Bankr. D. Mass. 1993) (plan cannot pay trade creditors in full on confirmation while paying deficiency claim in full over 9 years without interest, contingent on property sale).

Also instructive in this regard is *In re Snyders Drug Stores, Inc*. 307 B.R. 889 (Bankr. N.D. Ohio 2004).  *Snyders Drug Stores* involved a plan structured to prefer trade creditors.  The debtors operated 152 retail drug stores in 11 states.  Class 10 comprised creditors with whom the debtors intended to do business, who were to receive 6-7%.  Class 12 included landlords with lease rejection claims, who were to receive nothing.  The debtors argued there was a reasonable basis for the discrimination in that the trade vendors had value to the reorganized debtor and it was important to preserve their good will.  *See id*. at 894.

The *Snyders Drug Stores* court then applied the Four-Factor Test to assess whether the discrimination was unfair.  It noted that the proffered "reasonable basis" for the discrimination was undercut because the 2,569 creditors in class 10 were not just trade vendors, but others as to which there was no evidence supporting preferential treatment.  "Second, there was no evidence to prove that the trade and service creditors included in class 10 would refuse to deal with the reorganized debtor going forward absent some preferential payment under the plan."  *Id*. at 895.

---

(continued)
(Bankr. E.D. Mich. 1986) (rejects 100% payment of consumer debts and 5% payment of business creditors of debtor's failed business).

There was also no evidence to support the second factor – that the discrimination was necessary to confirm and consummate a plan – or the fourth factor – whether the plan provided a meaningful recovery – since Class 12 was to receive nothing at all. Accordingly, confirmation was denied. *Id.*

*Sentry, supra,* is similar. The joint plan of the debtor and its secured lender in *Sentry* proposed to pay a class of trade claims in full while paying 1% on other unsecured claims. The court explained that the issue was whether the plan discriminated "unfairly by proposing to pay a greater percentage distribution to [the trade creditors] than it pays to [the unsecured creditors], even though both have equal rank under state law and under the distribution priorities of the Code." *Sentry*, 264 B.R. at 862. Finding discrimination,[28] the court proceeded to find that the rebuttable presumption of unfair discrimination had not been overcome by either a showing that the lower distribution for the "dissenting class [was] consistent with the results that would obtain outside of bankruptcy, or that a greater recovery for the other class [was] offset by contributions from that class to the reorganization." *Id.* at 864. "While a deferred payout and possibly risk differential among the different kinds of creditors in this case might be justified, a 99% payout differential is not justified." *Id.*; *see also In re Arn Ltd., L.P.* 140 B.R. 5, 13 (Bankr. D.D.C. 1992) (rejecting a plan that paid tenants nothing and holding: "That the debtor views the claimants as disgruntled tenants who are a nuisance to the debtor's reorganization efforts is simply not a basis for such discrimination, and no showing has been made that the plan could not succeed were the [tenants] accorded the same treatment as [other unsecured creditors].")

---

[28] "It is clear that the plan discriminates between the two groups of creditors since it proposes to pay one set 1% of their claims and it proposes to pay the other group 100%." *Id.*

The Debtors here propose to pay 100 cents to some customers and other creditors with which the Debtors simply hope to continue doing business (whether or not they are essential and whether or not the creditors in question even agree to do business with the Debtors), while paying nothing to other customers and other creditors, many of whom <u>are</u> doing business with the Debtors. Put simply, such disparate treatment would be grossly inequitable and, frankly, without precedent. The Proposed Plan's "all or nothing" treatment of Class 4 and Class 5 Claims therefore must fail under either the Markell Test or the Four-Factor Test:

- Under the Markell Test, the Debtors cannot rebut the presumption of unfair discrimination, based on the materially different recovery afforded Class 5. Outside of bankruptcy, the Class 5 Claims would be entitled to the same recovery as Class 4 Claims. The holders of Class 4 Claims have also made no promises whatsoever in terms of "infusing new value into the reorganization" in order to justify the preferred treatment granted to Class 4 Claims.

- A similar conclusion must be reached under the "Four-Factor" test: (1) the discrimination against Class 5 Claims is not supported by a reasonable basis, as Class 4 is grossly over inclusive with respect to any legitimate rationale the Debtors could offer for the discrimination; (2) the Debtors cannot offer any evidence that the discrimination is necessary to confirm a Proposed Plan;[29] (3) the discrimination is not proposed in good faith, as there is not even a token attempt

---

[29] The Debtors advised the Court at the First Day Hearing that the Class 5 Claims consisted of liquidated claims having "a low seven figure balance," the UK Pension Claim (which has subsequently been resolved as a practical matter by the subsequent UK sale), and litigation claims which counsel described as "unliquidated claims where candidly we don't think the claims are worth anything." Committee Exhibit 3, Feb 5 Hrg. Tr. at 72. Counsel further stated that: "So you compare that to the billion dollars that run through the cash management system, the several billion dollars a year of pay outs that we make to creditors I think it's -- I would call it insignificant, but I wouldn't call it immaterial." *Id.* The Debtors therefore can hardly now contend that their proposed discrimination is "necessary" to confirm the Proposed Plan.

at offering fair compensation to Class 5 creditors; and (4) the degree of discrimination is grossly disproportionate to any possible legitimate rationale.

Thus, under either standard, the Debtors' proposed treatment of Class 5 Claims is inconsistent with the letter and spirit of the Code. The Proposed Plan therefore is not confirmable.

## C. The Unfair Discrimination Cannot Be Justified as a "Gift" to Class 4 From the Secured Lenders

The Debtors may argue that the discrimination against Class 5 Claims is not unfair because the payment in full to Class 4 creditors represents a "gift" made by the Pre-Petition Lenders. If made, any such argument would be untenable factually and legally. First, on a factual basis, the distributions in question are from property of the estate, not from the Lenders, and not all of the property of these estates is encumbered. (Class 5 therefore cannot be excluded from a distribution of estate property on the basis that all such property effectively belongs to the Lenders.) Second, the exclusion of Class 5 Claims from a general distribution under a chapter 11 proposed plan of reorganization cannot be justified as a matter of law, even if all the Debtors' assets were encumbered. On less extreme facts, the Second Circuit and Third Circuit have recently rejected in recent years the use of "gifting" to deviate from the Code's distribution requirements, and the distribution scheme proposed here is even more clearly impermissible than in those cases. *See In re Iridium Operating LLC*, 478 F.3d 452 (2d Cir. 2007) ("*Iridium*"); *Armstrong World Industries*, *supra*, 432 F.3d at 514-515.

The genesis of the "gifting" theory is a chapter 7 case, *In re SPM Manufacturing Corp.*, 984 F.2d 1305 (1st Cir. 1993) ("*SPM*"). In *SPM*, a secured creditor agreed to give a portion of its chapter 7 liquidation collateral proceeds to general unsecured creditors in exchange for their agreement to an orderly liquidation. *Id*. at 1308. A taxing authority holding a priority claim that

would be bypassed by the agreement objected.  The First Circuit held that the "gift" was permissible.  Critical to the court's reasoning was the fact that the proceeds were no longer property of the estate once they were distributed to the lender on account of its secured claim.  *Id*. at 1313.  The court stated:  "While the debtor and the trustee are not allowed to pay nonpriority creditors ahead of priority creditors, creditors are generally free to do whatever they wish with the bankruptcy dividends they receive, including to share them with other creditors."  *Id.*

Nothing in *SPM* suggests that the Court intended to create a "gifting" exception to the chapter 11 plan confirmation requirements of the Code.  Several courts have rejected any such suggestion in circumstances closely resembling this case.

In *Sentry*, *supra*, for example, as set forth above, the debtors and the secured creditor jointly proposed a plan that paid the class of unsecured trade creditors 100% of their claims, while other unsecured creditors would receive only 1% of their claims.  *Sentry*, 264 B.R. at 855-56.  The less favored creditor class objected on the basis that the plan discriminated unfairly in violation of Code § 1129(b).  The secured creditor argued that the uneven distributions were not "unfair discrimination," because the secured creditor was giving up part of its entitlement in order to pay the trade creditor class, and the less favored class would not receive any distribution if the secured creditor merely foreclosed on its liens and security interests.  The *Sentry* Court rejected the argument and held that the plan discriminated unfairly.  *See id*. at 864.  The court rejected the concept that a "secured [creditor] may simply purchase the assent of an unsecured class by giving up part of its claim."  *Id*.  The court reasoned that, although the secured creditor could have foreclosed on the collateral treatment and used the proceeds as it wished without regard to the requirements of Code § 1129, the decision to use the "powerful equitable tools" in a

chapter 11 reorganization results in a price to be paid, namely the "treatment of all non-accepting classes fairly, equitably, and without unfair discrimination" consistent with the Code. *Id.* at 866. "To accept SCI-L's argument that a secured lender can, without any reference to fairness, decide which creditors get paid and how much those creditors get paid, is to . . . read the § 1129(b) requirements out of the Code." *Id*. at 865. *See also Snyders Drug Stores*, *supra,* 307 B.R. at 894 (rejecting a plan gifting and distinguishing SPM because (1) SPM dealt with property that was not property of the estate and (2) SPM concerned an agreement that "was not proposed as part of a plan of reorganization, but was instead in the nature of a partial assignment or subordination agreement that was not subject to the code's confirmation requirements").

As indicated, the Third Circuit flatly rejected the concept of a "gifting" exception to the plan confirmation requirements of Code § 1129 in *Armstrong World Industries*. The *Armstrong World Industries* plan provided that an equity holder would receive a distribution of warrants in the reorganized debtor. If all classes consented, the warrants would be issued directly to the equity holder. The plan provided, however, that if general unsecured creditors rejected the plan, the warrants would be technically distributed to the class of asbestos personal injury claimants (which the plan proponent knew would accept the plan), which would waive receipt of the warrants and contribute the warrants to the equity holder. The effect was that the warrants were being "gifted" directly to the equity holder over the objection of several unsecured creditors.

The Third Circuit rejected Armstrong's argument that *SPM*-style "gifting" was permissible, stating that such "gifting" cases "do not stand for the unconditional proposition that creditors are generally free to do whatever they wish with the bankruptcy proceeds they receive." *Armstrong World Industries*, 432 F.3d at 514. The district court had held that *SPM* was inapposite because (i) it occurred in a chapter 7 case where the absolute priority rule does not

apply, (ii) the distribution came from liquidated collateral that was no longer property of the bankruptcy estate and thus not subject to distribution under the Code's priority scheme, and (iii) the sharing agreement in *SPM* more closely resembled an ordinary carveout. 320 B.R. at 538-39. The district court had also held that, to the extent *SPM* and its progeny "stand for the unconditional proposition that 'creditors are generally free to do whatever they wish with the bankruptcy dividends they receive, including sharing them with other creditors, so long as recoveries received under the plan are not impacted,' . . . without adherence to the strictures of 11 U.S.C. § 1129(b)(2)(B)(ii), that contention is flatly rejected here." *Id*. at 539-40. The Third Circuit endorsed this construction, holding that "such agreements would 'impermissibly sidestep the carefully crafted strictures of the Code, and would undermine Congress's intention to give unsecured creditors bargaining power in this context.'" *Armstrong World Industries*, 432 F.3d at 514-15.

The Second Circuit also had an opportunity in *Iridium* to discuss the applicability of *SPM* in the chapter 11 context. In *Iridium*, the bankruptcy court was asked to approve a pre-plan Rule 9019 settlement. The settlement provided, in part, that the estate's cash would be distributed to the lenders except for $47 million that was to fund a litigation trust to prosecute certain claims for the benefit of the several lenders, administrative creditors and general unsecured creditors, but not priority creditors. Motorola, holding a priority claim, objected to the settlement on the grounds that it violated the absolute priority rule. The bankruptcy court and district court held that the $47 million was not estate money and so its use to fund the trust did not violate the absolute priority rule.

The Second Circuit reversed. The court ruled that it need not decide whether the settlement could be justified under *SPM* because the lenders' interest was not conceded except

pursuant to the settlement agreement at issue. *See Iridium*, 478 F.3d at 461. As for the approval

of the settlement, however, the court held that although Code § 1129(b), which codifies the "fair

and equitable" test, applies by its terms only to proposed plans and not to settlements, the

standard applies to Rule 9019 settlements nonetheless, and most likely would be fatal to any

settlement that provides for a distribution that deviates from the absolute priority rule except "in

some minor respects." *Id.* at 464-65.

In this case, the Proposed Plan contemplates a general distribution of property of the

estate through a chapter 11 plan of reorganization. Such assets are not the Lenders' property. As

indicated, as of the Petition Date, there were substantial assets in these estates that were not

encumbered by the liens securing the Pre-Petition Credit Facility. Thus, even if a "gifting"

exception to the Code § 1129 confirmation standards existed after *Iridium* and *Armstrong World*

*Industries*, the facts do not fit the theory here.

More fundamentally, even if all the assets of these estates were fully encumbered, the

Committee respectfully submits that this Court should reject the concept of a "gifting" exception

to the confirmation requirements of Code § 1129. The selective isolation and exclusion of

Class 5 Claims from a class of several thousand creditors with legally equivalent claims is

antithetical to the fundamental chapter 11 tenet of equality of distribution among claims of equal

rank.

This Proposed Plan, with its coarse unfairness to an otherwise unrelated select group of

disadvantaged creditors, is a poster child for the inevitable, pernicious consequences of applying

chapter 7 logic to the confirmation of a chapter 11 plan. The Lenders have elected to use the

chapter 11 plan process and the equitable authority of this Court to maximize their recovery and

facilitate their acquisition of the Debtors. Having made that election, the Debtors/Lenders must

be held to all of the chapter 11 requirements, rather than simply those requirements that would maximize the Lenders' returns. To do otherwise is to "read the § 1129(b) requirements out of the Code,"[30] "impermissibly sidestep the carefully crafted strictures of the Code, and . . . undermine Congress's intention to give unsecured creditors bargaining power in this [chapter 11] context." *Armstrong World Industries, supra,* 432 F.3d at 514-15.

D.     **The Proposed Plan Is Not Confirmable Because It Violates the Absolute Priority Rule**

The Proposed Plan is also not "fair and equitable" to Class 5 under Code § 1129(b)(2)(1) and 1129(b)(2)(B)(ii). The Debtors propose to pay Class 5 nothing, while paying in full Class 6 (Intercompany Claims), a class that is arguably subordinate to but at least equal in priority to Class 5 and leaving unimpaired Class 8 (Intercompany Interests), a class plainly junior to Class 5. The Debtor's proposal violates the absolute priority rule and should therefore be denied.

Code § 1129(b)(1) provides that a plan may be "crammed down" if it does not discriminate unfairly and is fair and equitable with respect to each dissenting, impaired class of claims and interests. 11 U.S.C. § 1129(b)(1). The condition that a plan be fair and equitable is satisfied with respect to a dissenting, impaired class of unsecured creditors when either (i) each claimant receives or retains on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim, or 2) that each holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property. *See* 11 U.S.C. § 1129(b)(2)(B)(i)-(ii); *In re Fur Creations By Varriale, Ltd.*, 188 B.R. 754, 761-62 (Bankr. S.D.N.Y. 1995). As the Second Circuit stated in *Iridium*, "this provision codifies the judge-made 'absolute priority rule,' which

---

[30] *Sentry, supra,* 264 B.R. at 865.

provided that any plan of reorganization in which 'stockholders [a]re preferred before the creditor, [is] invalid.'" *Iridium*, 478 F.3d at 463 (citing *Armstrong World Indus.*, 320 B.R. at 533)). As the *Iridium* decision instructs, *even outside the plan confirmation context*, the proponent of a compromise that deviates from the absolute priority rule must provide "specific and credible grounds to justify … deviation [from the absolute priority rule] and the court must carefully articulate its reasons for approval of the agreement." *Id.* at 466.

The Proposed Plan is not fair and equitable to Class 5 because it violates the absolute priority rule. Under well-established principles, anything less than payment in full to Class 5 precludes payment to Classes 6 and 8. Accordingly, the Proposed Plan may not be crammed down under Code § 1129(b).

**E.  The Proposed Plan Is Not Confirmable Because Debtors Cannot Carry Their Burden of Demonstrating the Satisfaction of the BIC Test in Respect of Class 5 Claims**

1.  The Standards For A Proper BIC Analysis

Code § 1129(a)(7) ("§ 1129(a)(7)") establishes the "BIC Test". Section 1129(a)(7) provides that a proposed plan of reorganization is only confirmable if:

> with respect to each impaired class of claims or interest – (A) each owner of a claim or interest of such class (i) has accepted the proposed plan; or (ii) will receive or retain under the proposed plan on account of such claim or interest property of a value, as of the effective date of the proposed plan, that is not less than the amount that such holder would so receive or retain if the debtor had liquidated under chapter 7 of this title on such date.

As with every other affirmative aspect of the plan confirmation requirements, the plan proponents (Debtors here) have the burden of establishing that the BIC Test is satisfied. *See, e.g., In re Global Ocean Carriers Ltd.,* 251 B.R. 31, 46 (Bankr. D. Del. 2000); *In re Trevarrow Lanes, Inc.*, 183 B.R. 475, 479 (Bankr. E.D. Mich. 1995); *In re Zaleha*, 162 B.R. 309, 316 (Bankr. D. Idaho 1993); *In re Future Energy Corp.*, 83 B.R. 470, 489 (Bankr. S.D. Ohio 1998).

In order to carry their burden, the Debtors must produce sufficient financial information about themselves, their assets and liabilities and their prospects to permit the bankruptcy court to judge whether best interest for confirmation has been satisfied. *See Global Ocean Carriers*, 251 B.R. at 46. A debtor proposing a chapter 11 plan of reorganization cannot satisfy its burden in respect of the BIC Test unless it presents "plausible, complete evidence" as to the current value of all of its assets. *See, e.g., In re Rusty Jones, Inc.*, 110 B.R. 362, 373 (Bankr. N.D. Ill. 1990). An appropriate analysis also must take into account all assets available for recovery in a chapter 7 case, including the potential recovery of preferences from creditors and insiders. *See In re Affiliated Foods, Inc.,* 249 B.R. 770, 788 (Bankr. W.D. Mo. 2000). As stated in *Affiliated Foods*:

> The valuation of a hypothetical chapter 7 for purposes of § 1129(a)(7)(ii) is not an exact science. "The hypothetical liquidation entails a considerable degree of speculation about a situation that will not occur unless the case is actually converted to chapter 7." *In re Sierra-Cal*, 210 B.R. at 172. It requires an estimation of the value of all of the bankruptcy estate's assets, including such hard to determine values as disputed and contingent claims, *id.*, the potential disallowance of claims (under § 502(d)), *id.*, the probability of success and value of causes of action held by the estate, *In re Texas Extrusion Corp.*, 844 F.2d 1142, 1158 (5th Cir. 1988), and, in this case, potential preference actions.[ftn] Additionally, some courts have considered more intangible sources of value such as the increased likelihood of a creditor recovering money through a structured settlement in a chapter 11 versus a difficult collection process in a chapter 7. *See In re Keck, Mahin & Cate*, 241 B.R. 583, 590-91 (N.D. Ill. 1999).
>
> On the other hand, although the valuation of a hypothetical chapter 7 is, by nature, inherently speculative, it must be based on evidence. *In re Voluntary Purchasing Groups*, 222 B.R. 105, 108 (Bankr. E.D. Tex. 1998).

249 B.R. at 788.

2.    The New Liquidation Analysis Is Inadequate

As noted, the Debtors' Disclosure Statement Liquidation Analysis did not even address Class 5 and simply assumes that the Pre-Petition Lenders are entitled to a recovery on all assets of the estates, even though the Debtors acknowledge that material assets were not subject to perfected liens in favor of the Pre-Petition Lenders.

The New Liquidation Analysis is also wholly inadequate.  Among other things, the New Liquidation Analysis is again presented on a consolidated basis – there is no attempt made to perform a liquidation analysis on a Debtor by Debtor basis.

Even if a consolidated liquidation analysis was acceptable (it isn't), the New Liquidation Analysis is largely an exercise in making unfair assumptions in order to achieve a result - - no recovery on Class 5 Claims.  The BDO Liquidation Rebuttal (Committee Exhibit 1) goes through each of these fallacious assumptions, with BDO reaching the following conclusions:

| | |
|---|---|
| Value of Avoidance Actions Recoveries: | $22-109 million |
| Value of Other Unencumbered Assets as of the Petition Date: | $63-71 million |
| Total Administrative and Priority Claims Payable Prior to a Distribution on General Unsecured Claims (Including Class 5 Claims): | $58 million[31] |

As such, there is a minimum of $ 27 million in reasonably projected liquidation proceeds in which Chapter 5 Creditors are entitled to share.  Debtors therefore fail the BIC Test.

The Committee will not review in this Objection all of the faulty assumptions/contentions contained in the New Liquidation Analysis - -BDO identifies each in the BDO Liquidation

---

[31] With respect to Avoidance Action Recoveries, the priority claims number is substantially reduced, as the Lenders have no recovery right against such Avoidance Action Recoveries, except as an unsecured creditor. *See* Discussion at footnote __, *supra*.

Rebuttal. *See generally*, Committee Exhibit 1. Three examples, however, are perhaps useful as exemplifying the slanted nature of the New Liquidation Analysis:

- The cost of the chapter 7 liquidation is estimated to be $27 million, all but approximately $6 million of which would be incurred in liquidating the Lenders' collateral. *See id.* at 33. The New Liquidation Analysis, however, assumes that a chapter 7 trustee would simply agree to exhaust all of the Unencumbered Assets of the Chapter 7 estate in order to maximize the Lenders' recovery on their secured claim (as opposed to simply abandoning the Lenders' collateral to them unless the Lenders were willing to fund the collateral liquidation for their benefit).

- In the asset section of the New Liquidation Analysis, it is assumed that the Debtors' have $9 million in equity in the LaSalle Securitization- - a reasonable assumption. In the claims section, however, Debtors project that LaSalle will have a $19 million priority deficiency claim. It is impossible for both of these projections to be accurate.

- There is no serious analysis of Avoidance Action Recoveries. In sum, the New Liquidation Analysis is little more than an exercise in inflating expenses and minimizing recoveries.

3.      No More Than $58 Million of the DIP Loan Can Be Assumed to Be Properly Payable From Unencumbered Assets

One aspect of a proper BIC analysis requires legal discussion -- the proper amount of the DIP Loan equitably payable from Unencumbered Assets.

As of April 18, 2008, the outstanding principal balance of the DIP Loan is projected to be $133 million. Only $58 million of this balance, however, was used for a purpose other than making payments on the Pre-Petition Debt. The Committee does not contest that this $58

million would be properly payable from Unencumbered Assets (but not Avoidance Action Recoveries) in the event of a chapter 7 liquidation.

The remaining portion of the DIP Loan - $75 million as of April 18, 2008 - should not be first payable from Unencumbered Assets. To the contrary, it is reasonable to assume that, in a chapter 7 liquidation, the Court would exercise its equitable authority to require the DIP Lenders to marshal and to obtain payment from the Debtors' encumbered assets.

A chapter 7 trustee is given the rights and powers of a lien creditor as of the date of the bankruptcy filing. *See* 11 U.S.C. § 544(a)(1); *General Electric Credit Corp. v. Nardulli & Sons, Inc.*, 836 F.2d 184 (3d Cir. 1988) (trustee's hypothetical lien creditor status determined as of date of bankruptcy filing, not subsequent conversion of case).

Courts in this district and others have held that a chapter 7 trustee, armed with the strong arm powers given to him under section 544(a)(2), has standing to request the marshalling of a debtor's assets. *See, e.g.*, *In re Tampa Chain Co., Inc.*, 53 B.R. 772, 777 (Bankr. S.D.N.Y. 1985) ("*Tampa Chain*"); *Herkimer County Trust Co. v. Swimelar (In re Prichard)*, 170 B.R. 41, 45 (Bankr. N.D.N.Y. 1994) (Gerling, C.J.); *see also Trust Co. v. Sebert Lumber Co. (In re Vermont Toy Works, Inc.)*, 135 B.R. 762 (D.Vt. 1991) ("*Vermont Toy*") (reversing bankruptcy court decision granting marshalling). Section 544(a)(2) gives a chapter 7 trustee the rights and powers of an unsatisfied execution creditor as of the commencement of the bankruptcy case. *Tampa Chain*, 53 B.R. at 777 (citing section 544(a)(2) of the Code). These rights and powers are governed by state law because marshalling involves competing property interests. Under New York law, the trustee is deemed a secured creditor with "rights to personal property of a debtor served with a writ of execution superior to all but prior secured creditors and bona fide purchasers for value." *Id.* at 777-78 (*quoting* New York CPLR §5202(a)). Accordingly, a

chapter 7 trustee, as a deemed secured creditor, would have standing to seek marshalling of the Debtors' assets.

As the court in *Tampa Chain* noted, "bankruptcy courts have long had the power to marshal the debtor's assets on [sic] order to effectuate an equitable distribution of funds to creditors of the debtor's estate." *Tampa Chain*, 53 B.R. at 777 (citing *Meyer v. U.S.*, 375 U.S. 233, 236-237, 84 S.Ct. 318 (1963)). Marshalling assets is "an equitable doctrine developed to prevent injustice to junior creditors and foster fair dealing, justice and common honesty." *Craner v. Marine Midland Bank, N.A. (In re Craner)*, 110 B.R. 111, 122 (Bankr. N.D.N.Y. 1988) (citation omitted). The Supreme Court stated that the purpose of marshalling is "to prevent the arbitrary action of a senior lienor from destroying the rights of . . . all who have an interest in the property involved." *Meyer v. U.S.*, 375 U.S. at 237. Thus, where one creditor can reach two funds of the debtor and another creditor can reach only one of those two funds, a court will require the first creditor to attempt to collect his claim out of the asset unavailable to the second creditor. *See In re Williams Communications Group, Inc.*, 337 B.R. 490, 494 (Bankr. S.D.N.Y. 2005) (approving channeling fund order requiring securities fraud claimants to look first to insurance proceeds for payment on their claims, noting that such result was in accordance with the equitable dictates of marshalling). Because it is an equitable doctrine, however, courts will not apply marshalling to the detriment of senior or junior lien creditors. *See*, *e.g.*, *Prichard*, 170 B.R. at 45 ("If it is shown that the creditor holding a superior lien will be delayed or inconvenienced in the collection of its debt, the doctrine cannot be applied.") (citations omitted); *In re Borges*, 184 B.R. 874, 880 (Bankr. D. Conn. 1995).

Marshalling requires three elements: (1) two or more creditors of the same debtor, also known as the "common debtor" requirement;[32] (2) multiple funds belonging to that debtor; and (3) one creditor having the ability to resort to all of the funds, while the creditor seeking marshalling can reach only one. *Prichard*, 170 B.R. at 45.

Courts have held that a trustee's judicial lien status entitles it to compel a secured creditor to marshal a debtor's assets *for the benefit of the estate*. For example, in *Berman v. Green (In re Jack Green's Fashions for Men Big and Tall, Inc.)*, 597 F.2d 130 (8th Cir. 1979) ("*Jack Green's Fashions*"), the Eighth Circuit upheld a decision requiring a secured creditor to marshal assets simply by reference to general principles of equity. In that case, a bank made two loans to a corporation and took a security interest in the assets of the corporation and in personal real estate holdings of the guarantors, who were the corporation's controlling shareholders. The corporation and the shareholders filed for bankruptcy. The chapter 7 trustee sought an order requiring the bank to proceed first against the shareholders' assets before going after the corporate assets. The court granted the request with no finding of fraud and without piercing the corporate veil. *Jack Green's Fashions*, 597 F.2d 130, 132. As the District Court noted, the Bankruptcy Court found that:

> [U]nder the facts of this case, it would be grossly unfair to the general creditors not to apply the doctrine of marshalling. They

---

[32] There are three exceptions to the "common debtor" requirement: (1) where the nondebtor that owns the non-shared collateral is the alter ego of the debtor; (2) where the nondebtor's property should equitably be deemed a capital contribution to the debtor; and (3) where the debtor has engaged in inequitable conduct. *See In re Sunset Hollow Properties, LLC v. Bank of Western Massachusetts (In re Sunset Hollow Properties, LLC)*, 359 B.R. 366, 379 (Bankr. D. Mass. 2007) (citing *Borges*, 184 B.R. at 879, n. 3 (Bankr. D. Conn. 1995); *see also Vermont Toy*, 82 B.R. 258, 323 (Bankr. S.D.N.Y. 1987) (bankruptcy court's ruling that exceptions to the "common debtor" or "two fund" requirements should be applied when the moving party presents clear and convincing evidence of the basis of the exception and inequitable conduct by the entity whose assets are the subject of marshalling); *cf. Kittay v. Atlantic Bank of N.Y. (In re Global Service Group LLC)*, 316 B.R. 451, 463 (Bankr. S.D.N.Y. 2004) (discussing exception to "common debtor" element but finding that chapter 7 trustee failed to plead a basis to pierce the corporate veil to treat as alter egos the corporate debtor and its controlling shareholder who provided the primary collateral for the operating loan to the company).

> are the ones who sold the inventory on open account to the
> bankrupt which fell under the bank's lien.

*Jack Green's Fashions*, 65 B.R. 317, 319 (W.D. Mo. 1978).  Echoing the Bankruptcy Court and

District Court, the Eight Circuit noted that "in this case it would be in the highest degree

inequitable to allow the Bank to exhaust the business assets … without first looking to the real

estate mortgaged to it.  To permit such a course would leave the general creditors of the business

with nothing."  *Jack Green's Fashions*, 597 F.2d at 133.

Similarly, in *In re Hazen*, 96 B.R. 924 (W.D. Mo. 1988), the chapter 7 trustee moved to

compel a secured creditor to marshal assets.  In that case, a bank had a security interest in

inventory proceeds (due to its predicate security interest in the inventory) that was superior to

that of the trustee, as well as a second mortgage in a piece of real property in which the trustee

had no interest.  Thus, the bank had positions senior to the trustee in both funds, the inventory

proceeds and the real estate, but the trustee had an interest only in the inventory proceeds.  The

court noted that it was irrelevant that the bank's lien on the real estate was junior to the lien of

another secured creditor.  The court concluded that the trustee satisfied the elements of

marshalling, and affirmed the bankruptcy court's decision requiring the bank to look first to the

real estate to satisfy its claim against the debtor.  *Id*. at 929.

In these Cases, there are two related reasons why marshalling is compelled in order to

require the DIP Lenders to satisfy the DIP Loan from encumbered assets.  First, the Pre-Petition

Lenders have already benefited directly from $75 million in DIP Loans, as this portion of the

DIP Loans was used solely to satisfy the 2008 Loans and make adequate protection payments.

Imposing marshalling simply restores the Pre-Petition Lenders to the collateral position they held

as of the Petition Date.

Second, marshalling is particularly justified here because the Court approved the $65 million DIP Loan based on representations that, in retrospect, were not accurate. As discussed above, the Court was advised at the First Day Hearing that the 2008 Loans were properly rolled into the DIP Loan because the 2008 Loans were fully secured and accruing very high interest. *See* Financing Motion at ¶ 19; Committee Exhibit 3, Feb. 28, 2008 Hrg. Tr. at 32-33.

The Debtors' counsel repeated these contentions at the Final Hearing and further assured the Court that "there was no prejudice done to any creditor" by rolling the 2008 Loans into the DIP Loan:

> [The lenders in respect of the 2008 Loans] put the money in at the top and we believe that that was perfectly appropriate and that that further justifies the rollup in the sense that that was a money-good loan under any reckoning. And I wouldn't expect the committee or Triple Net to get up and argue that this company's value was less than that sixty-five million dollar number.
>
> Your Honor, so, again, the 2008 loans conferred a benefit and no burden and there was no prejudice done to any creditor by rolling those loans . . . .
>
> … One, with regard to their argument that the 2008 loans were unsecured, I think my prior comments covered that. The 2008 loans were at the top of the food chain, not at the bottom, and thus there was no payment or improvement in position by paying those fully collateralized, fully secured money-good claims in the rollup, number one.

Committee Exhibit 143, Feb. 28, 2008 Hrg. Tr. at 72-76 (emphasis added).

These contentions by the Debtors (without any documents for the Court to review in order to verify their accuracy) were presumably a fundamental consideration of the Court in permitting the Debtors to transform the 2008 Loans from a pre-petition loan into an administrative claim secured by previously unencumbered assets. The contentions, however, are inaccurate – a review of the Tenth Amendments and Eleventh Amendments (Committee Exhibits

6 and 7) make clear that the 2008 Loans are not separate, fully-secured credit facilities. The 2008 Loans were nothing more than an additional advance under the existing Pre-Petition Credit Facility which served to increase the amount of the Pre-Petition Debt. Other holders of the Pre-Petition Debt did not subordinate their new lien to a lien in favor of the Lenders who made the 2008 Loans – there is only one lien and one set of "Obligations" secured by that lien. *See* Tenth Amendment at § 2, 7; Eleventh Amendment at § 2, 14. There is no "collateral waterfall" -- there is simply a "payment waterfall." The 2008 Loans were "at the top" only in the sense that the Pre-Petition Lenders agreed among themselves that any payment on the Pre-Petition Debt would be applied first to repay principal and interest on the 2008 Loans. *See id*. This prioritization is an irrelevancy to the Debtors – it is an inter-lender issue. The 2008 Loans therefore were not oversecured – the 2008 Loans were simply a component of the undersecured Pre-Petition Debt.

As such, by rolling the 2008 Loans into the DIP Financing, the Debtors did not save interest expense as represented to the Court at the First Day Hearing. Rather, the Debtors increased their interest expense by incurring an additional $65 million in administrative debt.

The transformation of the 2008 Loans into the DIP Loans also obviously constituted a dramatic improvement in the Pre-Petition Lenders' position to the detriment of Class 5 Creditors as the $65 million in question now continues to accrue interest post-petition and has become collateralized by the Unencumbered Assets. Unless the DIP Lenders are required to seek repayment of this $65 million from encumbered assets, the "prejudice" to other creditors (which Debtors' counsel assured the Court did not exist) would in fact be enormous. Class 5 Creditors will lose $65 million in Unencumbered Asset value for no legitimate reason. The Committee respectfully submits that equity compels marshalling in these circumstances to rectify the harm to Class 5 Creditors caused by this portion of the DIP Loan.

If the Court were to require the DIP Lenders to seek recovery of $75 million ($65 million in respect of the 2008 Loans and $10 million borrowed for adequate protection and interest payments) from encumbered assets, the value of the Unencumbered Assets (even excluding Avoidance Action Recoveries) would exceed the $58 million remaining portion of the DIP Loan. *See* BDO Liquidation Rebuttal at p. 13. Class 5 Creditors would be entitled to a recovery from the Unencumbered Assets in a chapter 7 liquidation. The Debtors can not satisfy the BIC Test for this reason as well.

F.   **The Proposed Plan is Not Fair and Equitable to Class 5 Creditors Because the Pre-Petition Lenders Are Receiving Distributions On A Claim Which Is Not Currently Allowable Under Code Section 502(d)**

Code § 502(d) ("§ 502(d)") provides as follows:

> "(d) Notwithstanding subsections (a) and (b) of this section, the court shall disallow any claim of any entity from which property is recoverable under section 542, 543, 550 or 553 of this title or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of this title.

The Pre-Petition Lenders are obviously receiving a distribution of estate assets of enormous value under the Proposed Plan (while Class 5 Creditors receive nothing). At this time, however, the Pre-Petition Lenders do not even have an allowed claim pursuant to § 502(d). The Pre-Petition Lenders cannot have such an allowed claim under § 502(d) until the preference issues concerning the Pre-Petition Lenders discussed above are resolved and the Pre-Petition Lenders have returned to the estate the preferential transfers they are determined to have received. The Proposed Plan is not fair and equitable to Class 5 Creditors for this reason as well.

**G.** **The Proposed Plan is Not Confirmable to the Extent it Seeks to Discharge the Unnamed Customer Illegal Pricing Claims**

1. Known Creditors Are Entitled to Actual Notice of Confirmation

The Debtors/Lenders are attempting to discharge the Illegal Pricing Claims as might be asserted by the Unnamed Customers. In essence, the Debtors seek the discharge of potentially tens of thousands of customer claims against them simply by sending actual notice of these Cases to a few named plaintiffs on a complaint seeking class relief. (As mentioned, the "class" in question has not yet even been certified and therefore does not exist.) Any such discharge violates the due process rights of the Unnamed Customers as set forth below. The Proposed Plan is not confirmable for this reason as well.

As a general matter, a debtor's plan of reorganization, once confirmed, binds the debtor and all creditors, whether or not a creditor is impaired or has accepted the plan. *See* 11 U.S.C. § 1141(a). However, discharge under the Code presumes that all creditors bound by the plan have been given notice sufficient to satisfy due process. *See Waterman Steamship Corp. v. Aguiar (In re Waterman Steamship Corp.)*, 157 B.R. 220, 222 (Bankr. S.D.N.Y. 1993) ("*Waterman Steamship*") (finding that known claimants entitled to actual notice); *In re Turning Point Lounge, Ltd.*, 111 B.R. 44, 47-48 (Bankr. W.D.N.Y. 1990) (holding that claim not discharged where debtor did not schedule claim or provide notice or bar date or confirmation hearing and claimant had no opportunity to participate in reorganization); *Solow Building Co., LLC v. ATC Associates, Inc.*, 175 F. Supp. 2d 465, 471 (E.D.N.Y. 2001) ("Inadequate notice is a defect which precludes discharge of a claim in bankruptcy.") (quoting *Chemetron Corp. v. Jones*, 72 F.3d 341, 346 (3d Cir. 1995); *see also In re U.S.H. Corp.*, 223 B.R. 654, 659 (Bankr. S.D.N.Y. 1998) (same).

Due process is met if notice is "reasonably calculated to reach all interested parties, reasonably conveys all of the required information, and permits a reasonable amount of time for response." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950) ("*Mullane*"). The Supreme Court explained further that:

> An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.

*Id.* at 314; *see also In re XO Communications, Inc.*, 301 B.R. 782, 792 (Bankr. S.D.N.Y. 2003).

The type of notice required depends on whether the creditor is "known" or "unknown." When a creditor is unknown to the debtor, publication notice may satisfy the requirements of due process. *Mullane*, 339 U.S. at 317. However, if a creditor is known to the debtor, notice by publication is not constitutionally reasonable, and actual notice of the bankruptcy filing and relevant bar dates must be afforded to the creditor in order to warrant a legally effective discharge of the creditor's claim. *In re U.S.H. Corp. of New York*, 223 B.R. 654, 658-659 (Bankr. S.D.N.Y. 1998); see also *City of New York v. N.Y., New Haven & Hartford R.R. Co.*, 344 U.S. 293, 296, 73 S. Ct. 299 (1953). Actual notice must be sent directly to a creditor unless the creditor's agent directs otherwise in a request filed with the bankruptcy court. *See In re R.H. Macy & Co., Inc.*, 161 B.R. 355, 360 (Bankr. S.D.N.Y. 1993) (citing Bankruptcy Rule 2002(g)).

Under such circumstances, if actual notice is not afforded, the known creditor's claims cannot be discharged. *See, e.g., U.S.H. Corp.*, 223 B.R. at 659. Moreover, a creditor who is not given notice, even if it has actual knowledge of the reorganization, does not have a duty to investigate or inject itself into the proceedings. *See*, *e.g.*, *In re Brunswick Hospital Center, Inc.*, 1997 WL 836684, at *15 (Bankr. E.D.N.Y. 1997); *In re General Oil Distributors, Inc.*, 68 B.R. 603 (Bankr. E.D.N.Y. 1986) (debtor's failure to give claimant notice of bar date and

confirmation excused claimant from filing a claim and barred a discharge of his debt under the plan even though creditor had actual knowledge of the bankruptcy case).

> 2.    The Unnamed Creditors Are "Known Creditors" – Debtors Obviously Know the Identity of Their Customers

The Debtor clearly must be charged with knowing that thousands of Unnamed Customers may have a claim against them -- a class action asserting customer claims has been commenced prior to the Petition Date.  Such information makes the Unnamed Customers potentially holding such claims, although the subject of litigation, "known" creditors entitled to actual, personal notice of confirmation.

The Unnamed Customer claims here resemble those at issue in *Waterman Steamship*, a case in which a chapter 11 debtor sought to enjoin the continuation or commencement of asbestosis claims by seamen after confirmation of the debtor's plan.  The seamen sought a declaratory judgment that such claims were not discharged under the Proposed Plan.  The District Court found that the Bankruptcy Court, by granting summary judgment in favor of all asbestosis claimants, had not conducted the proper inquiry with respect to the type of notice to which such claimants were entitled.  The court ruled that all former seamen who were known to be actual or potential claimants that had manifested signs of the disease were entitled to actual, personal notice in order to permit such claimants "to perceive the significance and implications of the information."  157 B.R. at 222.  Significantly, the court indicated that neither notice by publication nor *through a lawyer representing them in another proceeding* sufficed.[33]  *See id.* The case was therefore remanded to the Bankruptcy Court.  *See id.*

---

[33]  Even in class action cases, although class representatives generally bear the burden of prosecuting their own cases and providing notice to class members, district courts may require a defendant's cooperation in identifying the class members to whom notice must be sent in certain circumstances, including where the defendant may be able to perform the task with less difficulty or expense than the class representative.  *See Oppenheimer Fund, Inc. v.*

(continued)

The Debtors' failure to provide actual notices to its known, Unnamed Customers is designed to impair such creditors' due process rights. This failure to provide notice dooms any attempt at discharge of such Unnamed Customers' claims.

**H.      Substantive Consolidation is Not Appropriate As It Is Potentially Inequitable to the Unnamed Customers and Other Class 5 Creditors and Has No Purpose Except to Gerrymander**

Finally, the Debtors propose through their Proposed Plan to effectuate a substantive consolidation. The Debtors' only explanation for substantive consolidation offered in discovery is that Debtors' intercompany accounts are "hopelessly commingled." *See* Committee Exhibit 14, Kruse Report at *passim*. This explanation, of course, is something of an absurdity since intercompany claims are left unimpaired under the Proposed Plan, and could be left equally unimpaired under sixty separate reorganization plans. The condition of Debtors' intercompany accounts is simply an irrelevancy in these cases – Debtors' argument is a pretext.

The only apparent purpose of the substantive consolidation is to gerrymander a consenting impaired class in respect of the Non-Obligor Debtors (as well as perhaps attempting to solve absolute priority rule problems by assuming away the Debtors' equity interests in each other). Courts, including the Second Circuit, have warned against the use of substantive consolidation to basically manipulate the plan process for the benefit of only certain creditors. Indeed, the "sole purpose of substantive consolidation is to ensure the equitable treatment of *all* creditors." *In re Augie/Restivo Baking Co., Ltd.*, 860 F.2d 515, 518 (2d Cir. 1988)).

Therefore, as discussed below, the Debtors have failed to meet their substantial and heavy burden in satisfying the Second Circuit's test for substantive consolidation.

---

(continued)
*Sanders*, 437 U.S. 340, 355, 98 S. Ct. 2380 (1978). Here, as mentioned, although there is a pending Class Action, the class has not even been certified. In any event, the Debtors are also obviously in a better position than the Named Customers to identify the members of the class whose claims they are seeking to discharge.

1.      <u>Due Process and Notice Concerns</u>

Because of the potential impact on creditors that substantive consolidation might have in a case, the Court and the Committee, as well as creditors and parties in interest, must thoroughly review and understand the Debtors' reasons and basis for the proposed consolidation.  *See generally FDIC v. Colonial Realty Co.*, 966 F.2d 57, 61 (2d Cir. 1992) ("[o]nly through *a searching review of the record*, on a case-by-case basis, can a court ensure that substantive consolidation effects its sole aim: fairness to all creditors") (emphasis added).  Yet, neither the Proposed Plan nor the Disclosure Statement contains *any* explanation of the basis for substantive consolidation.[34]  Only recently has the Committee begun receiving documents and information in response to its discovery requests in order to understand the Debtors' purported need for such relief under the Proposed Plan.  The Committee's opportunity to obtain and analyze any supporting information from the Debtors has been truncated, to say the least.

---

[34] The Debtors' apparent desire to shorten the Committee's review process is also evidenced by the Debtors' attempt to do away with the filing of their Schedules.  The Debtors unsuccessfully sought to have the deadline extended until April 20, 2008, unless the Proposed Plan were to be confirmed before then, in which case they requested a waiver of filing any Schedules.  *See Motion of the Debtors for an Order (A) Granting an Extension of Time to File the Schedules and Statements of the Debtors' Financial Affairs, and (B) Permanently Waiving the Requirement to File the Schedules and Statements Upon Confirmation of the Debtors' Prepackaged Proposed Plan of Reorganization* [Docket No. 91].

Incredibly, the Debtors asserted in such motion that preparation and filing of the Schedules was not necessary and would be "duplicative" because "much of the information that would otherwise be contained in the Schedules and Statements is already available in the Disclosure Statement and the Debtors' filings with the Securities and Exchange Commission."  *Id.* at ¶ 13.  As noted above, the Disclosure Statement is completely <u>devoid</u> of information justifying substantive consolidation.  Any SEC filings also lack the level of detail on assets, liabilities and financial operations for each Debtor (including whether a particular Debtor may be solvent) that would and should be provided in the Schedules.

2.      Because Substantive Consolidation is an Extraordinary Equitable Remedy, the
        Second Circuit Has Adopted an Exacting Test, and the Debtors Have a Heavy
        Burden in Satisfying Such Test

The Second Circuit has pronounced that substantive consolidation is only appropriate

where the plan proponent has established through a factual record the existence of one of the two

following factors:

> (i) creditors dealt with the entities as a single economic unit and
> did not rely on their separate identity in extending credit; or (ii) the
> affairs of the debtors are so entangled that consolidation will
> benefit all creditors.

*Augie/Restivo*, 860 F.2d at 518 (internal citations omitted).

Substantive consolidation is an extraordinary remedy that vitally affects the substantive

rights of creditors.  Such relief may potentially redistribute wealth among the various estates'

creditors.  *Colonial Realty*, 966 F.2d at 61 (potential for unfairness may arise where "the entities

to be consolidated … have different debt-to-asset ratios [which effectively and] 'almost

invariably redistributes wealth among the creditors of the various entities'"; citations omitted).

The Second Circuit has therefore mandated that this mechanism must be applied "*sparingly*

because of the possibility of unfair treatment to creditors."  *Colonial Realty*, 966 F.2d at 61

(emphasis added) (citing, *inter alia*, *Augie/Restivo*, 860 F.2d at 518; *Chemical Bank New York

Trust Co. v. Kheel*, 369 F.2d 845, 847 (2d Cir. 1966)).  *See also Augie/Restivo*, 860 F.2d at 518

("[r]esort to consolidation … should not be Pavlovian).[35]

---

[35] Some courts outside of the Second Circuit have opined that there is a "modern trend" or "liberal trend" in the case
law towards allowing substantive consolidation.  *See e.g., In re Affiliated Foods, Inc.*, 249 B.R. 770, 776 (Bankr.
W.D. Mo. 2000).  However, the Second Circuit has not noted any such "trend" and not deviated from the exacting
test set forth in *Augie/Restivo*.  Indeed, as discussed above, the potential harm to some creditors through the
redistribution of wealth or otherwise if substantive consolidation were granted heavily militates against any relaxing
of the Second Circuit's standards.  *See also Owens Corning*, 419 F.3d at 209, n. 15 (discussing and following
*Augie/Restivo* test; "we disagree with the assertion of a 'liberal trend' toward increased use of substantive
consolidation").

Such judicial restraint is especially required because "substantive consolidation has no express statutory authority but is a product of judicial gloss." *Augie/Restivo*, 860 F.2d at 518 (explaining that authority for substantive consolidation is court's general equitable powers under § 105). *See also Owens Corning*, 419 F.3d at 205, 211 (stating that "[s]ubstantive consolidation, a construct of federal common law, emanates from equity" and "because substantive consolidation is extreme (it may affect profoundly creditors' rights and recoveries) and imprecise, *this 'rough justice' remedy should be rare and, in any event, one of last resort*") (emphasis added). *In re Owens Corning*, 419 F.3d 195 (3d Cir. 2005), *amended on other grounds*, 2005 U.S. App. LEXIS 18043 (3d Cir. 2005), *and* 2007 U.S. App. LEXIS 25525 (3d Cir. 2007)

In line with the foregoing admonishments, the party proposing substantive consolidation bears the heavy and substantial burden of proving the necessity and propriety of such relief, a burden which the Debtors cannot satisfy. *See, e.g., Reider v. FDIC (In re Reider)*, 31 F.3d 1102, 1109 (11th Cir. 1994) ("[t]he burden is upon the proponent of a motion for consolidation and is exacting"; citation omitted); *In re Avery*, 377 B.R. 264, 269 (Bankr. D. Alaska 2007) (same); *Fishell v. Soltow (In re Fishell)*, 1995 U.S. Dist. LEXIS 7461, at *4-*5 (W.D. Mich. 1995), *aff'd*, 1997 U.S. App. LEXIS 8394 (6th Cir. 1997) ("The moving party has the burden of proof in consolidation of cases…. The burden is substantial."); *In re Snider Bros., Inc.*, 18 B.R. 230, 238 (Bankr. D. Mass. 1982) (similar). *See also In re Adelphia Communications Corp.*, 368 B.R. at 219 (noting the "very high standards the Second Circuit imposes to justify substantive consolidation").

3.     <u>There is No Factual Justification For Substantive Consolidation Under Either Prong of the Second Circuit's Test</u>

    a.     <u>The Debtors Must Prove Either *Augie/Restivo* Prong In Relation to Each and Every Debtor</u>

Under the Proposed Plan, the Debtors seek the substantive consolidation of all sixty Debtors into a single estate – not piecemeal consolidation of only some of the Debtors.  As such, the Debtors must demonstrate that either of the two prongs under *Augie/Restivo* is satisfied vis-à-vis each Debtor.  Thus, for example, the Debtors' burden is to show not just that <u>some</u> Debtor entities are hopelessly entangled, but that <u>each</u> of the entities to be consolidated is hopelessly entangled with the others.  *See, e.g., Fishell*, 1995 U.S. Dist. LEXIS 7461, at *5 ("[t]he proponent must show that a substantial identity exists between <u>the entities to be consolidated</u>") (emphasis added).

    b.     <u>Not All of the Debtors Were Run as a Single Economic Unit, and Some Creditors, Including the Pre-Petition Lenders Themselves, Accordingly Treated the Debtors as Separate Entities</u>

As indicated, the Debtors cannot meet this burden of proof.  The Debtors themselves did not view themselves as a "single unit" as their operations and affairs were broken down into several units or divisions, instead of a single unit.  As previously indicated:

- The Debtors made SEC filings with financials broken out by their various business units.  *Seegenerally* Committee Exhibit 10, SIRVA 10-Q ().

- The Debtors engaged in a securitization program involving only SIRVA Relocation LLC and only certain Debtors and nondebtor affiliates; Gathany Affidavit at ¶¶ 53-56.  The Debtors operated a cash flow system used by moving services operating segment, relocation business segment (including Debtor SIRVA Relocation LLC, which has separate accounts), and Debtor Executive Relocation Corporation.  *See id.* at ¶ 124.

- The Debtors were capable of filing Schedules on a Debtor-by-Debtor basis.

- The Debtors negotiated with the Pre-Petition Lenders concerning the specific Debtors that were to be obligated on the Pre-Petition Credit Facility.

Even if the Debtors subjectively view(ed) themselves as one conglomerate, the Debtors' "view" is not determinative in any event. *See In re 599 Consumer Electronics, Inc.*, 195 B.R. 244, 249 (S.D.N.Y. 1996). The first prong of the Second Circuit's test focuses on the view of the *creditors* rather than that of the debtor. *See id.* ("[t]he inquiry is whether *creditors* treated the debtors as a single entity") (emphasis in original). In *Augie/Restivo*, for example, the court denied substantive consolidation, relying in part on the fact that one objecting creditor had extended credit to one of the two debtors prior to a merger and based its decision solely on the financial condition of the one debtor. *See Augie/Restivo*, 860 F.2d at 519.

Moreover, a court must look at the perspective/reliance of the creditor body and not just that of the creditors opposing substantive consolidation. *See Augie/Restivo*, 860 F.2d at 519. Indeed, in *Augie/Restivo*, the court denied consolidation in large part due to the reliance of Manufacturers Hanover (a creditor who would have benefited from, and thus supported, consolidation), which evidenced its own reliance on and recognition of the existence of separate entities by having demanded prepetition a guaranty from one debtor entity for a loan to another debtor. *See id.* Ironically, here, the prepetition actions of the Pre-Petition Lenders – co-architects of the Proposed Plan – clearly demonstrate that creditors dealt with the Debtors on an individual, separate basis. The Pre-Petition Lenders recognized the separateness of the Debtors, having negotiated and executed prepetition financing arrangements and guarantees with only 37

of the 60 Debtors.[36]  *See generally Augie/Restivo*, 860 F.2d at 518-19 ("[C]reditors who make

loans on the basis of the financial status of a separate entity expect to be able to look to the assets

of their particular borrower for satisfaction of that loan.  Such lenders structure their loans

according to their expectations regarding that borrower and do not anticipate either having the

assets of a more sound company available in the case of insolvency or having the creditors of a

less sound debtor compete for the borrower's assets.").  *See also In re Convalescent Center of*

*Roanoke Rapids, Inc.*, 2006 Bankr. LEXIS 4484 (Bankr. E.D.N.C. Aug. 7, 2006) (although

debtor entities shared some financial and management resources, consolidation denied where,

among other things, "the bulk of the creditors are unique to each debtor" meaning that creditors

are "looking to a specific [debtor's] case for payment").

    Harm to a minority of creditors is also a sufficient ground to deny consolidation,

irrespective of whether consolidation would benefit most other creditors.  *Augie/Restivo*, 860

F.2d at 521 (substantive consolidation denied where one creditor would suffer for the benefit of

other creditors).[37]  That is, the good of the whole should not outweigh the harm to the few.  As

observed by the Second Circuit:

> [A] creditor cannot be made to sacrifice the priority of its claims
> against its debtor by fiat based on the bankruptcy court's
> speculation that it knows the creditor's interests better than does
> the creditor itself.  The rationale of the bankruptcy judge in the
> instant case would allow consolidation of two completely unrelated

---

[36]  Other creditors have also filed pleadings in this case, explaining that they relied upon the separate credit of
particular Debtors and viewed such entities as stand-alone companies.  *See, e.g., Objection by Triple Net Investments*
*IX, LP, to, and Request for Reconsideration of Interim Relief Already Granted for, Debtors' Motion for Interim and*
*Final Orders (A) Authorizing Debtors to Obtain Post Petition Secured Financing, and Utilize Cash Collateral; (B)*
*Granting Adequate Protection to Pre Petition Secured Lenders; and (C) Scheduling Final Hearing* [Docket No.
119] at ¶ 11 ("In negotiating and entering in the Lease, Triple Net dealt exclusively with [Debtor, North American
Van Lines, Inc.] as a stand alone entity, which never offered its parent or other affiliates as guarantors of North
American's obligations under the Lease.").

[37] Because 23 of the Debtors are not obligors or guarantors under the Pre-Petition Credit Facility, it is conceivable
that some creditors of these specific Debtors may have greater recoveries if all of the estates were not consolidated.

> companies upon a finding that the creditors would be better off
> under some proposed plan involving the joint sale of their assets.
> The proposed plan would then be approved under "cram-down"
> provisions that would subordinate the wishes of the creditors of
> one debtor to those of the other. We do not read the bankruptcy
> code to allow such a result.

*Augie/Restivo*, 860 F.2d at 520. *See also Owens Corning*, 419 F.3d at 215

("substantive consolidation should be used defensively to remedy identifiable

harms, not offensively to achieve advantage over one group in the proposed plan

negotiation process (for example, by deeming assets redistributed to negate

proposed plan voting rights) …."). Debtors therefore cannot satisfy the first

prong of the *Augie/Restivo* test.

c.       Debtors Can Not Prove Their Assets, Liabilities and Affairs Are
         Hopelessly Entangled

As indicated, the Debtors advised the Court on the Petition Date that "Debtors maintain

records of all fund transfers and can ascertain, trace and account for Intercompany Transactions."

Gathany Affidavit at ¶ 142. The Debtors have now submitted the Kruse Report, however,

contradicting Mr. Gathany. The Debtors' position now is that the Debtors' intercompany

accounts are so "hopelessly entangled" that substantive consolidation will benefit all creditors.

*See* Committee Exhibit 14, Kruse Report at *passim*.

Second Circuit decisions confirm that the "hopeless entanglement" prong turns not on

accounting difficulties but on a fundamental inability to identify which assets and liabilities

belong to which debtor without swallowing up the recoveries for the estates' creditors. *See id.* at

519 (entanglement necessary to justify consolidation must reach "the level of 'hopeless[]

obscure[ity]' of 'interrelationships of the group'" (citing *Kheel*, 369 F.2d at 847); denying

consolidation where "[other debtor's] real property and equipment appear to be traceable [and]

[t]he record also indicates that each company's inventory, liabilities and receivables … are identifiable"); *Kheel*, 369 F.2d at 847 (effort to unscramble entities' financial affairs must be "so substantial as to threaten the realization of any net assets for all the creditors"; ordering substantive consolidation because of "expense and difficulty amounting to *practical impossibility* of reconstructing the financial records of the debtors to determine intercorporate claims, liabilities and ownership of assets") (emphasis added).

The Debtors' assets and liabilities are not so "hopelessly entangled." The Debtors have had no trouble identifying the Non-Obligor Debtors. The Debtors also had no difficulty identifying the specific Debtors they believed to be obligated in respect of Class 5 Claims. Again, the Debtors have filed Schedules identifying the assets and liabilities for each Debtor. The Debtors therefore also cannot satisfy the "hopeless entanglement" prong of the *Augie/Restivo* test.

The Kruse Report contends that substantive consolidation is appropriate because it would be a mind-boggling exercise to make sense the Debtors' intercompany claims, the cost of which "could easily exceed $100 million". Committee Exhibit 14, Kruse Report at ¶ 69. The Kruse Report, however, is built on a straw man. An inadequate intercompany claim accounting system presumably could be a material, substantive consolidation consideration in respect of some other plan of reorganization. Under the Proposed Plan being considered here, however the issue is an irrelevancy - - no creditor or party in interest has even suggested that the Debtors' inability to articulate intercompany claims against each other are of any significance whatsoever. The Proposed Plan leaves intercompany claims unimpaired. The obvious import of the Kruse Report is that the intercompany claims (whatever they are) are unprovable. Intercompany claims will never be enforced or collected. In sum, the Debtors are basing their requests for extraordinary

relief- - substantive consolidation- - based on intercompany accounting issues that matter to no one.

        d.      <u>The Debtors' Suspect Motivation Behind the Substantive Consolidation Construct</u>

The "*sole* purpose of substantive consolidation is to ensure the equitable treatment of *all* creditors." *Augie/Restivo*, 860 F.2d at 518 (emphasis added). *Accord*, *Colonial Realty*, 966 F.2d at 61 ("sole aim" of substantive consolidation is "fairness to all creditors"). Such extraordinary relief cannot be granted for any other purpose.

Code § 1129(a)(10) ("§ 1129(a)(10)") provides that, in order for a plan to be confirmable:

> If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider.

Certainly, the *Augie/Restivo* court did not countenance a gerrymandering basis for the substantive consolidation remedy that is in all events to be "sparingly used":

> Courts confronted with similar gerrymandering motivations of a plan proponent have recognized the patent impropriety of ordering substantive consolidation in such circumstances. *See, e.g.*, *In re Central European Industrial Development Co. LLC*, 288 B.R. 572 (Bankr. N.D. Cal. 2003) . .
>
> "[S]ubstantive consolidation via a proposed plan would require the affirmative vote of each class of each of debtors' creditors, counted before consolidation. As Lehman is the only creditor of TKGE, there could be no affirmative vote for such consolidation in view of its adamant opposition to Debtors' efforts in these cases. Stated otherwise, the democratic process found to be so critical by the court in [*In re Orfa Corp. of Philadelphia*, 129 B.R. 404 (Bankr. E.D. Pa. 1991), a case relied upon by the debtors,] dooms Debtors' theories here."

*Augie/Restivo*, 860 F.2 at 575-76 (footnote added).

No case has ever held that substantive consolidation is permissible simply in order to permit a plan proponent to satisfy section 11299a)(10). It appears here, however, that the

substantive consolidation has no other purpose. As indicated, based on the Debtors' first day pleadings, *over 20 of the 60 Debtors* (*i.e.*, the Non-Obligor Debtors) are not obligors or guarantors under the Pre-Petition Credit Facility. *See* Gathany Affidavit at Exhibit A thereto (corporate chart). Thus, if the Court were to deny substantive consolidation, the Proposed Plan could not be confirmed as a matter of law with respect to at least some Debtors if such Debtors were also obligated on any Class 5 Claims, because there would be no impaired accepting class. The Proposed Plan would therefore violate § 1129(a)(10).

At this point, the Court cannot even determine what Debtors have Class 5 Creditors. The Debtors have filed their Class 5 Claims List, which states the Debtors' belief as against whom each Class 5 Creditor asserts a claim. The Class 5 Claims List, however, is not binding on the Class 5 Creditors themselves – no bar date has passed by which Class 5 Creditors must file their proofs of claim. Moreover, Unnamed Customers are not even identified on the Class 5 Claims List. As such, no one has any idea against which Debtors such Unnamed Customers might assert their claims.[38] The Debtors are attempting to use substantive consolidation to solve this problem and their absolute priority rule problems in respect of intercompany equity. This is an improper use of substantive consolidation under *Augie/Restivo, et al.* The Debtors have not provided any relevant basis for substantive consolidation. Debtors certainly have not met their heavy burden in proving the "need" for substantive consolidation. The Proposed Plan therefore is not confirmable for this reason as well.

---

[38] The Debtors have also left open the possibility of including more named claims in Class 5. *See* Committee Exhibit 17, Paul Declaration at ¶ 3 ("The Debtors hereby declare and affirm that the Debtors will not add additional Class 5 Claims beyond those Class 5 Claims set forth on <u>Exhibit A</u> without further order of the Court."). The classification process therefore is apparently still fluid.

**IV.**

**CONCLUSION**

For the foregoing reasons, the Committee respectfully submits that the Court should deny

confirmation of the Proposed Plan.


Dated:  New York, New York
      April 11, 2008

                        PACHULSKI STANG ZIEHL & JONES LLP


                        */s/ Brad R. Godshall*
                        Laura Davis Jones (admitted pro hac vice)
                        Brad R. Godshall (admitted pro hac vice)
                        Alan J. Kornfeld (AK-5647)
                        Ilan D. Scharf (IS 3468)
                        780 Third Avenue, 36th Floor
                        New York, NY 10017
                        (phone) (212) 561-7700
                        (facsimile) (212) 561-7777

                        Attorneys for the Official Committee of
                        Unsecured Creditors

**Annex A**
**Perfection Analysis Concerning Home Inventory**

The revised version of the Uniform Commercial Code ("UCC") provides that Article 9 does not apply to "the creation or transfer of an interest in or lien on real property, including a lease or rents thereunder, except to the extent that provision is made for [enumerated exceptions inapplicable here]." U.C.C. § 9-109(d)(11). The predecessor of the revised UCC provided similarly. *See* former UCC § 9-104(j). In line with this broad exception, Courts interpreting the scope of the former UCC reasoned that the thrust behind contracts that revolve around real property interests is the debtor's interest in the underlying real property and, as such, the debtor's rights are not simply or only contract rights (which may arguably constitute "general intangibles" under the UCC).[39] The granting of security interests in such rights and interests of the debtor should be viewed as "the creation or transfer of an interest in or lien on real property" which is outside the scope of Article 9, and thus, a creditor's financing statement filing is ineffective in perfecting the creditor's security interest.

For example, in *In re Blackwell*, 43 B.R. 398, 400 (Bankr. N.D. Ala. 1984), the Court found that, by making an appropriate recording, creditor had properly perfected its lien in a real estate vendee's rights under a bond for title. Such transaction was excluded from Article 9, and therefore, that perfection of security interest was governed by applicable real estate law. *Id.* The Court agreed with a commentator's conclusion:

> "Is a real estate vendee's right to specific performance an Article 9 'general intangible'? …. The contract vendee's interest focuses almost exclusively on the real estate; the right to possession and the right to claim legal title once the installment payments are completed…. Therefore, any assignment of the vendee's interest

---

[39] There is no reason to believe that the principles set forth in such case law do not apply equally to the essentially identical real property exclusion in the revised UCC.

should be governed by applicable real estate law and excluded from Article 9 ….”

*Id.* (*quoting* Clark, *The Law of Secured Transactions Under the Uniform Commercial Code*).

Similarly, in *In re Valley Liquors, Inc.*, 103 B.R. 961 (Bankr. N.D. Ill. 1989), the Court granted a competing creditor's motion to dismiss a complaint of a plaintiff bank alleging that proceeds received by the debtor from the sale of its option to purchase real property (included in a lease agreement) during a bankruptcy case was subject to the bank's senior lien. The court rejected the bank's argument that the option to purchase was a "general intangible" in which the bank was granted a blanket lien. The Court instead found that the option, even if unexercised, was realty rather than personal property, and, accordingly, that the bank had to record its interest in county records in order to perfect. *See id.* at 965-67. Reaching a similar conclusion was the court in *In re Southworth,* 22 B.R. 376 (Bankr. D. Kan. 1982). In *Southworth*, a debtor was a vendee under two prior installment sale contracts, and had subsequently sold its equitable interest in the two real properties to a third party under a separate contract for deed. A bank had properly perfected its interest in the debtor's right to receive payments under a subsequent contract for a deed. The bank, however, did not perfect any interest in the real properties because it failed to record any mortgage. The Court held that, consequently, the bankruptcy trustee could avoid the bank's asserted interests in realty as bona fide purchaser under section 544. *Id*. at 379-80; *see also, Cooper v. First Citizens Bank (In re Jones)*, 186 B.R. 71, 77 (Bankr. W.D. Ky. 1995) (bankruptcy trustee could not avoid creditor's lien in debtor-vendee's contract for deed where creditor had properly recorded its interest; said interest was not a general intangible but was instead an interest in real property outside the scope of Article 9); *Dominion Bank, N.A. v. Wilson*, 867 F.2d 203, 205-06 (4th Cir. 1989) ("We conclude that the doctrine of equitable conversion should apply and that [secured creditor]'s interest in the Holyfield contract [under

which debtor previously had exercised option to purchase real estate but which sale was not yet closed] should be treated as real property, rather than personal property."; because debtor had equitable title to real estate, security agreement's reference to "contract rights" was insufficient to extend to such real property interest); *Rush v. Anestos*, 661 P.2d 1229, 1231, 104 Idaho 630 (Idaho 1983) (secured creditor who had been assigned by vendee its interests in an installment land sale contract had priority in subject real estate over party who purchased vendee's interest, expressly subject to the secured creditor's interest and any other encumbrances, in vendee's bankruptcy case; importantly, earlier, secured creditor had duly recorded the assignment of vendee's interest to it).

Moreover, the possibility that Home Inventory <u>could</u> perhaps be viewed as a contract right (and thus, a general intangible) does not mean that it is not also a real property interest outside the purview of Article 9. For example, in *Weitzner v. Goldman (In re Kavolchyck)*, 154 B.R. 793 (Bankr. S.D. Fla. 1993), *aff'd by, remanded in part by* 164 B.R. 1018 *(S.D.Fla. 1994)*, the bankruptcy court applied the plain language of the predecessor to U.C.C. § 9-109 in concluding that a mortgaged leasehold interest was outside the scope of Article 9. Thus, the asserted secured creditor – who had filed a UCC-1 financing statement but had not recorded its interest in the county public records – did not have a perfected security interest in the debtors' leasehold estate and interest in any rents derived from the debtors' sublease, and the creditor's unperfected lien was voidable by the trustee under Code section 544. The *Kavolchyck* court reasoned:

> [E]ven if leasehold interests are defined as personal property, it is still an 'interest in real estate' covered by [the predecessor to 9-109(d)] and is thus excluded from coverage under the UCC Article 9….
>
> …. [The argument that] the term 'contract rights' in the security

agreement included the borrower rights under a lease agreement also fails to support the idea that UCC Article 9 applies to leasehold mortgages. An interest in real estate can certainly be obtained by contract. For example, when a person buys a home via an installment contract, that person has both an interest in the purchased real estate and a set of rights under the installment contract. So that person has both an 'interest in real estate' and a 'contract right.' Likewise, the lease in question gave [debtor lessee] both rights under the lease agreement and a possessory interest in the leased premises…. Thus, the leasehold mortgages granted to the [secured creditors] encumbered property that could be defined both as a 'contract right' and an 'interest in real estate.'

There is absolutely nothing in Florida's enactment of U.C.C. Article 9 to support the view that [the predecessor to 9-109(d)(11)] does not apply when an interest in real estate could also be defined as a contract right. Indeed, the inclusion of the phrase 'including leases' following the words 'interest in or lien on real estate' in [that statute] makes just the opposite point clear.

154 B.R. at 798, 799. *See also generally* U.C.C. § 9-109(a) ("*Except as otherwise provided in subsections (c) and (d)*, this article applies to a transaction, regardless of its form, that creates a security interest in personal property or fixtures by contract….") (emphasis added).

# Annex B
## Legal Discussion Concerning Possible Defenses to Lender Preferences

The New Liquidation Analysis identifies two potential defenses to preference claims based on the prepetition paydown of the Debtors' undersecured debt: (1) that the repayments during the preference period (the "Payments") were not preferential because the Pre-Petition Lenders were paid from their own collateral; and (2) that the Payments were made in the ordinary course of business. This Annex discusses the applicability of these defenses.

1.      The Payments to the Pre-Petition Lenders Satisfy Section 547(b)(5).

Section 547(b)(5) requires that, for a transfer to constitute a preference, it must be, *inter alia*, a transfer "that enables such creditor to receive more than such creditor would receive if- (A) the case were a case under chapter 7 of this title; (B) the transfer had not been made; and (C) such creditor received payment of such debt to the extent provided by the provisions of this title."

The New Liquidation Analysis asserts that the Payments are not subject to avoidance because they were made from the Lenders' own collateral. Payments to a fully secured creditor cannot be a preference because the creditor would receive 100% in a hypothetical liquidation. *In re Santoro Excavating, Inc.*, 32 B.R. 947, 948 (Bankr. S.D.N.Y. 1983) ("a payment to a creditor with an allowed fully secured claim is not a preference."). *See also In re Smith's Home Furnishings, Inc.*, 265 F.3d 959, 963 (9th Cir. 2001); *Sloan v. Zions First National Bank (In re Castleton's Inc.)*, 990 F.2d 551, 554 (10th Cir. 1993).

The Pre-Petition Lenders' claims in this case, however, are admittedly undersecured. An undersecured creditor that receives prepetition transfers during the preference window is presumed to have received more than it would in a hypothetical liquidation:

> To satisfy § 547(b)(5), the plaintiff must prove that the transferee received more as a result of the preference than if the preference was never paid, and instead, the transferee received a distribution on its claim in a hypothetical chapter 7 case. . . .  As a practical matter, this element is satisfied whenever the plaintiff shows that the creditor would receive less than 100% in a hypothetical chapter 7 distribution. *Elliott v. Frontier Properties/LP (In re Lewis W. Shurtleff, Inc.)*, 778 F.2d 1416, 1421 (9th Cir. 1985); *CIS Corp.*, 195 B.R. at 262 (citing cases); *Candor Diamond Corp.*, 68 B.R. at 595.

*In re Teligent, Inc.*, 380 B.R. 324, 339 (Bankr. S.D.N.Y. 2008).  An undersecured creditor is presumed to apply any transfer it receives from the debtor to the unsecured portion of its debt.

*Krafsur v. Shurlock Permian Corp. (In the Matter of El Paso Refinery, L.P.)*, 171 F.3d 249, 254 (5th Cir. 1999); *see also Barash Public Finance Corp.*, 658 F.2d 504, 507 (7th Cir. 1981) (agreeing and quoting *In re McCormick*, 5 B.R. 726, 730 (Bankr. N.D. Ohio 1980), holding that in the absence of proof to the contrary, payments are credited toward the unsecured portion of a bifurcated claim as "this course of action would comport with standard business practice.").

> If a payment to an undersecured creditor … is applied to the unsecured portion of the debt, then the undersecured creditor will have recovered a greater percentage on this claim if the estate cannot pay its unsecured creditors 100% of these claims.… In contrast, if the undersecured creditor applies the payment to the secured portion of the debt, the creditor effectively releases a portion of its collateral from its security interest, that is, its secured claim is reduced, freeing up a corresponding amount of collateral. In this situation, the creditor does not receive a greater percentage recovery. If, however, the creditor does not actually release collateral upon application of the payment, then the payment is *ipso facto* a payment on the unsecured portion of the claim.

*In re El Paso Refinery, LP*, 171 F.3d 249, 254 (5th Cir. 1993); *see In re Intercontinental Polymers, Inc.*, 359 B.R. 868, 875 (Bankr. E.D. Tenn. 2005) (§ 547(b)(5) satisfied where there was no indication that creditor released collateral for each payment, and where it was paid with money from a line of credit rather than from proceeds of its collateral).  Where the lien in question is a floating lien, then "[u]nder § 547(b)(5), the trustee must show that the amount of

indebtedness under the floating lien was greater than the amount of collateral at some point during the 90-day period." *In re Smith's Home Furnishings, Inc*., 265 F.3d at 964.

Some courts have held that the presumption that payments on an undersecured claim were applied to the unsecured portion of the claim is <u>conclusive</u>. "We believe, therefore, that the 'presumption' noted in the McCormick case is properly treated as conclusive, not subject to rebuttal based on evidence of the parties' intent." *Drabkin v. A.I. Credit Corp*., 800 F.2d 1153, 1157 (D.C. Cir. 1986). "Payments on an undersecured debt are conclusively attributable first to the unsecured portion of the debt." *In re Tax Reduction Institute*, 148 B.R. 63, 69 (Bankr. D. Col. 1992). As noted in *Collier*: "The creditor could apply the payment to the secured part of his claim by releasing a corresponding amount of collateral. But there is no recorded instance of a partially secured creditor doing so. Instead, the creditor always takes the payment and retains all of his collateral." 5 Collier on Bankruptcy at ¶ 547.03[7] (15th Ed. Rev'd).

When an undersecured creditor is paid <u>solely</u> from its own collateral, the payment does not allow it to receive more than it would have received in a hypothetical liquidation. Thus, in *In re Castletons*, 990 F.2d 551 (10th Cir. 1993), an undersecured creditor was found not to have received a preference where it held a floating lien on all assets. *Id*. at 555.

Here, however, the Pre-Petition Lenders did <u>not</u> have a floating lien on all assets. There are Unencumbered Assets, as discussed in the body of the Objection (and as the New Liquidation Analysis acknowledges). Thus, absent proof to the contrary, the Payments consisted of commingled funds.

Case law does not offer clear guidance on situations where the payments are made from commingled funds. In *El Paso Refinery*, the payments came from encumbered funds, but the bankruptcy court ruled that the creditor had assigned 45.47% of its lien position, and therefore

45.45% of the payments it received were not from its own collateral. The Fifth Circuit reversed, not because this methodology was wrong, but because as a matter of contract interpretation, the creditor had not actually assigned its lien position, but only subordinated it to another creditor's lien. *El Paso Refinery*, 171 F.3d at 257.

In *In re JKJ Chevrolet, Inc.*, 412 F.3d 545 (4th Cir. 2005), the court ruled that the amount that the floor plan finance company would have received on account of its lien on a car dealerships' inventory and in a commingled account with proceeds from the sale of that inventory could not be determined by reference to state law tracing principles. The bankruptcy court had stated that the burden was placed upon the secured creditor. In a footnote, the circuit court stated that the bankruptcy court's observation was correct in placing that burden on the creditor, but that it did not matter because no tracing is required. *Id*. at 550, n.4. Instead, the court ruled that the secured creditor's interest in the commingled account would be determined by application of Virginia's version of U.C.C. § 9-306(4):

> In the event of insolvency proceedings instituted by or against a debtor, a secured party with a perfected security interest in proceeds has a perfected interest only in the following proceeds:
>
> (a) in identifiable non-cash proceeds and in separate deposit accounts containing only proceeds;
>
> (b) in identifiable cash proceeds in the form of money which is neither commingled with other money nor deposited in a deposit account prior to the insolvency proceedings;
>
> (c) in identifiable cash proceeds in the form of checks and the like which are not deposited in a deposit account prior to the insolvency proceedings; and
>
> (d) in all cash and deposit accounts of the debtor in which proceeds have been commingled with other funds, but the perfected security interest under this paragraph (d) is
>
> (i) subject to any right to set-off; and

(ii) limited to an amount not greater than the amount of any cash proceeds received by the debtor within ten days before the institution of the insolvency proceedings less the sum of (I) the payments to the secured party on account of cash proceeds received by the debtor during such period and (II) the cash proceeds received by the debtor during such period to which the secured party is entitled under paragraphs (a) through (c) of this subsection (4).

2.    The Payments Were Not Made in the Ordinary Course of Business

Code § 547(c)(2), the ordinary course of business defense, states:

The trustee may not avoid under this section a transfer ... to the extent that such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and such transfer was – (A) made in the ordinary course of business or financial affairs of the debtor and the transferee; or (B) made according to ordinary business terms.

In determining whether a transfer is made in the ordinary course of business, a court may consider (i) the prior course of dealing between the parties, (ii) the amount of the payment, (iii) the timing of the payment, (iv) the circumstances of the payment, (v) the presence of unusual debt collection practices, and (vi) changes in the means of payment. *In re Teligent, Inc.*, 380 B.R. 324, 340 (Bankr. S.D.N.Y. 2008); *In re Cassirer v. Herskowitz (In re Schick)*, 234 B.R. 337, 348 (Bankr. S.D.N.Y.1999). According to the legislative history, "the purpose of [section 547(c)(2) ] is to leave undisturbed normal financial relations, because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy." H.R.Rep. No. 95-595, at 373 (1977); S.Rep. No. 95-989, at 88 (1977); *In re Teligent, Inc.*, 380 B.R. at 340.

There is no room for argument that certain of the Payments were not made in the ordinary course of business of the Debtors and the Pre-Petition Lenders. While the spreadsheet information provided by the Debtors to date does not appear to contain sufficient data to perform a comparative ordinary course analysis, certain Payments are clearly extraordinary. For instance,

on December 31, 2007, the Debtors repaid $34,000,000, plus outstanding interest. In the twelve preceding days, other repayments were made exceeding $26,000,000, against only $5,200,000 in advances. In addition, the Lenders admitted that the Debtors paid approximately $10 million to the Lenders outside of the ordinary course of business. *See* Transcript of deposition of Charles Freedgood held April 8, 2008 (the "Freedgood Deposition") (Committee Exhibit 18) at 55:20-56:25. 74:10-76:13; Committee Exhibit 6, Tenth Amendment to the Credit Agreement at ¶ 7; Committee Exhibit 7, Eleventh Amendment to the Credit Agreement at ¶ 14.

These paydowns were made as the Debtors were descending into bankruptcy. Payments resulting from economic pressures are not in the ordinary course of business. *In re Pan Trading Corp.*, 125 B.R. 869, 877 (Bankr. S.D.N.Y. 1991). Certain of these Payments, at minimum, were exceptional, substantially reducing the debt to the Pre-Petition Lenders just prior to the restructuring of the loans and the bankruptcy filing. "[T]he hallmark of a payment in the ordinary course is consistency with prior practice . . . ." *Brandt v. Repco Printers & Lithographics, Inc. (In re Healthco Int'l, Inc.)*, 132 F.3d 104, 110 (1st Cir. 1997). The Pre-Petition Lenders will not establish such consistency as to all of the Payments.

The Pre-Petition Lenders might contend that the Payments were made according to ordinary business terms, and thus satisfy the second, disjunctive portion of the ordinary course of business defense. Presumably, their argument would be that payments under a restructuring agreement may be deemed made in the ordinary course of business. *See In re Roblin Industries, Inc.*, 78 F.3d 30, 41 (2d Cir. 1996) ("We decline to adopt a rule that payments made pursuant to debt restructuring agreements, even when the debt is in default, can never be made according to ordinary business terms as a matter of law. That determination is a question of fact that depends on the nature of industry practice in each particular case, a factual inquiry that is appropriately

left to the bankruptcy court.").  The court went on to state: "If the terms in question are ordinary for industry participants under financial distress, then that is ordinary for the industry."  *Id*. at 42.

Any such defense is untenable.  Factually, most Payments were made prior to the time the credit facility was restructured, precluding reliance on this argument.  Legally, the cases in which payments under restructuring agreements are deemed ordinary involve payments made pursuant to restructure agreements entered well prior to the preference period.  Here, the paydown occurred *during* the preference period.

> The distinction is important because a debtor, by altering its actual payment history prior to the preference period, establishes a pre-preference course of business with its counter-party that can be compared to the parties' preference period transactions. A payment Proposed Plan that differs drastically from the parties' past payment history and that does not require payment until the parties are within the preference period cannot establish a baseline of payments to which payments in the preference period can then be compared under § 547(c)(2)(B) to determine whether they were "made in the ordinary course of business or financial affairs of the debtor and the transferee."

*In re NETtel Corporation, Inc.*, 364 B.R. 433, 451 (Bankr. D.C. 2006) (holding that "payment plan" argument cut against "ordinary course" defense because the plan prompted preference period payments that differed so sharply from previous terms).  As the court noted: "transactions in the distress period that were prompted by aggressive collection efforts that plainly would result in preferring a creditor over other creditors of a debtor must be excluded from the universe of transactions examined to determine what was ordinary.  Without that caveat, § 547(c)(2) might create an exception to the preference avoidance power based on transactions in the industry that were themselves of the very preferential character that § 547(b) is designed to redress, including those that were intentionally designed to prefer the creditor."  *Id*. at 454.

The Payments at issue were not made pursuant to a preexisting restructuring plan. Patently, they were not made in the ordinary course of business of the Debtors and the Pre-Petition Lenders or on ordinary business terms.

i