WOLFF & SAMSON PC
THE OFFICES AT CRYSTAL LAKE
ONE BOLAND DRIVE
WEST ORANGE, NEW JERSEY 07052
973-325-1500
Attorneys for Triple Net Investments IX, LP
(REN-3034)

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE:<br><br>DJK RESIDENTIAL LLC, <u>et al</u>.,<br><br>Debtors. | Chapter 11<br><br>Bankruptcy Case No. 08-10375<br><br>(Jointly Administered) |

**OBJECTION SUPPLEMENT BY TRIPLE NET INVESTMENTS IX, LP,**
**<u>TO THE ADEQUACY OF DEBTORS' DISCLOSURE STATEMENT</u>**

**TO: HONORABLE JAMES M. PECK**
**UNITED STATES BANKRUPTCY JUDGE**

Triple Net Investments IX, LP ("Triple Net"), a party-in-interest and creditor of Debtor North American Van Lines ("North American" or "Debtor")), through its undersigned counsel, respectfully files its objection supplement (the "Supplement")[1] to the adequacy of the disclosure set forth in the Disclosure Statement for North American and its affiliated debtors' (collectively, the "Debtors") Prepackaged Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code (the "Disclosure Statement") (Docket No. 32), and, in support of the Supplement, respectfully states:

---

[1] The Supplement is filed in accordance with the Notice of Rescheduled Combined Hearing on the Adequacy of the Debtors' Disclosure Statement and Confirmation of the Debtors' Prepackaged Plan of Reorganization (the "Notice") (Docket No. 225). Capitalized terms, unless otherwise stated or clear from the context, shall have the meaning ascribed in the Notice or the Plan. Triple Net incorporates here by reference, as though fully set forth herein, its initial Objection to the Plan (Docket No. 280).

1124933.1

## PRELIMINARY STATEMENT

1. The adequacy of disclosure in a traditional prepackaged plan of reorganization, in which general unsecured creditors are paid 100% of their claims, understandably may be less rigorous. There is no real need to fully understand and value avoidance actions and causes of actions against non-debtor third parties, since fully paid unsecured creditors have neither the incentive nor the legal basis to sue anyone else.

2. Similarly, in a traditional prepackaged plan of reorganization, reliable estimates of the number and value of claims in a given class, or of the operating revenues of the Debtor during bankruptcy or, for the reorganized Debtors upon emergence from bankruptcy, are less significant. This again is because unsecured creditors are being paid in full.

3. Here, reliable and complete disclosure is critical to Class 5 claimants, because they will receive nothing under the Plan while thousands of other unsecured claims totaling over $400 million have been paid or will be paid in full from on-going operating revenues and some-yet-undisclosed amount derived from the DIP lending, which was authorized on the first day of those bankruptcies expressly to pay Class 4 claimants (and $65 million to the Prepetition Lenders).

4. The Disclosure Statement in this case contains none of the disclosures required by Triple Net, as a Class 5 Claimant, to intelligently understand and oppose the treatment of its claim under the Plan. For example, although several experts have opined on this, there simply is no disclosure concerning the <u>facts</u> of any preference or avoidance actions. There has been no factual analysis or valuation at all; nor has any disclosure of <u>facts</u> concerning potential causes of action been made. The failure of the Debtors' to disclose this information is critical particular since these valuable rights will be controlled by the Reorganized Debtors. Similarly, no

accounting of on-going operations has been made to determine a fundamental question that Debtors' Senior Vice President and Treasurer could not answer at his recent deposition:

> Q: Assuming that 20 to 21 million dollar number, do you expect that the Debtors will have cash availability to make a 20 to 21 million dollar payment on Class 5 claims if they are so ordered by the court in connection with this confirmation?
>
> A. I couldn't answer that question because I don't know – are we saying at the expiration date a payment of 21 million or as they might pay out in the ordinary course?
>
> Q. As they might pay out in the ordinary course.
>
> A. Again, without – I don't know what the cash flow impacts of paying those claims in the ordinary course would be.
>
> Q. Have you done any such analysis?
>
> A. I have not, and I don't know if any one has.

Deposition Transcript of Douglas Gathany, taken on April 10, 2008 ("Gathany Dep"), at pg 63, LL. 20-25; pg 64, LL. 1-13. A copy of the relevant sections of the Gathany Dep is attached hereto as Exhibit A.

5. Rather than fulfill their fiduciary duty to creditors to assemble the relevant and critical operating and financial information in a single, readily understandable document - - the Disclosure Statement - -, Debtors instead have relied exclusively on expert reports and a massive document production clearly intended to shift the burden and expense to creditors to find relevant disclosure information. Indeed, the day before the deposition of Debtors' first designated representative, Debtors produced over 200,000 pages of documents, 15,000 of which were produced that night at 9:44 p.m., and had been designated as responsive specifically to Triple Net's discovery requests.

6. Accordingly, for each of the reasons that follow, Triple Net respectfully requests entry of an order denying the disclosure in the Disclosure Statement as legally and factually inadequate.

## LEGAL ARGUMENT

7. Triple Net objects to the Disclosure Statement because it does not meet the adequacy of information requirement of Section 1125 of the Bankruptcy Code (the "Code"). Before considering the adequacy of the information provided, a threshold issue is whether the Plan is so inherently and incurably non-confirmable, that the Court should stop the Debtors' confirmation process. Where it is clear that a proposed plan is not capable of confirmation on its face, it is appropriate for the Court to refuse to approve the disclosure statement. See In re Batten, 141 B.R. 899, 909 (Bankr. W.D. La. 1992) (the bankruptcy court's equitable powers should not be used to override the Bankruptcy Code and allow an inherently defective plan to proceed to confirmation).

8. In addition to the inherent Plan defects set forth in Triple Net's "Objection Supplement by Triple Net Investments IX, LP, to Confirmation of Debtors' Chapter 11 Plan", filed simultaneously herewith, that render the Plan non-confirmable as a matter of law, the Disclosure Statement fails to contain "information of a kind, and in sufficient detail, . . .that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan. . . ." 11 U.S.C. § 1125(a). Full disclosure is the very essence of the obligation imposed by the Code's requirement that a reorganization plan be proposed in good faith. In re PC Liquidation Corp., 2008 WL 314189, *6 (E.D.N.Y. Feb. 1, 2008) (citing In re Momentum Manufacturing Corp., 25 F.3d 1132, 1136 (2d Cir. 1994)); Kunica v. St. Jean Fin., Inc., 233 B.R. 46, 55 (S.D.N.Y. 1999), amended on other grounds, 63 F.Supp.2d 342 (S.D.N.Y). As stated by the court in Kunica, "the importance of full disclosure is underlaid by the reliance placed upon

the disclosure statement by the creditors and the court. Given this reliance, we cannot overemphasize the debtor's obligation to provide sufficient data to satisfy the Code standard of 'adequate information.'" 233 B.R. at 55 (citation omitted).

**Debtors Improper Discovery Tactics For Confirmation.**

9.  The information provided by Debtors to their creditors -- in the Disclosure Statement-- is scant at best; it does not approach, let alone cross, the threshold of adequacy required by the Code. For example, Debtors fail to provide an estimate of the number of claimants and dollar amount of claims in Class 4 or Class 5. Similarly, Debtors fail to disclose the amounts paid to Class 4 Claimants since the Petition Date, the balance owed on Class 4 prepetition claims, and any administrative claims incurred for Class 4 Claimants. Debtors also fail to disclose the value of avoidance actions, the likelihood of success of causes of action retained by the Reorganized Debtors, and the economic impact, if any, on Class 5 Claimants from these recoveries. Further, Debtors failed to give any explanation for the tremendous write-down in the value of assets (as shown in Alverez & Marsal's Expert Report) from December 31, 2007 and January 31, 2008 to April 5, 2008 ("A&M" Report").

10. Instead of filing a Disclosure Statement consisting of sufficiently detailed information that would allow creditors, like Triple Net, to make an informed decision regarding the Plan's feasibility and confirmability, Debtors buried creditors with literally hundreds of thousands of pages of mostly useless documentation outside of the Disclosure Statement, shifting the burden and expense to creditors to determine what is relevant disclosure for the Plan. This, Triple Net submits, is an abdication of their fiduciary duty to provide adequate information to creditors. The Court should not permit an attempt by the Debtors, which owe fiduciary duties to their creditors, to bury the relevant facts of this case in a massive document

production rather than to meet head on their obligation to produce the relevant information -- in a single comprehensive document --regarding their assets and liabilities. That is the very purpose of the Disclosure Statement.

11. As such, approval of Debtors' Disclosure Statement should be summarily denied because the Disclosure Statement: (A) fails to provide any factual information whatsoever in support of the Plan's proposed substantive consolidation, including the market value of the Debtors' assets (that information to some extent is provided in expert reports, but not the Disclosure Statement circulated to all creditors); (B) contains no information concerning the purported consideration for the release of non-debtor third parties; (C) contains virtually no information regarding the value of any potential claims and causes of action held by the Debtors' estates, including valuable avoidance actions, and (D) does not include an analysis of preferential and fraudulent transfers to Prepetition Lenders and their professionals, the Debtors' professionals, and to insiders.

    **A.**    **Inadequate Information Concerning Substantive Consolidation & Valuation.**

12. The Debtors propose to substantively consolidate the assets and liabilities of the Debtors only for purposes relating to confirmation and consummation of the Plan. Disclosure Statement, Art. IV. A at p. 35. The Disclosure Statement discloses that one of the results of substantive consolidation is that any claim based upon a guaranty or indemnity given by the Debtors will be treated as a single claim and will be entitled to one distribution from the Debtors. This, of course, is a meaningless disclosure since almost all creditors are being paid in full, except for Class 5 creditors, who are being paid nothing – regardless of whether they hold guaranties or whether multiple Debtors are jointly liable on their claims. The Second Circuit Court of Appeals, in addressing substantive consolidation, has determined that it is an

extraordinary remedy that should be used sparingly and lead to an equitable result. See e.g., Chem. Bank N.Y. Trust Co., v. Kheel, 369 F.2d 845, 847 (2d Cir. 1996). Debtors should disclose, therefore, whether they issued guaranties to creditors and whether there are other claims that would be affected by substantive consolidation as proposed under the Plan. Id.; see also In re Owens Corning, 419 F.3d 195, 200-02 (3d Cir. 2005).

13. Presently, there is no information in the Disclosure Statement concerning the impact of substantive consolidation upon the only class of claimants which is not getting a recovery, Class 5. Debtors must disclose how substantively consolidating their assets and liabilities for confirmation and consummation purposes leads to a more equitable result in this case for Class 5 Claimants; otherwise, there is no basis to allow this fiction, particularly since all other creditors get paid in full. Chem. Bank, 369 F.2d at 847.

14. Similarly, in order for creditors to make an informed decision regarding whether the contemplated transfers of ownership of Debtors to the Prepetition Lenders and management are fair and reasonable, Debtors must first disclose a myriad of current and reliable market values for those assets. Debtors must explain staggering deterioration in the value of their assets as shown in the A&M Report, which questions the whole operational capabilities of the Reorganized Debtors. Debtors' also must include detailed projections of their post-confirmation operations to gauge feasibility and the likelihood of a confirmed Plan failing. (Disclosure Statement, Exhibit B), In re Cardinal Congregate I, 121 B.R. 760 (Bankr. S.D. Ohio 1990 (debtor's "disclosure statement must, among other things, (a) contain a detailed analysis of projected income, expenses and surplus funds available to satisfy claims; (b) clearly identify all assumptions made in calculating pro forma information regarding the future of the debtor's business; (c) include information regarding accounting and valuation methods, and (d) provide a

detailed estimation of allowable administrative expenses); see also In re Oxford Homes, Inc., 204 B.R. 264, 270 (Bankr. D. Me. 1997); In re Dakota Rail, Inc., 104 B.R. 138, 142 (Bankr. D. Minn. 1989). None of these disclosures have been made, principally because Debtors contend disclosure is unnecessary to cramdown a zero recovery on Class 5 Claimants.

    **B.    Inadequate Information Concerning Justification For Releases of Non-Debtor Parties**

15. The Disclosure Statement lacks any information, let alone adequate information, justifying the exculpation and release of non-debtor third parties under the Plan. While the Second Circuit Court of Appeals has not ruled out the appropriateness of non-debtor releases where unusual circumstances exist, see In re Metromedia Fiber Network, Inc., 416 F.3d 136, 141-42 (2d Cir. 2005), no disclosure whatsoever about "unusual circumstances" has been made here. Creditors are entitled to that kind of information before a confirmation hearing occurs.

16. Since Debtors fail to provide in the Disclosure Statement any factual basis to establish the required "unusual circumstances" to justify confirmation of a Plan that has such extraordinary relief, Debtors' disclosure is patently inadequate. The inadequate disclosure in the Disclosure Statement on file requires an end to this confirmation process.

    **C.    Inadequate Information Concerning Nature of Claims in Class 4 and The Amount of Postpetition Payments to Members of Classes 4**

17. The Plan and Disclosure Statement are ambiguous about, and/or omit material facts regarding, the nature of all claims classified under Class 4. This is critical to consider fairly the propriety of the classifications in the Plan and whether they are appropriate and legal, when in fact they may not be. Moreover, discovery has made it clear that Class 4 includes claims that should be in Class 5 and are being paid in full. See, Deposition Transcript of Eryk Spytek, Senior Vice President, General Counsel and Corporate Secretary of the Debtors, dated

April 3, 2008, ("Spytek Dep"), at pg. 19-27.  A copy of the relevant pages of the Spytek Dep is attached hereto as Exhibit B.

18. Under the Plan, Class 4 Claims (Unsecured Ongoing Operations Claims) consist of "any unsecured Claim against any of the Debtors that is not a/an: (a) DIP Facility Claim; (b) Administrative Claim; (c) Priority Tax Claim; (d) Prepetition Facility Claim; (e) Other Priority Claim; (f) Other Secured Claim; (g) General Unsecured Claim or (h) Intercompany Claim" [except such claims classified under Class 5].  See Plan, Art. I, §104.  Thus, it would appear that Class 4 contains all *unsecured* claims not included in Class 5, 6 or 8.

19. That definition, however, is inconsistent with the testimony of Mr. Gathany.  In his deposition, Mr. Gathany testified that approximately $200 million of claims included in Class 4 are actually outstanding mortgage payables for homes that are held in inventory by the Debtors.  See Gathany Dep, at p. 13, ¶¶ 1-17.  As such, it would appear that Class 4 Claims comprise not only unsecured claims, but also secured claims.

20. Classification of claims or interests is governed by section 1122 of the Code, which provides that substantially similar claims or interests should be included in the same class. See 11 U.S.C. §1122(a).  It is well established that the Bankruptcy Code's requirement of substantial similarity does not mean that claims or interests within a particular class must be identical.  See, e.g., In re DRW Property Co., 60 B.R. 505, 511 (Bankr. N.D. Tex. 1986).  It is equally well established that Section 1122 "bars aggregating dissimilar claims in the same class."  In re Boston Post Road Ltd. Partnership, 21 F.3d 477, 481 (2d Cir. 1994).  Therefore, since secured mortgage claims are dissimilar to the unsecured "trade" claims allegedly already placed in Class 4, these types of claims cannot, consistent with the Code, be classified together.

21. As such, at the very least, for Disclosure Statement purposes, information should be provided regarding detailed disclosure of the members and the nature of their claims in Class 4, whether each claim in fact comports with the Plan's classification scheme, and the potential impact of those disclosures on the confirmability of the Plan and the treatment of Class 5 claimants. In addition, Debtors must provide information concerning all postpetition payments made by the Debtors pursuant to the Order of this Court dated, February 5, 2008, authorizing Debtors to pay the prepetition claims of holders of Class 4 claims in the ordinary course of the Debtors' business and, critically, whether any of these creditors have refused to do business in the ordinary course and, thus requires reclassification of their claims. See Order Authorizing Payment of Prepetition Unimpaired Claims in the Ordinary Course of Business, [Doc. No. 47] to all creditors classified under Class 4.

### D. **Inadequate Information Regarding Claims of the Estate.**

22. The Disclosure Statement should contain information about the Debtors and their assets, including potential claims Debtors may have against third parties, against Class 4 and 5 claimants, and against each other. Oxford Homes, 204 B.R. at 270. For example, in his deposition, Gathany testified that the Debtors believe that they retain an interest in the assets that are part of the LaSalle Securitization worth approximately $30 million. See Gathany Dep, at p. 66, ¶¶ 1-18. However, nowhere in the Disclosure Statement is this potential asset disclosed. Vague reference by Debtors to potential causes of actions, including avoidance actions, in the retention clause included in Plan and the Disclosure Statement, does not reveal the substance, nature and value of these claims and how they may have an impact on Class 5. Moreover, the Disclosure Statement does not explain the enormous variation in the potential value of avoidance claims between the Debtors' ($10 million) and the Committee's ($70 million), and

the over $100 million in potential avoidance claims against Debtors' secured lenders, professionals and certain prepetition creditors. Therefore, the present disclosure is insufficient to allow interested parties to make an informed decision regarding feasibility of the plan. See In re Metrocraft Publ'g. Serv., Inc., 39 B.R. 567, 570-71 (Bankr. N.D. Ga. 1984) (denying chapter 11 debtor's application for approval of disclosure statement where it failed to include information concerning potential avoidance claims and steps that have been taken toward settling or litigating these claims).

## CONCLUSION

For each of the above reasons, Triple Net respectfully requests entry of an order: (i) that the plan confirmation process terminate, because the Plan is inherently unconfirmable; and (ii) alternatively, directing Debtors to amend the Disclosure Statement to meet Triple Net's objections.

**WOLFF & SAMSON PC**
Attorneys for Triple Net Investments IX, LP


By: /s/ Robert E. Nies
　　ROBERT E. NIES

Dated: April 11, 2008