IN RE:

DJK RESIDENTIAL LLC, et al.,

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

CHAPTER 11

BANKRUPTCY CASE NO. 08-10375

(JOINTLY ADMINISTERED)

---

## OBJECTION SUPPLEMENT BY TRIPLE NET INVESTMENTS IX, LP, TO CONFIRMATION OF DEBTORS' JOINT CHAPTER 11 PLAN

---

**WOLFF & SAMSON PC**
The Offices at Crystal Lake
One Boland Drive
West Orange, NJ 07052
973-325-1500
Attorneys for Triple Net Investments IX, LP

On the Brief:
   Robert E. Nies
   Natasha M. Songonuga

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................................ 1

LEGAL ARGUMENT ............................................................................................................... 3

POINT I: THE PLAN VIOLATES MULTIPLE PROVISIONS OF 11
U.S.C. § 1129(a). ........................................................................................................ 3

    A.    The Plan Contains Illegal Releases Which Violate §§
1129(a)(1) And Section 524(E) Of The Bankruptcy Code. ....................... 3

    B.    The Debtors Have Not Proposed The Plan In Good Faith,
And, Therefore, It Violates §1129(a)(3). ..................................................... 8

    C.    The Plan Does Not Satisfy The "Best Interest Of Creditors"
Test, As Required By § 1129(a)(7). ............................................................ 11

    D.    The Debtor Cannot Demonstrate That An Impaired Class Of
Claims Has Accepted The Plan, Because The Prepetition
Lenders Are Insiders. .................................................................................. 12

POINT II: THE PLAN VIOLATES 11 U.S.C. § 1129(b). ............................................... 13

    A.    The Plan Does Not Satisfy The Cramdown  Requirements
Of Section 1129(b). ..................................................................................... 13

    B.    The Plan Should Not Be Confirmed Because There Is  No
Justification For A "Deemed" Substantive  Consolidation In
This Case. ..................................................................................................... 23

CONCLUSION ......................................................................................................................... 29

1125068.1

Triple Net Investments IX, LP ("Triple Net"), a party-in-interest and creditor of Debtor North American Van Lines ("North American" or "Debtor"), through its undersigned counsel, respectfully files its objection supplement (the "Supplement")[1] to confirmation of the Debtors' Prepackaged Joint Plan of Reorganization (the "Plan") (Docket No. 31), and, in support of the Supplement, respectfully states:

## PRELIMINARY STATEMENT

1.     Debtors' Plan has been conceived and prosecuted by pre-petition management and the Prepetition Lenders (together, the "Plan Proponents"). Its purpose is the capital restructuring of a very complex and lucrative public company. If successful, it will result in management and the Prepetition Lenders owning 100% of a privately held, reorganized enterprise that generates $4 billion in annual revenue. Despite that potential for the Prepetition Lenders to recover an incalculable windfall, Triple Net will receive nothing on its' $2 million undisputed and stipulated unsecured claim. That is true even though Debtors are presently paying over $400 Million to other unsecured creditors, either in the ordinary course of business or upon confirmation.

2.     The Plan has been pushed to an expedited, contested confirmation hearing without any meaningful observance of due process, while the Plan Proponents arrogantly refuse even to consider alternatives to the Plan. For example, a five percent "gift" by Class 4 Claims to Class 5 Claims would result in all claims of all unsecured creditors being paid approximately 95% of

---

[1] The Supplement is filed in accordance with the Notice of Rescheduled Combined Hearing on the Adequacy of the Debtors' Disclosure Statement and Confirmation of the Debtors' Prepackaged Plan of Reorganization (the "Notice") (Docket No. 225). Capitalized terms, unless otherwise stated or clear from the context, shall have the meaning ascribed in the Notice or the Plan. Triple Net incorporates here by reference, as though fully set forth herein, its initial Objection to the Plan (Docket No. 280).

their claims and virtually guarantee confirmation of the Plan.[2] Of course, this would require voting. The structure of the Plan, however, is purposely designed to afford grossly disparate treatment to similarly situated claimants - - Class 4 unsecured claims are paid in full, while Class 5 unsecured claims receive nothing - - in order to preserve value for one class of equity, intercompany affiliates, and to save the Prepetition Lenders several millions of dollars. There is no legitimate business purpose for this treatment. This treatment, Triple Net submits, is rightly prohibited under the Bankruptcy Code.

3.     As discussed in more detail below, confirmation of the Plan would make terrible legal precedent: (i) it would sanction the unfair, unnecessary and illegal release of valuable creditors' rights being granted to non-debtor third parties for no consideration; (ii) it relies, for its success, on the manipulation of voting rights through a separate, unlawful classification scheme; (iii) it treats creditors with claims of equal priority unequally; (iv) it uses the equitable, creditor "remedy" of substantive consolidation as an offensive weapon to target certain, unsecured creditors to receive zero distribution; (v) it sanctions the wholesale abandonment of a critical vendor concept in favor of the unfettered discretion of Debtors to pay any claims of creditors of their choosing, whether demonstrably critical or not; (vi) it permits the Prepetition Lenders, as the Reorganized Debtors, to settle or simply to not pursue substantial avoidance actions, including a $65 million preference claim against themselves and millions more received by their professionals and the Debtors' professionals, without any court supervision whatsoever; (vii) it assures pre-petition management's acquiescence in this unlawful undertaking by granting management retention incentives, including 10% of the equity in the Reorganized Debtors; and

---

[2] The estimate of actual Class 5 Claims, between $20 and $21 Million, excludes the Anti-Trust Class action, certification for which has yet to be granted. See, (i) Spytek Dep. at pps. 63 and 64; and (ii) Committee's Expert Report.

(viii) it rewards the wholesale manipulation of the financial affairs of the Debtors to produce an inequitable result.

## LEGAL ARGUMENT

4.　　As the Proponents of the Plan, Debtors and the Prepetition Lenders have the burden to establish that the Plan satisfies each and every element of section 1129(a) of the Bankruptcy Code (the "Code"), as a prerequisite to this Court's confirmation of the Plan.  In re Boston Post Road, Ltd. P'ship., 21 F.3d 477, 480 (2d. Cir. 1999); In re Crowthers McCall Pattern, Inc., 120 B.R. 279, 300 (Bankr. S.D.N.Y. 1990).  The proponent bears the burden of proof at the confirmation hearing by a preponderance of the evidence.  See In re Kent Terminal Corp., 166 B.R. 555, 561 (Bankr. S.D.N.Y. 1994); In re Cellular Info. Sys., Inc., 171 B.R> 926, 937 (S.D.N.Y. 1994).

## POINT I: THE PLAN VIOLATES MULTIPLE
## PROVISIONS OF 11 U.S.C. § 1129(a).

5.　　The legislative history of Section 1129(a) of the Code makes clear that this provision encompasses the requirements of Sections 1122 and 1123 of the Code, which govern the classification of claims and interests and the contents of a plan, respectively.  See S. Rep. No. 95-989, at 126 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5972 (1978); In re Texaco Inc., 84 B.R. 893, 905 (Bankr. S.D.N.Y. 1988) (In determining whether a plan complies with section 1129(a)(1), reference must be made to Code §§ 1122 and 1123 with respect to classification of claims and the contents of a plan of reorganization).

6.　　The Plan violates numerous provisions of Section 1129 of the Code and therefore cannot be confirmed.

**A.　　The Plan Contains Illegal Releases Which Violate §§ 1129(a)(1) And Section 524(E) Of The Bankruptcy Code.**

7.　　(a)　　Illegal Releases under Article VIII, §§ A and D of the Plan.

3

Article VIII § D of the Plan provides, in pertinent part:

. . .

> D.     Releases by the Debtors
>
> Pursuant to section 1123(b) of the Bankruptcy Code, . . . for good and valuable consideration, including the service of the Released Parties to facilitate the expeditious reorganization of the Debtors and the implementation of the restructuring contemplated by the Plan, on and after the Effective Date, the Released Parties are deemed released and discharged by the Debtors, the Reorganized Debtors, and the Estates from any and all Claims, obligations, rights, suits, damages, Causes of Actions,. . . . *including any derivative Claims* . . .asserted on behalf of the Debtors . . . or on behalf of the Holder of any Claim or Interest . . . based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases . . .

See, Plan, Art. VIII, § D (emphasis added).

8.     While Section D purports only to grant a release by the Debtors, not its creditors, to the non-debtor Released Parties[3], it legally effects the release by creditors and interest holders of their valuable claims against these same, non-debtor third parties. Specifically, Section D releases creditors' derivative claims against these non-debtor third parties. Section D's involuntary release of the claims held by Debtors' creditors and interest holders is made explicit

---

[3] Under the Plan's definition, "Released Party" includes, among others, the DIP Agent, the DIP Lenders, the Prepetition Lenders, non-debtor Affiliates of Debtors, and any of their respective members, officers, directors, employees, advisors, attorneys, representatives, financial advisors, investment bankers, or agents, and any of their successors and assigns. See Plan, Art. I, § 90.

4

in Article VIII, § A, of the Plan.[4]  The release is automatic, whether or not a proof of claim or interest has been filed, and whether or not the creditor or interest holder votes to accept the Plan. Moreover, the language of Article VIII, §§ A and D, of the Plan belies § F of that same Article, which on its face appears to carve out - - from the scope of third-party releases - - those holders of claims who have not voted on the Plan from the releases granted under the Plan. At best, these are drafting errors that create irreconcilable conflicts concerning valuable rights and the ability to pursue those rights post confirmation. At worse, they are a blatant attempt to reward management and the Prepetition Lenders for Debtors' last three (3) unsuccessful years of operations, while wiping out public shareholders and preparing for a new offering to the public, when the market has either forgotten SIRVA or is more hospitable.

9.     Thus, under these Plan provisions, unsecured creditors, such as Triple Net, who are impaired under the Plan and are not entitled to vote, but, rather are deemed to have rejected the Plan, will have released on confirmation non-debtor third parties of all potential liability to them, notwithstanding that such creditors (i) get nothing under the Plan, (ii) have affirmatively rejected the Plan, and (iii) get no consideration from the released non-debtor third parties for giving up, involuntarily, these valuable rights. The involuntary release of these non-debtor third parties, including Debtors' officers, directors, representatives and agents, under the Plan not only violates Code section 524(e), but also ignores it.

---

[4] Article VIII, § A provides, in relevant part:

> Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims . . . ., Interests, and Causes of Action of any nature whatsoever, . . . regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, . . .

10.     Section 524(e) provides that "[e]xcept as provided in subsection (a)(3) of this section, discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." 11 U.S.C. § 524(e). The Second Circuit has held that under section 524(e) of the Code, a non-debtor third party release is only appropriate in truly unusual circumstances and when it is critical to the success of a plan of reorganization. See, Deutsche Bank Ag v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.), 416 F.3d 136 (2d Cir. 2005) (noting that no other court has tolerated non-debtor releases except under "unique" circumstances, which render the proposed release important to the success of the plan); In re Karta Corp., 342 B.R. 45 (S.D.N.Y. 2006) (holding that non-debtor releases under a plan of reorganization must bear a reasonable relationship to the protection of the estate and may not be broader than necessary to protect the estate's interest). In Metromedia, the Court of Appeals found that a non-debtor's contribution to the plan, even though material, was insufficient support for a non-debtor release, because there was no showing that the release *itself* was important to the success of the plan. See id. at 143.

11.     Here, the Debtors have presented no evidence that the non-debtor releases are essential to the success of the Plan. Almost all creditors are being paid in full and, therefore, have no reason to sue third parties. Certainly, no Class 5 creditor, however, has any reason to release these claims, particularly since none will receive any consideration from the non-debtor third parties to be released under the broad releases proposed to be given by the Debtors. See MacArthur Co. v. Johns-Manville Corp. ( In re Johns-Manville Corp.), 837 F.2d 89, 93-94 (2d Cir. 1988) (approving non-debtor releases where the estate received substantial consideration for the release and where the enjoined claims were channeled to a settlement fund). Thus, it is disingenuous for the Plan Proponents to assert that the distributions to be made under the Plan (to

everyone in full, except for Triple Net and the other Class 5 creditors), as well as the Released Parties' facilitation and implementation of the expeditious reorganization of the Debtors contemplated by the Plan, are essential to the success of the Plan. They are essential only, arguably, for the Prepetition Lenders and a furtherance of their business interests.

12. First, the Plan clearly states that "[a]ll consideration necessary for the Reorganized Debtors to make payments or distributions pursuant hereto shall be obtained from the New Credit Facility, the issuance of New Common Stock or other Cash from the Debtors, including Cash from operations." See Plan, Art. IV(Q). No other consideration -- from any non-debtor third party -- is proffered. See, Spytek Dep. at pp. 190-192. Second, the work done by the Released Parties, in aiding the Debtors to facilitate a successful reorganization, is not valid consideration. The Released Parties are being handsomely compensated for their work, some monetarily and others in their recovery under the Plan. Thus, the purported consideration given by the non-debtor third parties, in exchange for a release by creditors of their valuable claims, is illusory.

(b) ***Illegal Releases under Article VIII, § E of the Plan.***

13. Similar to the broad, illegal releases set forth in Article VIII, §§ A and D, of the Plan, § E of that Article exonerates any conduct, pre and post petition, taken by certain non-debtor parties, including, among others, non-debtor affiliates, the DIP Lenders, the Creditors' Committee, the Prepetition Lenders, and the Debtors' officers, directors, principals, attorneys and agents, with respect to certain duties and responsibilities under the Plan.[5] If the Plan is confirmed as written, this section would exonerate, among others, counsel for the Committee,

---

[5] Article VIII, § E, also exculpates these non-debtor parties from "[a]ny claim related to any act or omission in connection with, relating to, or arising out of the Debtors' in or out of court restructuring, the Debtors' Chapter 11 Cases, formulation, preparation, . . . of the Disclosure Statement or the Plan . . ." See Plan, Art. I, § 45 and Art. VIII, §.E.

Prepetition Lenders, and the Debtors, with respect to powers and duties exercised under the Bankruptcy Code, beyond the immunity afforded under applicable legal authority. See In re Genesis Health Ventures, Inc., 266 B.R. 591, 605-608 (Bankr. D. Del. 2001) (noting that the standard of liability under section 1103 of the Bankruptcy Code for committee members and professional extends only to postpetition actions conduct not prepetition conduct; and striking exculpation clause provision in plan of reorganization that called for release of debtor's secured lenders).

14.     Consequently, the Plan is an unlawful attempt by the Plan Proponents to exonerate non-debtors of liability for any claims of creditors and equity holders for no consideration, in violation of the Code. Such exonerations are patently improper. This express train of a pre-pack rewards negligence, failure and non-disclosure with exoneration. Accordingly, the Plan does not comply with section 1129(a)(1), as it violates Section 524(e) of the Code, and, therefore, cannot be confirmed.

**B.      The Debtors Have Not Proposed The Plan In Good Faith, And, Therefore, It Violates §1129(a)(3).**

15.     The Debtors' Plan is unconfirmable because it has not been proposed in good faith, as required under Section 1129(a)(3). See 11 U.S.C. § 1129(a)(3). To be proposed in good faith, a plan must be proposed with honest and good intentions and absent impermissible ulterior motives. See Kane v. Johns-Manville Corp., 843 F.2d 636, 649 (2d Cir. 1988) (citing Koelbl v. Glessing (In re Koelbl), 751 F.2d 137, 139 (2d Cir. 1984) (noting that the good faith provision requires a showing that "the plan was proposed with 'honesty and good intentions' and with 'a basis for expecting that a reorganization can be effected.'"); In re Best Prods. Co., Inc., 168 B.R. 35, 72 (Bankr. S.D.N.Y. 1994), appeal dismissed, 177 B.R. 791 (S.D.N.Y.), aff'd, 68 F.3d 26 (2d Cir. 1995).

1125068.1

16.    Whether a plan has been proposed in good faith requires a consideration of the totality of the circumstances surrounding the origin of the plan. In re Oneida Ltd., 351 B.R. 79, 85 (Bankr. S.D.N.Y. 2006).   Among the factors that indicate bad faith is an attempt to give favorable treatment to insiders.  In re Jandous Elec. Constr. Corp., 115 B.R. 46, 51-52 (Bankr. S.D.N.J. 1990); In re Future Energy, 83 B.R. 470, 482 (Bankr. S.D. Ohio 1988).   Similarly, ulterior motives on the part of the debtor are indicia of bad faith.  See Oneida, 351 B.R. at 85.  A debtor's lack of candor with the court or creditors also indicates bad faith.  In re Champion Oil Co., 13 B.R. 472, 474 (Bankr. S.D. Ohio 1980).  These factors are present in this case.

17.    A consideration of the totality of the circumstances surrounding the Plan compels the conclusion that it was filed in bad faith.  The Plan was filed in what purports to be a "pre-packaged" bankruptcy case, even though the Plan does not pay all unsecured creditors in full on confirmation, but, rather, treats those identical claims unequally.  The only class to vote on the Plan is Class 1, the Prepetition Lenders--the main beneficiaries of the Plan.  The Plan more properly should be considered a contested, cram-down plan.

18.    The Plan takes extraordinary measures - - with no corresponding benefit to Class 5 creditors - - to protect the potential largesse granted to the Prepetition Lenders: it provides for the release of all creditor claims against all non-debtor third parties, including the Prepetition Lenders, for no consideration; it vests with the Prepetition Lenders - - not estate fiduciaries - - the unfettered right to settle or pursue (or not pursue) valuable avoidance actions against, among others, the Prepetition Lenders themselves and their professionals, without any judicial supervision at all; and it keeps in place pre-petition management to run the Prepetition Lenders' businesses, by, inter alia, the granting to management  of valuable stock interests.  In short, the circumstances surrounding the filing of the Plan make clear that the Debtors exude bad faith in

9

filing the Plan. Their motive is to preserve management and to save the Prepetition Lenders several million dollars in a multi billion dollar case in which all other creditors are not paid in full. See Spytek Dep. at pg. 155-158. Indeed, confirmation of the Plan principally benefits management, the Prepetition Lenders and those unsecured claims arbitrarily, albeit fortuitously, placed in Class 4.

19.     Similarly, Debtors' preservation of the powers and rights of debtors under the Code for the Prepetition Lenders, post-emergence, is indicative of bad faith. The Reorganized Debtors (the Prepetition Lenders) reserve sole and absolute discretion after the Effective Date to object to or allow claims in all classes, to pursue or settle a broad range of retained causes of action, including all avoidance actions, and to reject or assume pre petition contracts -- all of which could have had a material impact on the property of the estate available for distribution to those unpaid unsecured creditors, like Triple Net. These rights may be exercised under the Plan without judicial oversight. Since these rights vest with the Reorganized Debtors (the Prepetition Lenders), they would presumably be unavailable to pay claims of Class 5, even though these rights are not subject to the Prepetition Lenders' or DIP Lenders' claims because they are completely unencumbered.

20.     This unfettered discretion in the Reorganized Debtors – not estate or trust fiduciaries -- is indicative of bad faith. See Hansen, Jones & Leta, P.C. v. Segal, 220 B.R. 434, 473 (D. Utah 1998) (improper for debtors to operate post-confirmation free of protections granted to creditors under the Bankruptcy Code). Here, the Reorganized Debtors are the Prepetition Lenders with Debtors' pre petition management safely in place. That valuable rights are to be exercised post-confirmation by this non-fiduciary group without court supervision is unfathomable. The result of their non-action on these valuable rights is to insure zero recovery

10

to Class 5 Claimants, from unencumbered assets. That is inconceivable as an appropriate result in this case. Based on the foregoing, the Plan was not filed in good faith and, therefore, should not be confirmed.

### C. The Plan Does Not Satisfy The "Best Interest Of Creditors" Test, As Required By § 1129(a)(7).

21. To be confirmable, a plan must also satisfy the so-called "best interest of creditors" test. The standards for meeting this requirement are set forth in Section 1129(a)(7) of the Code. Section 1129(a)(7) requires that the holder of a claim in an impaired class receives or retains under a plan on account of such claim property of value, as of the effective date, that is not less than the holder would receive upon liquidation. 11 U.S.C. § 1129(a)(7). It is a plan proponent's burden to prove that the plan complies with § 1129(a)(7). In re MCorp Financial, Inc., 137 B.R. 219, 228 (Bankr. S.D. Tex. 1992). The proponent meets that burden by showing that creditors who reject a plan will receive at least as much under a plan as they would receive in a liquidation of the debtor's assets under Chapter 7. Johns-Manville, 843 F.2d at 649. The Debtors cannot meet their burden, because their "consolidated" liquidation analysis wrongfully states that unsecured creditors would receive nothing in liquidation. That analysis ignores valuable, unencumbered avoidance actions, rights available upon liquidation but not confirmation of the Plan. See, Triple Net's Expert Rebuttal Report (range of preference value); and Committee's Expert Reports (range of preference values).

22. The proceeds of avoidance actions, under 11 U.S.C. §§ 544 to 551, are: (i) not collateral for the Prepetition Lenders' secured loans; (ii) expressly carved out of the collateral for the DIP Lenders; and (iii) valuable assets to satisfy all unsecured claims in a Chapter 7 liquidation, including creditors like Triple Net. Those preference actions against the Prepetition Lenders are valued, by the experts of Triple Net and Committee, at $5.7 million to $70.3 million.

11

Preference actions against others, including professionals employed by the Debtors and the Prepetition Lenders, are estimated by the experts for Triple Net and the Committee to be $33 million to $55 million. See, Committee's Expert Report.

23.     In an attempt to eviscerate these valuable avoidance rights, Article IV, § G, of the Plan provides for the Debtors' causes of action (including avoidance actions under the Code) to vest in the Reorganized Debtors after confirmation. The Reorganized Debtors - - who are by definition the Prepetition Lenders - - are able, in their sole discretion and "without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules", to decide whether to settle or to prosecute these valuable claims. It should go without saying this is wrong. First, the greatest beneficiaries of the Plan - - the Prepetition Lenders - - are the Reorganized Debtors under the Plan. Even without the Plan's exculpatory language, they owe no fiduciary duty to anyone and happen to be the recipients of the largest - - over $65 Million - - preferential transfers. Second, their professionals, along with those of the Debtors, as a group, are the second largest recipients of preferences. In a Chapter 7 liquidation, the proceeds of these actions are available to all unsecured creditors. Clearly, this Plan provision on its face is unlawful and is akin to placing the fox squarely in charge of the hen house.

> **D.     The Debtor Cannot Demonstrate That An Impaired Class Of Claims Has Accepted The Plan, Because The Prepetition Lenders Are Insiders.**

24.     Section 1129(a)(10) of the Code conditions the confirmation of a plan on its acceptance by at least one class of impaired claims, excluding insiders, if there are any such classes.

25.     Section 101(31)(B), provides that "[t]he term 'insider' includes—if the debtor is a corporation—(i) director of the debtor; (ii) officer of the debtor; (iii) person in control of the debtor . . ." The Proponents of the Plan - - the Prepetition Lenders - - and management have

exercised control, pre and post petition, of the Debtors. The Pre Petition Lenders, who will take over the company post-emergence, are the principal beneficiaries of the Plan. They will own a viable company without having been subjected to market competition. The Prepetition Lenders are also the ones who required a Class 5 over Debtors' objection, even though Debtors ostensibly are determining which of the creditors and claims will be paid and which, like the Class 5 unsecured creditors such as Triple Net and the Class 7 equity interests, will not. See Spytek Dep. at 29. Triple Net submits the ability to dictate a critical element of the Plan is control.

26.     Class 1, consisting of the Pre Petition Lenders, is the only impaired class to accept the Plan. Class 1 is impaired only because no reliable valuation has been done for its election to take stock and a second lien for its debt. The only other impaired classes, Class 5 (general unsecured creditors) and Class 7 (public equity interests), have been deemed to reject the Plan. Consequently, Debtors have not obtained the affirmative vote of the necessary impaired accepting class required by § 1129(a)(10), because the only impaired class to accept the Plan, Class 1, is a class of "insiders." As such, the Plan cannot be confirmed.

## POINT II: THE PLAN VIOLATES 11 U.S.C. § 1129(b).

### A. The Plan Does Not Satisfy The Cramdown Requirements Of Section 1129(b).

27.     Triple Net's claim under the Plan is impaired and Triple Net does not accept the Plan. Therefore, Debtors are required to meet the cramdown requirements under section 1129(b), in addition to satisfying the requirements outlined above for section 1129(a) of the Code. The cramdown provision allows a plan to be confirmed over the objection of a class of impaired creditors, only if the plan can meet two tests: (1) it must not "discriminate unfairly"; and (2) it must be "fair and equitable", with respect to each impaired class that has not accepted

the plan. In re Armstrong World Indus., Inc., 432 F.3d 507, 532 (3rd Cir. 2005); 11 U.S.C. § 1129(b)(1) (2007).

28.     The proposed Plan is not confirmable because it does not comport with the requirements of section 1129(b), as it both discriminates unfairly in its classification of similarly situated creditors in its distribution of estate property and is not fair and equitable.

    (i)    *The Plan Unfairly Discriminates Against Class 5.*

29.     Unfair discrimination has been held to mean that creditors who are similarly situated regarding their legal rights and priority cannot receive unequal treatment under a plan. Johns-Manville, 843 F.2d at 650. The requirement of fair treatment "ensures that a dissenting class will receive relative value equal to the value given to all other similarly situated classes." Armstrong World, 348 B.R. at 121 (citing Matter of Johns Manville Corp., 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986).

30.     The Plan unfairly discriminates by treating Triple Net's Class 5 Claim less favorably than the treatment of other unsecured claims under the Plan. Such unfair discrimination renders the Plan unconfirmable, under section 1129(b)(2)(B)(ii) of the Code. See, e.g., In re Pine Lake Village Apartment Co., 19 B.R. 819, 813 (Bankr. S.D.N.Y. 1982) (separate classification of unsecured deficiency claim with less favorable treatment than trade creditor class constitutes unfair discrimination); In re Economy Cast Stone Company, 16 B.R. 647 (Bankr. E.D. Va. 1981) (same result with superior treatment of separately classified unsecured insider claim to that of general unsecured creditors).

31.     Many courts have denied confirmation of chapter 11 plans of reorganization which propose disparate treatment of similarly situated creditors. See, e.g., In re Snyder Drug Stores, Inc., 307 B.R. 889, 894 (Bankr. N.D. Ohio 2004) (denying confirmation where plan

unfairly discriminated against impaired class of unsecured creditors); In re Sentry Operating Co, of Texas, Inc., 264 B.R. 850 (Bankr. S.D. Tex 2001) (declining to approve the granting of a gift by a secured creditor under a plan of reorganization to unsecured trade creditors because it unfairly discriminated against other general unsecured creditors); and In re Scott Cable Communications, 227 B.R. 596 (Bankr. D. Conn. 1998) (denying confirmation of pre-packaged plan intended to pay creditors with the exception of tax claims).

32.     In Snyder, a case similar to this case, the Bankruptcy Court for the Northern District of Ohio refused to confirm a plan of reorganization that provided a secured creditor would share its bankruptcy dividend with trade creditors (a class made up primarily of trade creditors with whom the debtor hoped to continue to do business post reorganization), while the unsecured claims of landlords and lessors, which were classified separately, would receive nothing under the plan. 307 B.R. at 892-94. As in this case, the debtor in Snyder classified general unsecured claims in two relevant classes: (i) class 10, consisting of trade creditors and lessors of stores with whom the debtor hoped to do business, after confirmation; and (ii) class 12, consisting of unsecured claims for damages resulting from lease rejections. Under the debtor's plan, McKesson Corporation, the debtor's secured creditor, would make concessions in favor of holders of claims only in class 10, by gifting part of the proceeds of its collateral to this class, while holders of claims in class 12 would receive no distribution from McKesson or from estate property. Id. The holders of class 12 claims objected to confirmation of the debtor's plan, arguing that the plan, among other things, unfairly discriminated against class 12 creditors.

33.     In refusing to confirm the debtor's plan, the court first looked at whether the separate classification of unsecured claims under the plan was proper. Even though the court found that "[s]ection 1122(a) [of the Bankruptcy Code] does not demand that all similar claims

be in the same class", 307 B.R. at 893, the court emphasized that in order to justify a separate classification of similar claims, the plan proponent must prove that a valid business reason supports the classification and the plan must satisfy a four prong test justifying the discrimination. Id. The plan proponent must show that (i) the discrimination is supported by a reasonable basis; (ii) the debtor cannot confirm a plan without discrimination; (iii) the discrimination is proposed in good faith; and (iv) the class that is being discriminated against is receiving a meaningful recovery. Id. In its application of this test, the court in Snyder rejected the debtor's argument that the debtor's need for the good will of class 10 trade creditors, alone, justified the discrimination. See, 307 B.R. at 895 (noting that the including of service providers and other creditors in class 10 with trade creditors, and debtor's failure to show that the holders of class 10 claims would refuse to deal with the debtor going forward on acceptable terms, weighed against the debtor's explanation). The court also found that the debtor had provided no evidence that a non-discriminatory plan could not be confirmed, and the plan did not offer any meaningful recovery to holders of class 12 claims. Id. at 896.

34. Like the plan in Snyder, this Plan unfairly discriminates by treating Triple Net's Class 5 Claim less favorably than the treatment afforded other unsecured claims in Class 4. The Debtors have not provided any legitimate business justification for the disparity in treatment. The explanations provided for discrimination have varied and none withstand scrutiny and none comport with the actual make-up of the creditors in Class 4. In fact, in his Deposition dated April 3, 2008, Eryk Spytek, Senior Vice President, General Counsel and Corporate Secretary of the Debtors ("Spytek Dep"), testified that the Debtors' intention at first was to pay all creditors in full - - consistent with the best business interests of the Debtors - - while the Prepetition Lenders proposed to create a Class 4 of only "critical" vendors, presumably so they would

maintain the business value of the Reorganized Debtors. The end result under the Plan incorporates neither business objective. Class 4 now includes every claim except Class 5 claims. Debtors admittedly concede that Class 4 in fact includes claims of creditors that should be in Class 5 and, the payment of which, will have no on-going business value to the Reorganized Debtors. See Spytek Dep., at pp 19-22. Because the claimants in Class 4 include those that have no on-going business relationship with the Debtors, even the business rationale advocated in the definition section of the Plan is not adhered to in practice. That creates both an arbitrary and discriminatory classification scheme.

35. Moreover, Debtors have provided no evidence to show that they cannot confirm a plan that does not discriminate, because they have considered no alternatives. For example, considering the disarray of the economy, Class 4 (with approximately $400 million in claims) would have willingly accepted a proposal of a 95% distribution, which would have given Class 5 (with approximately $20 million in claims), separately or included within Class 4, a similar divided of 95%. See Expert Report of Alvarez & Marshal, pg. 19 (noting that Class 5 claims equal less than 5% of the total unsecured creditors). Debtors have refused to consider alternatives, because to do so would require a Plan amendment and, arguably, delay confirmation. Such unfair discrimination - - without any effort to eliminate the discrimination - - renders the Plan unconfirmable under section 1129(b) of the Code. See, Synder, 307 B.R. at 894; In re Pine Lake Village Apartment Co., 19 B.R. 819, 813 (Bankr. S.D.N.Y. 1982) (separate classification of unsecured deficiency claim with less favorable treatment than trade creditor class constitutes unfair discrimination).

(ii)     *The Plan Violates the Absolute Priority Rule And Eviscerates
         the Code's Concept of Property of the Estate.*

36.     The Plan violates the plain language of the "fair and equitable" test codified in 11

U.S.C. § 1129(b)(2)(B)(ii); its' gifting provisions also are inconsistent with the Code's definition

of "property of the estate". Part of the "fair and equitable" test is known as the "absolute priority

rule." See. 11 U.S.C. § 1129(b)(2)(B)(ii). Pursuant to Section 1129(b)(2)(B)(ii) of the Code, a

plan is fair and equitable to holders of unsecured claims if:

> (i)     the plan provides that each holder of a claim of such class
>         receive or retain on account of such claim property of a value,
>         as of the effective date of the plan, equal to the allowed amount
>         of such claim; or
>
> (ii)    the holder of any claim or interest that is junior to the claims
>         of such class will not receive or retain under the plan on
>         account of such junior claim or interest any property.

11 U.S.C. § 1129(b)(2)(B). In other words, the absolute priority rule, as codified in section

1129(b)(2)(B)(ii), prohibits a junior claim or interest holder from receiving or retaining any

property under a plan of reorganization where a dissenting class with higher priority has not been

paid in full. Norwest Bank Worthington v. Ahlers, 485 U.S. 197, 202 (1988). The absolute

priority rule is applicable to a pre-package plan of reorganization. See In re Iridium Operating

LLC, 478 F.3d 452, (2d Cir. 2007).

37.     The Plan violates the absolute priority rule by providing for distributions of estate

property to Classes 6 and 8 of the Plan, which are junior creditors and equity interests to Triple

Net. This is done over the objection of Triple Net. See Norwest Bank Worthington v. Ahlers,

485 U.S. 197 (1988). The plain language of section 1129(b)(2)(B)(ii) cannot be read as anything

other than prohibiting equity holders, including individual Debtors (holders of junior claims),

from receiving or retaining anything under a plan on account of their claims or interests when the

1125068.1

claims of unsecured creditors are impaired. The value, among other things, is the vesting of avoidance actions with the Reorganized Debtors. The reinstatement of the Intercompany Claims and Interests is a clear violation of the plain language of section 1129(b)(2)(B)(ii). See Armstrong, 432 F. 3d at 513 ("The plain language of the statute makes it clear that a plan cannot give property to junior claimants over the objection of a more senior class that is impaired...").

38. Debtors apparently seek to circumvent the absolute priority rule by invoking the judicial doctrine of gifting, which in some limited instances would allow a secured creditor to share proceeds of their collateral with junior interest holders over the objection of dissenting, higher-priority creditors. The cases which have endorsed the gifting doctrine either (i) do not involve the absolute priority rule, or (ii) are distinguishable from our case and, therefore, are inapposite. See e.g., In re Genesis Health Ventures, Inc., 266 B.R. 591 (Bankr. D. Del. 2001); In re Parke Imperial Canton, Ltd., 1994 WL 842777 (Bankr. N.D. Ohio 1994). In re SPM Mfr. Corp., 984 F.2d 1305 (1st Cir. 1993); In re MCorp Fin. Inc., 160 B.R. 941 (S.D. Tex. 1993).

39. In both Genesis Health and MCorp, the "skipped class" was co-equal in priority with the class receiving the gift. See Genesis Health, 266 B.R. at 602 (general unsecured creditors class was on par with punitive damage claimants); MCorp, 160 B.R. at 960 ("[n]o class of claims inferior to the [subordinated bondholders] will receive anything . . . [t]he plan gives nothing to the classes below the [subordinated bondholders], [and § 1129(b)(2)(B)(ii)] is met."). The courts' reasoning in SPM and Parke Imperial also is not applicable here, because neither of those cases involved confirmation of a plan of reorganization and, therefore, the absolute priority rule was not implicated. See SPM, at 1309 ("[T]he Agreement is not a 'plan' requiring confirmation within the meaning of section 1129 and thus not subject to the [absolute priority rule].");  Parke Imperial, 1994 WL 842777 at *2 (involving a plan of liquidation). Consequently,

19

these cases do not support a broad rule in favor of allowing senior secured lenders to violate the confirmation requirements of section 1129(b)(2)(B)(ii) of the Code.

40. Moreover, the gifting doctrine has been rejected or significantly restricted in several jurisdictions, including the Second Circuit. See In re Iridium Operating LLC, 478 F.3d 452 (2d Cir. 2007) (finding that pre-plan settlement under the gifting doctrine must comply with the Code's priority scheme); Armstrong, 432 F.3d at 514 (noting that a creditors' right to do whatever it wishes with the bankruptcy dividend it received is not unconditional and is, instead, limited by the statutory prohibitions in 11 U.S.C. § 1129(b)(2)(B)(ii)); In re CGE Shattuck, LLC, 254 B.R. 5 (Bankr. D. N.H. 2000) (noting that the requirements of the Code cannot be avoided by private agreement, denying a secured creditor's efforts to gain approval of a commitment to share proceeds with certain designated unsecured creditors).

41. The Second Circuit's decision in Iridium, the only case within this Circuit addressing the gifting doctrine in the context of the absolute priority rule, is factually distinguishable yet nonetheless instructive. In Iridium, the creditors' committee and Iridium's prepetition secured lenders, represented by JP Morgan Chase Bank. (collectively, "JP Morgan"), sought court approval of a pre-plan settlement which provided, among other things, that JP Morgan would gift part of its collateral to a litigation trust, whose beneficiaries would be unsecured creditors, expressly for the purpose to bankroll suits against Motorola, the parent company of Iridium. Motorola challenged a section of the settlement that provided for funds remaining in the trust at the end of the litigation, those from JP Morgan's initial transfer, be distributed by the trust directly to unsecured creditors, without regards to any payment to any other creditor in violation of the absolute priority rule. Id. at 462. Notwithstanding Motorola's

objection, the bankruptcy court approved the settlement between the committee and JP Morgan and the district court affirmed. Motorola appealed.

42.     In arguing that the order approving the settlement should be affirmed on appeal, JP Morgan and the committee cited to the First Circuit decision in SPM for the proposition that Iridium's cash on hand, including the funds to be transferred to the trust, was actually JP Morgan's property, not property of the estate, to do with as JP Morgan saw fit. 478 F.3d at 460. The Second Circuit rejected this argument finding, instead, that the gifting doctrine did not support the settlement at issue because until the settlement was approved, Iridium's cash on hand remained property of the estate and not property of JP Morgan. Id at 461. *[Emphasis supplied]*. ("Until the settlement was approved, the lenders' liens were contested and the money held by the lenders was an asset of the estate."). The Second Circuit went on to find that while a creditors' committee has a duty to maximize creditors' recovery, if it reaches "a settlement that in someway impairs the rule of priorities [it] must be brought before the court with *specific and credible grounds to justify* that deviation and the court must carefully articulate its reasons for approval of the agreement." Id. (emphasis added). The Second Circuit concluded that the committee and JP Morgan had not provided *specific and credible grounds to justify* the proposed violation of the absolute priority rule. Id.

43.     The Second Circuit's reasoning in Iridium is instructive here. Before this Court can confirm the Plan, Debtors must provide the Court with *specific and credible grounds* (i) to prove that the distribution to Class 4 claimants is from the Prepetition Lenders' collateral, not property of the estate; and (ii) that the value represented by a reinstatement of the Intercompany Claims and Interests, in violation of the absolute priority rule, also somehow constitutes a permissible gift of the Prepetition Lender's recovery. Iridium, at 466. That cannot happen here.

Indeed, although the Second Circuit did not elaborate on what constitutes "specific and credible grounds", presumably Debtors have not met that requirement because they have not offered any justification or explanation why Intercompany Claims and Interests (junior creditors) should, essentially, receive a 100% distribution, while Class 5 claims receive nothing under the Plan.

44.     Again, the gifting doctrine is a lynchpin of two critical components of the Plan: (i) the disparate treatment of Class 4 claims getting a 100% recovery, while Class 5 claims gets nothing under the Plan; and (ii) the retention and unimpairment of Intercompany Claims and Interests, while Class 5 claims are impaired and reject the Plan.  The gifting doctrine, however, simply is not applicable in this case, because the alleged property to be gifted, ostensibly the Prepetition Lenders' collateral, in fact presently is property of the estate.  See Stipulation and Agreed Order Between the Debtors, the Official Committee of Unsecured Creditors, and the Official Committee of Unsecured Creditors of 360Networks (USA) Inc. in Connection With the Order Authorizing Payment of Unimpaired claims in the Ordinary Course of Business, [Doc. No. _____], at ¶3, (agreement between parties thereto, including Debtors but excluding Triple Net, whereby Debtors would continue to pay Class 4 Claims in the ordinary course of business but that a portion of Class 4 Claims would remain unpaid at the time of confirmation and all payment would be deemed to have been made under the Plan).

45.     Moreover, the Prepetition Lenders may not, as Debtors purport to allow in the Plan, take any action to designate estate property for transfer to anyone else, before a plan has been confirmed.  In fact, any attempt by the Prepetition Lenders to exercise control over the Debtors' collateral (i) absent a default, and (ii) before this Court has confirmed a plan of reorganization or entered an order lifting the automatic stay as to the Prepetition Lenders' collateral, would violate the automatic stay, 11 U.S.C. § 362.

22

46. Therefore, because the Debtors' Plan clearly discriminates unfairly against Class 5 and otherwise violates the absolute priority rule, it cannot be confirmed.

**B. The Plan Should Not Be Confirmed Because There Is No Justification For A "Deemed" Substantive Consolidation In This Case.**

47. In much the same way as the Debtors have failed to demonstrate that critical Plan provisions conform with the Code, Debtors also have failed to provide an adequate reason for the Court to allow "deemed" substantive consolidation in this matter. The Plan calls for the "deemed" consolidation of the assets and liabilities of 61 Debtors for confirmation and consummation purposes only, with the Reorganized Debtors emerging from bankruptcy with exactly the same corporate structure, exactly the same tax structure, exactly the same intercompany debt, exactly the same intercompany equity interests, and exactly the same allegedly "hopelessly entangled" accounting system, as existed pre-petition. Thus, Debtors' expert's opinion, concerning the "hopelessly entangled" intercompany obligations of the 60 or so affiliated subsidiaries under North American Van Lines, Inc., the debtor with which Triple Net entered into a lease, really makes no difference in this case. In this case, substantive consolidation is irrelevant to the treatment afforded all classes under the Plan, a plan in which liquidation values are meaningless because most creditors - - tens of thousands in number with hundreds of millions of dollars in claim amounts - - are being paid on confirmation or will be paid presently by operating revenues and DIP loans, as if no bankruptcies were ever filed. Those payments have nothing to do with consolidated liquidation values or substantive consolidation. It is only Class 5 that remains unpaid under the Plan.

48. Typically, substantive consolidation is a creditor remedy invoked to address a specific harm or prejudice suffered as the result of actual operations of the business being at odds

with the corporate structures held out to the public. Here, substantive consolidation addresses no articulated creditor harm and is sought by the Debtors exclusively for the benefit of their Prepetition Lenders. Neither the Debtors nor their joint Plan Proponents, the Prepetition Lenders, have articulated a harm that substantive consolidation is intended to remedy in this case. Indeed, the Prepetition Lenders in litigation would likely be estopped from denying the corporate separateness of the Debtors, given the corporate guarantees obtained by the Prepetition Lenders from all Debtors and their extraordinary efforts to perfect their liens both in stock (of each Debtor) as well as in the assets of all 61 Debtors. See In re Owens Corning, 419 F.3d 195, 208 (3d Cir. 2005) (separate guarantees of affiliated entities to a creditor evidence that the entities should be treated separately and not consolidated).

49.     Rather, substantive consolidation here serves an ulterior and improper purpose: it enables Debtors arguably to meet multiple Plan objections and for the Prepetition Lenders to argue for a consolidated liquidation analysis of the 61 Debtors' estates to support the fiction that the Prepetition Lenders may "gift" a portion of their liquidation recovery to Class 4 Claimants.

50.     As will be shown, substantive consolidation is inappropriate in this case because: (i) it fails to address, as a remedy, a perceived harm to a creditor; and (ii) the rationale for its application - - "hopelessly entangled" Debtor estates-- simply does not apply where it might arguably be relevant, at the North American Van Lines, Inc., and SIRVA, Inc., levels. See, Triple Net's Expert Rebuttal Report, at 7.

51.     The Second Circuit has reiterated that "[t]he sole purpose of substantive consolidation is to ensure the equitable treatment of all creditors" (emphasis added) and "is no mere instrument of procedural convenience . . . but a measure vitally affecting substantive rights." In re Augie/Restivo Baking Co., Ltd. , 860 F.2d 515, 518 (2d Cir. 1988) (internal

quotations and citations omitted); Owens Corning, 419 F.3d at 208 (substantive consolidation is a remedy to be used "sparingly"). The Second Circuit provides that, for a Court to permit substantive consolidation, the proponent of the consolidation must prove either 1) that the "creditors dealt with the debtor entities as a single economic unit and did not rely on their separate identities in extending credit;" or 2) that "the affairs of the debtors are so entangled that consolidation will benefit all creditors." Id. (emphasis added); see also Chem. Bank N.Y. Trust Co. v. Kheel, 369 F.2d 845, 847 (2d Cir. 1966) ("The power to consolidate should be used sparingly because of the possibility of unfair treatment of creditors of a corporate debtor who have dealt solely with that debtor without knowledge of its interrelationships with others.").[6] In this case, Debtors have only asserted the second factor—"hopelessly entangled" affairs-- as the basis for consolidation.

52.    First and foremost, Debtors must demonstrate that substantive consolidation is necessary to permit them to treat all of the creditors equally and to remedy some harm to the creditors that cannot be cured by a creditor seeking recourse against an individual debtor. Debtors have not shown here that substantive consolidation will remedy any harm to creditors. To the contrary, all creditors, except for Triple Net and like Class 5 creditors, are being paid in full, or have already been paid in full, regardless of substantive consolidation. The doctrine here is being used only to deny any payment to Class 5 claimants. That is improper.

---

[6] While not binding precedent on this Court, the analysis of the Third Circuit in In re Owns Corning, 419 F.3d 195 (3d Cir. 2005), cited throughout this section, is most instructive in this matter because the Third Circuit reversed the District Court's approval of a substantive consolidation after applying a test almost identical to that of the Second Circuit in Augie/Restivo. See id. at 210- 211 (discussing its reliance upon the Augie/Restivo analysis and outlining a similar two-prong test).

53. It is particularly wrong, since the only Debtor with which Triple Net has done business is North American Van Lines. It did not seek, nor rely, on the guarantees of any related entities when it entered into with North American a lease. See Affidavit of Greg Rogerson, ¶¶ 7-9. Based on North American's credit worthiness alone, Triple Net also did not require North American to post a security deposit. Id. at ¶ 10. Because North American is the only company with which Triple Net transacted business, and because it may be able to recover on its claim against North American from assets unencumbered by either the claims of Prepetition Lenders or DIP Lenders, Triple Net should not be subject to the substantive consolidation of the SIRVA related entities, all of which are fully subject to the Prepetition Lenders' claims. See Augie/Restivo, 860 F.2d at 520 ("Where, as in the instant case, creditors . . . made loans to separate entities and no irremediable commingling of assets has occurred, a creditor cannot be made to sacrifice the priority of its claims against its debtor. . ."); Owens-Corning at 210, 215 (substantive consolidation should not be permitted where creditor will be adversely affected by consolidation and relied on separate existence of affiliated entity). Absent the secured lenders' manipulation, Triple Net could have recovered from North American in full.

54. Furthermore, as the Owens Corning court noted, the entanglement of finances is only a justification for the consolidation of the entities when such consolidation benefits all of the creditors, because the time and expense of disentangling the finances reduces the recovery to all creditors. 419 F.3d at 214. In this case, the consolidation, in fact, harms some of the creditors, Class 5 Claimants, rather than providing a benefit to all of the creditors. Indeed, because Class 5 Claimants receive nothing under the Plan there is no basis to avoid the time and expense to unwind the allegedly entangled records, since all other unsecured creditors have been paid in full already.

55.     Lastly, while it may be more convenient for the Court and the Debtors to treat all of the entities as one, as the Second Circuit admonished, substantive consolidation is not to be used as a vehicle for convenience.  Augie/Restivo, 860 F.2d at 520.  Nor should substantive consolidation be permitted where, as here, the Prepetition Lenders are seeking consolidation as an offensive weapon: under the theory of the Plan, if all of the consolidated assets were to be liquidated, the Prepetition Lenders would be entitled to the only recovery and can then "gift" the proceeds, as they see fit.  For the Plan Proponents' ill-conceived, quasi pre-packaged joint Plan to work as the Prepetition Lenders intend, however, the separate assets and liabilities must be "deemed" consolidated.  In Owens-Corning, the Court discussed that, while substantive consolidation is supposed to be used "defensively" to remedy any harms to the creditors, it is not to be used "offensively" to alter creditors' rights or place one group of creditors at a disadvantage.  419 F.3d 195 at 211, 215.  Indeed, there is no reason for this sparingly used remedy to be applied with respect to Triple Net's claim and at least three good reasons why it should not be applied:  1) substantive consolidation does not prevent any harm to Triple Net or like creditors in Class 5 - - the only creditors paid zero under the Plan - - and, in fact, works a harm by being used to prevent them from obtaining any recovery in bankruptcy; 2) Triple Net did not deal with the various corporate entities, as a single unit; and 3) there is no complicated entanglement of multiple entities to be sorted out, but only the accounting for three relevant Debtors: NAVL, SIRVA Worldwide, and SIRVA, Inc.  See, Triple Net's Expert Rebuttal Report, at pg. 7.

56.     In this case, a "deemed" substantive consolidation,[7] a remedy not provided for in the Code, is being used to deny any recovery to a very limited class of creditors, violating both Code requirements for the best interests of the creditors and the absolute priority rule.  See Timothy E. Graulich, Substantive Consolidation-A Post Modern Trend, 14 ABI L. Rev.527, 555-56 (2006).  As the Owens Corning court noted, it was hard to believe that all of the related corporate entities should be part of a deemed substantial consolidation and treated as one entity when, upon emergence from bankruptcy, each entity would continue to exist independently and the corporate structure would remain in place.  That is exactly the case here.  The Owens Corning Court would not permit this "deemed" consolidation, when it appeared its only purpose was not to remedy a harm to the creditors, "but rather [it was] a stratagem to "deem" separate resources reallocated to OCD [the debtor] to strip the Banks [the creditors] of rights under the Bankruptcy Code, favor other creditors, and yet trump possible Plan objections by the Banks." 419 F.3d at 216 (also noting that a "deemed" consolidation is not in line with any of the principles governing when a court should permit substantive consolidation.  Id. at 212).  Thus, substantive consolidation - - as a lynchpin of the Plan - - should be rejected outright because it has no relevance to the case, except as an offensive weapon aimed directly at Class 5.

---

[7]  As discussed above, the consolidation is only for the purposes of confirmation and consummation of the Plan. Afterwards, the Debtors emerge from bankruptcy with the same corporate structure, including intercompany equity interests and claims, which were in place before bankruptcy.

## CONCLUSION

For each of the above reasons, Triple Net respectfully requests entry of an order denying confirmation of the Plan. Triple Net also incorporates by reference any and all objections to the Plan filed by other parties-in-interest.

Respectfully submitted,

WOLFF & SAMSON PC
Attorneys for Triple Net Investments IX, LP

By: /s/ Robert E. Nies
ROBERT E. NIES

Dated: April 11, 2008

1125068.1