Marc Kieselstein, P.C. (admitted *pro hac vice*)
Adam C. Paul (admitted *pro hac vice*)
Scott R. Zemnick (admitted *pro hac vice*)
Jeffrey Gettleman (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, Illinois 60601
Telephone: (312) 861-2000
Facsimile: (312) 861-2200

Counsel for the Debtors and Debtors in
Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | Case No. 08-10375 (JMP) |
| DJK Residential LLC, et al., | ) | Jointly Administered |
| | ) | |
| Debtors. | ) | |
| | ) | |

**DEBTORS' MEMORANDUM OF LAW IN SUPPORT OF ENTRY OF AN ORDER
(I) APPROVING (A) THE DEBTORS' DISCLOSURE STATEMENT PURSUANT TO
SECTION 1125 AND 1126(B) OF THE BANKRUPTCY CODE, (B) SOLICITATION OF
VOTES AND VOTING PROCEDURES, AND (C) FORMS
OF BALLOTS; AND (II) CONFIRMING THE DEBTORS' JOINT
PREPACKAGED PLAN OF REORGANIZATION PURSUANT
TO CHAPTER 11 OF THE BANKRUPTCY CODE**

**TABLE OF CONTENTS**

Page

I.   THE DISCLOSURE STATEMENT SHOULD BE APPROVED ......................................3

     A.   The Plan Solicitation Was Exempt From Federal Securities Registration
          Requirements ......................................................................................................3

     B.   The Disclosure Statement Provides Adequate Information......................................5

          1.   Triple Net's Objections to the Disclosure Statement Should Be
               Overruled ....................................................................................................7

II.  THE DEBTORS' SOLICITATION AND VOTING PROCEDURES SHOULD
     BE APPROVED ...........................................................................................................9

     A.   The Debtors Have Complied with the Notice Requirements of Bankruptcy
          Rule 3017(d) ......................................................................................................10

     B.   The Debtors' Forms of Ballots Should Be Approved............................................12

     C.   The Voting Classes Were Given a Reasonable Period of Time in Which to
          Accept or Reject the Plan.....................................................................................12

III. THE PLAN SHOULD BE CONFIRMED .................................................................15

     A.   The Plan Complies With Section 1129(a)(1) of the Bankruptcy Code. ................16

          1.   The Plan Properly Classifies Claims and Equity Interests Under
               Section 1122 of the Bankruptcy Code. ......................................................16

               a.   Overview......................................................................................16

               b.   The Objections to the Plan's Classification Pursuant to
                    Sections 1129(a)(1) and 1122 of the Bankruptcy Code
                    Should be Overruled ....................................................................20

          2.   Sections 1123(a)(1) Through 1123(a)(3) are Satisfied .............................34

          3.   The Plan Satisfies the Requirements of Section 1123(a)(4) by
               Providing the Same Treatment to Holders of Claims Within the
               Same Class .................................................................................................35

          4.   Section 1123(a)(5)  is Satisfied Because the Plan Provides
               Adequate Means for Its Implementation....................................................35

          5.   The Plan Prohibits the Issuance of Nonvoting Equity Securities,
               Thereby Satisfying Section 11 U.S.C. § 1123(a)(6) ..................................36

          6.   The Plan's Provisions Satisfy Section 1123(a)(7) ....................................36

i

B.      Substantive Consolidation is Justified by the Facts and Circumstances Herein .................................................................................................37

     1.      The Legal Standards for Granting Substantive Consolidation .................37

     2.      Substantive Consolidation Causes No Harm in This Case .......................41

     3.      The "Hopeless Entanglement" Prong is Satisfied....................................42

     4.      The "Creditor Reliance" Prong is Satisfied .............................................52

     5.      The Committee's Objection to Substantive Consolidation is Fundamentally Flawed and Baseless. ........................................................58

         a.      The Committee's Objection to "Hopeless Entanglement" is Hopelessly Flawed ........................................................................60

         b.      The Committee's Objection Regarding Creditor Reliance Is Similarly Flawed. ......................................................................64

         c.      The Committee's Assertion that the Debtors' Motivation for Substantive Consolidation Is Suspect Is Wholly Speculative ..........................................................................65

C.      Discretionary Contents of the Plan .......................................................66

D.      The Debtors Have Complied Fully With the Applicable Provisions of the Bankruptcy Code (Section 1129(a)(2))....................................................67

E.      The Plan has Been Proposed in Good Faith and not by Any Means Forbidden by Law (Section 1129(a)(3)) ................................................67

     1.      The Plan Was Proposed in Good Faith Under Section 1129(a)(3)...........67

     2.      The Plan Has Not Been Proposed by Any Means Prohibited by Law ....................................................................................................69

F.      The Plan Provides For Bankruptcy Court Approval Of Certain Administrative Payments (Section 1129(a)(4)) .....................................69

G.      Post-Emergence Directors and Officers Have Been Disclosed Before Confirmation and Their Appointment is Consistent With Public Policy (Section 1129(a)(5))...............................................................................71

H.      The Plan Does Not Require Governmental Regulatory Approval (Section 1129(a)(6))...............................................................................73

I.      The Plan is in the Best Interests of Creditors and Interest Holders (Section 1129(a)(7))...............................................................................74

     1.      The Committee's "BIC" Objection Fails .................................................76

     2.      The Committee's so-called "marshaling" argument lacks legal or factual support.......................................................................................77

a. The Committee seeks an unprecedented inversion of the doctrine of marshaling ................................................................78

b. The equitable doctrine of marshaling cannot be used to re-write the Bankruptcy Code by eliminating the Prepetition Lenders' adequate protection .........................................................82

c. The Attempt to Justify Marshaling by Recharacterizing the 2008 Loan Must Fail ......................................................................85

3. The Liquidation Analysis establishes the LaSalle Securitization Facility will have a substantial deficiency claim ......................................89

4. The Committee overvalues the Debtors' inventoried homes....................89

5. The Committee's liquidation analysis overvalues potential preference claims and avoidance actions....................................................92

6. The Prepetition Lenders Received No Preferences ..................................94

a. None of the Applicable Transfers Had a Preferential Effect ........94

b. All Payments to the Prepetition Lenders in the Preference Period Were "Ordinary Course of Business" or "Ordinary Business Term" Payments ............................................................97

c. The $10 Million Interest Payment Was For New Value................99

7. The Committee's liquidation analysis fails to consider the significant administrative costs that would be incurred through liquidation of the Debtors' estates ...........................................................100

J. Triple's Net's objection under 1129(a)(7) fails because Triple Net provides no support for its contention that the Plan fails to satisfy section 1129(a)(7) of the Bankruptcy Code ..................................................................102

K. Acceptance of Impaired Classes (Section 1129(a)(8)) ........................................103

L. The Plan Complies With Statutorily Mandated Treatment of Administrative and Priority Tax Claims (Section 1129(a)(9)) ............................104

M. At Least One Impaired Class of Claims Has Accepted the Plan, Excluding the Acceptances of Insiders (Section 1129(a)(10))................................................105

1. Class 1 Members Are Not "Insiders"........................................................105

N. The Plan Is Feasible (Section 1129(a)(11)) ..........................................................109

1. The Debtors Have Used Chapter 11 to Create a Viable Capital Structure..................................................................................................111

2. The Debtors Secured Valuable Exit Financing........................................111

3. The Debtors' Financial Projections Have Been Scrutinized And

Validated By Key Stakeholders And Independent Third Parties.............113

O.    The Plan Provides for the Payment of All Fees Under 28 U.S.C. § 1930 ..........114

P.    The Plan Complies With Section 1129(a)(13) of the Bankruptcy Code .............114

Q.    The Plan Satisfies The "Cram Down" Requirements ..........................................114

    1.    The Plan Is Fair and Equitable With Respect to Impaired Classes That Have Not Voted to Accept the Plan...................................................115

    2.    Objections Premised on the Absolute Priority Rule are Misplaced.........116

    3.    The Plan Does Not Unfairly Discriminate Against Classes 5 and 7........118

        a.    The Disparate Treatment Between Class 4 and Class 5 is not "Unfair Discrimination" Because Recoveries Received by Class 4 are a "Gift" from the Prepetition Lenders .................119

        b.    There are Legitimate Business Reasons to Discriminate Between Class 4 and Class 5 ........................................................127

    4.    The Objections Asserting the Plan Unfairly Discriminates Should be Overruled..................................................................................131

        a.    The Committee's Objection to Gifting is Without Merit.............131

    5.    Remaining Objections Asserting the Plan Unfairly Discriminates Should Also Be Overruled .....................................................................140

    6.    The Plan Satisfies the Fair and Equitable Requirements ........................142

IV.    THE MISCELLANEOUS OBJECTIONS TO PLAN CONFIRMATION SHOULD BE OVERRULED ..........................................................................142

A.    Triple Net's Objections to the Plan's Releases Should Be Overruled.................142

    1.    The Debtors' Releases Are Appropriate .................................................142

    2.    Releases By Holders Of Claims And Interests Are Consensual and Should be Approved ..............................................................................145

    3.    The Exculpation Provision Should Be Approved....................................147

B.    The Committee's Miscellaneous Objections Should Be Overruled ....................150

    1.    The Committee's Objection to 502(d) Should Be Overruled. .................150

    2.    The Committee's objection regarding the discharge of pricing claims is both incorrect and irrelevant to confirmation of the Plan.........151

**TABLE OF AUTHORITIES**

**Cases**

Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship,
    526 U.S. 434 (1999)........................................................................................... 68

Bank of Am., Ill. v. 203 N. LaSalle St. P'ship,
    195 B.R. 692 (Bankr. N.D. Ill. 1996), F.3d 955 (7th Cir. 1997) ..................................... 72

Chemetron v. Jones,
    72 F.3d 341 (3d Cir. 1995)............................................................................. 153

DePippo v. Kmart Corp.,
    335 B.R. 290 (S.D.N.Y. 2005)....................................................................... 152

Drexel Burnham Lambert,
    138 B.R. at 757 ..................................................................................... passim

Dulieu v. White,
    [1901] 2 K.B. 669 (1901)................................................................................. 54

FDIC v. Colonial Realty Co.,
    966 F.2d 57 (2d Cir. 1992)................................................................... 37, 38, 39

In re 11,111, Inc.,
    117 B.R. 471 (Bankr. D. Minn. 1990) ............................................................. 19

In re 500 Fifth Ave. Assocs.,
    148 B.R. 1010 (Bankr. S.D.N.Y. 1993)........................................................... 17

In re Abatement Envtl. Resources, Inc.,
    307 B.R. 491 (Bankr. D. Md. 2004) ............................................................... 95

In re Adams,
    240 B.R. 807 (Bankr. D. Me. 1999)................................................................ 96

In re Adana Mortgage Bankers, Inc.,
    14 B.R. 29 (Bankr. N.D. Ga. 1981) ................................................................. 8

In re Adelphia Commc'ns Corp.,
    368 B.R. 140 (Bankr. S.D.N.Y. 2007)..................................................... passim

In re Affiliated Foods, Inc.,
    249 B.R. 770 (Bankr. W.D. Mo. 2000)..................................................... 39, 40

In re Am.'s Hobby Ctr., Inc.,
    223 B.R. 275 (Bankr. S.D.N.Y. 1998)........................................................... 79

K&E 12473324.

In re Ambanc La Mesa Ltd. P'ship,
  115 F.3d 650 (9th Cir. 1997) ............................................................ 128

In re Apex Oil Co.,
  118 B.R. 683 (Bankr. E.D. Mo. 1990) .......................................... 71, 72

In re Arlco, Inc.,
  239 B.R. 261 (Bankr. S.D.N.Y. 1999) ................................................ 79

In re Armstrong World Indus., Inc.,
  348 B.R. 111 (D. Del. Aug. 14, 2006) ........................................ 15, 107

In re Atkins Nutritionals, Inc.,
  Case No. 05-15913 (ALG) (Bankr. S.D.N.Y. Dec. 21, 2005) ................. 61, 64

In re Augie/Restivo Baking Co., Ltd.,
  860 F.2d 515 (2d Cir.1988) ................................................ 38, 39, 40, 54

In re Auto-Train Corp.,
  49 B.R. 605 (D.D.C. 1985) .............................................................. 100

In re Aztec Co.,
  107 B.R. 585 (Bankr. M.D. Tenn. 1989) .......................................... 127

In re B.D. Int'l Disc. Corp.,
  701 F.2d 1071, n.8 (2d Cir. 1983) ..................................................... 68

In re Bally Total Fitness of Greater N.Y., Inc.,
  Case No. 07-12395 (Bankr. S.D.N.Y. Sept. 17, 2007) ................. 4, 15, 18, 68

In re Barakat,
  99 F.3d 1520 (9th Cir. 1997) ....................................................... 26, 27

In re Beyond.com Corp.,
  289 B.R. 138 (Bankr. N.D. Cal. 2003) .............................................. 72

In re Bonham,
  229 F.3d 750 (9th Cir. 2000) ....................................................... 39, 40

In re Borges,
  184 B.R. 874 (Bankr. D. Conn. 1995) ................................................ 79

In re Boston Post Road Ltd. P'ship,
  21 F.3d 477 (2d Cir. 1994) ...................................................... 17, 26, 27

In re Briscoe Enters., Ltd. II,
  994 F.2d 1160 (5th Cir. 1993) .......................................................... 15

K&E 12473324.

In re Buttonwood Partners, Ltd.,
    111 B.R. 57 (Bankr. S.D.N.Y. 1990) .......................................................................... 128

In re Cajun Elec. Power Coop., Inc.,
    150 F.3d 503 (5th Cir. 1998) ...................................................................................... 67

In re Calpine Corp.,
    Case No. 05-60200 (Bankr. S.D.N.Y. Jan. 31, 2008) ............................................ 61, 64

In re Cavalier Indus., Inc.,
    Case No. 99-31737, 2002 WL 975868 (Bankr. E.D. Pa. Apr. 16, 2002) ...................... 100

In re Center Wholesale,
    788 F.2d 541 (9th Cir. 1986) ...................................................................................... 80

In re Chateaugay Corp.
    89 F.3d 942 (2d Cir. 1996) ................................................................................... passim

In re Chateaugay Corp.,
    10 F.3d 944 (2d Cir. 1993) .......................................................................................... 17

In re Chateaugay Corp.,
    155 B.R. 625 (Bankr. S.D.N.Y. 1991) .......................................................................... 18

In re Continental Vending Machine Corp.,
    517 F.2d 997 (2d Cir. 1975) ........................................................................................ 37

In re Copy Crafters Quickprint Inc.,
    92 B.R. 973 (Bankr. N.D.N.Y. 1988) ............................................................................. 5

In re Coram Healthcare Corp.,
    315 B.R. 321 (Bankr. D. Del. 2004) .......................................................................... 144

In re Creditors Serv. Corp.,
    195 B.R. 680 (Bankr. S.D. Ohio 1996) ........................................................................ 39

In re Crowthers McCall Pattern, Inc.,
    120 B.R. 279 (Bankr. S.D.N.Y. 1990) .......................................................................... 93

In re Ctr. Wholesale, Inc.,
    788 F.2d 541 (9th Cir. 1986) ...................................................................................... 80

In re D & W Realty Corp,
    165 B.R. 127 (S.D.N.Y. 1991) ..................................................................................... 17

In re Dana Corp.,
    Case No. 06-10354 (Bankr. S.D.N.Y. March 29, 2006) ................................................. 88

K&E 12473324.

In re Delta Airlines,
    Case No. 05-17923 (Bankr. S.D.N.Y. Apr. 25, 2007) .................................................. 61

In re Deltacorp, Inc.,
    179 B.R. 773 (Bankr. S.D.N.Y. 1981) ............................................................ 37, 38, 39, 64

In re Dig It, Inc.,
    129 B.R. 65 (Bankr. D.S.C. 1991) ....................................................................................... 80

In re Dragone,
    324 B.R. 445, n.4 (Bankr. D. Conn. 2005) ...................................................................... 68

In re Drexel Burnham Lambert Group, Inc.,
    960 F.2d 285 (2d Cir. 1992) ............................................................................................. 103

In re DRW Prop. Co.,
    60 B.R. 505 (Bankr. N.D. Tex. 1986) ............................................................................... 17

In re Dura Auto. Sys., Inc.,
    Case No. 06-11202 (KJC) (Mar. 18, 2008) .................................................................... 112

In re Eagle-Picher Indus., Inc.,
    216 B.R. 611 (Bankr. S.D. Ohio 1997) ........................................................................... 153

In re Eddington Thread Mfg. Co.,
    181 B.R. 826  (Bankr. E.D. Pa. 1995) ............................................................................ 109

In re El Paso Refinery, LP,
    171 F.3d 249 (5th Cir. 1999) ............................................................................................. 95

In re Elsinore Shore Assocs.,
    91 B.R. 238 (Bankr. D.N.J. 1988) ..................................................................................... 70

In re Enron Corp.,
    326 B.R. 497 (S.D.N.Y. 2005) ......................................................................................... 148

In re Flagstaff Food Serv. Corp.,
    762 F.2d 10 (2d Cir. 1985) ............................................................................................... 138

In re Flanagan,
    503 F.3d 171 (2d Cir. 2007) ............................................................................................... 95

In re Flora Mir Candy Corp.,
    432 F.2d 1060  (2d Cir. 1970) ........................................................................................... 53

In re Food Fair, Inc.,
    10 B.R. 123 (Bankr. S.D.N.Y. 1981) ........................................................................... 38, 39

K&E 12473324.

In re Freymiller Trucking, Inc.,
    190 B.R. 913 (Bankr. W.D. Okla. 1996) ....................................................... 127

In re Genesis Health Ventures, Inc.,
    266 B.R. 591 (Bankr. D. Del. 2001) ............................................................ 21

In re Gibson Group, Inc.,
    151 B.R. 133 (Bankr. S.D. Ohio 1993)........................................................ 80

In re Granite Broad. Corp.,
    369 B.R. 120 (Bankr. S.D.N.Y. 2007)........................................................ 68

In re Graphic Commc'ns, Inc.,
    200 B.R. 143 (Bankr. E.D. Mich. 1996)..................................................... 128

In re Graphic Communications,
    200 B.R. 143 (Bankr. E.D. Mich. 1996)..................................................... 31

In re Great Bay Hotel & Casino, Inc.,
    251 B.R. 213 (Bankr. D.N.J. 2000) ............................................................ 19

In re Greystone III Joint Venture,
    995 F.2d 1274 (5th Cir.1991) ......................................................... 17, 26, 27

In re Gucci,
    174 B.R. 401 (Bankr. S.D.N.Y. 1994)............................................... 41, 52, 58

In re Gulf City Seafoods, Inc.,
    296 F.3d 363 (5th Cir. 2002) .................................................................... 99

In re Heritage Org.,
    375 B.R. 230 n.86 (Bankr. N.D. Tex. 2007).................................................. 18

In re Ionosphere Clubs, Inc.,
    98 B.R. 174 (Bankr. S.D.N.Y. 1989)..................................................... 17, 18

In re Iridium Op. LLC,
    478 F.3d 452 (2d Cir. 2007)................................................................... 139

In re IT Group, Inc.,
    307 B.R. 762 (D. Del. 2004) .................................................................... 90

In re Jenkins,
    99 B.R. 949 (Bankr. W.D. Mo. 1988)......................................................... 80

In re Jersey City Med. Ctr.,
    817 F.2d 1055 (3d Cir. 1987).............................................................. 17, 18

In re Kelton Motors, Inc.,
   97 F.3d 22 (2d Cir. 1996) ............................................................ 96

In re Kent Terminal Corp.,
   166 B.R. 555 (Bankr. S.D.N.Y. 1994) ........................................ 15

In re King,
   305 B.R. 152 (Bankr. S.D.N.Y. 2004) ........................................ 79

In re Kliegl Bros. Univ. Elec. Stage Lighting Co. Inc.,
   149 B.R. 306 (Bankr. E.D.N.Y. 1992) ...................................... 129

In re Koelbl,
   751 F.2d 137 (2d Cir. 1984) ........................................................ 68

In re Lafayette Hotel P'ship,
   227 B.R. 445 (S.D.N.Y. 1998) .................................................... 18

In re Lason, Inc.,
   300 B.R. 227 (Bankr. D. Del. 2003) ........................................... 92

In re Leslie Fay Co,
   207 B.R. 764 (Bankr. S.D.N.Y. 1997) ........................................ 37

In re M. Silverman Laces,
   Case No. 01-6209, 2002 WL 31412465 (S.D.N.Y. Oct. 24, 2002) ................................ 108

In re Madison Hotel Assocs.,
   749 F.2d 410 (7th Cir. 1984) ...................................................... 68

In re Magic Circle,
   64 B.R. 269 (Bankr. W.D. Okla. 1986) ...................................... 98

In re Master Mortgage Inv. Fund, Inc.,
   168 B.R. 930 (Bankr. W.D. Mo. 1994) ..................................... 146

In re McElwaney,
   40 B.R. 66 (Bankr. M.D. Ga. 1984) ........................................... 80

In re MCorp Fin., Inc.,
   160 B.R. 941 (S.D. Tex. 1993) .................................................. 121

In re Middle Plantation of Williamsburg, Inc.,
   47 B.R. 884 (E.D. Va. 1984), 755 F.2d 928 (4th Cir. 1985) ............................. 8

In re Momentum Mfg. Corp.,
   25 F.3d 1132 (2d Cir. 1994) .......................................................... 5

K&E 12473324.

In re Monroe Well Serv., Inc.,
    80 B.R. 324 (Bankr. E.D. Pa. 1987) ............................................................. 42

In re Movie Gallery, Inc.,
    Case No. 07-33849 (Bankr. E.D. Va. Apr. 10, 2008) ................................... 118

In re Musicland Holding Corp.,
    Case No. 06-10064 (Bankr. S.D.N.Y. July 24, 2007) ............................... 61, 64

In re NII Holdings, Inc.,
    288 B.R. 356 (Bankr. D. Del. 2002) ........................................................... 69

In re O.P. Held, Inc.,
    74 B.R. 777 (Bankr. N.D.N.Y. 1987) ................................................... 84, 139

In re One Times Square Assocs. Ltd. P'ship,
    165 B.R. 773 ................................................................................ 17, 26, 27

In re Oneida Ltd.,
    Case No. 06-10489 (Bankr. S.D.N.Y. Aug. 30, 2006) ............................. 61, 64

In re Owens Corning,
    419 F.3d 195 (3d Cir. 2005)......................................................... 40, 52, 57, 65

In re Pan Trading Corp.,
    125 B.R. 869 (Bankr. S.D.N.Y. 1991) ......................................................... 97

In re Parke Imperial Canton, Ltd.,
    Case No. 93-61004, 1994 WL 842777 (Bankr. N.D. Ohio Nov. 14, 1994) ................... 121

In re Phoenix Petrol. Co.,
    278 B.R. 385 (Bankr. E.D. Pa. 2001) ............................................................. 5

In re Phoenix Steel Corp.,
    39 B.R. 218 (D. Del. 1984)................................................................... 84, 139

In re Pioneer Fin. Corp.,
    246 B.R. 626 (Bankr. D. Nev. 2000) ............................................................. 3

In re Piper Aircraft Corp.,
    244 F.3d 1289 (11th Cir. 2001) ................................................................. 68

In re Prudential Energy Co.,
    58 B.R. 857 (Bankr. S.D.N.Y. 1986)......................................................... 109

In re PWS Holding Corp.,
    228 F.3d 224 (3d Cir. 2000)................................................................... 8, 148

K&E 12473324.

In re Qualitech Steel Corp.,
    276 F.3d 245 (7th Cir. 2001) ................................................. 83

In re Quay Corp., Inc.,
    372 B.R. 378  (Bankr. N.D. Ill. 2007) ................................. 141

In re Quebecor World (USA), Inc.,
    Case No 08-10152 (Bankr. S.D.N.Y. Apr. 1, 2008) ............ 88

In re Quigley Co., Inc.,
    377 B.R. 110 (Bankr. S.D.N.Y. 2007) ............................... 128

In re R.J. Patton Co.,
    348 B.R. 618 (Bankr. D. Conn. 2006) ............................... 103

In re Radnor Holdings Corp.,
    353 B.R. 820 (Bankr. D. Del. 2006) ................................. 109

In re Red Dot Scenic, Inc.,
    313 B.R. 181 (Bankr. S.D.N.Y. 2004) ............................... 150

In re Repurchase Corp.,
    332 B.R. 336 (Bankr. N.D. Ill. 2005) ............................... 110

In re Richton Intl Corp.,
    12 B.R. 555 (Bankr. S.D.N.Y. 1981) ................................. 38

In re Riggel,
    142 B.R. 199 (Bankr. S.D. Ohio 1992) ............................... 19

In re Roblin Indus.,
    78 F.3d 30 (2d Cir. 1995) ................................................. 98

In re Rochem, Ltd.,
    58 B.R. 641 (Bankr. D.N.J. 1985) ..................................... 128

In re Rosen Auto Leasing, Inc.,
    346 B.R. 798 (8th Cir. B.A.P. 2006) ................................. 107

In re Rusty Jones, Inc.,
    110 B.R. 362 (Bankr. N.D. Ill. 1990) ............................... 72

In re S&W Enter.,
    37 B.R. 153 (Bankr. N.D. Ill. 1984) ................................. 16

In re Safe-T-Brake,
    162 B.R. 359 (Bankr. S.D. Fla. 1993) ............................... 96

K&E 12473324.

In re Seatrade Corp.,
369 F.2d 845 (2d Cir. 1966) ........................................................................ 40

In re Sentry Operating Co. of Tex., Inc.,
264 B.R. 850 (Bankr. S.D. Tex. 2001) ........................................................ 126

In re Seth Co.,
281 B.R. 150 (Bankr. D. Conn. 2002) .......................................................... 83

In re SGL Carbon Corp.,
200 F.3d 154 (3d Cir. 1999) ........................................................................ 68

In re Smith's Home Furnishings, Inc.,
265 F.3d 959 (9th Cir. 2001) ..................................................................... 100

In re Snyders Drug Stores, Inc.,
307 B.R. 889 (Bankr. N.D. Ohio 2004) .................................................. 31, 33

In re Solutia Inc.,
Case No. 08-01057 (Bankr. S.D.N.Y. Feb. 6, 2008) ................................. 112

In re Sound Radio, Inc.,
93 B.R. 849 (Bankr. D.N.J. 1988) ................................................................ 68

In re Source Enters., Inc.,
Case No. 06-11707(AJG), 2007 WL 2903954  (Bankr. S.D.N.Y. Oct. 1, 2007) ....... 68, 73

In re Southworth,
22 B.R. 376 (Bankr. D. Kan. 1982) .............................................................. 90

In re Specialty Equip. Cos., Inc.,
3 F.3d 1043 (7th Cir. 1993) ....................................................................... 146

In re Spiegel, Inc.,
No. 03-11540 (BRL), 2006 WL 2577825 (Bankr. S.D.N.Y. Aug. 16, 2006) ............... 146

In re SPM Mfg. Corp.,
984 F.2d 1305 (1st Cir. 1993) ................................................................... 121

In re SPW Corp.,
96 B.R. 676 (Bankr. N.D. Tex. 1989) ........................................................... 99

In re Stone & Webster, Inc.,
286 B.R. 532 (Bankr. D.Del. 2002) .............................................................. 38

In re Stoney Creek Techs., LLC,
364 B.R. 882 (Bankr. E.D. Pa. 2007) ........................................................... 83

K&E 12473324.

*In re Stratford Assocs. Ltd. P'ship*,
    145 B.R. 689 (Bankr. D. Kan. 1992) ............................................................ 72

*In re Swedeland Dev. Group, Inc.*,
    16 F.3d 552 (3d Cir. 1994) ........................................................................ 84

*In re Telesphere Commc'ns, Inc.*,
    229 B.R. 173 (N.D. Ill. 1999) .................................................................... 95

*In re Teligent, Inc.*,
    282 B.R. 765 (Bankr. S.D.N.Y. 2002) ...................................................... 121

*In re Teltronics Servs., Inc.*,
    29 B.R. 139 (Bankr. S.D.N.Y. 1983) ......................................................... 78

*In re Tex. Extrusion Corp*,
    844 F.2d 1142 (5th Cir. 1988) ..................................................................... 5

*In re Texaco Inc.*,
    254 B.R. 536 (Bankr. S.D.N.Y. 2000) ............................................. 5, 67, 71

*In re T-H New Orleans L.P.*,
    116 F.3d 790 (5th Cir. 1997) ..................................................................... 68

*In re Tip Top Tailors, Inc.*,
    127 F.2d 284 (4th Cir. 1942) ..................................................................... 38

*In re Tolona Pizza Prods. Corp.*,
    3 F.3d 1029 (7th Cir. 1993) ....................................................................... 99

*In re Tower Auto., Inc.*,
    Case No. 05-10578 (Bankr. S.D.N.Y. July 12, 2007) ............................ 61, 64

*In re Toy & Sports Warehouse, Inc.*,
    37 B.R. 141 (Bankr. S.D.N.Y. 1984) ......................................................... 72

*In re Trump Taj Mahal Assocs.*,
    No. 93-3571, 1993 WL 534494 (D.N.J. Dec. 13, 1993) ........................... 152

*In re U.S. Truck Co., Inc.*,
    800 F.2d 581 (6th Cir. 1986) ..................................................................... 18

*In re U.S.H. Corp. of N.Y.*,
    223 B.R. 654 (Bankr. S.D.N.Y. 1998) ...................................................... 152

*In re Union Fin. Servs. Group, Inc.*,
    303 B.R. at 422 ...................................................................................... 136

K&E 12473324.

In re Valley Steel Corp.,
    182 B.R. 728 (Bankr. W.D. Va. 1995) ........................................................... 98

In re Vecco Const. Industries, Inc.,
    4 B.R. 407 (Bankr. N.D. Va. 1980) ............................................................... 38

In re Waterman S.S. Corp.,
    141 B.R. 552 (Bankr. S.D.N.Y.) ................................................................... 155

In re White,
    64 B.R. 843 (Bankr. E.D. Tenn. 1986) ......................................................... 99

In re World Health Alternatives, Inc.,
    344 B.R. 291 (Bankr. D. Del. 2006) ............................................................. 21

In re WorldClass Processing, Inc.,
    323 B.R. 164 (Bankr. W.D. Pa. 2005) ......................................................... 95

In re Worldcom,
    2003 WL 23861928 at 60. ..................................................................... passim

In re XO Commc'ns, Inc.,
    330 B.R. 394 (Bankr. S.D.N.Y. 2005) ......................................................... 143

In re Zenith Elecs. Corp.,
    241 B.R. 92 (Bankr. D. Del 1999) ............................................................... 115

In re Zenith Elecs. Corp.,
    241 B.R. 92 (Bankr. D. Del. 1999) ............................................................... 7

Kane v. Johns-Manville Corp.,
    843 F.2d 636 (2d Cir. 1988) ................................................................. 16, 109

Larry's Equip. Serv., Inc.,
    23 B.R. 132 (Bankr. D. Me. 1982) ............................................................... 79

Matter of New Center Hosp.,
    187 B.R. 560 (E.D. Mich. 1995) ................................................................. 41

McCormick v. Banc One Leasing Corp.,
    9 F.3d 1524 (11th Cir. 1995) ..................................................................... 68

Mercury Capital Corp. v. Milford Conn. Assocs., L.P.,
    354 B.R. 1  (D. Conn. 2006) ..................................................................... 109

Meyer v. United States,
    375 U.S. 233, 236 (1963) ......................................................................... 78

K&E 12473324.

N. P.R. Co. v. Boyd,
    228 U.S. 482, 504 (1913).................................................................................. 140

Nat'l Bank of Newport v. Nat'l Herkimer County Bank,
    225 U.S. 178 (1912).................................................................................... 96

Nesbit v. Gears Unlimited, Inc.,
    347 F.3d 72 (3d Cir. 2003)............................................................................ 40

Norwest Bank Worthington v. Ahlers,
    485 U.S. 197, 206 (1988).............................................................................. 82

Pepper v. Litton,
    308 U.S. 295 (1939).................................................................................... 118

Quality Inns Int'l, Inc. v. L.B.H. Assocs. Ltd. P'ship,
    911 F.2d 724 (4th Cir. 1990) ........................................................................ 8

Schaffer ex rel. Lasersight, Inc. v. CC Investments, LDC,
    286 F. Supp. 2d 279 (S.D.N.Y. 2003)............................................................ 143

Shimman v. Frank,
    625 F.2d 80 (6th Cir. 1980) .......................................................................... 54

Soviero v. Franklin Nat'l Bank,
    328 F.2d 446 (2d Cir. 1964).......................................................................... 39

Sowell v. Fed. Reserve Bank,
    268 U.S. 449 (1925)...................................................................................... 78

Tidwell v. AmSouth Bank,
    102 B.R. 878 (Bankr. M.D. Ga. 1989).......................................................... 107

Walther v. Bank of New York,
    772 F. Supp. 754, (S.D.N.Y. 1991)................................................................ 79

Woodhams v. Moore,
    840 F.Supp. 517 (S.D. Ohio 1994) ................................................................ 54

**Statutes**

11 U.S.C. §  1123(a) ........................................................................... 34, 35, 38

11 U.S.C. §  1123(a)(1)................................................................................. 34

11 U.S.C. §  1126(b) ............................................................................... passim

11 U.S.C. §  1126(b)(1) ................................................................................. 5

11 U.S.C. § 1145.................................................................................................................. 4

11 U.S.C. § 1122............................................................................................................ passim

11 U.S.C. § 1122(a)......................................................................................................... 17

11 U.S.C. § 1123.................................................................................................. 15, 16, 36

11 U.S.C. § 1123(a)(1)-(7)............................................................................................. 34

11 U.S.C. § 1123(a)(3).................................................................................................... 34

11 U.S.C. § 1123(a)(5)(C).............................................................................................. 38

11 U.S.C. § 1123(b)(3)(A)-(B)....................................................................................... 66

11 U.S.C. § 1123(b)(5)-(6)............................................................................................. 66

11 U.S.C. § 1125(a)........................................................................................... 3, 5, 6, 15

11 U.S.C. § 1125(a)(1).................................................................................................. 5, 8

11 U.S.C. § 1126(b).......................................................................................................... 3

11 U.S.C. § 1126(f)................................................................................................... 18, 26

11 U.S.C. § 1126(g)................................................................................................... 8, 26

11 U.S.C. § 1129..................................................................................................... 2, 15

11 U.S.C. § 1129(a).......................................................................................................... 15

11 U.S.C. § 1129(a)(1)............................................................................................. 16, 20

11 U.S.C. § 1129(a)(10).................................................................................................. 27

11 U.S.C. § 1129(a)(3).................................................................................................... 67

11 U.S.C. § 1129(a)(4).................................................................................................... 70

11 U.S.C. § 1129(a)(5)(A)(ii)......................................................................................... 72

11 U.S.C. § 1129(a)(6).................................................................................................... 73

11 U.S.C.§ 1123(a)(4)..................................................................................................... 35

11 U.S.C.§ 1123(a)(5)..................................................................................................... 35

11 U.S.C.§ 1123(a)(6)..................................................................................................... 36

11 U.S.C.§  1123(a)(7)............................................................................................ 36, 37

11 U.S.C.§  1125(b) ...................................................................................................... 8

11 U.S.C.§  1129(a)(5) ................................................................................................ 37

11 U.S.C.§  1129(a)(7) ................................................................................................ 36

11 U.S.C.§ 1123(a)(2) ................................................................................................ 34

28 U.S.C. § 157(b)(2) .................................................................................................... 2

28 U.S.C. §§ 1125 .................................................................................................... 2, 67

28 U.S.C. §§ 1126 .......................................................................................................... 2

28 U.S.C. §§ 1128 .......................................................................................................... 2

28 U.S.C. §§ 1129 .......................................................................................................... 2

28 U.S.C. §§ 13334 ........................................................................................................ 2

28 U.S.C. §§ 1408 .......................................................................................................... 2

28 U.S.C. §§ 1409 .......................................................................................................... 2

28 U.S.C. §§ 157 ............................................................................................................ 2

**Rules**

Fed. R. Bankr. P. 3017 ................................................................................................... 9

Fed. R. Bankr. P. 3017(d) ........................................................................................... 10

Fed. R. Bankr. P. 3018 ................................................................................................... 9

Fed. R. Bankr. P. 3018(c) ............................................................................................ 12

Reg.D. Rule 506............................................................................................................. 4

K&E 12473324.

**Preliminary Statement**

For a company whose secured creditors are absorbing a loss measured in the hundreds of millions of dollars, the Debtors' plan of reorganization represents an exceptional result. The vast majority of unsecured creditors - entitled to no recovery - receive recovery in full. The cardinal purpose of chapter 11 - rehabilitation of a business with a viable service to sell - for the benefit of its vendors, customers and employees, made possible in this instance by the use of a prepackaged bankruptcy plan—is faithfully upheld. Nonetheless, in an extraordinary display of myopia, the Committee has launched an all-out assault on the Plan—a largely self-destructive exercise seemingly designed to deprive the bulk of its constituency of all 100 cents on the dollar they are slated to receive.

Putting aside the incongruity of this stance, each of the Committee's factual and legal justifications and the largely duplicative arguments of the other Class 5 objectors for denial of confirmation fail.

- The Debtors' separate classification of, and disparate treatment between, Class 4 and Class 5 represents a good faith, rational, and fair effort by the Debtors in the time that was available to identify those claims the payment of which would not assist the Debtors' in maintaining its goodwill and going concern value.

- The gifting of value by severely undersecured creditors on a basis of less than absolute parity among similarly situated creditors is perfectly appropriate. Indeed, the key gifting cases devote little discussion to classification and discrimination as those issues are disconnected from the right of a secured creditor to do what it pleases with the proceeds of its collateral. The Committee simply ignores relevant case law directly on point and further ignores that an impaired secured lender cannot be compelled to allocate its recovery as the Committee may desire.

- The updated liquidation analysis demonstrates that no recovery is available for unsecured creditors in a hypothetical Chapter 7. The Committee's only recourse is to construct far-fetched theories regarding preferences that (i) assume away fundamental elements of section 547; (ii) rely on mere arithmetic rather than any actual analysis by feebly citing an alleged lack of time to do so, and (iii) seeks to hold the Debtors to an impossible standard of proving a negative to absolute certainty - a standard nowhere found under

applicable case law. Moreover, the Committee seeks to pervert the doctrine of marshalling to the <u>detriment</u> of the prepetition lenders - a complete reversal of that doctrine.

- The Debtors' substantive consolidation evidence overwhelmingly demonstrates that the Company operates as an integrated whole and on a business unit , rather than legal entity basis, and such evidence easily satisfies the applicable Second Circuit standard. The Committee's halfhearted attempts to (i) suggest a "business unit" (as opposed to legal entity focus) somehow precludes substantive consolidation; (ii) borrow parts of the Plan it likes (intercompany claims left unimpaired) to undermine parts of the Plan it dislikes (substantive consolidation), and (iii) assert reliance claims of creditors that do not even raise such claims themselves are woefully insufficient.

The Committee's potpourri of other arguments - as well as those of the other Class 5 objectors - are equally unavailing. The Plan should be confirmed.

## <u>Jurisdiction and General Background</u>

1. This Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of this proceeding in this District and before this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory bases for the relief requested herein are sections 1125, 1126, 1128, and 1129 of 11 U.S.C. 101-1532 (as amended, the "Bankruptcy Code").

## <u>Argument</u>

2. This brief is divided into two parts. In the first part, the Debtors request approval of the Disclosure Statement, the solicitation materials, and the solicitation process. In the second part, the Debtors present their "case in chief" that the Plan satisfies Section 1129 of the Bankruptcy Code. In addition, the Debtors have contemporaneously filed the:

- Declaration of David R. Hilty in Support of the Debtors' Plan of Reorganization (the "Hilty Declaration" attached as <u>Exhibit A</u>)

- Declaration of Eryk J. Spytek in Support of the Debtors' Plan of Reorganization (the "Spytek Declaration" attached as <u>Exhibit B</u>)

- Declaration of Phillip E. Kruse in Support of the Debtors' Plan of Reorganization (the "Kruse Declaration" attached as <u>Exhibit C</u>)

2

- Declaration of Daniel P. Mullin in Support of the Debtors' Plan of Reorganization (the "Mullin Declaration" attached as <u>Exhibit D</u>)

- Declaration of Jim Lewis in Support of Confirmation of Debtors' Chapter 11 Plan of Reorganization (the "Lewis Declaration" attached as <u>Exhibit E</u>)

- Declaration of Jeffrey Stegenga in Support of the Debtors' Plan of Reorganization (the "Stegenga Declaration" attached as <u>Exhibit F</u>)

- Declaration of Nathaniel Arnett and Jeffrey Stegenga in Support of the Debtors' Plan of Reorganization ("Stegenga Declaration" attached as <u>Exhibit G</u>)

in support of the Debtors' Plan and incorporated herein by reference. The Declarations will be referenced when necessary throughout the memorandum.[1]

## I. THE DISCLOSURE STATEMENT SHOULD BE APPROVED

3. Prepetition disclosure statements are subject to specified approval requirements distinct from postpetition disclosure statements. These requirements, set forth in Section 1126(b) of the Bankruptcy Code, are disjunctive. "Under § 1126(b), the holder of a claim or interest that has accepted or rejected 'the plan' prepetition is deemed to have done so if the solicitation was in compliance with any applicable nonbankruptcy law or, if there is no such law, there was disclosure of 'adequate information' under § 1125(a)."[2] The Debtors respectfully submit that they have met the requirements of section 1126(b) of the Bankruptcy Code.

### A. The Plan Solicitation Was Exempt From Federal Securities Registration Requirements

4. As described above, the Debtors distributed the Disclosure Statement and solicited approval of the Plan prior to the commencement of these chapter 11 cases. Although no

---

[1] To the extent this memorandum addresses specific objections, the arguments raised herein shall apply in full force and effect to all objections raising similar or related issues with respect to confirmation of the Debtors' Plan.

[2] <u>In re Pioneer Fin. Corp.</u>, 246 B.R. 626, 631 (Bankr. D. Nev. 2000).

K&E 12473324.

registration statement under the Securities Act of 1933 (as amended, the "Securities Act"), or any other federal or state securities or "blue sky" laws, has been filed with the Securities and Exchange Commission or any other similar agency, the Debtors submit that the Solicitation Procedures were in compliance with applicable nonbankruptcy law because the Debtors fall within the exception from registration contained in section 4(2) of the Securities Act.

5. The Plan provides for the Debtors to issue new common stock in the Reorganized Debtors (the "Plan Securities") to holders of Prepetition Facility Claims (Class 1). Section 4(2) of the Securities Act provides that the requirements of federal securities law relating to the offer and sale of a security do not apply to transactions not involving any public offering.[3] Here there is no "public offering" of securities within the meaning of federal securities laws or states with similar exemptions because the Debtors reasonably believed that all the Prepetition Lenders were Accredited Investors[4] under the Securities Act.[5]

6. In addition, Section 1145 of the Bankruptcy Code provides that section 5 of the Securities Act and any state law requirements for the offer and sale of a security do not apply to the offer or sale of stock, options, warrants, or other securities by a debtor if: (a) the offer or sale occurs under a plan of reorganization, (b) the recipients of the securities hold a claim against, an interest in, or claim for administrative expense against, the debtor, and (c) the securities are issued in exchange for a claim against or interest in a debtor or are issued principally in such exchange and partly for cash and property. All three of these requirements are met here. In

---

[3]   See In re Bally Total Fitness of Greater N.Y., Inc., Case No. 07-12395 (Bankr. S.D.N.Y. Sept. 17, 2007) (confirmation order approving prepackaged plan that used Section 4(2) exemptions to solicit prepetition) [Docket No. 466]

[4]   See Rule 506 of Regulation D promulgated under the Securities Act.

[5]   See Spytek Declaration at ¶ 13.

reliance upon these exemptions, the offer and sale of the Plan Securities will not be registered under the Securities Act or any state securities laws.

7.    Because no "nonbankruptcy law, rule, or regulation governing the adequacy of disclosure" applied to the Debtors' solicitation of votes on the Plan under Section 1126(b)(1) of the Bankruptcy Code, the requirements of Section 1126(b) apply.  Section 1126(b)  requires the disclosure of "adequate information" as defined in Section 1125(a) of the Bankruptcy Code.

### B.    The Disclosure Statement Provides Adequate Information

8.    Section 1125(a) of the Bankruptcy code defines "adequate information" as:

> [I]nformation of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant Class to make an informed judgment about the plan . . . .[6]

9.    Courts have stated that a debtor's disclosure statement must, as a whole, provide information that is "reasonably practicable" to permit an "informed judgment" by impaired creditors entitled to vote on the plan.[7]  In examining the adequacy of the information contained in a disclosure statement, the bankruptcy court has broad discretion.[8]

---

[6]    11 U.S.C. § 1125(a)(1).

[7]    See In re Momentum Mfg. Corp., 25 F.3d 1132, 1136 (2d Cir. 1994); In re Texaco Inc., 254 B.R. 536, 561 (Bankr. S.D.N.Y. 2000); see also In re Copy Crafters Quickprint Inc., 92 B.R. 973, 979 (Bankr. N.D.N.Y. 1988) (adequacy of disclosure statement "is to be determined on a case-specific basis under a flexible standard that can promote the policy of chapter 11 towards fair settlement through a negotiation process between informed interested parties").

[8]    See In re Tex. Extrusion Corp, 844 F.2d 1142, 1157 (5th Cir. 1988).  The determination of whether a disclosure statement contains adequate information is to be made on a case-by-case basis, focusing on the unique facts and circumstances of each case.  See In re Phoenix Petrol. Co., 278 B.R. 385, 393 (Bankr. E.D. Pa. 2001).

10.     The Debtors submit that the Disclosure Statement contains adequate information within the meaning of section 1125(a) of the Bankruptcy Code.  The Disclosure Statement is extensive and comprehensive.  It contains historical information about the Debtors and detailed financial and valuation information.  It also contains descriptions of the Debtors' restructuring efforts, the Debtors' Plan and treatment of Classes under the Plan, and descriptions of: (a) certain events leading up to the commencement of these chapter 11 cases; (b) claims asserted against the Debtors' estates; (c) the securities to be issued under the Plan; (d) risk factors affecting the Plan; (e) a liquidation analysis setting forth the estimated return that creditors would receive in a hypothetical chapter 7 case; (f) financial information and valuations that would be relevant to creditors' determinations of whether to accept or reject the Plan; and (g) securities law and federal tax law consequences of the Plan.

11.     The holders of Prepetition Facility Claims, who comprised the only voting Class and to whom the Debtors directed the Disclosure Statement had already developed a strong familiarity with the Debtors and their operations.[9]  The Prepetition Lenders will own the company at the conclusion of these chapter 11 cases and, therefore, had a keen self-interest in evaluating the Debtors' proposed Plan and information surrounding and supporting it.  In fact, the Plan and Disclosure Statement were the subject of a thorough review and comment by a steering committee of the Prepetition Lenders (the "Steering Committee"), their financial advisers, and their counsel.  The Debtors and the Steering Committee worked closely to ensure that the revised business plan, economic terms of the restructuring, and other relevant information were included in the Disclosure Statement.  These were the very parties (and the

---

[9]     Of course, the Debtors are a public company, and information about their operations and finances has been publicly available for many years.

only parties) to whom the Disclosure Statement applied because they were the only parties entitled to vote.

12.    In the particular circumstances of this case, given the sophistication of the constituency entitled to vote, the comprehensive information contained in the Disclosure Statement, and the complete lack of objection on this ground from those entitled to vote, the Debtors respectfully submit that the Disclosure Statement contains adequate information and the votes solicited by it are valid.[10]    Additionally, no party with standing (i.e. no party entitled to vote) has objected to the adequacy of the Disclosure Statement.

### 1.    Triple Net's Objections to the Disclosure Statement Should Be Overruled

13.    Despite having no right to vote, Triple Net Investments IX, LP ("Triple Net") has objected to the adequacy of the information presented in the Disclosure Statement.[11]    Triple Net's Disclosure Statement objection is based on its assertion that it cannot "consider the merits of the Plan" because the Disclosure Statement does not provide "any factual information whatsoever in support of the Plan's proposed substantive consolidation, or any other provision of the Plan."[12]    Triple Net has no standing to object to the Debtors' Disclosure Statement, and confuses its right to object to the Disclosure Statement with its right to seek discovery.

---

[10]    See In re Zenith Elecs. Corp., 241 B.R. 92, 100 (Bankr. D. Del. 1999) ("Given the sophistication of the parties, the wealth of information contained in the Disclosure Statement and publicly available elsewhere . . . and the lack of objection by any party entitled to vote on the Plan, we readily conclude that the Disclosure Statement contains adequate information and the votes solicited by it are valid. The Disclosure Statement will be approved, pursuant to section 1126(b) and/or 1125(a)" ) (emphasis added).

[11]    Notice of Objections by Triple Net Investments IX, LP to Adequacy of Disclosure and Confirmation of Debtors' Chapter 11 Plan [Docket No. 280] (the "Triple Net Objection"), at 8–9.

[12]    Id. at 8.

14.     Triple Net accurately quotes the definition of "adequate information" in section 1125(a)(1) of the Bankruptcy Code, to the effect that a disclosure statement must contain information to "enable . . . a hypothetical investor of the relevant Class to make an informed judgment about the plan . . . ."  However, Triple Net fails to note the limited applicability of the "adequate information" definition—it was not designed to require disclosure of general information for the benefit of any creditor.  Rather, it was designed to provide information to creditors who are entitled to <u>vote</u> on a plan.  Section 1125(b) of the Bankruptcy Code provides in relevant part, "An acceptance or rejection of a plan may not be solicited . . . from a holder of a claim or interest . . . unless, at the time of or before such solicitation, there is transmitted <u>to such holder</u> . . . a written disclosure statement . . . containing adequate information."[13]  Because Triple Net holds a Class 5 Claim and, as a holder of a Class 5 Claim it is not entitled to vote on the Plan because it is deemed to have rejected the Plan,[14] the "adequate information" requirement is not directed at Triple Net.  It is well-settled that "[h]olders of impaired claims who have been induced to vote in favor of a plan are the only ones who may raise the issue of the adequacy of the Disclosure Statement."[15]  Therefore, Triple Net has no standing to object to the Disclosure Statement.

---

[13]   11 U.S.C. § 1125(b) (emphasis added).

[14]   <u>See</u> 11 U.S.C. § 1126(g).  Triple Net acknowledges that it is not entitled to vote on the Plan.  <u>See</u>, Triple Net Objection, at 17.

[15]   <u>In re Middle Plantation of Williamsburg, Inc.</u>, 47 B.R. 884, 891 (E.D. Va. 1984), <u>aff'd</u>, 755 F.2d 928 (4th Cir. 1985); <u>see</u> <u>also</u> <u>In re Adana Mortgage Bankers, Inc.</u>, 14 B.R. 29, 30 (Bankr. N.D. Ga. 1981) (Norton, J.) ("Class IV creditors have standing to object to the Disclosure Statement only as to their Class and may not object to the adequacy of the Disclosure Statement as it may affect another Class of creditors . . . ."); <u>In re PWS Holding Corp.</u>, 228 F.3d 224, 249 (3d Cir. 2000) (same); <u>Quality Inns Int'l, Inc. v. L.B.H. Assocs. Ltd. P'ship</u>, 911 F.2d 724, 724 (4th Cir. 1990) (same).

15. The Debtors have not objected to Triple Net's participation in discovery relating to the Plan, and indeed Triple Net has participated in discovery.[16] Using available discovery tools, Triple Net was provided with the ability to develop the information it believed it needed to "consider the merits of the Plan,"[17] and Triple Net - which as the Court is well aware has been a routine participant in these chapter 11 cases - has filed a lengthy objection to the Plan.[18]

## II. THE DEBTORS' SOLICITATION AND VOTING PROCEDURES SHOULD BE APPROVED

16. Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules") 3017 and 3018 require, in relevant part, that a debtor distribute its plan and disclosure statement to all affected creditors and equity security holders, that it adopt effective procedures for the transmission of its plan and disclosure statement to beneficial owners of securities, and that creditors and equity security holders be permitted a reasonable period of time in which to accept or reject the proposed plan.[19] The Debtors respectfully submit that they have met all such requirements and no party in interest has objected with respect to these matters.

---

[16] Triple Net's counsel has served the Debtors with a request to produce documents and with interrogatories and provided with substantial discovery, as Triple Net admits. Objection Supplement by Triple Net Investments IX, LP, to the Adequacy of Debtors' Disclosure Statement dated April 11, 2008 (the "Supplemental Triple Net DS Objection") [Docket No. 426]. Triple Net also participated in the depositions of the Debtors' management related to the Plan.

[17] Triple Net Objection, at 8. Triple Net and the Beach Plaintiff's Objection (as defined herein) also objected to the Disclosure Statement on the ground that the Debtors had not filed their schedules of assets and liabilities and statements of financial affairs. Since the time the Triple Net Objection was filed, the Debtors have filed these documents. See Docket Nos. 352, 353.

[18] Objection Supplement by Triple Net Investments IX, LP, to Confirmation of Debtors' Joint Chapter 11 Plan dated April 11, 2008 (the "Triple Net Supplemental Plan Objection") [Docket No. 427].

[19] Fed. R. Bankr. P. 3017, 3018.

K&E 12473324.

### A. The Debtors Have Complied with the Notice Requirements of Bankruptcy Rule 3017(d)

17.     Bankruptcy Rule 3017(d) requires that, unless otherwise ordered by the court, a debtor must transmit to all creditors, equity security holders, and the United States Trustee:

    1.     the plan, or a court approved summary of the plan;

    2.     the disclosure statement approved by the court;[20]

    3.     notice of the time within which acceptances and rejections of such plan may be filed; and

    4.     such other information as the court may direct including any opinion of the court approving the disclosure statement or a court approved summary of the opinion.[21]

This rule also requires that all creditors and equity security holders be given notice of the time fixed for filing objections to the proposed disclosure statement and the hearing on confirmation, and that a ballot be mailed to each creditor and equity security holder entitled to vote on the plan.[22]

18.     On January 28, 2008 (the "Solicitation Date"), the Debtors commenced the plan solicitation by transmitting the applicable Voting Materials to the holders of claims in Class 1 (Prepetition Facility Claims), the only Class entitled to vote under the Plan.[23]  The service of the Voting Materials is described in detail in the Solicitation Affidavit.[24]

---

[20]  As the instant case involves a prepackaged plan, the solicitation was conducted pursuant to § 1126(b) of the Bankruptcy Code and, therefore, prior to approval of the Disclosure Statement by the Court.

[21]  Fed. R. Bankr. P. 3017(d).

[22]  Id.

[23]  "Voting Materials" included the Plan, the Disclosure Statement, and ballots, including the time by which votes to accept or reject the Plan must be received.

[24]  See Affidavit of Service of Alison M. Tearnen re (1) Amended Order (A) Authorizing, but Not Directing, the Debtors to Pay Certain Prepetition (I) Wages, Salaries, Bonuses and Other Compensation, (II) Reimbursable
(Continued…)

K&E 12473324.

19.     On February 8, 2008, the Debtors mailed notices to the Core Service List[25] informing them of: (a) the commencement of these chapter 11 cases; (b) the date and time set for the hearing to consider approval of the Disclosure Statement and confirmation of the Plan; (c) the deadline for filing objections to the Plan and the Disclosure Statement; and (d) a summary of the Plan (collectively, the "Notice").[26] The Notice was published in The Wall Street Journal The Chicago Tribune, and The New York Times on February 13 and 14, 2008.[27] Between February 13 and February 15, 2008 the Debtors served the Notice, along with a letter from the Debtors, to approximately sixty thousand creditors, potential creditors, equity holders of record,

---

Employee Expenses, and (III) Employee Medical and Similar Benefits and (B) Authorizing and Directing the Banks and Other Financial Institutions to Honor All Related Checks and Electronic Payment Requests; (2) Order Directing Joint Administration of the Debtor's Related Chapter 11 Cases; (3) Application to Employ Ernst & Young LLP as Accountants, Auditors, and Tax Advisors for the Debtors and Debtors in Possession Nunc Pro Tunc to the Petition Date; (4) Notice of Hearing and Filing of Application of the Debtors for an Order Authorizing the Employment and Retention of Ernst & Young LLP as Accountants, Auditors, and Tax Advisors for the Debtors and Debtors in Possession Nunc Pro Tunc to the Petition; and (5) Summary of the Plan Of Reorganization and Notice of Combined Hearing on the Adequacy of the Disclosure Statement and Confirmation of the Plan of Reorganization [Docket No. 83] (the "Solicitation Affidavit").

[25] On the first day, the Core Service List consisted of the following (a) the Office of the United States Trustee for the Southern District of New York; (b) the entities listed on the Consolidated List of Creditors Holding the 30 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (c) Simpson Thacher & Bartlett LLP as counsel to the agent for the Debtors' proposed postpetition secured lenders; (d) Simpson Thacher & Bartlett LLP as counsel to the agent for the Debtors' senior secured prepetition lenders; (e) Washington Mutual Bank and Colonial Bank, N.A., lenders to the Debtors' non-debtor affiliate, SIRVA Mortgage, Inc.; (f) Sidley Austin LLP as counsel to LaSalle Bank, N.A., as agent for the Debtors' receivables purchase program maintained through SIRVA Relocation Credit, LLC, the Debtors' non-debtor affiliate; (g) the Internal Revenue Service; (h) the Securities and Exchange Commission (NY Regional and Headquarters); (i) New York Attorney General's Office; and (j) United States Department of Justice.

[26] See Solicitation Affidavit at ¶ 1.

[27] See Affidavit of Publication in the New York Times re Summary of the Plan of Reorganization and Notice of Combined Hearing on the Adequacy of the Disclosure Statement and Confirmation of the Plan of Reorganization (published February 13, 2008) [Docket No. 109]; Affidavit of Publication in the Wall Street Journal re Summary of the Plan of Reorganization and Notice of Combined Hearing on the Adequacy of the Disclosure Statement and Confirmation of the Plan of Reorganization (published February 13, 2008) [Docket No. 110]; Affidavit of Publication in the Chicago Tribune re Summary of the Plan of Reorganization and Notice of Combined Hearing on the Adequacy of the Disclosure Statement and Confirmation of the Plan of Reorganization (published February 14, 2008) [Docket No. 111].

11

and other parties in interest.[28]  The Notice included instructions on how to obtain the Plan and

Disclosure Statement through the Voting Agent's web site or to request those materials via mail

or at the PACER web site.  Based on the foregoing, the Debtors submit that they have fully

complied with the notice requirements of Bankruptcy Rule 3017(d).

### B.      The Debtors' Forms of Ballots Should Be Approved

20.      Bankruptcy Rule 3018(c)  governs the acceptable form for accepting or rejecting a

plan and provides in relevant part that an "acceptance or rejection shall be in writing, identify the

plan or plans accepted or rejected, be signed by the creditor or equity security holder or an

authorized agent, and conform to the appropriate Official Form." Fed. R. Bankr. P. 3018(c).

21.      Each holder of a Class 1 Prepetition Facility Claim was served with a Ballot

(attached hereto as Exhibit H).  This form of the Ballot complies with Bankruptcy Rule 3018(c)

and is based substantially on the form provided in the Prepack Guidelines.  The Debtors

respectfully submit that the form of the Ballot is adequate and appropriate and should be

approved in all respects.  No party has objected to the sufficiency of the Ballots.

### C.      The Voting Classes Were Given a Reasonable Period of Time in Which to Accept or Reject the Plan

22.      Bankruptcy Rule 3018(b) sets the standard for a court to determine the validity of

votes with respect to a plan that are obtained before the petition date, the situation in these

chapter 11 cases.  This Rule provides, in relevant part:

> A holder of a claim or interest who has accepted or rejected a plan before
> the commencement of a case under the Code shall not be deemed to have

---

[28]  See Affidavit of Service Summary of the Plan Of Reorganization and Notice of Combined Hearing on the Adequacy of the Disclosure Statement and Confirmation of the Plan of Reorganization [Docket No. 88]; Affidavit of Service Supplemental Affidavit of Service of Alison M. Tearnen Summary of the Plan Of Reorganization and Notice of Combined Hearing on the Adequacy of the Disclosure Statement and Confirmation of the Plan of Reorganization [Docket No. 157].

accepted or rejected the plan if the court finds after notice and hearing that the plan was not transmitted to substantially all creditors and equity security holders of the same class, that an unreasonably short time was prescribed for such creditors and equity security holders to accept or reject the plan, or that the solicitation was not in compliance with § 1126(b) of the Code.[29]

The Debtors' solicitation fully satisfies all three prongs of this standard.

23. First, as demonstrated above, the Plan and Disclosure Statement were transmitted to all holders of Prepetition Facility Claims.

24. Second, the prepetition solicitation period, which lasted from January 28, 2008 through February 1, 2008 at 5:00 p.m. (prevailing Eastern Time), a total of five business days, was adequate under the particular facts and circumstances of this case and was not "unreasonably short."

25. The Debtors and the Prepetition Lenders engaged in substantial negotiations prior to the solicitation. The Debtors commenced workout negotiations with the Prepetition Lenders in December 2007. The Prepetition Lenders then formed the Steering Committee to negotiate a consensual reorganization with the Debtors. These negotiations occurred between December 2007 and until immediately prior to solicitation of the Plan in late January 2008 and resulted in: (a) several plan term sheets being negotiated among the Debtors and the Steering Committee during December and January; (b) the appointment of Alvarez & Marsal LLC as turnaround specialist; and (c) the appointment of Ray Dombrowski as a restructuring adviser to the Debtors.[30] Once it became clear that a prepackaged bankruptcy was necessary to effectuate the restructuring, the Prepetition Lenders made several additional loans in January 2008 in order to

---

[29] Fed. R. Bankr. P. 3018(b).

[30] See Spytek Declaration at ¶ 11.

K&E 12473324.

allow the negotiations on the prepackaged Plan to be completed. There were also a number of conference calls to which the entire universe of Prepetition Lenders were invited. As a result, the Steering Committee and Prepetition Lenders were well informed as to all relevant business, factual, and legal issues and had an opportunity to be heard with respect to the Plan even before solicitation commenced.

26.     Given the solicitation, the completeness of the information provided by the Disclosure Statement, the efforts made to ensure that the requisite documentation was supplied to Prepetition Lenders, and the fact that Prepetition Facility Claims holders are sophisticated institutional creditors with substantial knowledge of the Debtors businesses and operations, the holders of Prepetition Facility Claims had an adequate and reasonable solicitation period. This is supported by the fact that 69 of the 75 Prepetition Facility Claims holders voted, and none objected to the length of solicitation period—either at the time of solicitation or now. The reason is, for these sophisticated creditors who were highly focused on this transaction, five days was more than sufficient.

27.     Nor is this time period considered inadequate under the Prepack Guidelines of this Court. The Prepack Guidelines state that "<u>under ordinary circumstances</u> . . . [f]or securities which are not Publicly Traded Securities and for debt for borrowed money which is not evidenced by a Publicly Traded Security, a ten (10) business day voting period, measured from the date of commencement of mailing" is considered "reasonable."[31] However, section VII.B. of the Prepack Guidelines provides that "[n]othing herein is intended to preclude a shorter voting

---

[31]   Prepack Guidelines, section VII.A.2. (emphasis added).

period if it is justified in a particular case . . . ."  For the reasons set forth above, the Debtors submit that this is just such a case.

28.    <u>Third</u>, as demonstrated above, the solicitation was in compliance with section 1126(b) of the Bankruptcy Code by providing "adequate information" to the voting class, within the meaning of section 1125(a) of the Bankruptcy Code.  Accordingly, the Debtors submit that they have satisfied the requirements of Bankruptcy Rule 3018(b) and the Prepack Guidelines.  No party in interest has objected to the adequacy of the solicitation period.

## III.    THE PLAN SHOULD BE CONFIRMED

29.    To confirm the Plan, the Court must find that the Debtors have satisfied the provisions of section 1129 of the Bankruptcy Code by a preponderance of the evidence.[32]  The Debtors submit that the Plan complies with all relevant sections of the Bankruptcy Code, Bankruptcy Rules, and applicable nonbankruptcy law.  In particular, the Plan fully complies with all of the requirements of sections 1122, 1123, and 1129 of the Bankruptcy Code.  Each such requirement is addressed individually below.

---

[32]    <u>See</u> <u>In re Bally Total Fitness of Greater N.Y., Inc.</u>, No. 07-12395, 2007 WL 2779438, at *3 (Bankr. S.D.N.Y. Sept. 17, 2007) ("The Debtors, as proponents of the plan, have the burden of proving the satisfaction of the elements of sections 1129(a) and (b) of the Bankruptcy Code by a preponderance of the evidence."); <u>In re Kent Terminal Corp.</u>, 166 B.R. 555, 561 (Bankr. S.D.N.Y. 1994) ("Notwithstanding this time-sensitive evidentiary burden, the final burden of proof at . . . confirmation hearing[] remains a preponderance of the evidence."); <u>see also</u> <u>In re Briscoe Enters., Ltd. II</u>, 994 F.2d 1160, 1165 (5th Cir. 1993) ("The combination of legislative silence, Supreme Court holdings, and the structure of the [Bankruptcy] Code leads this Court to conclude that preponderance of the evidence is the debtor's appropriate standard of proof both under 11 U.S.C. § 1129(a) and in a cramdown."); <u>In re Armstrong World Indus., Inc.</u>, 348 B.R. 111, 120 (D. Del. Aug. 14, 2006) ("In the context of a cramdown, the debtor's standard of proof that the requirements of § 1129 are satisfied is preponderance of the evidence.").

15

## A. The Plan Complies With Section 1129(a)(1) of the Bankruptcy Code.[33]

30.     Section 1129(a)(1) of the Bankruptcy Code requires that a plan of reorganization comply with the applicable provisions of the Bankruptcy Code.[34]   A principal objective of section 1129(a)(1)  is to assure compliance with the sections of the Bankruptcy Code governing classification of claims and interests and the contents of a plan of reorganization.[35]   Accordingly, the determination of whether the Plan complies with section 1129(a)(1)  requires an analysis of sections 1122 and 1123 of the Bankruptcy Code.[36]   As explained below, the Plan complies with sections 1122 and 1123 in all respects.

### 1. The Plan Properly Classifies Claims and Equity Interests Under Section 1122 of the Bankruptcy Code.[37]

#### a. Overview

31.     The Plan satisfies section 1122, which provides that "a plan may place a claim or interest in a particular Class only if such claim or interest is substantially similar to the other

---

[33]  See Spytek Declaration at ¶16-17.

[34]  11 U.S.C. § 1129(a)(1).

[35]  See Kane v. Johns-Manville Corp., 843 F.2d 636, 648-49 (2d Cir. 1988) (suggesting that Congress intended the phrase "'applicable provisions' in this subsection to mean provisions of chapter 11 . . . such as section 1122 and 1123"); Drexel Burnham Lambert, 138 B.R. at 757 (noting that "[t]he legislative history of § 1129(a)(1) explains that this provision embodies the requirements of §§ 1122 and 1123 respectively, governing classification of claims and the contents of the Plan").  See also S. Rep. No. 989, 95th Cong., 2d Sess. 126 (1978); H.R. Rep. No. 595, 95th Cong., 1st Sess. 412 (1977).

[36]  In re S&W Enter., 37 B.R. 153, 158 (Bankr. N.D. Ill. 1984) ("An examination of the legislative history of section 1129(a)(1) reveals that although its scope is certainly broad, the provisions it was more directly aimed at were sections 1122 and 1123").

[37]  See generally Spytek Declaration.

16

claims or interests of such class."[38] This requirement of substantial similarity does not mean, however, that claims or interests within a particular Class must be identical.[39]

32.      Instead, the Second Circuit has recognized that under section 1122 of the Bankruptcy Code, plan proponents have significant flexibility in placing similar claims into different classes, provided there is a rational basis to do so.[40] A consistent thread running through the cases interpreting section 1122 is the courts' primary concern that equal rank claims would be placed in different classes in an attempt to gerrymander an accepting class.[41] That is clearly not the case here where Class 1 is an impaired Class entitled to vote and has voted to

---

[38]   11 U.S.C. § 1122(a).

[39]   In re DRW Prop. Co., 60 B.R. 505, 511 (Bankr. N.D. Tex. 1986).

[40]   See In re Chateaugay Corp., 10 F.3d 944, 956-57 (2d Cir. 1993) (finding separate classification appropriate because classification scheme had a rational basis; separate classification based on bankruptcy court-approved settlement); In re 500 Fifth Ave. Assocs., 148 B.R. 1010, 1018 (Bankr. S.D.N.Y. 1993) (Although discretion is not unlimited, "the proponent of a plan of reorganization has considerable discretion to classify claims and interests according to the facts and circumstances of the case"); Drexel Burnham Lambert, 138 B.R. at 757 ("Courts have found that the Bankruptcy Code only prohibits the identical classification of dissimilar claims. It does not require that similar claims be grouped together . . . ."); In re Ionosphere Clubs, Inc., 98 B.R. 174 (Bankr. S.D.N.Y. 1989) ("[A] debtor may place claimants of the same rank in different classes and thereby provide different treatment for each respective class"); see also In re Jersey City Med. Ctr., 817 F.2d 1055, 1060-61 (3d Cir. 1987) (recognizing that separate classes of claims must be reasonable and allowing a plan proponent to group similar claims in different classes.").

[41]   See In re Boston Post Road Ltd. P'ship, 21 F.3d 477, 480 (2d Cir. 1994) ("[S]imilar claims could not be placed in different classes solely to gerrymander a Class that will assent to the plan"); In re One Times Square Assocs. Ltd. P'ship, 165 B.R. 773, 776 ("[W]hile a debtor has a certain degree of flexibility in classifying claims, its discretion is limited by the principle that classification may not be used for the sole purpose of manipulating the vote."); In re D & W Realty Corp, 165 B.R. 127, 128 (S.D.N.Y. 1991) ("Case law makes clear that substantially similar claims may not be placed in separate classes for the sole purpose of affecting or "gerrymandering" the voting with respect to the debtor's proposed plan of reorganization under § 1129(a) of the Bankruptcy Code."); In re Adelphia Commc'ns Corp., 368 B.R. 140, 246–47 (Bankr. S.D.N.Y. 2007) ("When considering assertions of gerrymandering, courts in the Second Circuit have inquired whether a plan proponent has classified substantially similar claims in separate classes for the sole purpose of obtaining at least one impaired assenting class."); In re Greystone III Joint Venture, 995 F.2d 1274, 1279 (5th Cir.1991) ("[T]hou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan."); see also In re Chateaugay Corp. 89 F.3d 942, 950 (2d Cir. 1996) (holding that since the plan did not classify similar claims separately to gerrymander an impaired assenting class, the classification scheme satisfied section 1122).

accept the Plan. Neither Class 4 nor Class 5 are entitled to vote on the Plan.[42] By definition then, their separate nature had nothing to do with gerrymandering. The Debtors are classifying holders of Class 5 claims separately based purely on the business justification that such claims and, for the most part the claimants themselves, will provide no net benefit to, or have any relationship with, the Debtors' businesses in the future. Courts have identified grounds to determing whether separate classification is actually an attempt to gerrymander, including: (a) where members of a Class possess different legal rights,[43] and (b) where there is a reasonable basis for separate classification.[44] Where there is clearly no issue of gerrymandering, there is no balancing of motivations necessary. The Bankruptcy Code does not require the same classification for claims simply because they may share some attributes.[45]

33.     The Plan's classification scheme is as follows:

| Class | Claims and Interests | Status | Voting Rights |
| --- | --- | --- | --- |
| 1 | Prepetition Facility Claims | Impaired | Entitled to Vote |
| 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |

---

[42]  See 11 U.S.C. § 1126(f).

[43]  See Drexel Burnham Lambert, 138 B.R. at 715; see also In re Heritage Org., 375 B.R. 230, 299 n.86 (Bankr. N.D. Tex. 2007) (finding that if creditors had different legal rights under equitable subordination, then separate classification would be appropriate).

[44]  See In re Chateaugay Corp., 89 F.3d 942, 949 (2d Cir. 1996) (finding that separate classification of unsecured claims is justified if the Debtor has a legitimate business reason supported by credible proof ); Adelphia 368 B.R. at 246-47; Bally Total Fitness, 2007 WL 2779438, at *3; see also Heritage, 375 B.R. at 303 (recognizing separate classification of claims of equal rank and priority for valid business reasons).

[45]  See, e.g., Jersey City Med. Ctr., 817 F.2d at 1060 ("The express language of this statute explicitly forbids a plan from placing dissimilar claims in the same class; it does not, though, address the presence of similar claims in different classes."); In re U.S. Truck Co., Inc., 800 F.2d 581, 585 (6th Cir. 1986); In re Lafayette Hotel P'ship, 227 B.R. 445, 449 (S.D.N.Y. 1998) (Where similar claims have two different interests in the reorganized debtors it is appropriate to separately classify such claims); In re Adelphia Commc'ns, 368 B.R. 140, 246-47 (Bankr. S.D.N.Y. 2007) (similar claims may be classified separately on a reasonable basis); In re Chateaugay Corp., 155 B.R. 625, 632 (Bankr. S.D.N.Y. 1991) ("[Separate] [c]lassification of similar claims is permissible if the classification scheme of the claims or interests is reasonable."); Ionosphere Clubs, 98 B.R. at 177-78 ("[A] debtor may place claimants of the same rank in different classes and thereby provide different treatment for each respective class." (internal citations omitted)).

18

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| 3 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 4 | Unsecured Ongoing Operations Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 5 | General Unsecured Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 6 | Intercompany Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 7 | Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 8 | Intercompany Interests | Unimpaired | Not Entitled to Vote (Deemed to Accept) |

34.     In the obvious absence of gerrymandering, the Plan's classification scheme easily satisfies the requirements of section 1122.  Each Class differs from each other in a legal or factual nature, or based on other relevant criteria.[46]  Thus, the Debtors propose a classification scheme under the Plan that fits well within section 1122's flexible standard.[47]  In part, the Plan's classification scheme follows the Debtors' capital structure: debt and equity all separate, and secured debt (Classes 1 and 2) is classified separately from unsecured debt (Classes 3-6).[48] Likewise, other aspects of the classification scheme are reasonably related to the different legal or factual nature of each—priority claims (Class 3) are classified separately due to their required treatment under the Bankruptcy Code;[49] intercompany claims (essentially books and records claims) are classified separately since they do not involve third party creditors; interests are classified separately, rationally divided between interests held by third parties and those held by other Debtors.  Finally, as discussed more fully below, Class 4 and Class 5 are properly classified separately for legitimate business reasons.

---

[46]  Spytek Declaration at ¶ 17.

[47]  See Chateaugay, 89 F.3d at 949-50 ("Congress gave reorganizing debtors considerable flexibility in their treatment of general unsecured creditors to position themselves for future economic viability."); In re Great Bay Hotel & Casino, Inc., 251 B.R. 213, 224 (Bankr. D.N.J. 2000) (separate classification of similar claims permitted when classification "promotes the rehabilitative goals of chapter 11"); In re 11,111, Inc., 117 B.R. 471, 476 (Bankr. D. Minn. 1990) (same).

[48]  See Plan, Art. III.

[49]  In re Riggel, 142 B.R. 199, 203 (Bankr. S.D. Ohio 1992) (classification based on requirements of Bankruptcy Code is acceptable).

K&E 12473324.

**b. The Objections to the Plan's Classification Pursuant to Sections 1129(a)(1) and 1122 of the Bankruptcy Code Should be Overruled**

35.     Seven objections to the Plan's proposed classification were filed: (a) the Objection of the Official Committee of Unsecured Creditors to Debtors' Proposed Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code Creditors' Committee Objection [Docket No. 411] (the "Committee" and the "Creditors' Committee Objection," respectively); (b) the Supplemental Objection of the OOIDA Class to Debtors' Proposed Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code, [Docket No. 425] (the "OOIDA Objection"); (c) the Objection of Accretive Solutions to Debtors' Proposed Prepackaged Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code, and Supplement to Debtors' Prepackaged Joint Plan of Reorganization, [Docket No. 430] (the "Accretive Solutions Objection"); (d) the Objection of Robert Noia to Confirmation of Plan of Reorganization Dated January 28, 2008, and to Debtors' Disclosure Statement [Docket No. 256] (the "Noia Objection"); (e) the Class Action Antitrust Plaintiffs' Objection to Confirmation dated March 11, 2008 [Docket No. 414] (the "Beach Plaintiffs' Objection"); (f) IFL Industries, Inc. Supplemental Objection to Adequacy of Disclosure Statement and Objection to Confirmation of the Plan dated April 11, 2008 (the "IFL Objection") [Docket No. 408]; and (g) the Triple Net Objection.   These objections assert three main arguments against the Plan's classification scheme: <u>first</u>, that the Plan's separate classification of Class 4 and Class 5 is inappropriate on the Plan's own terms; <u>second</u>, that the separate classification of Class 4 and Class 5 is impermissible attempt to gerrymander to create an assenting Class of creditors; and <u>third</u>, there is not a reasonable basis to separate the creditors in Class 4 and Class 5.   These arguments have no merit and all objections to the Plan's classification should be overruled.

K&E 12473324.

**(1)  Section 1122 Does Not Apply to the Plan**

36.     Although entirely defensible even viewed in isolation, section 1122 simply does not apply in a gifting context.  Gifts are "not a treatment of . . . Claims under the plan."[50]  This is based on the fact that unsecured Claims are simply receiving a carve-out from the Prepetition Lenders' liens and not receiving a distribution of estate assets.[51]  As a result, the usual strictures on classification, unfair discrimination, and treatment under the Bankruptcy Code do not apply.[52]

37.     Indeed, both In re Worldcom[53] and In re Genesis Health Ventures[54] approved the placing of those claims receiving gifts into separate classes with minimal discussion of classification.  In Genesis Health, a case akin to the present bankruptcy cases, the bankruptcy court for the District of Delaware approved a plan of reorganization which provided for a gifted distribution to unsecured claims,[55] but no recoveries for unsecured punitive damage claims that were separately classified.  The bankruptcy court overruled classification objections, holding that the classification did not violate the Bankruptcy Code.[56]  Importantly, the bankruptcy court did not even address section 1122 when approving the classification and simply held that there was no indication the separate classification was designed to gerrymander voting on the plan at

---

[50]   In re Worldcom, Case. No. 02-13533, 2003 WL 23861928, at *60 (Bankr. S.D.N.Y. Oct. 31, 2006).

[51]   Id.

[52]   See Worldcom, 2003 WL 23861928 at *60; In re Genesis Health Ventures, Inc., 266 B.R. 591, 600–01 (Bankr. D. Del. 2001); see also In re World Health Alternatives, Inc., 344 B.R. 291 (Bankr. D. Del. 2006).

[53]   No. 02-13533, 2003 WL 23861928 (Bankr. S.D.N.Y. Oct. 31, 2006).

[54]   266 B.R. 591 (Bankr. D. Del. 2001).

[55]   Id. at 600-01.

[56]   Id.

K&E 12473324.

issue.[57]  Although not stated directly, the basis for the separate classification was to effectuate the gifting by the senior secured lenders.[58]  As a result, where the purpose of separate classification is to effectuate a gift from a senior secured party, separate classification does not implicate section 1122 and is appropriate.

38.     Similarly, the Worldcom plan separated the members of an ad hoc committee of bondholders into a sub class of the overarching bondholder class[59] and allocated additional distributions to the ad hoc committee member subclass from the senior secured creditors' recoveries.[60]  The Worldcom court approved this classification (which clearly had no operational purpose) without discussion as having a reasonable basis, despite that fact that there were objections to the gift.[61]  There was no articulated basis to separately classify the ad hoc committee members' offer than to provide a higher recovery to those claims by gifting.  This stands in sharp contrast to the Plan in this case, where there is a business basis for the separate classification.  As a result, Worldcom reaffirms the proposition that section 1122 does not apply where the classification is designed to facilitate gifting to creditors.

---

[57]  Id.

[58]  See id.

[59]  See In re WorldCom, Inc., Case No. 02-13533 (Bankr. S.D.N.Y. Oct. 21, 2003) , Modified Second Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code [Docket No. 9525].

[60]  See Worldcom, 2003 WL 23861928 at *61.

[61]  Id. .

### (2) The Plan's Classification of Unsecured Creditors is Appropriate

39.     In December and January, when the Plan was developed, the housing[62] and moving services sector[63] deteriorated drastically,[64] along with the Debtors' operations and liquidity.[65]  As a result, the Plan was negotiated in a compressed time frame in the context of a difficult housing market and where the Debtors' other lenders were refusing to extend credit, imposing substantial liquidity constraints on the Debtors.[66]  Additionally, the Debtors determined that the only way to preserve going-concern value was through a "business as usual" message consistent with prepackaged plans and to avail itself of the streamlined procedures and substantive relief set out in the General Order 203 of the United States Bankruptcy Court for the Southern District of New York, "Adoption of Prepackaged Chapter 11 Case Guidelines," dated February 24, 1999 (the "Prepack Guidelines"). The Debtors sought to provide recoveries for as many unsecured creditors as possible while remaining mindful of the fact that the Lenders' appetite for gifting was not unlimited or universal.   To that end, the Debtors engaged in substantial negotiations with the Prepetition Lenders regarding the funding of the vast majority

---

[62]   According to statistics compiled by the National Association of Realtors, sales of existing homes declined 12.8 percent between 2006 and 2007, and declined 8.5 percent between 2005 and 2006.  Sales of new homes declined by 26.5 percent between 2006 and 2007 and 18.1 percent between 2005 and 2006.  Median sale prices for existing homes declined by 1.9 percent between 2006 and 2007, and median sale prices for new homes declined 2.1 percent in the same period.

[63]   According to the U.S. Census Bureau, the number of household moves in each of the years 2005, 2006 and 2007 was approximately 6 percent less than the average number of moves in the period 1984-2004, a decline of approximately 2.4 million moves a year, a total of 7.2 million moves for the period.

[64]   <u>See</u> Spytek Declaration at ¶18.

[65]   <u>Id.</u>

[66]   <u>Id.</u>

of general unsecured claims out of the Prepetition Lenders' distributions.[67]   At first, the Prepetition Lenders refused to provide recoveries on any unsecured Claims or were willing, at most, to fund a small group of critical vendors.[68]   Subsequently, after substantial negotiations where the Debtors explained their view that the business could not survive a traditional bankruptcy with only a small universe of "critical vendors" receiving timely payments of prepetition claims, the Prepetition Lenders agreed to fund recoveries for the vast majority of Claims—those that provide a net benefit going forward.   The Prepetition Lenders,  however, were understandably unwilling to fund recoveries on account of junior Claims whose payment would provide no net benefit to the Debtors' maintenance of goodwill going forward.

40.     In light of severe time constraints, the Debtors identified those Claims that would provide minimal or no value on a net basis using their reasonable business judgment.[69]   Although a more time-consuming review of all Claims may well have uncovered additional Claims that could have been classified in Class 5, the Debtors' financial constraints did not allow them the luxury of time and the Prepetition Lenders were willing to forego the additional incremental benefit of classifying more Claims in Class 5 in order to launch and consummate the Plan in the most expeditious manner.   Any additional benefit spent on identifying incremental potential Class 5 Claims would have been substantially outweighed by the costs to the business from a delay in addressing the Debtors' pressing need to restructure.   Moreover, the overwhelming majority of the Class 4 Claims are Claims of customers and agents and are critical to the

---

[67]   Id.

[68]   Id.

[69]   See Spytek Declaration at ¶19.

K&E 12473324.

Debtors' business. Failure to pay the Claims of customers or agents would have resulted in a devastating loss of confidence in the Debtors' message of "business as usual" and substantial damage to the Reorganized Debtors. As a result, the separate classification of Class 4 and Class 5 in the time available was designed to best effectuate the Prepetition Lenders' gifting to those Claims in Class 4 and to separate those Claims that the Debtors were able to readily determine provided little to no benefit to the Reorganized Debtors. The separate classification is eminently reasonable and complies with the underlying purpose of the Plan, which is to provide recoveries for the vast majority of Claims that enhance the Debtors' going-concern value. Despite the Committee's assertion that the classification is incoherent and has no purpose, the purpose remains clear: to enable the vast majority of unsecured Claims (the Committee's constituents) to receive full recoveries, thereby enhancing the going-concern value of the Debtors. That the Committee—as fiduciary for all unsecured creditors—would seek an expansion of Class 5 as the medicine to cure its alleged ills is puzzling at best. To the extent that section has any relevance in the gifting plan context, the separate classification of Class 4 and Class 5 is appropriate pursuant to section 1122 of the Bankruptcy Code and should be approved.

### (3) The Plan's Classification Scheme is Not Designed to Gerrymander Voting on the Plan

41. The Beach Plaintiffs' Objection, among others, asserts the Debtors are attempting to gerrymander voting on the Plan. [70] These arguments are flawed. It is clear that the separate classification of Class 4 and Class 5 was not designed to gerrymander voting on the Plan for one simple reason: neither Class was entitled to vote. [71] Class 4 Claims holders were deemed to

---

[70] Beach Plaintiffs Objection, at 8.

[71] See Disclosure Statement, at 5.

K&E 12473324.

accept the Plan and Class 5 Claims holders were deemed to reject the Plan.[72]  Class 1, the only Class entitled to vote, is separately classified from all other Claims based on their status as senior secured creditors with liens on substantially all of the Debtors assets.  Further, and as discussed more fully below, Class 4 and Class 5 claims are classified separately for a legitimate business reason:[73] paying Class 4 Claims in full provides benefits to the Reorganized Debtors that paying Class 5 Claims would not.  The argument that Class 4 and Class 5 are separately classified to induce Class 1 to vote for the Plan and is thus gerrymandering once removed is ludicrous and unsupported by any authority whatsoever.  The Plan had to be satisfactory in all respects to an impaired secured creditor who could not be compelled to accept a plan that connects their debt to equity and pays hundreds of millions of dollars to junior creditors.  That is not gerrymandering.

42.     Further, majority of the cases relied on by the Committee's Objection,[74] the Accretive Solutions Objection,[75] the OOIDA Objection,[76] the IFL Objection, the Noia Objection[77] and the Beach Plaintiffs' Objection[78] all involved instances where a debtor sought to gerrymander the voting process by creating an impaired assenting class of unsecured creditors. The vast majority of cases relied upon by the objectors were also single asset real estate cases

---

[72]   See 11 U.S.C. § 1126(f)-(g).

[73]   See Spytek Declaration at ¶18.

[74]   Creditors' Committee Objection at 28 (citing Boston Post, 21 F.3d at 480; One Times Square 159 B.R. at 703).

[75]   Accretive Solutions Objection, at 13-14 (citing Boston Post, 21 F.3d at 480; In re Barakat, 99 F.3d 1520, 1528-29 (9th Cir. 1997); One Times Square, 159 B.R. at 703) .

[76]   OOIDA Objection, at 14 (same citations as Creditors' Committee)

[77]   Noia Objection at 9-10 (citing Boston Post, 21 F.3d at 480; Barakat, 99 F.3d at 1528-29; One Times Square Assoc., 159 B.R. at 703) .

[78]   Beach Plaintiffs' Objection, at 8-9 (citing Greystone III Joint Venture, 995 F.2d at 1279; Chateaugay 89 F.3d at 949).

K&E 12473324.

seeking to confirm a plan over the objection of a secured creditor and are factually distinguishable.[79]  Therefore, the opposite is the case here:  Class 1, which is the senior secured Class, is an assenting impaired Class and has voted to accept a plan that could not be forced upon it, thus satisfying section 1129(a)(10).  Thus, the argument that the Plan is designed to gerrymander is a non sequitur because an unimpaired assenting Class cannot satisfy the requirements of section 1129(a)(10) [80]

> **(4)  The Plan's Separation of Class 4 and Class 5 Claims is Reasonable Under the Circumstances and Has a Reasonable Basis**

43.     In its zeal to defeat a plan that benefits the majority of its constituency, The Committee argues that the Debtors should have classified <u>more</u> Claims into Class 5.[81]  The Committee believes that the Debtors should have included the Claims of trade creditors and former customers among the Class 5 Claims in order to make the Class more rigorously defined.[82]  The Debtors are at a loss as to why the Committee would want to include more constituents in a Class entitled to no distribution under the Plan.  As discussed above, the Debtors, in their reasonable business judgment, identified those Claims that plainly provided little or no benefit for the Debtors based on the time available to do so.  Paying the claims of former customers and trade creditors preserves value by improving the Debtors' reputation for

---

[79]  <u>See</u> <u>Boston Post</u> 21 F.3d at 478 ;; (single asset real estate company incorporated solely to own and manage an apartment complex); <u>One Times Square</u> 159 B.R. at 704 (same); <u>Barakat</u> 99 F.3d at 1521-22 (same); <u>Greystone III Joint Venture</u>, 995 F.3d. at 1276 (same).

[80]  <u>Greystone</u>, 995 F.2d at 1279.

[81]  Creditors' Committee Objection, at 33 (arguing that the Debtors' classification scheme was illegitimate because certain former employees' Claims were not included in Class 5).

[82]  <u>Id.</u> at 22-23 (criticizing the Debtors' classification scheme for not including trade creditors, former employees, and customers).

reliable service and backstops the all-important message that everything is "business as usual" during their chapter 11 cases, a crucial component in preserving goodwill for the Reorganized Debtors.[83]   Paying litigation Claims based on preference actions in other bankruptcies or class action claims does not.   Further, the Class 4 Claims are defined as those Claims the payment of which would provide some going-concern value to pay and would, therefore, receive a gift from the Prepetition Lenders.[84]  It is well within the Debtors' reasonable business judgment to classify those Claims in Class 4.

44.   The Committee also argues that because the concept of an "ongoing business relationship" has a subjective component, the Plan's definition of Class 5 Claims is incoherent.[85] This argument is simply incorrect.   As the Committee admits, all the Debtors are required to prove is that there is a "reasonable basis" for the Plan's separate classification.[86]  The Plan separates claims whose payment will provide a benefit to the Reorganized Debtors and, therefore, their estates (Class 4) and those that will have no benefit to the Debtors' ongoing operations (Class 5).  Simply because the separation is based on a business decision that includes a partially subjective component, as does any exercise in "reasonableness,"  this does not render the decision "incoherent."[87]   Further,  the classification  provides  a basis  for the Prepetition

---

[83]   See Spytek Declaration at ¶21.

[84]   Id.

[85]   Creditors' Committee Objection, at 20-24.

[86]   Id. at 28 (citing In re Adelphia, 368 B.R. at 246-47.

[87]   See, e.g., Adelphia, 368 B.R. at 246 (approving the separate classification of "trade claims" versus "other unsecured claims" with "general" characteristics).

Lenders' gifting, which provides a reasonable basis for separately classifying those creditors.[88] Additionally, the Prepetition Lenders are unwilling to gift universally. Although the Committee suggests that "universal gifting" is the price that must be paid for the benefits of a prepackaged plan, there is no authority for that sweeping proposition. The Prepetition Lenders are unwilling to fund any recoveries for Claims in Class 5. The Debtors have zero ability to force the Prepetition Lenders to fund those recoveries. Lack of ability to pay those Claims is the quintessential reasonable basis to not pay a Claim. And, as discussed above, gifting, to the extent it does not render classification moot, provides a reasonable basis for the separate classification of Class 4 and Class 5 Claims.

45.     Courts routinely approve plans of reorganization where the debtor would benefit from granting higher recoveries on subsets of unsecured claims. For example, in In re Chateaugay Corp.,[89] the Second Circuit approved a plan of reorganization that provided a higher recovery for employees' workers' compensation claims than to surety claims based on a surety's payments of the debtors workers' compensation obligations during the case where the debtor had temporarily defaulted on its workers' compensation obligations.[90] The court reasoned that classifying the employee claims separately from the surety claims was appropriate because paying the workers' claims would continue to provide value to the debtors while paying the surety claims in full would not contribute to the reorganization.[91]

---

[88]   Genesis Health, 266 B.R. at 600-01.

[89]   89 F.3d 942 (2d Cir. 1996).

[90]   Id. at 949-50.

[91]   Id.

46.     In a case that closely resembles the classification scheme at issue here, Adelphia Communications Corp.[92] addressed whether mostly liquidated unsecured "Trade Claims" (which mainly, but not entirely included claims of trade creditors) could be classified separately from "Other Unsecured Claims" (mostly consisting of litigation claims).[93]  In Adelphia the court held that separate classification of unsecured claims was appropriate where "when there is a reasonable basis for doing so or when the decision to separately classify 'does not offend one's sensibility of due process and fair play."[94]  The basis asserted to justify the separate classification of trade claims and other unsecured claims was that the size of the claims reserve would be substantially smaller for the mostly liquidated trade claims and separate classification would protect the trade claims in the event the claims reserve was insufficient to cover the litigation claims in "Other Unsecured Claims."[95]  The Adelphia court upheld the classification scheme as having a reasonable basis.[96]  It is important to note, contrary to the Committee's assertion,[97] that Adelphia held that the classification does not have to be "essential" to the reorganization to satisfy section 1122:

> Classifying Trade Claims apart from Other Unsecured Claims insulates the former against the risk that the reserves for the latter are not capable of precise estimation. Such motivation is more than sufficient reason for the classification structure embodied in the Plan, and I find, as a fact or mixed question of fact and

---

[92]   368 B.R. 140 (Bankr. S.D.N.Y. 2007) .

[93]   Id. at 246–47.

[94]   Id. at 247 (internal quotation marks omitted).

[95]   Id.

[96]   Id.

[97]   Creditors' Committee's Objection, at 29.

K&E 12473324.

law, that the classification structure was not established to gerrymander an impaired assenting class.[98]

Classifying claims separately to minimize estimation issues is definitely not "essential" to the reorganization. What <u>Adelphia</u> makes clear is that any reason other than gerrymandering the classes to obtain an assenting impaired class satisfies section 1122 of the Bankruptcy Code.[99]

47. <u>In re Graphic Communications</u>,[100] provides another example. <u>Graphic Communications</u> addressed the issue of whether claims based on loans made to the debtor by a competitor during an attempted merger could be separately classified from claims of creditors who had ongoing business relationships with the debtors.[101] The <u>Graphics Communications</u> court held that the separate classification was proper under section 1122 because the debtor had articulated a rational business reason for the separate classification: the creditor was no longer doing business with the debtor.[102] These cases make clear that whether a creditor continues to do business with the Debtor and, therefore, adds going-concern value, constitutes a legitimate business reason to separately classify those creditors from creditors who will not have a business relationship in the future with the debtors.

---

[98] <u>Adelphia</u>, 368 B.R. at 247.

[99] Additionally, in <u>In re Snyders Drug Stores, Inc.</u>, 307 B.R. 889, 892-93 (Bankr. N.D. Ohio 2004) the bankruptcy court held that the debtors could classify lease rejection claims separately from the claims of creditors who would continue to do business with the debtors. The claims of the creditors that continued to do business with the debtors included service providers, trade vendors, and lessors. The court specifically held that "the need to maintain goodwill for future operations can be [a legitimate business reason for separately classifying unsecured claims]."

[100] 200 B.R. 143, 147 (Bankr. E.D. Mich. 1996).

[101] <u>Id.</u>

[102] <u>Id.</u>

K&E 12473324.

48.     Class 4 Claims arise from the assorted goods and services utilized by the Debtors in their day-to-day business operations and from the Debtors' interactions with their customers.[103]  These goods and services facilitate the Debtors' operations and continue to add value to their estates.[104]  It is the Debtors' business judgment that, given the time it had available to formulate and solicit acceptances on its Plan, hewing as closely as possible to a conventional prepackaged case by paying the Class 4 claims in full would preserve the goodwill of the Debtors' business and further the rehabilitative goal of chapter 11.[105]

49.     The vast majority of the Class 4 Claims are related to agents and customers.  The agents and customers are unequivocally critical to the Debtors' operations.  Further, many of the remaining Class 4 claims consist of providers that have had longstanding relationships with the Debtors and there would be a considerable expense to the Reorganized Debtors if they had to establish new business relationships with different service providers.[106]  Additionally, a number of the Class 4 Claims are for equity advances and other products offered by the Debtors to their customers' employees.  Failure to pay those claims would cause substantial damage to those crucial relationships and substantially impair the Debtors going-concern value.  Relationships with foreign governments and other foreign businesses are also important and add substantial value to the reorganized Debtors.  While given an unlimited period of time to analyze the Class 4 Claims, the Debtors may have found other Claims that provide little to no net benefit to the

---

[103]  Spytek Declaration at ¶21.

[104]  Id.

[105]  Id.

[106]  Id.

K&E 12473324.

Debtors' operations and, therefore, could have been placed in Class 5, the Debtors were afforded no such luxury.

50.     Class 5 claims, on the other hand, comprise Claims that are not in any way essential or even relevant to the Reorganized Debtors' future operations. For example, a significant majority of creditors in Class 5 are contingent, unliquidated claims related to ongoing litigation, including various preference actions brought by bankruptcy trustees. Also included in Class 5 are a potpourri of "placeholder" tax, regulatory, and punitive claims. For example, the Debtors reviewed their nonresidential real estate portfolio and identified properties that were no longer necessary to their ongoing operations. Obligations imposed by these nonresidential leases imposed significant burdens on their ongoing businesses. Indeed such rejection claims represent the quintessential claim that provides no value to the estates going forward.[107] Thus, Class 5 reflects a focused range of prepetition claims held by creditors provide no economic value to the Reorganized Debtors and the Plan treats such creditors accordingly.[108]

51.     In sum, Class 4 and Class 5 are instead separately classified based on two reasonable bases: (a) the separate classification is necessary to effectuate the gifting by the Prepetition Lenders; and (b) Class 5 Claims provide no value to the Reorganized Debtors. These simple, inescapable facts provide the legitimate business reason to classify Class 4 and Class 5 separately. Thus, the objections to the Plan's classification should be overruled.

---

[107]  See Snyders Drug, 307 B.R. at 892-93 (debtors are within their business judgment to classify lease rejection claims separately from other claims because paying such claims provides no value to the reorganized debtors).

[108]  In the words of a leading bankruptcy treatise: "[t]o hold . . . that all such creditors should share proportionately in the reorganization surplus, when each group does not contribute proportionately to its creation and maintenance, makes little sense." It makes even less sense to provide proportional recoveries if there is no "reorganization surplus" and a secured creditor is funding junior recoveries.

K&E 12473324.

52.     The Plan Satisfies the Seven Mandatory Plan Requirements of Section 1123(a) and no party has filed an objection suggesting otherwise.[109]   Specifically, sections 1123(a)(1) through (7) require that a plan:

(a)     designate classes of claims and interests;

(b)     specify unimpaired classes of claims and interests;

(c)     specify treatment of impaired classes of claims and interests;

(d)     provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim agrees to a less favorable treatment of such particular claim or interest;

(e)     provide adequate means for the plan's implementation;

(f)     provide for the prohibition of nonvoting equity securities and provide an appropriate distribution of voting power among the classes of securities; and

(g)     contain only provisions that are consistent with the interests of the creditors and equity security holders and with public policy with respect to the manner of selection of the reorganized company's officers and directors.[110]

**2.     Sections 1123(a)(1) Through 1123(a)(3) are Satisfied**

53.     Article III of the Plan satisfies the first three requirements of section 1123(a) by: (a) designating Classes of Claims and Interests, as required by section 1123(a)(1); (b) specifying the Classes of Claims and Interests that are unimpaired under the Plan, as required by section 1123(a)(2); and (c) specifying the treatment of each Class of Claims and Interests that is impaired, as required by section 1123(a)(3) ).

---

[109]  See Spytek Declaration at ¶26-40.

[110]  See 11 U.S.C. § 1123(a)(1)-(7).

K&E 12473324.

### 3. The Plan Satisfies the Requirements of Section 1123(a)(4) by Providing the Same Treatment to Holders of Claims Within the Same Class

54. The Plan also satisfies section 1123(a)(4)—the fourth mandatory requirement—because the treatment of each Claim or Interest within a Class is the same as the treatment of each other Claim or Interest in that Class, unless the Holder of a Claim or Interest agrees to less favorable treatment on account of its Claim or Interest.[111]

### 4. Section 1123(a)(5) is Satisfied Because the Plan Provides Adequate Means for Its Implementation

55. Article IV and various other provisions of the Plan provide adequate means for the Plan's implementation, thus satisfying the fifth requirement of section 1123(a).[112] Section 1123(a)(5) specifies that adequate means for implementation of a plan may include: (a) retention by the debtor of all or part of its property; (b) the transfer of property of the estate to one or more entities; (c) cancellation or modification of any indenture; (d) curing or waiving of any default; (e) amendment of the debtor's charter; or (f) issuance of securities for cash, for property, for existing securities, in exchange for claims or interests or for any other appropriate purpose.

56. The provisions of Article IV of the Plan relate to, among other things: (a) the continued corporate existence of the Debtors; (b) the vesting of assets in the Reorganized Debtors; (c) restructuring transactions to effectuate the Plan; (d) generally allowing for all corporate action necessary to effectuate the Plan, including the adoption and filing of the Amended and Restated Certificate of Incorporation and Reorganized Bylaws, appointment of

---

[111] 11 U.S.C. § 1123(a)(4)

[112] 11 U.S.C. § 1123(a)(5) .

K&E 12473324.

officers and directors of the Reorganized Debtors, and the execution, delivery, and performance of the Exit Facility to satisfy the DIP Facility Claims, the Reorganized Debtors' authority to make other payments under the Plan, and to conduct the Debtors' post reorganization operations; (e) substantive consolidation of the estates for all purposes associated with confirmation and consummation;[113] (f) identification of the sources of consideration from which the Debtors will make distributions under the Plan; (g) the issuance of New Common Stock; (h) cancellation of old SIRVA common stock and related obligations; and (i) preservation of certain of the Debtors' Causes of Action.

### 5. The Plan Prohibits the Issuance of Nonvoting Equity Securities, Thereby Satisfying Section 11 U.S.C. § 1123(a)(6)

57.    The Plan also meets the requirement of section 1123(a)(6)—that the Plan prohibit the issuance of nonvoting equity securities.  Article 4.C of the Amended and Restated Certificate of Incorporation prohibits the issuance of nonvoting equity securities to the extent prohibited by section 1123.  This document is included as Exhibit D to the Plan Supplement, filed with this Court on April 4, 2008.[114]

### 6. The Plan's Provisions Satisfy Section 1123(a)(7)

58.    Finally, the Plan fulfills section 1123(a)(7).  Section 1123(a)(7)  requires that the Plan "contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan . . . ."[115]    Section 1129(a)(7) is supplemented by

---

[113]   See infra Section IV.C–D, (discussing the justification for substantive consolidation of the Debtors' estates.)

[114]   See Notice of Filing of Supplement to Debtors' Prepackaged Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code [Docket No. 388].

[115]   11 U.S.C. § 1123(a)(7) ).

K&E 12473324.

section 1129(a)(5) ), which directs a court to scrutinize the methods by which the management of the reorganized corporation is to be chosen in order to provide adequate representation of those whose investments are involved in the reorganization, i.e., creditors and equity holders.[116] Therefore, this Court should find that the Plan satisfies the requirements of section 1123(a)(7) . The manner of selecting the officers and directors of the Reorganized Debtors under the Plan is entirely consistent with Delaware corporate law, the Bankruptcy Code, and the interests of creditors, equity security holders, and public policy.[117] Indeed, the Debtors undertook painstaking efforts to incorporate "best practices" corporate governance into all of their governing documents.[118] Further, the Debtors engaged in negotiations with the Prepetition Lenders over the selection of the directors and officers for the Reorganized Debtors. The resulting board of directors and officers is consistent with public policy and the interests of the Creditors.

**B. Substantive Consolidation is Justified by the Facts and Circumstances Herein**

**1. The Legal Standards for Granting Substantive Consolidation**

59. Authority for substantive consolidation comes from a bankruptcy court's general equitable powers under section 105 of the Bankruptcy Code.[119] The Bankruptcy Code itself contemplates that substantive consolidation may be used to effectuate a plan of reorganization.[120]

---

[116] See 7 Collier on Bankruptcy ¶ 1123.01[7], at 1123-15.

[117] Id. )

[118] See Spytek Declaration at ¶31.

[119] FDIC v. Colonial Realty Co., 966 F.2d 57, 59 (2d Cir. 1992); In re Continental Vending Machine Corp., 517 F.2d 997, 1000 (2d Cir. 1975); In re Leslie Fay Co, 207 B.R. 764, 779 (Bankr. S.D.N.Y. 1997); In re Deltacorp, Inc., 179 B.R. 773, 777 (Bankr. S.D.N.Y. 1981); In re Richton Intl Corp., 12 B.R. 555, 557 (Bankr. S.D.N.Y. (Continued…)

60.     Substantive consolidation effectively consolidates the assets and liabilities of multiple debtors and treats them as if the liabilities were owed by, and the assets held by, a single legal entity.[121]   In the course of satisfying the liabilities of the consolidated debtors from this common pool of assets, intercompany claims are eliminated and guarantees from co-debtors are disregarded.[122]

61.     Because it is an equitable remedy, substantive consolidation should be used to afford creditors equitable treatment, and, therefore, may be ordered when the benefits to creditors from substantive consolidation exceed the harm suffered.[123]

62.     Courts in the Second Circuit and elsewhere have considered the following factors (the so-called "Vecco factors")[124] in determining whether to approve substantive consolidation: (i) the presence or absence of consolidated financial statements; (ii) the unity of interest and ownership among various corporate entities; (iii) the degree of difficulty in segregating and ascertaining individual assets and liabilities; (iv) transfers of assets without formal observance of corporate formalities; (v) commingling of assets and business functions; (vi) the profitability of

---

1981); 2 Collier on Bankruptcy, ¶ 105.09[1][b] ("[T]he authority of a bankruptcy court to order substantive consolidation derives from its general discretionary equitable powers.").

[120]   Section 1123(a) provides, in relevant part: "(a) Notwithstanding any otherwise applicable nonbankruptcy law, a plan shall (5) provide adequate means for the plan's implementation, such as (C) merger or consolidation of the debtor with one or more persons . . ." 11 U.S.C. § 1123(a)(5)(C); see In re Stone & Webster, Inc., 286 B.R. 532, 540-41 (Bankr. D.Del. 2002) (section 1123(a)(5) of the Bankruptcy Code authorizes substantive consolidation).

[121]   Colonial Realty Co., 966 F.2d at 58; Leslie Fay, 207 B.R. at 779.

[122]   In re Augie/Restivo Baking Co., Ltd., 860 F.2d 515, 518 (2d Cir. 1988); Deltacorp, 179 B.R. at 777.

[123]   Augie/Restivo, 860 F.2d at 518-19; see also In re Tip Top Tailors, Inc., 127 F.2d 284, 288 (4th Cir. 1942).

[124]   The "Vecco Factors" were originally compiled in In re Vecco Const. Industries, Inc., 4 B.R. 407, 410 (Bankr. N.D. Va. 1980), and adopted by courts in the Second Circuit.  See, e.g., Richton International, 12 B.R. at 557-58, In re Food Fair, Inc., 10 B.R. 123, 126 (Bankr. S.D.N.Y. 1981).

38

consolidation at a single physical location; and (vii) the disregard of legal formalities.[125]  The

decision to substantively consolidate affiliated debtors need not be supported by the presence of

all such factors.[126]

     63.    The Second Circuit, focusing in Augie/Restivo on what it called the "two critical

factors," held that substantive consolidation is warranted if it is demonstrated that (i) the

operational and financial affairs of the debtors are so entangled that the accurate identification

and allocation of assets and liabilities cannot be achieved ("hopeless entanglement"); or

(ii) creditors dealt with the debtors as a single economic unit and did not rely on the separate

identity of an individual debtor in extending credit ("creditor reliance").[127]  Notably, given

Augie/Restivo's explicit use of the conjunction "or," satisfaction of either prong is sufficient to

justify substantive consolidation.[128]  When deciding whether to allow substantive consolidation,

courts in this and other circuits utilize a balancing test to determine whether the relief achieves

the best results for all creditors.[129]  Courts have "a good deal of discretion" in determining

whether substantive consolidation is appropriate.[130]  In fact, substantive consolidation has

become commonplace in this District, no doubt reflecting the complicated and often tax driven

---

[125] See, e.g., Augie/Restivo, 860 F.2d at 518; Soviero v. Franklin Nat'l Bank, 328 F.2d 446, 447-48 (2d Cir. 1964); Food Fair, 10 B.R. at 126.

[126] Worldcom, Inc., 2003 WL 23861928 at *35.

[127] Augie/Restivo, 860 F.2d at 518; In re 599 Consumer Elec., Inc., 195 B.R. 244, 248 (S.D.N.Y. 1996).

[128] See In re Bonham, 229 F.3d 750, 766 (9th Cir. 2000) ("The presence of either [Augie/Restivo] factor is a sufficient basis to order substantive consolidation."); In re Adelphia Commc'ns Corp., 2007 WL 186796, at *12 (S.D.N.Y. Jan. 24, 2007); In re Worldcom, Case No. 02-13533 (AJG), 2003 WL 23861928, at *36 (Bankr. S.D.N.Y. Oct. 31, 2003).

[129] Colonial Realty, 966 F.2d at 60; In re Affiliated Foods, Inc., 249 B.R. 770, 780 (Bankr. W.D. Mo. 2000); In re Creditors Serv. Corp., 195 B.R. 680, 690 (Bankr. S.D. Ohio 1996).

[130] Deltacorp, 179 B.R. at 777.

K&E 12473324.

corporate structure that bears little resemblance to how large integrated enterprises actually operate their business. Virtually all of the "Mega" cases in this District over the past four years whose plans have requested substantive consolidation have been confirmed.[131]

64. To prevail on the "hopeless entanglement" prong of substantive consolidation, the Debtors are not required to prove that an allocation of assets and liabilities to the various legal entities cannot be achieved under any circumstances. Nor are the Debtors required to prove the absence of any legal entity capable of disentanglement, even those with little or no assets/ liabilities and no impaired creditors, to demonstrate that substantive consolidation is appropriate.[132] Rather, it is sufficient to demonstrate that it would be so costly and difficult to untangle the Debtors' financial affairs that doing so would be a "practical impossibility."[133] In the words of the Augie/Restivo court, "substantive consolidation should be used only after it has been determined that all creditors will benefit because untangling is either impossible or so costly as to consume the assets."[134] Or, as the Third Circuit put it, "whether the 'eggs'— consisting of the ostensibly separate companies—are so scrambled that we decline to unscramble them."[135] As discussed more fully below, not only are the Debtors' intercompany assets and liabilities so inexorably intertwined as to prevent disentanglement, such a process, even if

---

[131] See Chart attached hereto as Exhibit I setting forth cases authorizing substantive consolidation.

[132] In re Owens Corning, 419 F.3d 195, 211 (3d Cir. 2005) (substantive consolidation is appropriate if creditors consent).

[133] In re Seatrade Corp., 369 F.2d 845, 848 (2d Cir. 1966) ("practical impossibility"); In re Bonham, 229 F.3d 750, 766-67 (9th Cir.2000) ("needlessly expensive and possibly futile"); Affiliated Foods, 249 B.R. at 780 ("a real nightmare . . . probably would not be possible").

[134] Augie/Restivo, 860 F.2d at 519.

[135] Nesbit v. Gears Unlimited, Inc., 347 F.3d 72, 86 (3d Cir. 2003).

K&E 12473324.

theoretically possible, would jeopardize not only the Debtors' securitization facility (thereby resulting in an immediate need for up to $131 million in additional liquidity and placing feasibility of the Plan in peril) but also the Debtors' favorable exit financing. The loss of such facilities would be devastating to the Debtors and their estates.

65.     It is not necessary for the entanglement to be "hopeless" for substantive consolidation to be proper—"[E]ven when the financial relationships among the parties to be consolidated are capable of being untangled, the affairs of the parties may nonetheless be 'inextricably intertwined.' If intercompany debts and transfers are numerous and the operations are interdependent, the parties are 'entangled' even if a detailed analysis of the records could ultimately identify the true assets and liabilities of the separate entities."[136] The "inextricably intertwined" standard has been adopted by at least one court in this District.[137]

66.     The proof required to prevail on the "creditor reliance" prong likewise is less than absolute — this prong is satisfied if the Debtors demonstrate that a "substantial portion" of creditors dealt with the debtors as a single economic unit.[138]

### 2.     Substantive Consolidation Causes No Harm in This Case

67.     Substantive consolidation as proposed in the Plan is necessary and appropriate in this case. Most importantly, the Class 5 Claims—which would receive no recovery under the Plan — fare no differently whether the Debtors were substantively consolidated or not. The

---

[136] Matter of New Center Hosp., 187 B.R. 560, 569 (E.D. Mich. 1995).

[137] Drexel Burnham Lambert, 138 B.R. at 743.

[138] Worldcom, 2003 WL 23861928 at *37; In re Gucci, 174 B.R. 401, 414 (Bankr. S.D.N.Y. 1994) ("Indeed, even if it were found that some creditors may be prejudiced, that, in of itself, would not necessarily defeat the motion [seeking substantive consolidation] because [a]ny potential prejudice to creditors . . . and affiliates that may result from substantive consolidation . . . is greatly outweighed by the much greater for prejudice, harm and waste if substantive consolidation is not ordered.").

41

secured claim of the Debtors' DIP Lenders, the adequate protection claims of the Debtors' Prepetition Lenders and LaSalle Bank under the securitization facility, and the administrative claims that would be due would far exceed the proceeds of the Debtors' liquidation, whether calculated on the basis of a consolidated estate or on the basis of individual Debtors' estates.[139] Therefore, the Class 5 Claims would suffer no harm whatsoever from substantive consolidation.[140]

68.     In addition to the lack of any demonstrable harm, substantive consolidation of the Debtors' estates should be approved because the Debtors satisfy both prongs of the Augie/Restivo test.

### 3.     The "Hopeless Entanglement" Prong is Satisfied

69.     First, the facts amply demonstrate that the Debtors' operational and financial affairs are so entangled (or "inextricably intertwined") that the accurate identification and allocation of assets and liabilities to the Debtors' legal entities would take so long and be so costly such that creditors as a whole would be substantially harmed by the effort.[141]   In particular, there are various factors that have contributed to this condition.  As set forth in the Kruse Report:[142]

---

[139]   See Exhibit G (Consolidated Liquidation Analysis Expert Report, at 11).  The Committee, Triple Net, and the Official Committee of Unsecured Creditors of 360networks (USA) inc., et al. object to substantive consolidation on the alleged basis that substantive consolidation prevents Class 5 creditors from obtaining any recovery.  For the reasons set forth in this section, each of these objections fail.

[140]   In re Monroe Well Serv., Inc., 80 B.R. 324, 331 (Bankr. E.D. Pa. 1987) ("Moreover, the key issue for unsecured creditors in this case is not whether there exist unencumbered assets of the debtors sufficient to provide any measurable distribution.  Given the size of administrative and other priority claims as well as the total amount of unsecured claims, there is little possibility of that occurring.")

[141]   Kruse Report, ¶48 ("After examining SIRVA's accounting practices and data, it is my opinion that SIRVA's legal entities are hopelessly entangled.").

[142]   Kruse Report, ¶49.

K&E 12473324.

- SIRVA operates and is organized by segment and brand. Legal entity status is generally not considered in the day-to-day operation of the company.

- SIRVA does not keep independent books for most of its legal entities.

- SIRVA does not record many, if not most, transactions with sufficient detail to understand which legal entities were involved and at which particular legal entity such intercompany assets and liabilities reside. For many intercompany transactions, SIRVA did not assign debits and credits to the legal entity that actually incurred or earned them. Instead, they were recorded as incurred or earned by a cost center for the business under that segment or brand, without any attempt to determine which legal entity under that segment or brand was responsible. For many transactions, this crucial data does not seem to exist.[143]

- Rapid growth acquisitions, centralized cash management, shared services, and operational entanglements caused a proliferation of intercompany transactions.

- Many intercompany transactions are not settled; instead, the payables and receivables have simply accumulated.

Therefore, disentangling the financial affairs of the Debtors is a "practical impossibility."

70.     Second, and most relevant for the facts here, completely disentangling the individual Debtors' assets and liabilities, and constructing financial statements on an individual Debtor level would be time consuming (in excess of six months, if it could be done at all),[144] be extremely costly,[145] and require substantial resources.[146] Even after the expenditure of significant time and resources on such a project, at the end of the day the Debtors' books and

---

[143] As noted in the Committee's objection, "the Debtors advised the Court on the Petition Date that 'Debtors maintain records of all fund transfers and can ascertain, trace and account for Intercompany Transactions.'" While that statement is true,, the Debtors' analysis clearly shows that "there are intercompany balances that cannot be rebuilt, no matter what time, cost, and effort are expended. See Kruse Report, p. 16.

[144] Kruse Report, ¶¶46 and 59.

[145] Kruse Report, ¶¶46, 59, and 69.

[146] Kruse Report, ¶59.

K&E 12473324.

records may simply not yield enough information to actually create accurate financial statements for individual Debtors.[147]

71. "Hopeless entanglement" must be measured by reference to the time required to disentangle. The Debtors do not have the luxury of time. The effort of disentangling the Debtors' estates would result in a protracted chapter 11 case, which would have a significant negative impact on the Debtors' reorganization—the principal reason for filing these chapter 11 cases as prepackaged cases.

72. The agreement under which the Debtors' receivables purchase program through LaSalle Bank operates provides that if the Plan does not become effective by April 30, 2008, a Termination Date will occur and the entire program will terminate automatically.[148] As of April 1, 2008, the LaSalle securitization facility provided approximately $131 million in financing. If this facility were terminated, the Debtors would need to immediately find replacement financing while they waited for the accounts receivables to be collected in the ordinary course—not monetized almost instantly as the securitization provides—which would be virtually impossible for a company languishing in chapter 11, particularly given the current state of the credit markets. A delay of the length necessary to "disentangle" (or try to) would render unavailable the Debtors' already-negotiated and favorable exit financing, which expires on June 30, 2008. As has been well-documented, in the current roiled state of the credit markets, exit financing on affordable terms has been difficult to obtain.[149] In the absence of exit financing, (and assuming

---

[147] Kruse Report, ¶58.

[148] See Motion of the Debtors for Entry of an Order (I) Authorizing Certain Debtors to Continue Performing Under the Receivables Purchase Program and (II) Granting Related Relief [Docket No. 29], at ¶ 28(c).

[149] In just the past few months, Delphi Corp., Calpine Corp., Dura Automotive Systems, Inc., Solutia, Inc., Sea Containers Ltd., Lionel, LLC, and Federal Mogul Corp. have had difficulties in obtaining exit financing due to
(Continued…)

the LaSalle Facility has been voluntarily extended through June 30 - an assumption for which there is no basis) the Debtors would likely be forced into a liquidation. A liquidation triggered by either of these events would eliminate any recoveries that Class 4 creditors would receive under the current Plan, cost thousands of people their jobs, and leave many of the employees of the Debtors' customers, whose mortgages are currently being serviced by the Debtors, at risk of foreclosure. A delay would imperil the Debtors' agent network and drive its customers to book elsewhere. Negotiations with a variety of customers with non-exclusive contracts are currently ongoing. To delay exit from chapter 11 would simply drive many of those customers to place their business elsewhere. Simply put, the "business as usual" message associated with the Debtors' prepackaged chapter 11 cases would effectively be destroyed. Taking the time to achieve disentanglement would deprive the company of its ability to reorganize.

73. <u>Third</u>, a review of substantive consolidation opinions reveals a set of commonly-identified factual elements supporting a finding of "hopeless entanglement"—all of these factors are present here:

| Factual Element | Cases | Facts in this Case |
|---|---|---|
| Debtor subsidiaries are wholly owned by the Debtor parent company | <u>In re Food Fair, Inc.</u>, 10 B.R. 123 (Bankr. S.D.N.Y. 1981)<br><br><u>In re Richton Int'l Corp.</u>, 12 B.R. 555 (Bankr. S.D.N.Y. 1981) | SIRVA, Inc. is the ultimate parent of all the other Debtors, which are wholly-owned subsidiaries of SIRVA, Inc.<br><br><u>See</u> Affidavit of Douglas V. |

the "credit crunch." Solutia in fact sued the lenders who backed out of an exit financing commitment. <u>See, e.g.</u>, Ben Fidler, "Delphi continues noncore sales," The Daily Deal, March 21, 2008 (Delphi); Ben Fidler, "Dura creditors wilt under new plan," The Daily Deal, March 18, 2008 (Dura); Marie Beaudette, "Sea Containers Wins 2-Month Extension to File Ch. 11 Plan," Dow Jones Newswires, February 26, 2008 (Sea Containers); Jeffrey McCracken and John D. Stoll, "Delphi's Bankruptcy Exit Hits a Snag," The Wall Street Journal, February 13, 2008 (Delphi); Shanon D. Murray, "Solutia sues lenders," The Daily Deal, February 7, 2008 (Solutia); "Lionel chugs toward exit; Train-maker needs financing to get out of bankruptcy," Grand Rapids Press, December 23, 2007 (Lionel); "Federal-Mogul Emerges from Bankruptcy," Credit Investment News, December 21, 2007 (Federal-Mogul).

| Factual Element | Cases | Facts in this Case |
|---|---|---|
| | In re Affiliated Foods, Inc., 249 B.R. 770 (Bankr. W.D. Mo. 2000)<br><br>In re Continental Vending Mach. Corp., 517 F.2d 997 (2d Cir. 1975)<br><br>In re Walter John Giller, Jr., 1991 WL 335995 (W.D. Ark. 1991)<br><br>In re GC Companies, Inc., 274 B.R. 663 (Bankr. D. Del. 2002)<br><br>In re Drexel Burnham Lambert Group, Inc., 138 B.R. 723 (Bankr. S.D.N.Y. 1992)<br><br>In re Tureaud, 45 B.R. 658 (Bankr. D. Okla. 1985)<br><br>In re Adamson Co., Inc., 1983 WL 508603 (Bankr. E.D. Va. 1983) | Gathany, Senior Vice President and Treasurer of DJK Residential LLC in Support of First Day Motions and Pursuant to Local Bankruptcy Rule 1007-2 (the "First Day Affidavit"), Exhibit A. |
| Purchasing for the company was accomplished centrally | In re Food Fair, Inc.<br><br>In re New Center Hosp., 179 B.R. 848 (Bankr. E.D. Mich. 1994) | Purchasing is done centrally for the company, under a Director of Sourcing and Network Purchasing. |
| Debtors used a central cash management system | In re Food Fair, Inc.<br><br>In re I.R.C.C., Inc., 105 B.R. 237 (S.D.N.Y. 1989)<br><br>In re Affiliated Foods, Inc.<br><br>In re D.H. Overmyer Co., Inc., (S.D.N.Y. 1976)<br><br>In re GC Companies, Inc.<br><br>In re Drexel Burnham Lambert Group, Inc. | The Debtors utilize a centralized cash management system, in which funds are collected from various sources into a "Primary Cash Concentration Account," and from there disbursed to meet the needs of the Debtors' businesses.<br><br>See Motion of the Debtors for an Order (A) Authorizing the Debtors to Continue Using Their Existing Cash Management System, Bank Accounts and Business Forms, (B) Granting Postpetition Intercompany Claims Administrative Priority, and (C) Authorizing Continued Intercompany Transactions [Docket No. 17] (the "First Day Cash Management Motion"), ¶¶ 14-25. |
| Regularized funds flow within and among debtor entities | In re Food Fair, Inc.<br><br>In re Richton Int'l Corp.<br><br>In re I.R.C.C., Inc. | Approximately $1 billion per month flows through the Debtors' centralized cash management system daily to meet the needs of the Debtors' businesses. |

46

| Factual Element | Cases | Facts in this Case |
|---|---|---|
| | In re Affiliated Foods, Inc.<br><br>In re D.H. Overmyer Co., Inc.<br><br>In re Continental Vending Mach. Corp.<br><br>In re Walter John Giller, Jr.<br><br>In re Lahijani, 2005 WL 4658490 (Bankr. C.D. Cal. 2005)<br><br>In re Brentwood Golf Club, LLC, 329 B.R. 802 (Bankr. E.D. Mich. 2005)<br><br>In re GC Companies, Inc.<br><br>In re Creditors Serv. Corp., (Bankr. S.D. Ohio 1996)<br><br>In re New Center Hosp.<br><br>In re Drexel Burnham Lambert Group, Inc.<br><br>In re Tureaud<br><br>In re Adamson Co., Inc. | See First Day Cash Management Motion, ¶¶ 14-25. |
| Parent debtor hired debtor subsidiaries' employees | In re Food Fair, Inc.<br><br>In re Lahijani<br><br>In re GC Companies, Inc. | All SIRVA employees are employed by SIRVA, Inc. |
| Overlapping directors and officers among parent and subsidiaries | In re Food Fair, Inc.<br><br>In re I.R.C.C., Inc.<br><br>In re Affiliated Foods, Inc.<br><br>In re D.H. Overmyer Co., Inc.<br><br>In re Walter John Giller, Jr.<br><br>In re Lahijani<br><br>In re Brentwood Golf Club, LLC<br><br>In re Creditors Serv. Corp. | SIRVA's CEO is a director of all the Debtor entities. SIRVA, Inc., SIRVA Worldwide, Inc. and North American Van Lines, Inc. have identical boards—in addition to the CEO, they are composed of outside directors. SIRVA's General Counsel and Treasurer, along with SIRVA's CEO, are Directors of all remaining Debtor entities. |

K&E 12473324.

| Factual Element | Cases | Facts in this Case |
|---|---|---|
| | In re New Center Hosp. <br><br> In re Adamson Co., Inc. | |
| Company characterized by centralized decision-making | In re Food Fair, Inc. <br><br> In re Lahijani <br><br> In re GC Companies, Inc. <br><br> In re Creditors Serv. Corp. <br><br> In re Tureaud | All company-wide policy decisions are made by SIRVA, Inc. management. The boards of SIRVA, Inc., SIRVA Worldwide, Inc. and North American Van Lines, Inc. (having identical membership) have joint meetings. |
| Debtors filed consolidated financial statements and tax returns | In re Food Fair, Inc. <br><br> In re Richton Int'l Corp. <br><br> In re I.R.C.C., Inc. <br><br> In re D.H. Overmyer Co., Inc. <br><br> In re Brentwood Golf Club, LLC <br><br> In re GC Companies, Inc. <br><br> In re Adamson Co., Inc. | The Debtors file consolidated financial statements and tax returns. <br><br> See SIRVA, Inc. Form 10K for the fiscal year ending December 31, 2007 ("2007 10-K"), Part II, Item 8, pp. 65-192. |
| The parent debtor's board of directors made the decision to file the subsidiaries' bankruptcy petitions | In re Food Fair, Inc. | The SIRVA, Inc. board of directors made the decision to file bankruptcy petitions for all the Debtors. |
| Presence of cross-corporate guarantees among parent and subsidiary debtors | In re Food Fair, Inc. <br><br> In re Richton Int'l Corp. <br><br> In re D.H. Overmyer Co., Inc. <br><br> In re Continental Vending Mach. Corp. <br><br> In re Brentwood Golf Club, LLC <br><br> In re GC Companies, Inc. <br><br> In re Creditors Serv. Corp. <br><br> In re Drexel Burnham Lambert Group, Inc. | Many cross-corporate guarantees exist and have existed among the Debtors, e.g., SIRVA Worldwide, Inc. and NAVL are guarantors of the Debtors' receivables purchase program (see, First Day Affidavit, ¶ 195); many of the Debtors are guarantors of the Debtors' prepetition bank debt (see First Day Affidavit, Exhibit A); forty-two Debtor subsidiaries of SIRVA, Inc. are guarantors under the DIP Credit Agreement (see $150,000,000 Credit and Guarantee Agreement among SIRVA Worldwide, Inc., SIRVA, Inc., the Other Guarantors Named Herein, Each a Debtor and Debtor-in-Possession and the Several Lenders from Time to Time Parties Hereto, and JPMorgan Chase Bank, |

| Factual Element | Cases | Facts in this Case |
|---|---|---|
| | In re Adamson Co., Inc. | N.A., as administrative agent, dated February 6, 2008 (the "DIP Credit Agreement"), Schedule B |
| Issues with financial reporting systems | In re Food Fair, Inc.<br><br>In re I.R.C.C., Inc.<br><br>In re Continental Vending Mach. Corp.<br><br>In re Lahijani<br><br>In re Brentwood Golf Club, LLC<br><br>In re Creditors Serv. Corp.<br><br>In re New Center Hosp.<br><br>In re Drexel Burnham Lambert Group, Inc.<br><br>In re Tureaud<br><br>In re Adamson Co., Inc. | The Debtors' accounting system is not capable of producing accurate and reliable prepetition intercompany balances on a legal-entity-by-legal-entity basis.<br><br>See Kruse Report, ¶¶ 48-55. |
| Intercompany accounts out of balance | In re Food Fair, Inc.<br><br>In re Brentwood Golf Club, LLC<br><br>In re Creditors Serv. Corp.<br><br>In re New Center Hosp. | The Debtors' accounting system is not capable of producing accurate and reliable prepetition intercompany balances on a legal-entity-by-legal-entity basis.<br><br>See Kruse Report, ¶¶ 50-55. |
| Difficulty in reconciling intercompany accounts | In re Food Fair, Inc.<br><br>In re D.H. Overmyer Co., Inc.<br><br>In re Lahijani<br><br>In re Brentwood Golf Club, LLC<br><br>In re Creditors Serv. Corp.<br><br>In re Tureaud<br><br>In re Adamson Co., Inc. | The Debtors' accounting system is not capable of producing accurate and reliable prepetition intercompany balances on a legal-entity-by-legal-entity basis.<br><br>See Kruse Report, ¶¶53-69. |
| Debtors operated as a single business | In re Richton Int'l Corp.<br><br>In re I.R.C.C., Inc. | The Debtors operate a single, integrated, global moving and relocation services business.<br><br>See First Day Affidavit, ¶¶ 7-34; |

49

| Factual Element | Cases | Facts in this Case |
|---|---|---|
| | In re Affiliated Foods, Inc.<br><br>In re Continental Vending Mach. Corp.<br><br>In re Walter John Giller, Jr.<br><br>In re Brentwood Golf Club, LLC<br><br>In re GC Companies, Inc.<br><br>In re Creditors Serv. Corp.<br><br>In re Drexel Burnham Lambert Group, Inc.<br><br>In re Tureaud<br><br>In re Adamson Co., Inc. | 2007 10-K, Part I, Item 1, p. 2. |
| Directors of subsidiaries were appointed by parent board | In re Richton Int'l Corp. | The directors of all the Debtors' subsidiaries were approved by the SIRVA, Inc. board. |
| Parent established accounting reporting systems used by subsidiaries | In re Richton Int'l Corp. | Accounting policies, and decisions to add, drop or merge accounting systems, are made at the parent company level. |
| Subsidiaries' affairs discussed at parent board meetings | In re Richton Int'l Corp.<br><br>In re Affiliated Foods, Inc. | The business affairs of all the Debtors are discussed at SIRVA, Inc. board meetings, and policy is set at that level. |
| No regular meetings of subsidiaries' boards of directors | In re Richton Int'l Corp.<br><br>In re Affiliated Foods, Inc.<br><br>In re D.H. Overmyer Co., Inc. | The boards of the Debtors' subsidiary companies do not meet face-to-face. All corporate actions by directors are accomplished through consent resolutions. |
| Prepetition credit agreement entered into by parent on behalf of entire company | In re Richton Int'l Corp.<br><br>In re GC Companies, Inc. | SIRVA Worldwide, Inc. entered into the Prepetition Credit Facility on behalf of the entire company.<br><br>See Debtors' Motion for Interim and Final Orders (A) Authorizing Debtors to Obtain Postpetition Secured Financing and Utilize Cash Collateral; (B) Granting Adequate Protection to Prepetition Secured Lenders; and (C) Scheduling Final Hearing ("First Day DIP Motion"), |

50

| Factual Element | Cases | Facts in this Case |
|---|---|---|
| | | ¶ 15. |
| Prepetition credit agreement restricted the right of subsidiaries to borrow | In re Richton Int'l Corp. | The Prepetition Credit Facility restricted borrowing to SIRVA Worldwide, Inc. and certain (non-Debtor) foreign entities.<br><br>See $600,000,000 Credit Agreement among SIRVA Worldwide, Inc., the Foreign Subsidiary Borrowers, the Several Lenders from Time to Time Parties Hereto, JPMorgan Chase Bank, as administrative agent, Banc of America Securities LLC, as syndication agent and Credit Suisse First Boston, Deutsche Bank Securities, Inc. and Goldman Sachs Credit Partners L.P. as documentation agents, dated December 1, 2003 (the "Prepetition Credit Agreement"), section 2. |
| Funds of parent and subsidiaries commingled in bank accounts | In re I.R.C.C., Inc.<br><br>In re Lahijani<br><br>In re Brentwood Golf Club, LLC<br><br>In re New Center Hosp. | Funds of SIRVA, Inc. and its subsidiaries are commingled in the Debtors' bank accounts.<br><br>See First Day Cash Management Motion, ¶¶ 14-25. |
| Intercompany loans were made without documentation | In re I.R.C.C., Inc.<br><br>In re Creditors Serv. Corp.<br><br>In re New Center Hosp.<br><br>In re Tureaud | Intercompany loans were made without loan documentation, and not even always reflected by accurate accounting entries.<br><br>See, Kruse Report, ¶37. |
| Subsidiaries' corporate fees paid by parent | In re Affiliated Foods, Inc. | Corporate fees for all subsidiaries are paid at the NAVL level, and then charged back to the subsidiary's parent (e.g., NAVL, AVL and SIRVA Relocation each pay the corporate fees for their subsidiaries). These fees are never charged back or allocated to the subsidiary legal entities. |

51

| Factual Element | Cases | Facts in this Case |
|---|---|---|
| Employees were shared among parent and subsidiaries | In re Affiliated Foods, Inc.<br><br>In re Walter John Giller, Jr.<br><br>In re Brentwood Golf Club, LLC<br><br>In re Creditors Serv. Corp.<br><br>In re Drexel Burnham Lambert Group, Inc.<br><br>In re Adamson Co., Inc. | All SIRVA employees are employed by SIRVA, Inc. |

74.     Both Triple Net and the Official Committee of Unsecured Creditors of 360networks (USA) inc. assert general objections challenging the entanglement of the Debtors' operational and financial affairs.   For the reasons set forth in this section, each of these objections fail.

### 4.     The "Creditor Reliance" Prong is Satisfied

75.     As set forth above, the "creditor reliance" prong is satisfied if the Debtors demonstrate that a "substantial portion" of creditors dealt with the Debtors as a single economic unit.[150]  Unless a creditor is affected by or objects to substantive consolidation, the Debtors need not demonstrate the creditor reliance prong with respect to that creditor.[151]  The Plan provides for full payment of all but a small subset of the Debtors' creditors, which are included in Class 5 of the Plan, as follows:

| Class 5 Claim Category | Number of Claims in Category | Percentage of all Class 5 Claims | Number of Objections from Category |
|---|---|---|---|
|  |  |  |  |

---

[150]  Worldcom, 2003 WL 23861928 at *37; Gucci, 174 B.R. at 414.

[151]  Owens Corning, 419 F.3d at 211 (substantive consolidation is appropriate if creditors consent).

K&E 12473324.

| Litigation/preference | 19 | 50% | 6 |
|---|---|---|---|
| Foreign pension/tax | 3 | 7% | 0 |
| Lease Rejection | 8 | 21% | 3 |
| Contract Rejection | 8<br>(7 severance payment agreement, 1 consulting agreement) | 21% | 0 |

Accordingly, the only parties relevant to the "creditor reliance" prong are the Class 5 Claims.

76.     As set forth above, of approximately 40 creditors in Class 5, only three (Robert Noia, a litigation creditor, Triple Net Investments ("Triple Net"), a lease rejection creditor, and the Official Committee of Unsecured Creditors of 360networks (USA) inc., et al., a litigation creditor) objected to substantive consolidation - a fact which itself unsderscores the widespread lack of creditor reliance.

77.     Regardless of the number of objections, the Debtors satisfy the "creditor reliance" prong of <u>Augie/Restivo</u> as it applies to all categories of Class 5 Claims.   <u>First</u>, the litigation creditors cannot claim reliance at all, because they are not contractual creditors.   <u>Augie/Restivo</u> "focused on respecting the expectations of contractual creditors at the time they extend credit."[152] The court's rationale for the "reliance" factor was clearly stated:

> [C]reditors who make loans on the basis of the financial status of a separate entity expect to be able to look to the assets of their particular borrower for satisfaction of that loan.  Such lenders structure their loans according to their expectations regarding that borrower and do not anticipate either having the assets of a more sound company available in the case of insolvency or having the creditors of a less sound debtor compete for the borrower's assets. Such expectations create significant equities.  Moreover, lenders' expectations are central to the calculation of interest rates and other terms of loans, and fulfilling those expectations is

---

[152]  Mary Elizabeth Kors, <u>Altered Egos: Deciphering Substantive Consolidation</u>, 59 U. Pitt. L. Rev. 381, 408 (1998); <u>see also</u> <u>In re Flora Mir Candy Corp.</u>, 432 F.2d 1060, 1063 (2d Cir. 1970).

K&E 12473324.

therefore important to the efficiency of credit markets. Such efficiency will be undermined by imposing substantive consolidation in circumstances in which creditors believed they were dealing with separate entities.[153]

78. This rationale on its face does not apply to litigation creditors. The litigation creditors' situation is analogous to the familiar doctrine of the "eggshell skull plaintiff."[154] Tort defendants do not choose their plaintiff, rather they "must take their victim as they find him,"[155] and must pay damages whether the plaintiff had an "eggshell skull" or not.[156] Similarly, the litigation creditors here did not choose in advance or rely in any way on any particular debtor, and, therefore, cannot be said to have any expectations in this regard, or to have "relied" on the relative solvency of any member of the Debtors' family of companies.[157] The decision of the plaintiffs to bring the litigation was not based on the solvency of any particular entity in the Debtors' group, and the plaintiffs did not "foresee" which of the Debtors' legal entities might ultimately be liable for a judgment, nor the relative solvency of any of these entities.

---

[153] Augie-Restivo, 860 F.2d at 518-19. This same analysis is followed in Professor (now Judge) Posner's article "The Legal Rights of Creditors of Affiliated Corporations: An Economic Approach," 43 U. Chi. L. Rev. 499 (1976).

[154] Dulieu v. White, [1901] 2 K.B. 669, 679 (1901) (defendant was held liable in negligence to plaintiff with a thin skull who suffered death, when an ordinary man would only have suffered a mild bump on the head).

[155] Shimman v. Frank, 625 F.2d 80, 100 (6th Cir. 1980).

[156] Woodhams v. Moore, 840 F.Supp. 517, 519-20 (S.D. Ohio 1994).

[157] It is corroborative to note that the Restatement emphasizes forseeability to describe the "eggshell skull" doctrine:

> § 461. Harm Increased in Extent by Other's Unforeseeable Physical Condition. The negligent actor is subject to liability for harm to another although a physical condition of the other which is neither known nor should be known to the actor makes the injury greater than that which the actor as a reasonable man should have foreseen as a probable result of his conduct.

Restatement (Second) of Torts § 461 (1965).

K&E 12473324.

79.    Second, the same rationale is true of the governmental creditors.  "This [reliance] requirement eliminates tort and statutory creditors, who, as involuntary creditors, by definition did not rely on anything in becoming creditors."[158]

80.    Third, the contract rejection creditors cannot claim reliance on any individual SIRVA entity.  As shown above, this group is made up of one counterparty to a consulting contract, and seven former employees claiming under severance agreements.  The consulting agreement claimant is Clayton, Dubilier & Rice, Inc. ("CD&R"), a private equity firm that was the former owner of SIRVA.  The counterparty to their consulting contract is SIRVA, Inc., the ultimate parent company in the SIRVA hierarchy, which is a holding company, not an operating entity.  CD&R's consulting services under the agreement were provided for the company as a whole, not for any particular subsidiary.[159]   Therefore, CD&R cannot claim (and has not claimed) that it relied on the credit of any particular SIRVA entity in entering into the agreement.[160]

81.    Fourth, the Debtors submit that none of the lease or contract rejection claimants could successfully argue that they relied on the separate credit of any particular SIRVA entity. In particular, all of the negotiations with the lessors were conducted by a SIRVA, Inc.

---

[158]  Kors, 59 U. Pitt. L. Rev. at 418.

[159]  Mullin Declaration, at ¶ 36.

[160]  The seven individuals (none of whom have objected to the Plan at all) have claims for severance pay under essentially identical "General Release and Separation Agreements" (the "Separation Agreements").  All of these employees (as is true of all of the Debtors' employees) were employed by SIRVA, Inc., no matter which one of the Debtors' business segments they worked in.  In fact, four of the seven worked in the Debtors' "Corporate" segment, meaning they provided services which were shared across all SIRVA entities.  The counterparty on the Separation Agreements was "SIRVA, Inc. and its direct and indirect subsidiaries, including, but not limited to, SIRVA Relocation LLC, Allied Van Lines, Inc. and North American Van Lines, Inc. (collectively, the 'Company')."[160]   In view of these facts, it is clear that these individuals did not rely on the separate credit of any individual SIRVA entity when entering into employment with the company or upon separation.

K&E 12473324.

management employee whose title was "Director of Property and Business Services" or "Director of Real Estate." Consistent with the wholly integrated nature of the Debtors' business, all negotiations were conducted by SIRVA, Inc., not by any subsidiary.[161]

82.     Fifth, Triple Net was the only Class 5 landlord to object to substantive consolidation. Triple Net was a counterparty to a nonresidential real property lease with North American Van Lines ("NAVL"), dated March 22, 1999 (the "TN Lease"). Triple Net asserts that it relied only on NAVL and transacted business only with NAVL with respect to the TN Lease. Triple Net's assertions, however, are without merit.

83.     In fact, pursuant to the TN Lease, "Tenant may sublet or assign this Lease without Landlord's consent to an affiliate, parent or subsidiary . . . ."[162] This clearly shows that Triple Net treated the Debtors as a single unit. In addition, Triple Net asserts that "[i]n negotiating and entering into the [TN] Lease, Triple Net dealt exclusively with [NAVL] as a stand alone entity, which never offered its parent or other affiliates as guarantors of [NAVL's] obligations under the [TN] Lease."[163] NAVL, however, could not have "offered its parent or other affiliates" as guarantors, since, at the time, NAVL was essentially SIRVA's sole operating entity and ultimate parent entity for all subsidiaries in the SIRVA corporate structure. During the term of the TN Lease, however, the place and function of NAVL in the SIRVA corporate structure changed. In 2005, SIRVA divested NAVL's "Specialized Transportation," (logistics) business—the business for which the TN Lease was entered into. NAVL also is no longer the ultimate parent company

---

[161]  Mullin Declaration, ¶ 37.

[162]  See TN Lease, Section 8 (emphasis added).

[163]  See Triple Net Objection, at ¶ 9.

K&E 12473324.

of SIRVA and has added relocation operations to its moving services business.  As a result, the NAVL with which Triple Net entered into the lease bears little resemblance to the current NAVL.

84.    Further, throughout the term of the TN Lease, Triple Net dealt with various SIRVA personnel and representatives, including SIRVA's corporate manager and SIRVA's agent, CB Richard Ellis, and knew NAVL had a different corporate role.  In particular, Triple Net dealt with Rebecca Ross and later Jim Lewis, both of whom held the title of Director of Real Estate and Facilities, a corporate-wide position at the SIRVA, Inc. level.[164]  Most recently, throughout 2006 and 2007 Jim Lewis and Jim Petrucci, along with CB Richard Ellis, had numerous discussions regarding the potential subleases of the facility.  Indeed, prior to the filing of these cases, many discussions took place between Jim Petrucci of Triple Net and Jim Lewis of SIRVA concerning SIRVA's (not NAVL's) financial condition and the possibility that SIRVA might seek bankruptcy protection.  Accordingly, during the life of the TN Lease, Triple Net dealt with various Debtor entities as a single unit and did not rely on any particular Debtor entity.

85.    The remaining landlords/ subtenants that are in Class 5 have not objected to substantive consolidation.  As a result, the Debtors need not demonstrate a lack of creditor reliance with respect to such non-objecting creditors.[165]    In any event, there existed a lack of creditor reliance with respect to such entities as well.

- GLB 3 LLC.  Lease was dated July 31, 2003, counterparty is Relocation Dynamics, Inc. ("RDI").  RDI was acquired by SIRVA in 2004 and RDI was merged out of existence on

---

[164] Triple Net acknowledges as much in its objection to the Plan:  "For the past six months to a year, the parties have worked together to sublease the premises . . ."  Triple Net Objection, ¶ 10.

[165] Owens Corning, 419 F.3d at 211 (substantive consolidation is appropriate if creditors consent).

April 30, 2004. The company with which the lessor entered into the lease no longer exists.

- <u>Landerhaven II LLC</u>. Lease was dated August 3, 2000, counterparty is Cooperative Resources Services, Ltd. ("CRS"). CRS was acquired by SIRVA in 2002, but no longer exists.

- <u>San Tomas Limited Liability Partnership</u>. Lease was dated September, 2003, counterparty was NAVL. This was another warehouse leased for SIRVA's defunct North American Logistics division.

- <u>NAL Worldwide LLC</u>. This is a sublease <u>from</u> SIRVA <u>to</u> NAL. As such, the concept of "creditor reliance" is irrelevant, because in this case SIRVA is the creditor of the sublessee.

86. In sum, the benefits of substantive consolidation to the vast majority of creditors far outweigh any practical harm—although none has been identified beyond suggestions and innuendos—to Class 5 Claims. Even if any creditors in Class 5 that may be said to have relied on the credit of an individual Debtor entity (only one creditor did), that number is minuscule compared to the number of creditors that did not so rely. As discussed above, courts in many cases have allowed substantive consolidation even though a small number of creditors may have relied on the credit of an individual debtor.[166] Accordingly, the Debtors respectfully submit that, taking into account the facts and circumstances of this case, the use of substantive consolidation as an equitable remedy is appropriate and should be allowed.

5. **The Committee's Objection to Substantive Consolidation is Fundamentally Flawed and Baseless.**

87. In a last ditch attempt to scuttle a plan that favors the vast majority of its own constituency, the Committee objects to substantive consolidation. The Committee does so without any independent investigation of the Debtors' financial affairs, without the benefit of an

---

[166] <u>Worldcom</u>, 2003 WL 23861928 at *37; <u>Gucci</u>, 174 B.R. at 414.

opposing expert, and without any discussion of whether such consolidation actually benefits the majority of unsecured creditors.

88.     Based upon the Committee's lack of diligence and coherent position with respect to substantive consolidation, it is perhaps not surprising that the Committee provides misguided arguments against the Debtors' proposed consolidation.  These arguments can be summarized as follows:

(a)     <u>Hopeless Entanglement</u>:  The Debtors' affairs are not hopelessly entangled because:  (i) only certain debtor entities were obligors on the Prepetition Credit Facility and that the Debtors were able to provide the Committee with a list of such obligors; (ii) the Debtors were able to provide a list of entities that they believed were the entities wherein Class 5 claims reside; (iii) the Debtors were able to file bankruptcy schedules of liabilities and statement of financial affairs on a Debtor-by-Debtor basis; (iv) the Debtors made SEC filings with financials broken out by various business units; and (v) under the proposed Plan, the burden of disentangling intercompany claims is irrelevant.

(b)     <u>Creditor Reliance</u>:  Not all of the Debtors were run as a single economic unit, and some creditors treated the Debtors as separate entities because the Debtors: (i) negotiated with the Prepetition Lenders concerning which entities would be obligated under the Prepetition Credit Facility; (ii) filed bankruptcy schedules of liabilities and statement of financial affairs on a Debtor-by-Debtor basis; (iii) filed consolidated reports with separate financials by business unit; and (iv) engaged in a securitization program involving only certain Debtors and nondebtor affiliates.

(c)     <u>Debtors' Motivation Behind Substantive Consolidation</u>:  The Debtors are attempting to use substantive consolidation to satisfy section 1129(a)(10) of the Bankruptcy Court and the absolute priority rule.

None of these arguments have merit.  Nor do the alleged nefarious reasons for the Debtors' proposed substantive consolidation.  Simply put, the overwhelming lack of creditor reliance and evidence of hopeless entanglement, coupled with the very real risk that the Debtors' securitization facility will terminate and their exit financing will evaporate if the Debtors attempt to engage in a lengthy and expensive disentanglement of their financial affairs, all demonstrate

K&E 12473324.

that the equitable remedy of substantive consolidation is more than appropriate in the present chapter 11 cases.

### a. The Committee's Objection to "Hopeless Entanglement" is Hopelessly Flawed

89. <u>First</u>, whether the Debtors identified non-obligors for the Prepetition Credit Facility is irrelevant. Each of the non-obligor Debtors constitute non-operating, de minimis shell entities. To constitute a de minimis entity, the entity must have less than $1 million in assets and/or revenues less than $2 million. If an entity exceeded either of these thresholds, it was required to be an obligor under the Prepetition Credit Facility to ensure that the Prepetition Credit Facility was secured by substantially all of the Debtors' assets. The Debtors' ability to <u>simply</u> <u>name</u> operating entities satisfying the aforementioned criteria has no bearing on whether the operational and financial affairs of the Debtors' legal entities are so entangled that the accurate identification and allocation of assets and liabilities cannot be achieved.

90. <u>Second</u>, the fact that the Debtors identified the purported Debtor obligor for each of the Class 5 claims is irrelevant. As set forth above, Class 5 claims almost exclusively consist of litigation and lease/ contract rejection claims. Under these circumstances, to identify the Debtor obligor for the Class 5 claims, the Debtors need only review the applicable litigation pleading, lease, or contract, in which the applicable Debtor is listed. Plainly, analyzing approximately 40 litigations and rejection claims does not equate to disentanglement of the assets and liabilities of 60 Debtors with billions of dollars in revenue and monthly transactions. Moreover, litigation claimants named certain Debtor entities in their various complaints, so it is no mystery as to how the Debtors "divined" who the Claim was asserted against.

91. <u>Third</u>, although the Debtors filed their schedules of liabilities and statements of financial affairs on a Debtor-by-Debtor basis, the mere fact that the Debtors filed such schedules

and statements does not ipso facto prevent a finding that substantive consolidation is appropriate. In fact, courts in this District have confirmed myriad plans with substantive consolidation even where the relevant debtors filed schedules and statements on a debtor-by-debtor basis.[167] In any event, the Debtors' schedules and statements contained multiple caveats regarding the status of intercompany claims.[168]

92.    Fourth, in support of its objection, the Committee points to the Debtors' alleged ability to report on a business unit/ segment basis as a reason why hopeless entanglement is not

---

[167] See In re Calpine Corp., Case No. 05-60200 (Bankr. S.D.N.Y. Jan. 31, 2008); In re Musicland Holding Corp., Case No. 06-10064 (Bankr. S.D.N.Y. July 24, 2007); In re Tower Auto., Inc., Case No. 05-10578 (Bankr. S.D.N.Y. July 12, 2007); In re Delta Airlines, Case No. 05-17923 (Bankr. S.D.N.Y. Apr. 25, 2007); In re Oneida Ltd., Case No. 06-10489 (Bankr. S.D.N.Y. Aug. 30, 2006); In re Atkins Nutritionals, Inc., Case No. 05-15913 (ALG) (Bankr. S.D.N.Y. Dec. 21, 2005); In re Worldcom, Inc., Case No. 02-13533 (Bankr. S.D.N.Y. Oct. 31, 2003).

[168] The Schedules set forth the following caveats on page 3 of the "Notes Pertaining to All Debtors":

> **Consolidation of Certain Information**.  Many of the Debtors' operations are either conducted and/or accounted for and reported on a consolidated basis. Specifically, with respect to certain subsidiaries of Allied Van Lines, Inc. ("AVL") and North American Van Lines, Inc. ("NAVL"), respectively, the Debtors prepare unconsolidated information based largely on estimates and allocations and for limited purposes. When reviewing the Statements and Schedules of these Debtors, reference should also be made to the Statements and Schedules of AVL or NAVL, respectively.
>
> Additional information that is provided on a consolidated basis is specifically indicated in the applicable Schedule and/or Statement. The listing of information on a consolidated basis is not, and should not be interpreted as, an admission or view as to the appropriateness of substantive consolidation. The Debtors reserve their rights to amend [their] Schedules and Statements for any or all entities filing on a consolidated basis to file such Statement and/or Schedule of such entities on an unconsolidated basis.
>
> **Consolidated Accounts Payable and Disbursements Systems**.  All payments made by or on behalf of the Debtors are made through one of the following entities: SIRVA Settlement Inc., Allied International N.A. Inc., Allied Van Lines Inc., Executive Relocation Corp., Meridian Mobility Resources Inc., North American Van Lines Inc., SIRVA Global Relocation Inc., and SIRVA Relocation LLC. From time to time these Debtors may make payments to vendors on behalf of the other SIRVA entities. Additionally, most entities, including SIRVA, Inc., SIRVA Worldwide, Inc., SIRVA Settlement, Allied International N.A., Executive Relocation, Meridian Mobility Resources and SIRVA Global Relocation utilize consolidated accounts payable or payroll systems whereby payments are made by other Debtors on their behalf.

present. The Committee's focus on business unit reporting, however, misses the point. The "hopeless entanglement" prong of substantive consolidation centers on a <u>legal entity-by-legal entity basis</u>, not business units as a whole. Thus, the fact that the Debtors generate business unit financial performance by business unit actually contributes to the entanglements and the corresponding inability to disentangle present in these chapter 11 cases.

93.    As set forth in more detail in the Kruse Report, to maximize its operational efficiencies, the Debtors were not organized, for operational or internal performance measurement purposes, by legal entity or parent-subsidiary relationship.[169]  Instead, the Debtors were and continue to be operated as segments or brands within a segment.[170]  The Debtors viewed their organizational structure as a series of operational segments and brands that happened to encompass a number of legal entities (as opposed to viewing itself by legal entity).[171]  Neither the Debtors' management, nor most of their financial departments, including accounting, ever focused on the Debtors as a group of legal entities for transactional accounting purposes.[172]  In fact, some legal entities had a parent corporation in one business segment, but were operated as part of another business segment.[173]  As a consequence, the Debtors are unable to report - and have never reported - on legal entity basis.

---

[169]  Kruse Report, ¶21.

[170]  Kruse Report, ¶21.

[171]  Kruse Report, at ¶ 21.

[172]  Kruse Report, at ¶ 21.

[173]  Kruse Report, at ¶ 22 ("For example, although Allied Van Lines, Inc. is in the "Moving Services - North America" business segment, one of its subsidiaries, Meridian Mobility Resources, Inc., is a relocation company and part of the Relocation business segment.").

94.     While the Debtors were integrated operationally, behind the scenes the Debtors encompassed a mishmash of locations, legal entities, and accounting systems that were not designed to work together.[174]   In fact, over the past decade, at least ten separate accounting systems have been used by the Debtors, and little, if any, effort was made to integrate such systems.[175]   Instead, the Debtors take summary level information from each of the systems and combine it into one system.[176]   The aggregated summary data (not the details) collected in this system is used as the basis for SIRVA's audited, consolidated financial reports.[177]   Thus, SIRVA could only report on a consolidated basis—and, indeed standard accounting convention requires reporting on a consolidated basis, and the issues associated with the Debtors' intercompany accounting would be of no consequence as intercompany claims eliminate upon consolidation.

95.     Fifth, the Committee is misguided in its assertion that the Debtors' inability to articulate intercompany claims is irrelevant.  It is disingenuous to suppose that deconsolidated plans are proper, but intercompany claims should be ignored.  The Committee should not be permitted to object to certain parts of the Plan, while availing itself of the parts it likes.  In particular, there is no guarantee that intercompany claims would be left unimpaired under sixty deconsolidated plans.  If intercompany claims, which would be assets of some deconsolidated Debtors and liabilities of others, were not left unimpaired under such deconsolidated plans, any recovery that the Committee asserts would be available to Class 5 Claims on a deconsolidated basis could be substantially and adversely impacted depending whether a particular legal entity is

---

[174]  Kruse Report, at ¶ 24.

[175]  Kruse Report, at ¶ 24.

[176]  Kruse Report, at ¶ 26.

[177]  Kruse Report, at ¶ 26.

63

a net creditor or a net debtor with respect to intercompany claims. The point is that no one knows—and no one can tell in the absence of a significant investment in time (which the Debtors do not have) and expense, if at all—what the impact would be.

**b.** **The Committee's Objection Regarding Creditor Reliance Is Similarly Flawed.**

96. <u>First</u>, the Prepetition Lenders did not deal with each of the Debtor entities on an individual and separate basis. Rather, as stated above, to ensure that the Prepetition Credit Facility was secured by substantially all of the Debtors' assets, the Prepetition Lenders treated all of the Debtors' legal entities that were not de minimis shell companies as one economic unit, requiring each entity to be an obligor under the Prepetition Credit Facility. De minimis entities were simply excluded out of convenience.

97. <u>Second</u>, the fact that the Debtors filed their schedules and statements as part of these chapter 11 cases on a Debtor-by-Debtor basis does not mean that the Debtors held themselves out as separate entities to creditors or that creditors viewed the Debtors as separate entities. In addition, courts in this District have confirmed myriad plans with substantive consolidation even where the relevant debtors filed schedules and statements on a debtor-by-debtor basis.[178]

98. <u>Third</u>, the Committee's assertion that the Debtors did not view themselves as a single unit because they filed separate financials is simply incorrect and not determinative to the analysis. As set forth above, the Debtors' financials were reported on a consolidated basis. In

---

[178] <u>See</u> <u>In re Calpine Corp.</u>, Case No. 05-60200 (Bankr. S.D.N.Y. Jan. 31, 2008); <u>In re Musicland Holding Corp.</u>, Case No. 06-10064 (Bankr. S.D.N.Y. July 24, 2007); <u>In re Tower Auto., Inc.</u>, Case No. 05-10578 (Bankr. S.D.N.Y. July 12, 2007); <u>In re Delta Airlines</u>, Case No. 05-17923 (Bankr. S.D.N.Y. Apr. 25, 2007); <u>In re Oneida Ltd.</u>, Case No. 06-10489 (Bankr. S.D.N.Y. Aug. 30, 2006); <u>In re Atkins Nutritionals, Inc.</u>, Case No. 05-15913 (Bankr. S.D.N.Y. Dec. 21, 2005); <u>In re Worldcom, Inc.</u>, Case No. 02-13533 (Bankr. S.D.N.Y. Oct. 31, 2003).

K&E 12473324.

any event, the "creditor reliance" prong focuses on the view of the creditors rather than the Debtors—the Committee's mistaken "view" of the Debtors is not determinative of the analysis. And for a creditor to rely, such creditor must show reliance. Here, the Committee has failed to do so.

99. <u>Fourth</u>, the fact that the Debtors engaged in a securitization program involving SIRVA Relocation LLC and certain Debtors and nondebtor affiliates is simply irrelevant. Indeed, to the extent the securitization entity relied on any credit at all, it would have been the credit of the counterparty to the receivables sold into the LaSalle Facility, not any of the Debtors.

### c. The Committee's Assertion that the Debtors' Motivation for Substantive Consolidation Is Suspect Is Wholly Speculative

100. There is simply no suspect motivation behind the substantive consolidation construct. <u>First</u>, the Committee's allegations that the Debtors are using substantive consolidation to satisfy section 1129(a)(10) in light of the non-Debtor obligors under the Prepetition Credit Facility is baseless. None of the Class 5 claims are held against any of the non-obligor Debtors. Therefore, the Class 5 Claims—which would receive no recovery under the Plan—would fare no differently whether the non-obligor Debtors were substantively consolidated or not. Likewise, because Class 4 claims are paid in full, deconsolidation of the non-obligor Debtors would have absolutely no effect on the recovery of Class 4 claims. The Committee's assertions to the contrary are simply incorrect and misleading. In fact, the Committee's failure to point to even one creditor of a non-obligor Debtor who is objecting to substantive consolidation proves fatal to its argument.[179]

---

[179] <u>In re Owens Corning</u>, 419 F.3d at 211.

101.    Second, for the reasons set forth below, the reinstatement of Class 6 Intercompany Claims and Class 8 Intercompany Interests does not violate the absolute priority rule.    In particular, such claims and interests are left unimpaired only because the proposed Plan calls for substantive consolidation, thereby eliminating such claims and interests and making such claims and interests (and the issues associated with such claims and interests) irrelevant.

## C.    Discretionary Contents of the Plan

102.    Section 1123(b) of the Bankruptcy Code identifies various discretionary provisions that may be included in a plan of reorganization, but are not required.  For example, a plan may impair or leave unimpaired any class of claims or interests and provide for the assumption or rejection of executory contracts and unexpired leases.  A plan also may provide for (a) "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate" or (b) the retention and enforcement by the debtor, by the trustee, or by a representative of the estate appointed for such purpose, of any such claim or interest."[180]  Finally, a plan may "modify the rights of holders of secured claims . . . or . . . unsecured claims, or leave unaffected the rights of holders of any Class of claims" and may "include any other appropriate provision not inconsistent with the applicable provisions of [the Bankruptcy Code]."[181]

103.    Here, the Plan employs various provisions in accordance with section 1123(b)'s discretionary authority.  For example, Article III of the Plan impairs certain Classes of Claims and Interests, while leaving others unimpaired.[182]  The Plan also proposes treatment for executory contracts and unexpired leases (Article V), provides a platform for settlement of

---

[180]  11 U.S.C. § 1123(b)(3)(A)-(B).

[181]  11 U.S.C. § 1123(b)(5)-(6).

[182]  The following Classes are impaired:  1, 5, and 7.  The following Classes are unimpaired: 2, 3, 4, 6 and 8.

K&E 12473324.

Claims and Interests (Article VII), and seeks to implement release, exculpation, and injunction provisions (Article VIII).

### D. The Debtors Have Complied Fully With the Applicable Provisions of the Bankruptcy Code (Section 1129(a)(2))

104.    The Debtors have satisfied section 1129(a)(2) of the Bankruptcy Code, which requires that the proponent of a plan of reorganization comply with the applicable provisions of the Bankruptcy Code.  The cases and legislative history discussing section 1129(a)(2) indicate that this section principally embodies the disclosure and solicitation requirements of section 1125 of the Bankruptcy Code.[183]   As discussed above in paragraphs 3 to 12, the Debtors have complied with all applicable disclosure and solicitation requirements of Bankruptcy Code section 1125.

### E. The Plan has Been Proposed in Good Faith and not by Any Means Forbidden by Law (Section 1129(a)(3))

#### 1. The Plan Was Proposed in Good Faith Under Section 1129(a)(3)

105.    Section 1129(a)(3) of the Bankruptcy Code requires that a plan of reorganization be "proposed in good faith and not by any means forbidden by law."[184]   In the context of section 1129(a)(3), good faith is not some free floating conception of ethics or morality, but

---

[183]  See Worldcom, 2003 WL 23861928, at *49 (stating that section 1129(a)(2) requires plan proponents to comply with applicable provisions of the Bankruptcy Code, including "disclosure and solicitation requirements under sections 1125 and 11 U.S.C. § 1126 of the Bankruptcy Code."); Texaco, 84 B.R. at 903 ("The principal purpose of section 1129(a)(2) is to assure that the proponents have complied with the requirements of section 1125 in the solicitation of acceptances to the plan."); S. Rep. No. 989, 95th Cong., 2d Sess. 126 (1978); H.R. Rep. No. 595, 95th Cong., lst Sess. 412 (1977); see also In re Cajun Elec. Power Coop., Inc., 150 F.3d 503, 512 n.3 (5th Cir. 1998) ("a plan may not be confirmed unless the plan complies with . . . § 1129(a)(2), which provides that a plan may not be confirmed unless the proponent of the plan complies with the applicable provisions of Title 11" (citations omitted)).

[184]  11 U.S.C. § 1129(a)(3).

rather has a specific meaning: good faith means that "the plan was proposed with 'honesty and good intentions' and with 'a basis for expecting that a reorganization can be effected.'"[185]

106.    The fundamental purpose of chapter 11 is to enable a distressed business operation to reorganize its affairs and avoid the adverse economic effects associated with disposing of assets at their liquidation value.[186]   To determine whether the plan seeks relief consistent with the Bankruptcy Code, courts look to the reorganization plan itself.[187]   Thus, where the plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success, the good faith requirement of section 1129(a)(3) is satisfied.[188]

107.    Here, the Debtors have proposed the Plan in good faith, with the legitimate and honest purpose of reorganizing the Debtors' ongoing business and maximizing the value of each of the Debtors and the recovery substantial to creditors.   The Plan significantly restructures the

---

[185]   Johns-Manville, 843 F.2d at 649 (quoting In re Koelbl, 751 F.2d 137, 139 (2d Cir. 1984)); see In re SGL Carbon Corp., 200 F.3d 154, 165 (3d Cir. 1999) (finding good faith requires "some relation" between the chapter 11 plan and the "reorganization-related purposes" of chapter 11); In re T-H New Orleans L.P., 116 F.3d 790, 802 (5th Cir. 1997) (good faith inquiry involves a totality of circumstances analysis, "keeping in mind the purpose of the [Code] is to give debtors a reasonable opportunity to make a fresh start").

[186]   See Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship, 526 U.S. 434, 453 (1999) (basic purposes of chapter 11 are "preserving going concerns" and "maximizing property available to satisfy creditors."); In re B.D. Int'l Disc. Corp., 701 F.2d 1071, 1075 n.8 (2d Cir. 1983) (stating "the two major purposes of bankruptcy [are] achieving equality among creditors and giving the debtor a fresh start.").

[187]   See In re Granite Broad. Corp., 369 B.R. 120, 137 (Bankr. S.D.N.Y. 2007) (looking at the plan itself to determine whether such plan "will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code"); see also In re Piper Aircraft Corp., 244 F.3d 1289, 1300 (11th Cir. 2001) (focus of good faith inquiry is on the plan itself) (citing McCormick v. Banc One Leasing Corp., 49 F.3d 1524, 1526 (11th Cir. 1995)); In re Madison Hotel Assocs., 749 F.2d 410, 425 (7th Cir. 1984) (same); In re Dragone, 324 B.R. 445, 448 n.4 (Bankr. D. Conn. 2005) (same); In re Sound Radio, Inc., 93 B.R. 849, 854 (Bankr. D.N.J. 1988) (focusing good faith inquiry on plan itself rather than other factors).

[188]   See In re Source Enters., Inc., Case No. 06-11707(AJG), 2007 WL 2903954, at *6 (Bankr. S.D.N.Y. Oct. 1, 2007) (finding that the good faith requirement satisfied when plan filed with legitimate and honest purposes of maximizing value of the estate and effectuating equitable distribution); In re Bally Total Fitness, 2007 WL 2779438, at *5 (good faith requirement satisfied when the plan was proposed with legitimate and honest purpose of reorganizing the debtor); see also T-H New Orleans, 116 F.3d at 802 ("A debtor's plan may satisfy the good faith requirement even though the plan may not be one which the creditors would themselves design and indeed may not be confirmable.").

K&E 12473324.

Debtors' balance sheet and substantially reduces the interest burden associated with their long-term debt. Moreover, using the Debtors' comprehensive business plan as the platform, the Plan provides a blueprint for treating all Claims and enabling the Debtors to emerge from chapter 11 as a going concern. Therefore, the Plan has been proposed in good faith as interpreted under the Bankruptcy Code.

### 2. The Plan Has Not Been Proposed by Any Means Prohibited by Law

108. Additionally, the Plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code and is not proposed by any means forbidden by law.[189] Therefore, the good faith requirement of section 1129(a)(3) of the Bankruptcy Code has been fully satisfied.[190]

### F. The Plan Provides For Bankruptcy Court Approval Of Certain Administrative Payments (Section 1129(a)(4))

109. Section 1129(a)(4) of the Bankruptcy Code requires that certain professional fees and expenses paid by the plan proponent, by the debtor, or by a person issuing securities or acquiring property under the Plan, be subject to approval of the Court as reasonable. Specifically, section 1129(a)(4) requires that:

> Any payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case, or in

---

[189] See In re NII Holdings, Inc., 288 B.R. 356, 362 (Bankr. D. Del. 2002) (plan proposed in good faith if it has "the legitimate purpose of reorganizing the business affairs of each of the Debtors and maximizing the returns available to creditors of the Debtors").

[190] Triple Net alleges that the Plan was not filed in good faith because it vests ownership of causes and actions and grants a release to the Prepetition Lenders. See Triple Net Supplemental Plan Objection, at 9–10. This argument is simply off base and does not prove bad faith. First, the Reorganized Debtors, not the Prepetition Lenders will have control over the causes of action and, second, the releases granted to the Prepetition Lenders are appropriate and akin to those granted in other approved chapter 11 reorganizations. See Section IV.A.1. infra.

> connection with the plan and incident to the case, has been approved by, or is subject to approval of, the court as reasonable.[191]

110.     This section of the Bankruptcy Code has been construed to require that all payments of professional fees that are made from estate assets be subject to review and approval by the Court as to their reasonableness.[192]

111.     Here, all payments made or to be made by the Debtors for services or for costs or expenses in connection with the chapter 11 cases, including all professionals' Claims, have been approved by, or are subject to approval of the Court as reasonable.  In particular, Article II.B of the Plan provides for the payment of only Allowed Administrative Claims.[193]  In addition, Article IX.A of the Plan provides that all final requests for payment of professionals' Claims shall be filed no later than forty-five days after the Effective Date.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts of such professionals' Claims shall be determined by the Bankruptcy Court.[194]  Accordingly, the Plan complies fully with the requirements of section 1129(a)(4) of the Bankruptcy Code, and no party has objected to the Plan on that basis.

---

[191]  11 U.S.C. § 1129(a)(4).

[192]  See, e.g., Worldcom, 2003 WL 23861928, at *54; Drexel Burnham Lambert, 138 B.R. at 760.

[193]  See In re Elsinore Shore Assocs., 91 B.R. 238, 268 (Bankr. D.N.J. 1988) (holding that requirements of section 1129(a)(4) were satisfied where the plan provided for payment of only "allowed" administrative expenses).

[194]  See Plan, Art. IX.A.1.

### G. Post-Emergence Directors and Officers Have Been Disclosed Before Confirmation and Their Appointment is Consistent With Public Policy (Section 1129(a)(5))

112.     The Debtors have complied with all the elements of section 1129(a)(5) of the Bankruptcy Code (in addition to compliance with the related provisions of section 1123(a)(7), discussed above).  In particular, section 1129(a)(5)(A) requires that prior to confirmation, the proponent of a plan disclose the identity and affiliations of the proposed officers and directors of the reorganized debtors and that the appointment or continuance of such officers and directors be consistent with the interests of creditors and equity security holders and with public policy.[195]  In addition, section 1129(a)(5)(b) requires a plan proponent to disclose the identity of an "insider" (as defined by 11 U.S.C. § 101(31)) to be employed or retained by the reorganized debtor and the "nature of any compensation for such insider."[196]

113.     The Debtors' Plan satisfies the first requirement of section 1129(a)(5) because the identities and affiliations of any Person proposed to serve as an officer or director of the Reorganized Debtors have been disclosed in the Plan Supplement.[197]   In addition, the Plan Supplement details the officers and directors of each Reorganized Debtor.  Thus, the Debtors will satisfy section 1129(a)(5)(A)(i).

---

[195]  11 U.S.C. § 1129(a)(5)(A).

[196]  11 U.S.C. § 1129(a)(5)(b); see Drexel Burnham Lambert, 138 B.R. at 760 (section 1129(a)(5)(b) "requires a plan to disclose the identity of any 'insider' to be employed or retained by the reorganized debtor") (citation omitted); Texaco, 84 B.R. at 908 (finding requirements of section 1129(a)(5)(b) satisfied where the plan discloses debtors' existing officers and directors who will continue to serve after plan confirmation); see also In re Apex Oil Co., 118 B.R. 683, 704-05 (Bankr. E.D. Mo. 1990) (finding section 1129(a)(5)(b) satisfied where plan fully disclosed that certain insiders will be employed by reorganized debtor and the terms of employment of such insiders).

[197]  See Plan Supplement, Exhibit C.

K&E 12473324.

114.    The Debtors have also complied with section 1129(a)(5)(A)(ii), which requires that this Court find the appointment or continuance of the proposed directors and officers is "consistent with the interests of creditors and equity security holders and with public policy."[198] This section asks the Court to ensure that the post-confirmation governance of the Reorganized Debtors is in "good hands," which has been interpreted by courts to mean: (a) experience in the Reorganized Debtors' business and industry;[199] (b) experience in financial and management matters;[200] (c) that the Debtors and Committee believe control of entity by proposed individuals will be beneficial;[201] and (d) does not "perpetuate incompetence, lack of discretion, inexperience, or affiliations with groups inimical to the best interests of the debtor."[202]    The "public policy requirement would enable [the court] to disapprove plans in which demonstrated incompetence or malevolence is a hallmark of the proposed management."[203]    Here, the proposed directors and officers of the Reorganized Debtors are competent, have relevant and solid business and industry experience, and will give the Reorganized Debtors both continuity and fresh insights into running the business.    No party has suggested otherwise.    Therefore, section 1129(a)(5)(A)(ii)'s requirements are satisfied.

---

[198]  11 U.S.C. § 1129(a)(5)(A)(ii).

[199]  See Drexel Burnham Lambert, 138 B.R. at 760; In re Toy & Sports Warehouse, Inc., 37 B.R. 141, 149 (Bankr. S.D.N.Y. 1984); In re Rusty Jones, Inc., 110 B.R. 362, 372 (Bankr. N.D. Ill. 1990).

[200]  See In re Stratford Assocs. Ltd. P'ship, 145 B.R. 689, 696 (Bankr. D. Kan. 1992).

[201]  See Apex Oil, 118 B.R. at 704-05.

[202]  See In re Beyond.com Corp., 289 B.R. 138, 145 (Bankr. N.D. Cal. 2003).

[203]  7 Collier on Bankruptcy ¶ 1129.03[5][b]; see also Bank of Am., Ill. v. 203 N. LaSalle St. P'ship, 195 B.R. 692 (Bankr. N.D. Ill. 1996), aff'd 126 F.3d 955 (7th Cir. 1997), rev'd on other grounds, 526 U.S. 434 (1999).

115.    Finally, through the Plan Supplement the Debtors have disclosed publicly the identity of all insiders to be employed or retained by the Reorganized Debtors and the nature of any compensation for such insiders in compliance with section 1129(a)(5)(b) of the Bankruptcy Code.   Accordingly, the Debtors have satisfied the requirements of section 1129(a)(5) of the Bankruptcy Code.

### H.    The Plan Does Not Require Governmental Regulatory Approval (Section 1129(a)(6))

116.    Section 1129(a)(6) of the Bankruptcy Code permits confirmation only if any regulatory commission that will have jurisdiction over the debtor after confirmation has approved any rate change provided for in the plan.[204]   First, the Plan does not provide for any rate changes by the Debtors.   Second, the Surface Transportation Board ("STB"), a unit of the U.S. Department of Transportation, requires motor carriers to maintain tariffs, which contain rates for the Debtors' moving services.   Although the STB requires these rates to be published, available for public inspection, and requires a copy of the tariff to be provided upon a shipper's request, the STB does not dictate the Debtors' rates or approve the rates.[205]    Therefore, section 1129(a)(6) of the Bankruptcy Code is inapplicable to these chapter 11 cases.[206]   No party has objected to the Plan's satisfaction of section 1129(a)(6) of the Bankruptcy Code.

---

[204]  11 U.S.C. § 1129(a)(6).

[205]  The STB can require a carrier's rates to be changed if a shipper files a complaint with the STB stating that the rates are unreasonable, but this is a rare occurrence.

[206]  See, e.g., Source Enters., 2007 WL 2903954, at *6.

# I. The Plan is in the Best Interests of Creditors and Interest Holders (Section 1129(a)(7))[207]

117.     Section 1129(a)(7) of the Bankruptcy Code—the "best interest of creditors test"—requires that, with respect to each impaired class of claims or interests, each holder of a claim or interest of such class under a plan on account of such claim or interest:

    (1)    has accepted the plan; or

    (2)    will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date.[208]

The best interests test applies to individual dissenting creditors rather than classes of claims. Section 1129(a)(7) is satisfied where the estimated recoveries for a debtor's stakeholders in a hypothetical chapter 7 liquidation of that debtor's estate are less than or equal to estimated recoveries under that debtor's plan of reorganization.[209]  By its terms, section 1129(a)(7) applies only to non-accepting impaired claims or interests.

118.     Here, the Plan satisfies the best interest of creditors test as demonstrated by the Debtors' Liquidation Analysis.  Estimated recoveries for members of each impaired Class are equal to or in excess of the recoveries estimated in a hypothetical chapter 7 liquidation.  The Debtors believe that no stakeholders other than holders of Prepetition Facility Claims would

---

[207]   See Disclosure Statement Exhibit C (Liquidation Analysis).

[208]   11 U.S.C. § 1129(a)(7)(A)(i)-(ii).

[209]   See 203 N. LaSalle St. P'ship, 526 U.S. at 441 n.13 ("The 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan."); Source Enters., 2007 WL 2903954, at *7; In re Adelphia Commc'ns. Corp., 368 B.R. 140, 251 (Bankr. S.D.N.Y. 2007) (section 1129(a)(7) satisfied when impaired holder of claim would receive "no less that such holder would receive in a hypothetical chapter 7 liquidation").

K&E 12473324.

recover anything in a hypothetical chapter 7 liquidation.[210]    The Consolidated Liquidation

Analysis demonstrates that the proceeds from a hypothetical chapter 7 liquidation would yield

less than $233 million in net proceeds.[211]    Thus, a chapter 7 liquidation would satisfy in full all

Administrative and Priority Claims, but provide only an 18 percent recovery on Class 1

Prepetition Facility Claims.[212]    An additional $366 million in proceeds would need to be realized

before any Class 4 or Class 5 Claims would be entitled to recovery in any form.[213]    This is in

direct contrast to the Plan, which provides for a 100 percent recovery to the vast majority of the

Debtors' unsecured creditors.    Under the Plan, holders of claims in Class 2 (Other Secured

Claims), Class 3 (Other Priority Claims), and Class 4 (Unsecured Ongoing Operations Claims)

will receive a 100 percent recovery.[214]

119.    As discussed above, there is no need to analyze the Debtors on an entity-by-entity

basis for liquidation analysis purposes since the Plan contemplates substantive consolidation.[215]

Nonetheless, the Debtors, with the assistance of Alvarez & Marsal, developed deconsolidated

liquidation analyses[216] for each of the entities against which Class 5 creditors have Claims.

Based on this analysis, holders of Class 5 Claims would not receive any recovery under a

---

[210]    See Ex. G, Consolidated Liquidation Analysis Expert Report, at 11.

[211]    See id.

[212]    See id.

[213]    Id.

[214]    See Disclosure Statement, at 5.

[215]    See Worldcom, 2003 WL 23861928, at *56.

[216]    These analyses were each qualified to note that intercompany Claims were ignored for purposes of the illustrative analysis only an assumption that would not be appropriate in a true deconsolidated scenario.

deconsolidated liquidation. The distribution percentage (or lack thereof) to Class 5 Claims (or

Class 4 Claims for that matter) does not change in a deconsolidated liquidation. No reasonable

liquidation scenario could generate the $577 million to $647 million in proceeds necessary to

provide Class 5 Claims with any recovery.[217] Thus, the Debtors' going concern value

substantially exceeds the liquidation value set forth in the Liquidation Analysis, and the

distributions provided by the Plan satisfy section 1129(a)(7).

### 1. The Committee's "BIC" Objection Fails

120. The Committee incorrectly asserts that the Debtors' Plan fails to satisfy section

1127(a)(7) because certain unencumbered assets would be available for unsecured creditors in

the event of a liquidation. As a result, the Committee's expert claims unsecured creditors may be

able to realize anywhere from $83 million to $177 million in assets unencumbered by the

Debtors' lenders.[218] After subtracting the $58 million from the DIP Facility that the Committee

graciously "does not contest" could be satisfied through otherwise unencumbered assets, the

Committee concludes that "there is a minimum" of $27 million in unencumbered assets that

would be available for unsecured creditors.[219] All else being equal, the Debtors believe this

translates into a negligible recovery for unsecured creditors .

121. Setting aside the Debtors' inability to understand the Committee's willingness to

ignore a 100 percent recovery for the vast majority of their constituency in exchange for a

minimal (and highly speculative) recovery, the Committee's analysis fails on multiple levels.

First, the Committee's alleged unencumbered asset value relies on a "marshaling" theory under

---

[217] See Ex. G, Entity Level Liquidation Analyses Rebuttal Report, at 4.

[218] See Ex. G, Consolidated Liquidation Analysis, at 12.

[219] Creditors' Committee Objection, at 50.

which the Court "would exercise its equitable authority to require the DIP lenders to marshal" in order to increase recoveries for unsecured creditors at the expense of the Prepetition Lenders.[220] As discussed below, the Committee's theory is a radical inversion of the doctrine of marshaling that is without support under either existing law or the facts of this case. <u>Second</u>, the Committee's valuation of unencumbered collateral is predicated on unrealistic assumptions regarding, among other things, a chapter 7 trustee's ability to realize value from inventoried homes better than historically received by the going-concern Debtors, the value of potential preference claims, the chapter 7 trustee's ability to successfully pursue such claims, and the cost of administering a liquidation of the Debtors' estates.

122.    Further, the Committee does not even identify the projected recovery that unsecured creditors would receive under their liquidation analyses. The Committee makes no effort to translate the hidden value that would be apparently unlocked by liquidation into cents on the dollar for unsecured creditors. Clearly, the vast majority of the Debtors' unsecured creditors would receive less under the Committee's analysis than under the Plan through which ninety-six percent of the Debtors' unsecured claims will be paid at 100 cents on the dollar. But the Committee, in keeping with its telescopic focus on Class 5, and perhaps reluctant to disclose the degree to which a liquidation would be a worse—not better—outcome for the majority of its own constituents, has avoided providing any calculation.

### 2.    The Committee's so-called "marshaling" argument lacks legal or factual support

123.    An indispensable element of the Committee's recovery analysis is the Committee's claim that "it is reasonable to assume that, in a chapter 7 liquidation, the Court

---

[220]  Creditors' Committee Objection, at 52.

would exercise its equitable authority to require the DIP Lenders to marshal and to obtain payment from the Debtors' encumbered assets."[221]  The Committee would hijack the equitable doctrine of marshaling to compel the Debtors' DIP Lenders to wipe out $75 million of the Prepetition Lenders' collateral for the benefit of the Debtors' unsecured creditors.[222]  Such an outcome is fundamentally at odds with the equitable nature of marshaling, established precedent, and the facts and circumstances of these chapter 11 cases.  In essence, the Committee's so-called "marshaling" argument is little more than an argument for equitable subordination.[223]  No conceivable grounds exist to warrant the sort of extraordinary relief provided by section 510(c).[224]  Regardless, the Committee has elected to dress the same argument in different garb.

### a.    The Committee seeks an unprecedented inversion of the doctrine of marshaling

124.    Marshaling as a doctrine evolved at equity to preserve, not destroy, the rights of secured creditors.  "[T]he equitable doctrine of marshaling rests upon the principle that a creditor having two funds to satisfy his debt may not, by his application of them to his demand, defeat another creditor, who may resort to only one of the funds."[225]  The doctrine may be invoked by a junior <u>secured</u> creditor to compel a senior secured creditor, also fully secured, to satisfy its senior claim from assets apart from the junior secured creditor's collateral.  Marshaling has three elements: (a) two or more creditors of the same debtor; (b) multiple funds belonging to that

---

[221] <u>Id.</u>

[222] <u>Id.</u>

[223] <u>See</u> 11 U.S.C. § 510(c).

[224] <u>See</u> <u>In re Teltronics Servs., Inc.</u>, 29 B.R. 139, 168 (Bankr. S.D.N.Y. 1983).

[225] <u>Meyer v. United States</u>, 375 U.S. 233, 236 (1963) (<u>quoting</u> <u>Sowell v. Fed. Reserve Bank</u>, 268 U.S. 449, 456–57 (1925))

K&E 12473324.

debtor; and (c) one creditor having the ability to resort to all funds.[226]  Each element must be proven by clear and convincing evidence.[227]

125.    The Committee, however, fails to identify which Debtor-entity is the "common debtor" from which the DIP Lenders and other creditors must seek recovery under its marshaling theory.[228]  Rather, the Committee's marshaling argument implicitly treats the "Debtors" as a unitary entity.[229]    (Apparently here the Committee is willing to endorse substantive consolidation—at least on a selective basis.)

126.    More fundamentally, marshaling as an equitable doctrine requires that no party in interest will be impaired by its application.  "The party who seeks marshalling must demonstrate that the rights of other creditors, including the senior creditor, will not be prejudiced."[230]  Notwithstanding the requirements of equity, the Committee asserts that the Court would compel a marshaling of assets to wipe out $75 million in collateral of the Prepetition Lenders.  Hence, the Committee's conclusion that the outstanding balance of the DIP Loan should not be payable

---

[226]  Walther v. Bank of New York, 772 F. Supp. 754, 767 (S.D.N.Y. 1991).

[227]  See In re Arlco, Inc., 239 B.R. 261, 274 (Bankr. S.D.N.Y. 1999) ("These requirements have been strictly construed in the bankruptcy context . . . .").

[228]  In re King, 305 B.R. 152, 170 (Bankr. S.D.N.Y. 2004) (noting that marshaling is unavailable where debtor does not control two funds but, rather, two funds are held by two distinct entities).

[229]  See Creditors' Committee Objection, at 57–58.

[230]  Walther, 772 F. Supp. at 767; see Arlco, 239 B.R. at 274 ("[M]arshaling is not applied if either a senior secured creditor or other parties are prejudiced.").  The Debtors do not dispute the Committee's standing to invoke the doctrine of marshaling via section 544(a) of the Bankruptcy Code.  See In re Am.'s Hobby Ctr., Inc., 223 B.R. 275, 287 (Bankr. S.D.N.Y. 1998).  Rather, the Debtors' dispute the unprecedented and unjustified manner in which the Committee seeks to apply the doctrine.  The Committee's standing to invoke the doctrine of marshaling does not imply that the Committee is also a secured creditor.  The status of a hypothetical lien creditor "is held for the benefit of the estate, and is not intended to elevate the debtor and unsecured creditor to a status above that of a prepetition security interest holder."  In re Borges, 184 B.R. 874, 880 (Bankr. D. Conn. 1995) (emphasis added); Larry's Equip. Serv., Inc., 23 B.R. 132, 134 (Bankr. D. Me. 1982) ("Section 544 was intended to protect the estate from secret, unperfected liens, and it was not intended to benefit the Trustee over a perfected junior secured creditor.").

K&E 12473324.

first out of unencumbered assets is little more than an attempt at "reverse marshaling" in order to free up this collateral for the benefit of unsecured creditors. The offensive use of marshaling by general unsecured creditors to enrich themselves at the expense of secured creditors would be a radical departure from established precedent. The theory of "reverse marshaling" has been thoroughly discredited:

> [T]he doctrine of marshaling will not be employed to prejudice creditors with security interests of a priority equal to or higher than that of the security interest of the party seeking marshaling. The law is fairly clear that while this Court has the equitable power to order marshaling, it will not be applied at the request of the Trustee to the detriment of senior and junior lien creditor.[231]

127.    Indeed, the Ninth Circuit has described "reverse marshalling" as "a situation in which the equitable doctrine of marshaling is <u>distorted</u> in such a way that it works to the disadvantage of a junior secured creditor."[232]    In <u>In re Center Wholesale</u>,[233] the court held that a debtor in possession could not force a senior lienholder to satisfy its claim out of assets that were also subject to a junior lien where that result prejudiced the junior lienholder to the estate's benefit.[234]    Specifically, the court stated that:

> We have found no authority for the proposition that a trustee or debtor in possession may require a senior lienor to satisfy its claim out of a junior lienor's collateral. . . .    Marshaling prevents a senior secured party from willfully choosing the double-encumbered fund to the prejudice of junior secured parties. If the

---

[231]  <u>Borges</u>, 184 B.R. at 880 (quoting <u>In re Murdock</u>, 134 B.R. 417, 423 (Bankr. D. Mont. 1991)); <u>In re Gibson Group, Inc.</u>, 151 B.R. 133, 135 (Bankr. S.D. Ohio 1993); <u>In re Dig It, Inc.</u>, 129 B.R. 65, 67 (Bankr. D.S.C. 1991); <u>In re Jenkins</u>, 99 B.R. 949, 952 (Bankr. W.D. Mo. 1988) ("[N]either a trustee nor a debtor in possession can force 'reverse marshaling' of assets by requiring a senior lienor to satisfy its claim out of collateral also securing a junior lienor's interest when the senior lienor has other collateral it may draw from first."); <u>In re McElwaney</u>, 40 B.R. 66, 71 (Bankr. M.D. Ga. 1984) ("Marshalling is not equitable if applied for the benefit of a trustee to the detriment of a secured and properly perfected junior lien creditor.").

[232]  <u>In re Ctr. Wholesale, Inc.</u>, 788 F.2d 541, 542 n.1 (9th Cir. 1986) (emphasis added).

[233]  <u>In re Center Wholesale</u>, 788 F.2d 541 (9th Cir. 1986).

[234]  <u>Id.</u> at 542.

senior secured party does not choose the double-encumbered fund, however, there is no reason to think that a bankruptcy court would force the senior secured party to act detrimentally to the junior secured party.[235]

128.    Nor do the cases relied on by the Committee authorize such an unprecedented extension of the doctrine of marshaling.  Neither In re Jack Green's Fashions for Men Big & Tall, Inc,[236] nor First National Mercantile Bank & Trust Co. v. Hazen,[237] sanctioned the offensive application of marshaling to the detriment of a secured creditor.  Hazen, for example, marshaled assets by compelling the junior secured creditor in question to satisfy its claim first from proceeds of assets not otherwise available to general unsecured creditors.[238]  Hazen quite clearly noted that marshaling would not impair the junior secured creditor's total recovery.[239] Nothing in Hazen authorized the trustee to enhance unsecured creditor recoveries by compelling a senior secured creditor to wipe out a junior secured creditor's collateral, thereby increasing its deficiency claim.  Similarly, Jack Green's Fashions involved only the claims of a solitary secured lender and the bankruptcy trustee.[240]  As with Hazen, Jack Green's Fashions did not compel a senior secured lender to marshal assets so as to liquidate the collateral of a junior secured creditor.

---

[235]  Id. (emphasis added).

[236]  597 F.2d 120 (8th Cir. 1979).

[237]  96 B.R. 924 (W.D. Mo. 1988).

[238]  See 96 B.R. at 927.

[239]  See id. at 927.

[240]  See 597 F.2d at 132.

b.    **The equitable doctrine of marshaling cannot be used to re-write the Bankruptcy Code by eliminating the Prepetition Lenders' adequate protection**

        129.    Equitable doctrines cannot be used to re-write distribution priorities enacted by Congress through the Bankruptcy Code.[241]    Indeed, <u>Noland</u> overruled an attempt to engineer recovery for unsecured creditors through the ad hoc use of equitable subordination.[242]    In <u>Noland</u>, the bankruptcy court below "read [section 510(c)] to provide authority not only to deal with inequitable conduct . . . but also to adjust a statutory priority of a category of claims."[243] The Supreme Court held that a bankruptcy court's equitable powers cannot be used to circumvent distribution priorities established by Congress.    "Decisions about the treatment of categories of claims in bankruptcy proceedings are not dictated or illuminated by principles of equity and do not fall within the judicial power of equitable subordination . . . ."[244]    The present case is no different.    The Committee seeks to use an equitable doctrine in order to effectively subordinate the Debtors' secured claim, thereby undermining priorities established by the Bankruptcy Code.[245]    Application of marshaling in this manner would invalidate the selfsame distribution scheme enacted by Congress: "To permit marshalling in the manner sought by the

---

[241]    <u>See</u> <u>United States v. Noland</u>, 517 U.S. 535, 543 (1996).

[242]    The Debtors note that equitable subordination, unlike the doctrine of marshaling, is codified in Bankruptcy Code.    <u>See</u> 11 U.S.C. § 510(c).    <u>Cf.</u> <u>Norwest Bank Worthington v. Ahlers</u>, 485 U.S. 197, 206 (1988) ("[W]hatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code.").    To the extent an uncodified equitable doctrine, such as marshaling, subsists within the Bankruptcy Code, the doctrine would be circumscribed by Congress's understanding of that doctrine based on existing law when the Bankruptcy Code was enacted.    <u>See</u> <u>Noland</u>, 517 U.S. at 538–39. Given the utter lack of support for reverse marshaling, Congress could not possibly have authorized the radical extension of marshaling contemplated by the Committee's objection.

[243]    <u>Id.</u> at 537.

[244]    <u>Id.</u> at 541 (internal quotation marks omitted).

[245]    <u>See</u> 11 U.S.C. §§ 507, 726.

K&E 12473324.

trustee, in this case, would frustrate the objective of the Bankruptcy Code and conflict with the doctrine itself by prejudicing the rights of a superior class of creditors."[246]   Of course, the Committee has not—and cannot—assert inequitable conduct as part of the Prepetition Lenders' by whose grace the vast and silent majority of the Committees' constituency is being paid in full.

130.    Indeed, the Committee seeks to use marshaling to deny the Prepetition Lenders' right to adequate protection, undermining one of the fundamental protections provided to prepetition secured lenders by the Bankruptcy Code.[247]   "As a general principle, the Bankruptcy Code recognizes the primacy of pre-petition contractual liens and seeks to preserve the financial interests created thereby."[248]   Section 364(d) codifies this policy.[249]   Specifically, section 364(d) permits the priming of an existing lien only as a last resort:

> (1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—(A) the trustee is unable to obtain such credit otherwise; and (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.  (2) In any hearing under this subsection, the trustee has the burden of proof on the issue of adequate protection.[250]

---

[246]  McElwaney, 40 B.R. at 71 (citation omitted).

[247]  See 11 U.S.C. § 364(d).

[248]  In re Mosello, 195 B.R. 277, 287 (Bankr. S.D.N.Y. 1996).

[249]  Id.

[250]  11 U.S.C. § 364(d); see also In re Qualitech Steel Corp., 276 F.3d 245, 248 (7th Cir. 2001); In re Stoney Creek Techs., LLC, 364 B.R. 882, 891-90 (Bankr. E.D. Pa. 2007); In re Seth Co., 281 B.R. 150, 153 (Bankr. D. Conn. 2002); Douglas G. Baird, The Elements of Bankruptcy 187-88 (rev. ed. 2001).

Indeed, "the concept of adequate protection[] is based as much on policy grounds as on constitutional grounds. Secured creditors should not be deprived of the benefit of their bargain."[251]

131. The requirements of adequate protection, codified at 11 U.S.C. § 364(d), foreclose the Committee's attempt to "equitably" void the Prepetition Lenders' liens on their collateral without providing them "the same level of protection [they] would have had if there had not been post-petition superpriority financing."[252] As discussed above, the Bankruptcy Code protects the Prepetition Lenders' ability to retain the benefit of their prebankruptcy bargain.[253]

132. The Debtors' DIP Lenders were granted the extraordinary relief of a priming lien on the Prepetition Lender's collateral pursuant to the final DIP Order.[254] "Equitable" marshaling as sought by the Committee would therefore undermine the protections Congress clearly sought to establish through section 364(d) by compelling the DIP Lenders to seek payment from collateral that is unquestionably a "last resort." Marshaling cannot be used to frustrate the priorities and protections provided by the Bankruptcy Code by subordinating the Prepetition Lenders in this fashion.[255]

---

[251] H.R. Rep. No. 595, 95th Cong. 2d Sess. 339.

[252] See In re Swedeland Dev. Group, Inc., 16 F.3d 552, 564 (3d Cir. 1994).

[253] See In re Phoenix Steel Corp., 39 B.R. 218, 224 (D. Del. 1984) ("The concept of adequate protection does not envision a court stripping a secured creditor of the benefit of its bargain . . . ."); see also In re O.P. Held, Inc., 74 B.R. 777, 784 (Bankr. N.D.N.Y. 1987) ("[A] debtor must prove by clear and convincing evidence that the secured creditor will realize the value of its bargain in light of all the facts and circumstances of the case." (internal quotation marks omitted))

[254] Final Order Under 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and Fed. R. Bankr. P. 2002, 4001 and 9014 (I) Authorizing Debtors to Obtain Postpetition Financing, (II) Authorizing Debtors to Use Cash Collateral, and (III) Granting Adequate Protection to Prepetition Secured Parties [Docket No. 188], at ¶ 7(c).

[255] See Noland, 517 U.S. at 541.

K&E 12473324.

c.     **The Attempt to Justify Marshaling by Recharacterizing the 2008 Loan Must Fail**

133.     Although the Committee concedes—as it must—that marshaling cannot be used to prejudice the rights of a senior creditor,[256] the Committee argues that the Prepetition Lenders would suffer no prejudice because the rollup of the 2008 Loans illicitly enhanced their recovery by $75 million.  Stripped bare, the Committee argues the Debtors and their Prepetition Lenders pulled the wool over the Court's eyes and marshaling should be used to reverse the Court's mistaken authorization of the DIP Facility.  The Committee implicitly asserts that Debtors' counsel misled the Court as to the nature of the 2008 Loans and the benefits provided to the Debtors thereby.[257]  Hence, the Committee believes that requiring the Debtors' DIP Lenders to foreclose on this $75 million worth of collateral would simply return the Debtors' Prepetition Lenders to the status quo.[258]

134.     Nothing could be further from the truth.  The Debtors clearly disclosed the rollup and the priority of the 2008 Loans to the Court.[259]  The 2008 Loans were made pursuant to the terms of two amendments to the Prepetition Credit Agreement: the Tenth Amendment dated as of January 1, 2008, and the Eleventh Amendment dated as of January 22, 2008.  The Prepetition

---

[256]  Creditors' Committee Objection, at 53.

[257]  Id. at 56.

[258]  See id. at 57–58.

[259]  See Hr'g Tr., Feb. 28, 2008, at 32 (proffer of Mr. Gathany); id. at 77 (statement of Mr. Kieselstein); Debtors' Motion for Interim and Final Orders (A) Authorizing Debtors to Obtain Postpetition Secured Financing and Utilize Cash Collateral; (B) Granting Adequate Protection to Prepetition Secured Lenders; and (C) Scheduling Final Hearing [Docket No. 28], at 22.

Debtors provided the Debtors with liquidity necessary to implement an organized filing and, in effect, functioned as the liquidity bridge to a full DIP Facility.[260]

135.    To give effect to the priority of the 2008 Loans, the Tenth and Eleventh Amendments created clearly separate and distinct classes of loans (the 2008 Revolving Loans, the 2008 Swing Line Loans, the New Term Loans, and the 2008 Reimbursement Obligations) and amended both the terms of the "payment waterfall" (governing application of optional and mandatory repayments) under the terms of the Prepetition Credit Facility and the "collateral waterfall" contained in the Prepetition Guarantee and Collateral Agreement (governing the application of the proceeds of collateral following an event of default). The provisions of the collateral waterfall specifically provide that the 2008 Loans were to be treated as "Last in First out" loans, paid with priority over all other Prepetition Loans and also entitled to receive postpetition interest prior to any recovery on any other Prepetition Loan.[261]   Of course, the Committee seeks to avoid this point by characterizing the priority of the 2008 Loans as an "inter-lender issue."  This is a meaningless distinction.  The doctrine of marshaling is predicated on the equitable resolution of "inter-lender issues."[262]

136.    A fundamental provision of the 2008 Loans was that:

Borrower shall use its reasonable best efforts, subject to any judicial or other approval as may be required and notwithstanding anything to the contrary herein or in any other Loan Document, to prepay the New Term Loans, 2008 Revolving Credit Loans, 2008 Swing Line Loans and 2008 Reimbursement Obligations,

---

[260]  See Hr'g Tr., Feb. 28, 2008, at 31 (proffer of Mr. Gathany).

[261]  See Loan Agreement Section 7 (Amendment to Subsection 6.5 of the Guarantee and Collateral Agreement – Application of Proceeds) of the Tenth Amendment and Section 14 (Amendment to Subsection 6.5 of the Guarantee and Collateral Agreement – Application of Proceeds) of the Eleventh Amendment.

[262]  See Meyer, 375 U.S. at 236.

including, in each case, accrued and unpaid interest and fees thereon, with the
initial proceeds of any Restructuring Financing.

This provision reflected the Debtors' recognition that the 2008 Loans were, in effect, pre-filing

DIP loans necessitated by the Debtors' need to properly prepare for a smooth entry into

chapter 11.[263]  And, if the 2008 Loans were not repaid by the anticipated "outside" date of a

permanent DIP facility of February 29, 2008, the Debtors would have been further obligated to

pay a 4 percent fee of approximately $2,600,000.[264]

137.    As reflected in the Final DIP Order, the Prepetition Lenders consented to being

primed by the DIP Loans and ultimately agreed to an adequate protection package that included

a monthly payment on the outstanding amounts under the Prepetition Credit Facility calculated at

the rate of LIBOR plus 3.5 percent, far below the interest rate on the Prepetition Loans of

LIBOR plus 8.25 percent that was applicable as of the Petition Date. The Prepetition Lenders

who provided the 2008 Loans would not have agreed to be primed if the 2008 Loans were not

repaid through the DIP Loans.[265]  Alternatively, the Prepetition Lenders would have consented to

the priming only in exchange for current interest as adequate protection for the (substantially

oversecured) 2008 Loans consisting (at a minimum) of interest at the contract rate of LIBOR

plus 8.25 percent, plus default interest accruing at 2 percent and payment in full of the fees

described above.[266]

---

[263]  See Hr'g Tr., Feb. 28, 2008, at 31 (proffer of Mr. Gathany) ("Without that agreement, the Debtors may have
been forced to file for bankruptcy in a freefall in early January.  A freefall would have seriously eroded the
Debtors' enterprise value.").

[264]  See Loan Agreement Section 9 (Amendment to Subsection 4.5 Commitment Fees; Administrative Agent's Fee;
Other Fees).

[265]  See Hr'g Tr., Feb. 29, 2008, at 35 (proffer of Mr. Gathany) (discussing adequate protection requirements).

[266]  See id.

K&E 12473324.

138.     Thus, the repayment by the Debtors of the 2008 Loans with the proceeds of the DIP Loans generated real and immediate cash benefits to the Debtors.[267]   The terms of the DIP Facility were also consistent with the terms of debtor in possession facilities approved in similar chapter 11 cases,[268] and rollups are commonly allowed when necessary to secure DIP financing.[269]   The Court, recognizing the benefits provided by the 2008 Loans, authorized their rollup in no uncertain terms:  "It is indisputable that a solid case has been made as to the need for the financing, as to the business justification for the rollup and as to the importance to the success of the reorganization whatever form it takes in having the Debtor adequately financed."[270]

139.     In sum, the doctrine of marshaling is not a channel through which an unsecured creditor can make an untimely appeal, nor does marshaling authorize unsecured creditors to subvert a secured creditor's bargain duly authorized by the Court.  "At the very least, a creditor compelled to marshal assets must not receive less if there is marshaling than if there is not."[271] For these reasons, the Committee's marshaling argument must fail.

---

[267]  See id. at 32 (proffer of Mr. Gathany); Declaration of Jeffery Stegenga, Managing Director of Alvarez & Marsal, in Support of DIP Financing Motion [Docket No. 34], at 6–7.

[268]  See Declaration of Jeffery Stegenga, Managing Director of Alvarez & Marsal, in Support of DIP Financing Motion, at 6–7.

[269]  See, e.g., In re Quebecor World (USA), Inc., Case No 08-10152 (Bankr. S.D.N.Y. Apr. 1, 2008); In re Bally Total Fitness of Greater New York, Inc., Case No. 07-12395 (Bankr. S.D.N.Y. Aug. 21, 2007); In re Oneida, Ltd., Case No. 06-1048 (Bankr. S.D.N.Y. Apr. 7, 2006); In re Dana Corp., Case No. 06-10354 (Bankr. S.D.N.Y. March 29, 2006); In re Calpine Corp., Case No. 05-60200 (Bankr. S.D.N.Y. Jan. 26, 2006); In re Delphi Corp., Case No. 05-44481 (Bankr. S.D.N.Y. Oct. 28, 2005); In re Tower Auto., Inc., Case No. 05-10578 (Bankr. S.D.N.Y. Feb. 28, 2005).

[270]  Hr'g Tr., Feb. 28, 2008 (statement of the Court).

[271]  Borges, 184 B.R. at 881.

K&E 12473324.

### 3. The Liquidation Analysis establishes the LaSalle Securitization Facility will have a substantial deficiency claim

140.    The Debtors' liquidation analysis demonstrates that, in a hypothetical liquidation, the LaSalle securitization facility (the "LaSalle Securitization Facility") will have a deficiency claim of approximately $19 million.[272]  As the Court is aware, the LaSalle Securitization Facility has a superpriority claim <u>for any amounts</u> advanced to the Debtors after the Petition Date up to $19.5 million.[273]  The Debtors assume that, in the event of liquidation, LaSalle would demand immediate satisfaction on its superpriority claim without being obliged to wait for the liquidation of the Debtors' receivables which might otherwise take anywhere from 6 to 9 months.[274]  The order authorizing the Debtors' to perform under the LaSalle Receivables Facility authorizes precisely this result.[275]  Any "equity" the Committee believes would be available from the Debtors' receivables following liquidation by the receivables lenders would then be subject to liens held by the Debtors' Prepetition Lenders and, therefore, unavailable to general unsecured creditors.

### 4. The Committee overvalues the Debtors' inventoried homes

141.    The Committee ascribes a potential liquidation value to the Debtors' inventoried homes of approximately $44.9 million dollars.[276]  This valuation assumes that the proceeds of such sales are unencumbered by either the Debtors' DIP facility or the security interests held by

---

[272]  <u>See</u> Deconsolidated Liquidation Analysis, at 13.

[273]  <u>See</u> Order (I) Authorizing Certain Debtors to Continue Performing Under the Receivables Purchase Program and (II) Granting Related Relief [Docket No. 59] at ¶ 13.

[274]  <u>See</u> Consolidated Liquidation Analysis Expert Report at 22.

[275]  <u>See</u> <u>id.</u> at 7.

[276]  <u>See</u> Relocation Properties Held for Resale Expert Valuation Report, at 4.

the Debtors' prepetition secured lenders.[277]   This assumption is flawed.   Although interests in

real property are excluded from Article 9,[278] the proceeds from prepetition land sale contracts are

personal property subject to the rights of properly perfected secured creditors.[279]   Hence, the

proceeds from the sale of the Debtors' inventoried homes under contract at the time of the

Debtors' bankruptcy filing are encumbered by the interests held by the Debtors' prepetition

secured creditors.[280]

142.   The Committee cites In re Southworth[281] for the proposition that the right to

payment under a land sale contract is not governed by Article 9.[282]   This reading of Southworth

is incorrect.   The Southworth court clearly held that the right to receive payment under a land

sale contract is governed by the Uniform Commercial Code.[283]   The Committee properly notes

that "the bank . . . did not perfect any interest" in the home in question and the creditor's lien was

---

[277]   See Creditors' Committee Objection at Annex A.

[278]   See U.C.C. § 9-109(b)(11).

[279]   See In re IT Group, Inc., 307 B.R. 762, 765 (D. Del. 2004) (holding that proceeds from land sale contract are a "general intangible interest governed by Article 9 of the U.C.C"); In re Southworth, 22 B.R. 376, 378 (Bankr. D. Kan. 1982) ("Under the doctrine of equitable conversion, the vendor's right to receive payment in a land sale contract is a personal property right."); see also U.C.C. § 9-109(b) ("The application of this article to a security interest in a secured obligation is not affected by the fact that the obligation is itself secured by a transaction or interest to which this article does not apply.").

[280]   Proceeds from postpetition land sale contracts (and the homes themselves) are subject to liens of both the DIP Lenders and Prepetition Lenders pursuant to the Final DIP Order.

[281]   22 B.R. 376 (Bankr. D. Kan. 1982).

[282]   Creditors' Committee Objection, at 75.

[283]   22 B.R. at 379 ("[T]he Court holds the assignment of the right to receive payments under the instant contract for deed is governed by the UCC.").

therefore subject to avoidance.[284]  But the bank's failure to perfect arose from the bank's failure to file a financing statement as required by Article 9.[285]

143.    The Committee's liquidation analysis also overstates the value of these inventoried homes.  The Committee estimates that the range of "positive net equity values" ranges between $36.7 million and $44.9 million.[286]  This calculation, however, includes $13.9 million related to homes currently under contract to third parties at the time of the Debtors' bankruptcy filing.[287]  As discussed above, the proceeds from the sale of these homes would be unavailable to unsecured creditors in a hypothetical liquidation.[288]  The Committee believes that no incremental losses will be incurred beyond those loss reserves currently taken by the Debtors.[289]  In effect, the Committee has assumed that housing prices will flatline over a three or nine month period.[290]  This assumption is out of touch with the near and mid-term prospects for the U.S. housing market.[291]

---

[284]  Creditors' Committee Objection, at 75.

[285]  See id. at 379 ("Bank did not perfect its interest by filing a financing statement pursuant to [Article 9].").

[286]  See Relocation Properties Held for Resale Expert Valuation Report, at 18.

[287]  See id.  The Debtors note that the proceeds from inventoried home sales would be subject to the security interests held by the Debtors' postpetition lenders.

[288]  See Southworth, 22 B.R. at 379.

[289]  See id. at 5.  The Debtors have historically incurred losses on the sale of inventoried homes.  See SIRVA, Inc. (Form 10-K), at 69 (Mar. 12, 2008).  The Debtors have been able to sustain such losses through revenue generated by corresponding relocation service agreements with the Debtors' clients.  Obviously, this source of value would be unavailable in a chapter 7 liquidation.

[290]  See Relocation Properties Held for Resale Expert Valuation Report, at 3 ("I am assuming that the Debtors' mark to market on a property by property basis represents each property's ultimate sales price.").

[291]  See Dan Levy, U.S. Foreclosures Jump 57% as Homeowners Walk Away, Apr. 15, 2008, available online at http://bloomberg.com/apps/news?pid=20601087&sid=a3_Y.T_wvElI&refer=home (last visited Apr. 15, 2008) (discussing 57 percent increase in home foreclosure rates in March 2008 over previous year and doubling of bank repossessions over same period).

K&E 12473324.

144.     Moreover, the Committee's flatline assumption fails to reflect the Debtors' recent experience.  Between September 2007 and February 2008, over 168 out of 908 closes resulted in losses at least 14 percent above reserves.[292]  Losses on sale of 30 percent above the current reserve have also been seen in the ordinary course of the Debtors' business.[293]  Increasing losses sustained on inventoried homes and the increased time such homes were held in the Debtors' inventory were also two of the principle factors driving the Debtors' liquidity crisis in the run-up to bankruptcy.[294]  Yet the Committee assumes the wholesale liquidation of the Debtors' inventoried homes with a skeleton staff and no ongoing business to motivate its network of real estate agents will somehow reverse these negative trends and surmount the ills besetting the real estate market generally.  The Committee's valuation also fails to consider the impact of an expedited sale of the Debtors' entire inventory on the prices ultimately realized for those assets.[295]  This assumption is inappropriate in the context of a hypothetical chapter 7 liquidation: "A liquidation contemplates valuation according to the depressed prices that one typically receives in distress sales."[296]

> **5.     The Committee's liquidation analysis overvalues potential preference claims and avoidance actions**

145.     The Committee supposes that approximately $33.0 million to $55.8 million in potential preference actions exist for the benefit of unsecured creditors in a hypothetical

---

[292]  Rebuttal to Relocation Properties Held for Resale Expert Valuation Report, at 5.

[293]  Id.

[294]  See Affidavit of Douglas V. Gathany, Senior Vice President and Treasurer of DJK Residential LLC, in Support of First Day Motions and Pursuant to Local Bankruptcy Rule 1007-2 [Docket No. 2] at 19–21.

[295]  See Relocation Properties Held for Resale Expert Valuation Report, at 3.

[296]  In re Lason, Inc., 300 B.R. 227, 233 (Bankr. D. Del. 2003 (internal quotation marks omitted)).

liquidation scenario against non-Prepetition Lenders.[297] These figures were generated by nothing more than taking the Debtors' total disbursements made within the 90-day preference window and applying fixed percentages thereto.[298] For example, the Committee projects that up to 35 percent (or approximately $15.1 million) of general disbursements constitute recoverable preferences.[299] The Committee provides no explanation as to how this recovery range has been calculated. Nor does the Committee's "analysis" consider that all disbursements to the Debtors' agents (comprising from $7.6 million to $10.8 million in alleged "preferences")[300] have been made on a fixed payment schedule and in the ordinary course of business.[301] The Committee's failure to provide any actual evidence of these alleged preferences renders its analysis useless to consideration of the Plan under section 1129(a)(7).[302] Nor did the Committee's analysis take into account the inevitable costs associated with prosecuting these actions.[303] The Committee's

---

[297] Analyses of Preferences and Other Avoidance Actions (Non-Prepetition Lenders) Expert Report, at 24.

[298] Id. at 25.

[299] Id. at 24.

[300] Id.

[301] See Rebuttal to Analyses of Preferences and Other Avoidance Actions (Non-Prepetition Lenders) Expert Report, at 7; see also 11 U.S.C. § 547(c)(2).

[302] See In re Crowthers McCall Pattern, Inc., 120 B.R. 279, 298 (Bankr. S.D.N.Y. 1990) ("The judgment is to be made on the basis of evidence, not assumptions." (internal quotation marks omitted)).

[303] See Analyses of Preferences and Other Avoidance Actions (Non-Prepetition Lenders) Expert Report, at 25 ("The range of potential preferences is before the cost of litigation, reduction for settlements, and collectibility." (emphasis added))

failure to account for the costs associated with prosecuting and collecting on these alleged preferences—if any—must be subtracted from any valuation.[304]

### 6. The Prepetition Lenders Received No Preferences

#### a. None of the Applicable Transfers Had a Preferential Effect

146.    To establish a preference, the party challenging the transfer must prove all elements under section 547(b) of the Bankruptcy Code, including that the transfer enables the creditor to "receive more than such creditor would receive if: (a) the case were a case under chapter 7 of this title; (b) the transfer had not been made; and (c) such creditor received payment of such debt to the extent provided by the provisions of this title."[305]  The Committee does not, and cannot, illustrate that the transfers made to the Prepetition Lenders within the 90-day period had a preferential effect.  Here, the transfers made to the Prepetition Lenders were either from the proceeds of the Prepetition Lenders' collateral or from loan proceeds "earmarked" for the purpose of paying obligations in those circumstances when cash collateral in the account was not sufficient to do so.  Accordingly, such transfers are not preferential because they do not give the Prepetition Lenders any more than they are otherwise entitled to or that they otherwise would have recovered in a hypothetical chapter 7 distribution.

147.    In the case of undersecured creditors, transfers from the debtor's general funds are conclusively presumed to have been applied first to the unsecured debt, thus making the payments preferential to that extent.  If, however, the undersecured creditor has merely received

---

[304]    See In re Adelphia Commc'ns Corp., 368 B.R. 140, 254 (Bankr. S.D.N.Y. 2007) ("Given the amount of time such professionals would be required to devote to become familiar with the Debtors and the issues related to these cases, such fees and costs would reduce overall recoveries.").

[305]    11 U.S.C. §§ 547(b)(5).

its own collateral or the proceeds of its collateral, then the creditor has not received more than it would have obtained in a chapter 7 liquidation, and, thus, the transfer is not avoidable.[306]

148.    The transfers made on the Debtors' prepetition revolving loan (the "Revolving Loan") and the term loan (the "Term Loan") were paid out of the Debtors' primary cash consolidation account.  The aggregate cash balance on deposit in the primary cash consolidation account at the time of the applicable transfers constitute "proceeds" as defined in the Uniform Commercial Code, and as such, were part of the Prepetition Lenders' collateral subject to the Prepetition Credit Facility.  Given that the Prepetition Lenders had liens on substantially all of the Debtors' assets, with the limited exception of 35 percent of the stock of certain foreign subsidiaries, it is certain that the overwhelming majority of funds in the primary cash collateral account at any given time constituted proceeds of the Prepetition Lenders' collateral.  Indeed, during the preference period there was only approximately $3.5 million out of $1 billion that arguably could be said to represent proceeds of unencumbered collateral.  Accordingly, the source of the transfers made to the Prepetition Lenders during the 90-day period is the Lenders' own collateral and, thus, such transfers are not preferential.

149.    In addition, none of the $10 million in Term Loan interest paid could be recoverable as a preference because the funds used to pay the interest were advanced for that express purpose.  In particular, the "earmarking" doctrine, which has been specifically endorsed by the Second Circuit as a defense to preference actions,[307] provides that, where a third-party remits necessary funds to retire a specific obligation a debtor owes to an existing creditor, the

---

[306] In re El Paso Refinery, LP, 171 F.3d 249 (5th Cir. 1999); In re Telesphere Commc'ns, Inc., 229 B.R. 173 (N.D. Ill. 1999); see In re WorldClass Processing, Inc., 323 B.R. 164 (Bankr. W.D. Pa. 2005); In re Abatement Envtl. Resources, Inc., 307 B.R. 491 (Bankr. D. Md. 2004).

[307] See, e.g., In re Flanagan, 503 F.3d 171 (2d Cir. 2007).

payment to the existing creditor is not a transfer involving the debtor's property and, therefore, cannot be avoided as a preference.[308]  The earmarking doctrine "encompass[es] any situation where a subsequent loan was made on the condition that it be used to repay an existing loan,"[309] including situations wherein the third-party was not contractually obligated to pay the debtor's debt.[310]  The earmarking doctrine is premised on the theory that, where a third-party "earmarks" funds to pay a pre-existing creditor, the transfer does not harm the debtor's bankruptcy estate because the third-party "merely steps into the shoes of an old creditor."[311]

150.    Here, immediately upon the effectiveness of the Tenth Amendment the Debtors borrowed the $10 million that was used to make the Term Loan interest payment expressly for the purpose of making that payment.  Indeed, the Tenth Amendment would never had gone effective but for the understanding that those funds would be used to effect that payment.  Accordingly, the funds borrowed to make the $10 million Term Loan interest payment never became "part of the estate and the transfer cannot be avoided in bankruptcy."[312]

---

[308]  See, e.g., Nat'l Bank of Newport v. Nat'l Herkimer County Bank, 225 U.S. 178 (1912); In re Kelton Motors, Inc., 97 F.3d 22 (2d Cir. 1996).

[309]  In re Adams, 240 B.R. 807, 810 (Bankr. D. Me. 1999) (citation omitted).

[310]  See, e.g., In re Heitkamp, 137 F.3d 1087 (8th Cir. 1998); In re Safe-T-Brake, 162 B.R. 359, 364 (Bankr. S.D. Fla. 1993) (to limit the earmarking doctrine to cases wherein the third-party was contractually obligated to pay the debtor's debt "ignores the march of history").

[311]  Heitkamp, 137 F.3d at 1089; see also Flanagan, 503 F.3d at 184; 5 Collier on Bankruptcy ¶ 547.03[2] at 547-23.

[312]  Flanagan, 503 F.3d at 185.

### b. All Payments to the Prepetition Lenders in the Preference Period Were "Ordinary Course of Business" or "Ordinary Business Term" Payments

151.     To be exempt from recovery as a preference under the "ordinary course" defense, a transfer must be (a) "made in the ordinary course of business or financial affairs of the debtor and the transferee"; or (b) "made according to ordinary business terms."  11 U.S.C. § 547(c)(2) (emphasis added).  The two defenses are separate, and either provides complete protection to a challenged transfer.

152.     The Committee argues that certain payments made to the Prepetition Lenders during the preference period are not exempt under section 547(c)(2).   Contrary to the Committee's assertions, all payments made by the Debtors to the Prepetition Lenders during the preference period were either (a) regularly scheduled payments of principal and interest on the Term Loan, or (b) payments on the Revolving Facility consistent with customary payments made under such facility in the pre-preference period.[313]

153.     The Committee first argues, citing inapposite case law, that any payment made to the Prepetition Lenders while the Debtors were in prepetition financial distress cannot be considered ordinary course.[314]  However, payments protected by the "ordinary course" defense

---

[313] All transfers made to the Prepetition Lenders under the Revolving Facility (the "Revolving Facility Lenders") during the preference period were consistent with the Debtors' and the Revolving Facility Lenders' customary practice established over the course of their lending relationship under their loan agreements and were consistent with how a revolving secured credit facility works generally.  The Revolving Facility was structured (as many secured revolving loans are) such that when the Debtors received inflows of excess cash in their primary cash consolidation account that was not needed for operating expenses, such cash was used to pay down the Revolving Facility in order to avoid any additional interest expense the Debtors would otherwise owe on borrowings from the Revolving Facility.  When the Debtors' cash needs exceeded then available funds, the Debtors drew down additional amounts from the Revolving Facility.  The timing and amount of such payments and draw-downs varied depending on the Debtors' particular financial circumstances at a given time.

[314] See Committee Objection, at p. 83.  The single case the Committee cites in support of this argument dealt with a prepetition payment of a fine to a local housing authority by a welfare hotel operator.  In re Pan Trading Corp., 125 B.R. 869 (Bankr. S.D.N.Y. 1991).  The circumstances in Pan are very different circumstances from those in

(Continued…)

are precisely those payments that are made during periods of financial distress.  In fact, as the Second Circuit has acknowledged, even payments made in the course of an ongoing, active restructuring may be ordinary course.[315]

154.    In this case, all payments were either (a) scheduled payments of interest or principal or (b) periodic applications of excess cash to reduce revolver balances.  The Debtors made the $10 million Term Loan interest payment to their prepetition term loan lenders (the "Term Loan Lenders") on January 10, 2008—six days after the interest payment was due and only <u>one</u> day outside the grace period permitted by the Prepetition Credit Agreement.  Such time period only slightly differs from the timing of pre-preference period ordinary course interest payments by the Debtors to the Prepetition Lenders and does not place this payment outside the ordinary course.[316]  As a result, the interest payment is protected by section 547(c)(2)(A)'s "ordinary course of business defense."[317]

---

this case—a restructuring arrangement designed to give the debtor liquidity to run its business and prepare for an orderly chapter 11 filing.  In <u>Pan</u>, the debtor was required by a state court order to pay the $25,000 fine to the housing authority in four installments.  After paying the first two installments several weeks late, the debtor accelerated its last two payments so that it completed the payments three weeks early.  The court inferred that the debtor made these payments early to prevent the housing authority from invoking a provision in the state court order that permitted the housing authority to enter a penalty judgment for $100,000, and concluded that since the debtor's payments were not made in a "timely and orderly" manner, the transfer was not in the orderly course of business.  As discussed herein, such facts are not present in these cases.

[315]  <u>In re Roblin Indus.</u>, 78 F.3d 30, 42 (2d Cir. 1995) (restricting "a creditor to courses of action typical in untroubled times leaves no room for realistic debt workouts and unfairly penalizes those creditors that take conventional steps to institute a repayment plan."); <u>In re Magic Circle</u>, 64 B.R. 269, 273 (Bankr. W.D. Okla. 1986) ("[t]he mere restructuring of the payment terms does not alter the fact that the underlying debt was incurred under normal circumstances.").

[316]  <u>See</u> <u>In re Valley Steel Corp.</u>, 182 B.R. 728, 737 (Bankr. W.D. Va. 1995) (check payments made in the preference period approximately 67 days after the invoice dates, when compared to the average in the pre-preference period of 54 days (a difference of 13 days), were deemed to be within an acceptable range and in the ordinary course of business).

[317]  All other interest and principal payments were made on their contractual due date.

155.    Nor was the $10 million Term Loan interest payment so "extraordinary" or "idiosyncratic" as to fall outside the broad range of business terms which the case law has defined for section 547(c)(2)(B)'s separate "ordinary business terms defense."[318]    Because "'ordinary business terms' sets an outer boundary to the parties' practices, the ultimate question is simply whether a particular arrangement is so out of line with what others do that it fails to be 'according to ordinary business terms.'"[319]    The Committee cites to nothing (nor can they) to suggest that a regularly scheduled interest payment that is made one day after its grace period is, in Roblin's words, "so idiosyncratic" as to be "extraordinary."[320]

### c.    The $10 Million Interest Payment Was For New Value

156.    As discussed above, on January 4, 2008, a $10 million interest payment on the Term Loan became due.    The payment was made concurrently with a vote of the Prepetition Lenders, including the Term Lenders, to approve the Tenth Amendment.

157.    The Tenth Amendment reopened revolver availability of approximately $45 million—an amount far in excess of the $10 million then paid in Term Loan interest.    In the Tenth Amendment, as well as in the Eleventh Amendment, which provided another $20 million in additional new loans, the Term Loan Lenders agreed to subordinate their liens to the liens

---

[318]  Roblin, 78 F.3d at 39-40; Metromedia, 2005 Bankr. LEXIS 3168, at *37 (monthly installment payment on account of antecedent debt pursuant to a debt restructuring agreement under which the debt was to be cut in half and paid over twenty-two months was in the ordinary course); see also In re Tolona Pizza Prods. Corp., 3 F.3d 1029, 1033 (7th Cir. 1993) ("We conclude that 'ordinary business terms' refers to the *range* of terms that encompasses the practices in which firms similar in some general way to the creditor in question engage, and that only dealings so idiosyncratic as to fall outside that broad range should be deemed extraordinary and therefore outside the scope of subsection C."); In re SPW Corp., 96 B.R. 676, 681-82 (Bankr. N.D. Tex. 1989); In re White, 64 B.R. 843, 850 (Bankr. E.D. Tenn. 1986).

[319]  In re Gulf City Seafoods, Inc., 296 F.3d 363, 369 (5th Cir. 2002).

[320]  Roblin, 78 F.3d at 39–40.

securing the new "2008 Loans." They did so in connection with the concurrent payment by the Debtors of the $10 million Term Loan interest payment.

158.    Under section 547(c)(1), a transfer that is a contemporaneous exchange between a debtor and a creditor for new value given to the debtor is exempt from avoidance as a preference. A payment to an oversecured creditor (or to an undersecured creditor to the extent that such payment comes from the creditor's own collateral) accompanied by a corresponding reduction in the creditor's lien and release of collateral is for "new value,"[321] and, therefore, is not preferential.[322]   The economic effect of the $10 million interest payment to the Term Loan Lenders and the Term Loan Lenders' corresponding agreement to subordinate their liens is identical to the economic effect of payment to a secured creditor accompanied by the release of some or all of the secured creditor's collateral and, therefore, is exempt from preference avoidance under section 547(c)(1).

> **7.      The Committee's liquidation analysis fails to consider the significant administrative costs that would be incurred through liquidation of the Debtors' estates**

159.    The Debtors believe approximately $28 million would be necessary to satisfy unpaid administrative costs in a chapter 7 liquidation.[323]   Yet the Committee casually disputes the Debtors' projected $28 million in administrative fees under the theory that "the bulk of these

---

[321] Under section 547 of the Code, "new value" means "money or money's worth in goods, services, or new credit, or release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debtor or the trustee under any applicable law, including proceeds of such property . . . ." 11 U.S.C. § 547(a)(2).

[322] See, e.g., In re Cavalier Indus., Inc., Case No. 99-31737, 2002 WL 975868, at *3-4 (Bankr. E.D. Pa. Apr. 16, 2002); In re Smith's Home Furnishings, Inc., 265 F.3d 959, 963 (9th Cir. 2001); In re Auto-Train Corp., 49 B.R. 605, 610 (D.D.C. 1985); see also Vern Countryman, The Concept of a Voidable Preference in Bankruptcy, 38 Vand. L. Rev. 713, 742 (1985) ("A payment to a secured creditor that comes from the creditor's own collateral does not effect a preference, whether he is fully or only partially secured.").

[323] See Ex. H ., Consolidated Liquidation Analysis, at 40.

K&E 12473324.

claims are pass through expenses or can be offset by the collection of related receivables."[324] These considerations have already been taken into account by the Debtors' own analysis of potential administrative expenses in liquidation.[325] The Debtors' analysis is based on the Debtors' expert's experience with the Debtors' operations, their collection cycle, and resulting estimates regarding the expenses incurred in a liquidation scenario.[326] The Committee lacks any comparable experience or familiarity with the Debtors' operations. Although the Debtors' made every effort to provide access to their operations, facilities, advisers, and management to the Committee and the Committee's advisors, these offers were not taken up. Yet the Committee asserts—without any explanation—that the Debtors' figure is "excessive" and, therefore, claims that $11 million is appropriate.[327] This allegation lacks any reasonable factual support and should not be considered when determining the administrative expenses that might otherwise be incurred in a hypothetical chapter 7.

160. Moreover, the Committee significantly understates the administrative cost of liquidating the Debtors' estates. The Debtors believe the liquidation of the Debtors' estates would require approximately $27 million. This calculation is based on the wind-down costs associated with businesses of this size, including professional fees, trustee fees, and associated priority claims.[328] The Committee's unsupported contention is that $8 million to $10 million is

---

[324] See Committee Expert Rebuttal Report Consolidated Liquidation Analysis, at 14.

[325] See Ex. H., Consolidated Liquidation Analysis, at 40.

[326] See generally id.

[327] See Expert Rebuttal Report Consolidated Liquidation Analysis, at 14.

[328] SIRVA, Inc., Consolidated Liquidation Analysis, at 33.

a more accurate figure.[329]  The Committee's claim is particularly surprising given its position

that a chapter 7 trustee would sell the Debtors' inventoried homes at higher prices than the

Debtors have been able to achieve in the ordinary course of business—and during the worst

residential real estate market in recent memory.  "Realization of value in liquidation is not

accomplished through merely turning over the keys to a trustee."[330]

161.    The Debtors submit that this contention lacks any credible factual basis.

Additionally, the Committee's position is inconsistent.  The Committee asserts it would cost $5

million to liquidate approximately $70 million in unencumbered assets it identifies.  However,

using that liquidation rate for the remaining encumbered assets—an admittedly more expensive

task—the administrative cost of liquidating the Debtors' estates would exceed $20 million.

Rather than focusing on the total cost to liquidate the estate, the Committee understates its costs

to create the appearance of a significant difference in opinion.

**J.      Triple's Net's objection under 1129(a)(7) fails because Triple Net provides no
support for its contention that the Plan fails to satisfy section 1129(a)(7) of
the Bankruptcy Code**

162.    Triple Net relies on the value of alleged preference actions to assert that Class 5

Claims would receive a larger distribution under a liquidation scenario than under the Debtors'

Plan.  Triple Net relies exclusively on the Committee's preference analysis.[331]  As discussed,

above, the Committee's "analysis" is nothing more than a fraction of total disbursements

presented as a "preference."  Nor does Triple Net even attempt to explain how the Debtors'

---

[329]  Expert Rebuttal Report Consolidated Liquidation Analysis, at 15.

[330]  Crowthers McCall, 120 B.R. at 292.

[331]  See Triple Net Objection, at 11–12.

Prepetition Lenders "happen to be the recipients of the largest . . . preferential transfers."[332] Whether or not a preference exists is a question of law and fact, and not solely satisfied by the barest of conclusory allegations.[333]  Hence, the Triple Net's objection to the Plan under section 1127(a)(7) must fail.

### K.    Acceptance of Impaired Classes (Section 1129(a)(8))

163.    Section 1129(a)(8) of the Bankruptcy Code requires that each Class of claims or interests must either accept a plan or be unimpaired under a plan.[334]  Pursuant to section 1126(c), a Class of impaired claims accepts a plan if holders of at least two-thirds in dollar amount and more than one-half in number of the claims in that Class actually vote to accept the plan.[335] Pursuant to section 1126(d), a Class of interests accepts a plan if holders of at least two-thirds in amount of the allowed interests in that Class actually vote to accept the plan.[336]  A Class that is not impaired under a plan, and each holder of a claim or interest in such class, is conclusively presumed to have accepted the plan.[337]  Classes 2, 3, 4, and 8 are unimpaired and, therefore, conclusively deemed to have accepted the Plan.  On the other hand, a Class is deemed to have rejected a plan if the plan provides that the claims or interests of that Class do not receive or

---

[332]  Id. at 12.

[333]  See 11 U.S.C. § 547(g); In re R.J. Patton Co., 348 B.R. 618 (Bankr. D. Conn. 2006) ("The burden is on the Trustee to prove by a preponderance of the evidence every element of Section 547(b) . . . .").

[334]  11 U.S.C. § 1128(a)(8).

[335]  11 U.S.C. § 1126(c).

[336]  11 U.S.C. § 1126(d).

[337]  11 U.S.C. § 1126(f); see In re Drexel Burnham Lambert Group, Inc., 960 F.2d 285, 290 (2d Cir. 1992) (an unimpaired Class is presumed to have accepted the plan); S. Rep. No. 989, 95th Cong. 2d Sess. 123 (1978) (section 1126(f) of the Bankruptcy Code "provides that no acceptances are required from any Class whose claims or interests are unimpaired under the Plan or in the order confirming the Plan.").

K&E 12473324.

retain any property under the plan on account of such claims or interests.[338]   Classes 5 and 7 receive no recovery under the Plan, and, therefore, are deemed to have rejected the Plan.

164.    As evidenced in the Voting Affidavit, Class 1 Prepetition Facility Claims, the sole impaired Class entitled to vote, overwhelmingly voted to accept the Plan.  In fact, 94 percent in number and 96 percent in amount of the holders of Class 1 Prepetition Facility Claims voted in favor of the Plan.  Further, in light of the fact that Class 5 and Class 7 are deemed to reject the Plan, as discussed more fully below, the Debtors have satisfied section 1129(a)(10) of the Bankruptcy Code because an impaired Class, Class 1 Prepetition Facility Claims, has accepted the Plan and the Debtors have met the requirements of section 1129(b) to "cram down" any rejecting classes.  Therefore, the Debtors have satisfied section 1129(a)(8).  Indeed the receipt of $10 million in cash in exchange for the subordinate of lien to $45 million of new loans to other lenders - far from preferring the Term Lenders - considerably worsened their position.

**L.      The Plan Complies With Statutorily Mandated Treatment of Administrative and Priority Tax Claims (Section 1129(a)(9))**

165.    Section 1129(a)(9) of the Bankruptcy Code requires that persons holding claims entitled to priority under section 507(a) receive specified cash payments under the plan.[339] Unless the holder of a particular claim agrees to a different treatment with respect to such claim, section 1129(a)(9) of the Bankruptcy Code generally requires the plan to satisfy administrative and priority tax claims in full in cash.

166.    As required by section 1129(a)(9) of the Bankruptcy Code, Article II.B of the Plan provides for full payment of Allowed Administrative Claims on the Effective Date or in the

---

[338]  See 11 U.S.C. § 1126(g).

[339]  11 U.S.C. § 1129(a)(9).

ordinary course of business.[340]   Further, Article II.C of the Plan generally provides for full

payment in cash of Allowed Priority Tax Claims on the Effective Date as provided in

section 1129(a)(9)(c) of the Bankruptcy Code.[341]   Therefore, the Debtors submit that the Plan

complies with section 1129(a)(9) of the Bankruptcy Code.   No party has objected to the Plan's

treatment of Administrative or Priority Claims.

### M. At Least One Impaired Class of Claims Has Accepted the Plan, Excluding the Acceptances of Insiders (Section 1129(a)(10))

167.   Section 1129(a)(10) provides that to the extent there is an impaired Class of

Claims, at least one impaired Class of Claims must accept the plan, excluding acceptance by any

Insider.[342]   Here, Class 1 voted to accept the Plan with 94 percent in number and 96 percent in

amount voting to accept the Plan, well above the 50 percent by number and 66 percent by

amount required for acceptance by section 1126 of the Bankruptcy Code.   Therefore, the Plan

satisfies the requirements of section 1129(a)(10).

### 1. Class 1 Members Are Not "Insiders"

168.   The Beach Plaintiffs argue that the Plan does not satisfy the requirements of 11

U.S.C. § 1129(a)(10) because the members of Class 1 (the Prepetition Lenders) are "insiders"

---

[340] See Plan, Art. VII.E (providing for payment on the Periodic Distribution Date that is at least thirty days after the Disputed Claim becomes an Allowed Administrative Claim after the Effective Date).   Disputed Administrative Claims relating to liabilities incurred by the Debtors in the ordinary course of business during the chapter 11 cases or assumed by the Debtors on or before the Effective Date that become Allowed after the Effective Date will be paid in the ordinary course of business upon such other terms as agreed upon by the Holder thereof and the relevant Reorganized Debtor or in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice.

[341] See Plan, Art. VII.C (providing for payment in full in cash of Disputed Priority Tax Claims that become Allowed after the Effective Date on the Periodic Distribution Date that is at least thirty days after the Disputed Claim becomes Allowed, or over a five-year period as provided in section 1129(a)(9)(c) with annual interest provided by applicable non-bankruptcy law).

[342] 11 U.S.C. § 1129(a)(10).

K&E 12473324.

within the meaning of section 101(31) of the Bankruptcy Code.[343]  Even a cursory review of relevant authority makes it clear that Class 1 members do not fall into any of the categories of "insiders."

169.    Section 1129(a)(10) of the Bankruptcy Code requires a plan to be accepted by at least one impaired class, but such an accepting Class may not contain an insider.[344] section 101(31)(B) of the Bankruptcy Code states that the term "insider" includes (if the debtor is a corporation):

> i.      director of the debtor;
>
> ii.     officer of the debtor;
>
> iii.    person in control of the debtor;
>
> iv.     partnership in which the debtor is a general partner;
>
> v.      general partner of the debtor; or
>
> vi.     relative of a general partner, director, officer, or person in control

of the debtor.[345]

170.    None of the entities in Class 1 are directors or officers of any of the Debtors, partnerships in which any of the Debtors are a general partner, a general partner of any of the Debtors, or a relative of a general partner, director, officer, or a relative of a person in control of any of the Debtors.  The final category—"a person in control of the debtor"[346]—deserves a closer

---

[343]  Beach Plaintiffs' Objection, at 13-15.  The IFL Objection and the Triple Net Objection also suggest the Prepetition Lenders may be "insiders," however, they adduce no proof or legal argument that this is the case.

[344]  See, 11 U.S.C. § 1129(a)(10).

[345]  11 U.S.C. § 101(31)(B).

[346]  11 U.S.C. § 101(31)(B)(iii).

K&E 12473324.

look because it is the heart of the requirement, and because such an analysis makes it quite clear that there is no "insider" in Class 1.

171.     An insider is one who has a sufficiently close relationship with the debtor that his or her conduct should be subject to closer scrutiny than those dealing at arm's length with the debtor.[347]  However, such a creditor would have to exert <u>control over</u> the debtor before gaining insider status.[348]  Additionally, determining whether the creditors has exerted control "must be made with the understanding that control over financial affairs may be an unavoidable circumstance attendant to many creditor-debtor relationships."[349]  As a result, "Courts have been reluctant to construe financial oversight-even intrusive financial oversight-as the control required to impose insider status.[350]  Courts will only consider lenders insiders when the bank exercises day-to-day control over the debtors' business operations.[351]  Monitoring the debtors and requiring frequent reports on the debtors receivables, invoices and operations, receiving all payment on receivables, or even having the power to endorse the debtors' checks does not render a lender an "insider."[352]

---

[347]  <u>See</u>, H.R. Rep. No. 95-595, at 25 (1978), reprinted in 1978 U.S.C.C.A.N. 5963, 6269; S.R. Rep. No. 95-989, at 24 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5810.

[348]  <u>In re Rosen Auto Leasing, Inc.</u>, 346 B.R. 798, 804 (8th Cir. B.A.P. 2006).

[349]  <u>In re Armstrong</u>, 231 B.R. 746, 749 (Bankr. E.D. Ark. 1999).

[350]  <u>Id.</u>

[351]  <u>Id.</u>

[352]  <u>Id.</u> (citing <u>Tidwell v. AmSouth Bank</u>, 102 B.R. 878 (Bankr. M.D. Ga. 1989))

K&E 12473324.

172.     The relationship of the Debtors' Prepetition Lenders to the Debtors is purely contractual and is governed by the terms of the Prepetition Credit Facility.[353]  The Prepetition Credit Facility was an arm's-length agreement negotiated and entered into in good faith, and no party has suggested otherwise.  Although some terms of the Prepetition Credit Facility restrict the Debtors' actions—the consideration in return for the lenders agreeing to lend to the Debtors—these contractual terms do not give the Debtors' Prepetition Lenders "control" over the Debtors, in the sense meant by section 101(31), i.e., that the lenders could control the Debtors in the conduct of their businesses.  Since the Prepetition Lenders' power over the Debtors only came from the remedies available under the Prepetition Credit Facility, none of the actions taken by the Prepetition Lenders exerted sufficient control to render the Prepetition Lenders' insiders.[354]

173.     Further, the Prepetition Lenders do not exercise day-to-day control over the Debtors, exercise managerial control or direct the debtors work performance.  Although the Prepetition Lenders are often briefed on the operations and financial health of the business, the Prepetition Lenders do not exercise operational control or control over ordinary business decisions.[355]  Therefore, it is clear, that the Lenders are not "insiders" as that term is defined in

---

[353] $600,000,000 Credit Agreement among SIRVA Worldwide, Inc., the Foreign Subsidiary Borrowers, the Several Lenders from Time to Time Parties Hereto, JPMorgan Chase Bank, as administrative agent, Banc of America Securities LLC, as syndication agent and Credit Suisse First Boston, Deutsche Bank Securities, Inc. and Goldman Sachs Credit Partners L.P. as documentation agents, dated December 1, 2003.

[354] In re M. Silverman Laces, Case No. 01-6209, 2002 WL 31412465, *5 (S.D.N.Y. Oct. 24, 2002). (citing Armstrong 231 B.R. at 749).

[355] Id.

the Bankruptcy Code.[356]  As a result, the Debtors' Prepetition Lenders do not fit into any of the statutory categories, and do not exert control over the Debtors, they are not "insiders" within the meaning of section 101(31) of the Bankruptcy Code, and the Beach Plaintiff's Objection should be overruled.

### N.    The Plan Is Feasible (Section 1129(a)(11))

174.    Section 1129(a)(11) of the Bankruptcy Code requires that the Bankruptcy Court find that the plan is feasible as a condition precedent to confirmation.   Specifically, the Bankruptcy Court must determine that:

> [c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.[357]

To demonstrate that a plan is feasible, it is not necessary that success be guaranteed.[358]  Rather, only a reasonable assurance of success is required.[359]   As demonstrated below, the Plan is feasible within the meaning of section 1129(a)(11) of the Bankruptcy Code.

---

[356]  In re Radnor Holdings Corp., 353 B.R. 820, 841 (Bankr. D. Del. 2006) (only where lenders exercise managerial control or direct work performance do they exert sufficient control to constitute an "insider"); In re Winstar Commc'ns, Inc., 348 B.R. 234, 279 (Bankr. D. Del. Dec. 21, 2005) (same).

[357]  11 U.S.C. § 1129(a)(11).

[358]  See Kane v. Johns-Manville Corp., 843 F.2d 636, 649 (2d Cir. 1988) ("[T]he feasibility standard is whether the plan offers a reasonable assurance of success. Success need not be guaranteed.").

[359]  See Texaco, 84 B.R. at 910; In re Prudential Energy Co., 58 B.R. 857, 862-63 (Bankr. S.D.N.Y. 1986); see also Briscoe Enters., 994 F.2d at 1166 ("Only a reasonable assurance of commercial viability is required"); Mercury Capital Corp. v. Milford Conn. Assocs., L.P., 354 B.R. 1, 9 (D. Conn. 2006) (A "'relatively low threshold of proof' will satisfy the feasibility requirement." (quoting In re Brotby, 303 B.R. 177, 191-92 (9th Cir. B.A.P. 2003))); In re Eddington Thread Mfg. Co., 181 B.R. 826, 832-33 (Bankr. E.D. Pa. 1995) (finding plan is feasible "so long as there is a reasonable prospect for success and a reasonable assurance that the proponents can comply with the terms of the plan"); In re Patrician St. Joseph Partners L.P., 169 B.R. 669, 674 (Bankr. D. Ariz. 1994) ("A plan meets the feasibility standard if the plan offers a reasonable prospect of success and is workable.").

K&E 12473324.

175.    In determining standards of feasibility, courts have identified the following probative factors:

- the prospective earnings of the business or its earning power;

- the soundness and adequacy of the capital structure and working capital for the business which the debtor will engage in post-confirmation;

- the prospective availability of credit;

- whether the debtor will have the ability to meet its requirements for capital expenditures;

- economic and market conditions;

- the ability of management, and the likelihood that the same management will continue; and

- any other related matter which determines the prospects of a sufficiently successful operation to enable performance of the provisions of the plan.[360]

176.    In the instant cases, the Plan is feasible. The Debtors have thoroughly analyzed their ability to meet their obligations under the Plan post-confirmation, and submit that confirmation is not likely to be followed by liquidation or the need for further reorganization..[361] The Debtors sought chapter 11 protection for a number of reasons including, but not limited to, their large debt burden, the decline in the U.S. housing market, and the general economic conditions. In aggregate, these factors resulted in a liquidity crisis for the Debtors. As of the Petition Date, the Debtors' outstanding debt obligations and the cash drain caused by debt service obligations were the principal factor that threatened the Debtors' ongoing viability even though they had a viable underlying business.

---

[360]  See, e.g., Worldcom, 2003 WL 23861928, at *58; Leslie Fay Cos., 207 B.R. at 789; Texaco, 84 B.R. at 910; Prudential Energy, 58 B.R. at 862-63; see also U.S. Truck, 800 F.2d at 589; In re Repurchase Corp., 332 B.R. 336, 342 (Bankr. N.D. Ill. 2005).

[361]  Stegenga Declaration, at ¶ 13.

### 1. The Debtors Have Used Chapter 11 to Create a Viable Capital Structure

177.    As part of the negotiations that led to the Plan and throughout the chapter 11 cases, the Debtors have focused their efforts on achieving a viable capital structure with cash flows sufficient to service outstanding debt, including the Exit Facility, and satisfy ongoing working capital needs.  The Debtors' restructuring efforts have included substantially reducing and restructuring their debt load, and rejecting unused leases.  The Debtors' capital structure on exit includes substantially reduced debt service obligations postpetition:  (a) LIBOR plus 6.5 percent (or base rate plus 5.5 percent) on $215 million in first lien debt (including a term loan facility of $85 million and a revolving credit facility of $130 million); and (b) LIBOR plus 6.0 percent (with a 10 percent floor) on $200 million in second lien debt, which is "payable-in-kind" ("PIK") for the first three years following the exit closing date, versus the prepetition debt of LIBOR plus 8.5 percent (or base rate plus 6.25 percent) on $511 million.[362]  The incremental reduction in debt substantially reduces debt service obligations by millions of dollars, and the Debtors' financial projections and current performance suggest they will be viable after emergence from chapter 11 protection.[363]    Indeed, the financial projections indicate the Reorganized Debtors will return to profitability in 2010.

### 2. The Debtors Secured Valuable Exit Financing

178.    During the negotiations before the Petition Date that resulted in the Plan, the DIP Lenders agreed to provide both DIP and exit financing.  The DIP financing will convert into a $215 million senior secured credit facility upon the Debtors' emergence (the "Exit Financing"),

---

[362]  See Restructuring Term Sheet, Exhibits B & C; definition of "Applicable Margin," DIP Credit Agreement, section 1.1.

[363]  Stegenga Declaration, at ¶ 17.

$130 million of which will be available for revolver borrowings and letters of credit. The Exit Financing is a critical piece of the Plan, and given the current state of the credit markets, it was vitally important to secure exit financing as soon as possible.[364]

179. The current market conditions have made it extremely difficult for debtors-in-possession to obtain exit financing, and substantial delay and litigation have occurred in other major cases on account of the current market turmoil even where those debtors have obtained exit financing.[365] In this case, however, there are substantial incentives for the lenders to cooperate with the Debtors because the DIP lenders will hold a significant portion of the New Common Stock after exiting from chapter 11. Indeed, it is doubtful that the terms of the Exit Financing would be as favorable, or whether the Debtors would be able to obtain exiting financing at all, absent this relationship. The Exit Financing has other significant benefits as well: it contemplates a second lien facility that has a PIK feature that reduces the cash drain on the Debtors and provides breathing space for the reorganized Debtors to complete ongoing operational restructuring after the exit from chapter 11. Additionally, the principal amount on the Exit Facility is substantially smaller than the Prepetition Credit Facility, thereby reducing the size of the interest payments and increasing the likelihood that the facility can be refinanced once the credit markets return to normal.

---

[364] See note 260, supra, citing articles discussing the recent difficulties in obtaining, or retaining, an exit financing commitment.

[365] See In re Solutia Inc., Case No. 08-01057 (Bankr. S.D.N.Y. Feb. 6, 2008) [Docket No. 1] (complaint filed against lender for refusing to close exit financing); see also In re Dura Auto. Sys., Inc., Case No. 06-11202 (KJC) (Mar. 18, 2008) [Docket No. 2974] (status report describing difficulties in exit financing); Equity Group Ends Plan to Help Delphi Exit Bankruptcy, N.Y. Times, Apr. 4, 2008 (discussing Delphi's difficulties in obtaining exit financing).

### 3. The Debtors' Financial Projections Have Been Scrutinized And Validated By Key Stakeholders And Independent Third Parties

180.    The Debtors' key stakeholders, the Prepetition Facility Claims holders, have scrutinized the Debtors' business plan and financial projections.  After initially presenting the business plan to the Steering Committee, the Debtors conducted in-depth due diligence meetings delving into the assumptions underlying the business plan.  Moreover, the Debtors have continually supplied the Steering Committee with relevant financial information throughout the Plan negotiation process and the pendency of these chapter 11 cases.  The Prepetition Facility Claims holders are undersecured and are the crucial stakeholders who are funding recoveries for the Class 4 claimants.  Additionally, the DIP/Exit Financing lenders are also holders of Prepetition Facility Claims.  Thus, they intensely examined and scrutinized the Plan, underlying business plan, and financial results.  Having conducted this due diligence, the significant constituents in these chapter 11 cases and ultimate owners of the Debtors were satisfied that the Debtors' EBITDA projections provide a reasonable basis for the Plan.

181.    The Reorganized Debtors' projected cash flows contained in the November 2007 business plan, comprehensively reviewed by the Debtors' DIP/Exit lenders, demonstrate the Reorganized Debtors' future viability.  Thus, the Debtors and the future owners believe that they will satisfy their obligations under the Plan and that confirmation will not be followed by the need for liquidation or further financial reorganization.  While no one suggests that the housing market—which substantially impacts the Debtors' prospects—is recovering, the Debtors' business plan and capital structure are sufficiently flexible to weather foreseeable downside scenarios.

182.    Accordingly, the Debtors submit that the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code.

K&E 12473324.

### O. The Plan Provides for the Payment of All Fees Under 28 U.S.C. § 1930

183.     Section 1129(a)(12) of the Bankruptcy Code requires the payment of all fees payable under 28 U.S.C. § 1930.[366]   Article XIII.C of the Plan provides that such fees will be paid for each quarter (including any fraction thereof) until these chapter 11 cases are converted, dismissed, or closed, whichever comes first.  Moreover, substantive consolidation will not affect the Debtors' obligation to pay such fees on a Debtor-by-Debtor basis.  The Plan, therefore, complies with section 1129(a)(12) of the Bankruptcy Code, and no party has suggested otherwise.

### P. The Plan Complies With Section 1129(a)(13) of the Bankruptcy Code

184.     Section 1129(a)(13) of the Bankruptcy Code requires that all retiree benefits continue to be paid post-confirmation at any levels established in accordance with section 1114 of the Bankruptcy Code.[367]   Article IV.O of the Plan provides that on or after the Effective Date of the Plan, the payment of all retiree benefits, as defined in section 1114 of the Bankruptcy Code, will continue to be paid in accordance with applicable law.  In light of the foregoing, the Plan satisfies the requirements of section 1129(a)(13) of the Bankruptcy Code, and no party has objected to the Plan's satisfaction of this requirement.

### Q. The Plan Satisfies The "Cram Down" Requirements

185.     Section 1129(a)(8) of the Bankruptcy Code requires that each Class of claims and interests either accept a plan or be unimpaired under the plan.[368]   As described above, the existence of Classes 5 and 7, which are deemed to have rejected the Plan, prevents the Plan from

---

[366]   11 U.S.C. § 1129(a)(12).

[367]   11 U.S.C. § 1129(a)(13).

[368]   11 U.S.C. § 1129(a)(8).

complying with section 1129(a)(8) of the Bankruptcy Code. Nonetheless, section 1129(b)(1) of the Bankruptcy Code provides that, if certain requirements are met, a plan shall be confirmed notwithstanding that section 1129(a)(8) is not satisfied with respect to one or more classes:

> [I]f all of the applicable requirements of … section [1129(a) of the Bankruptcy Code] other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each Class of claims or interests that is impaired under, and has not accepted, the plan.

11 U.S.C. § 1129(b)(1). Thus, to confirm a plan that has not been accepted by all impaired classes, the plan must show that "the plan does not discriminate unfairly" and is "fair and equitable" with respect to the non-accepting impaired classes.[369]

186.    As discussed below, the Debtors meet the "cram down" requirements in section 1129(b) of the Bankruptcy Code to confirm the Plan over Classes 5 and 7 rejection.

### 1.    The Plan Is Fair and Equitable With Respect to Impaired Classes That Have Not Voted to Accept the Plan.

187.    Sections 1129(b)(2)(B)(ii) and 1129(b)(2)(C)(ii) provide that a plan is fair and equitable with respect to a Class of impaired unsecured claims or interests if the plan provides that the holder of any claim or interest that is junior to the claims or interests of such Class will not receive or retain under the plan on account of such junior claim or interest any property.[370] This central tenet of bankruptcy law—the "absolute priority rule"—requires that if the holders of

---

[369]    See Boston Post, 21 F.3d at 480; In re Zenith Elecs. Corp., 241 B.R. 92, 105 (Bankr. D. Del 1999) (explaining that "[w]here a Class of creditors or shareholders has not accepted a plan of reorganization, the court shall nonetheless confirm the plan if it does not discriminate unfairly and is fair and equitable").

[370]    See 11 U.S.C. § 1129(b)(2)(B)(ii), (C)(ii). Section 1129(b)(2)(A), which sets forth the absolute priority rule as to secured claims, is not applicable here because the Plan leaves all holders of Other Secured Claims unimpaired.

claims in a particular Class receive less than full value for their claims, no holders of claims or interests in a junior Class may receive property under the plan.[371] The corollary of the absolute priority rule is that senior classes cannot receive more than a 100 percent recovery for their claims.

188.    The Plan satisfies the absolute priority rule with respect to all Claims and Interests.  No junior holder of a Claim or Interest will receive any distribution unless the holders of higher priority Claims receive the full value of their Claims or have consented to such treatment.  The Plan provides that holders of Other Secured Claims and Priority Claims will be paid in full in cash.  Holders of General Unsecured Claims and Equity Interests receive nothing under the Plan.  Further, no claims or interests junior to either the General Unsecured Claims or the Equity Interests receive any distributions under the Plan.  Additionally, no party has questioned the fact that secured creditors are not receiving more than – and, in fact, are receiving hundred of millions of dollars less than – 100 cents on the dollar.  Accordingly, the Plan satisfies the requirements of sections 1129(b)(2)(B)(ii) and 1129(b)(2)(C)(ii) for all Classes of Claims and Interests and, therefore, is fair and equitable.

### 2.    Objections Premised on the Absolute Priority Rule are Misplaced

189.    The Committee and various objectors argue that the Debtors' Plan fails to satisfy the absolute priority rule established by section 1129(b) because the Plan leaves Intercompany Interests unimpaired.  Under this view, leaving such Interests unimpaired improperly distributes

---

[371] See 203 N. LaSalle St. P'ship, 526 U.S. at 441-42 ("As to a dissenting Class of impaired unsecured creditors, such a plan may be found to be 'fair and equitable' only if the allowed value of the claim is to be paid in full, 11 U.S.C. § 1129(b)(2)(B)(i), or, in the alternative, if 'the holder of any claim or interest that is junior to the claims of such [impaired unsecured] Class will not receive or retain under the plan on account of such junior claim or interest any property,' § 1129(b)(2)(B)(ii).  That latter condition is the core of what is known as the 'absolute priority rule.'").

"value" to equity in a reorganization where certain unsecured creditors do not receive payment in full.[372]   In effect, these objections raise issues of corporate structure as an absolute bar to confirmation.

190.   These objections lack merit.   The Debtors' Plan provides that the Debtors' secured lenders will own all of the equity in the parent company of the Reorganized Debtors. Indeed, the Prepetition Lenders have liens on the assets of each of the material subsidiaries and are entitled to the equity of the reorganized subsidiaries which it, in effect, is gifting back to each of the parents up and down the corporate ownership change.   As owners of the corporate parent, the secured lenders are the effective owners of the Intercompany Interests as well.   The Plan reinstates Intercompany Interests to implement the substantive transfer of ownership contemplated by the Plan and to avoid the unnecessary and potentially destructive burdens created by the elimination of the Reorganized Debtors' existing corporate structure.   The value through which the Debtors can provide full recoveries to approximately 96 percent of unsecured claims derives from the Debtors' value as an intact business—not through the balkanization of the Debtors into sixty different entities.[373]   The Debtors' Intercompany Interests are effectively worthless as between the individual Debtor entities since, on a deconsolidated basis, equity would receive no recovery.   Leaving Intercompany Interests unimpaired provides no distribution or benefit for that matter that would have or should have been flowing to holders of Class 5 Claims.   No class of junior interest holders is receiving any distribution in violation of section 1129.

---

[372]   The Debtors note, again, that the overwhelming majority of their unsecured creditors will be paid in full under the Plan.

[373]   See 203 N. LaSalle St. P'ship, 526 U.S. at 453 (identifying the two policies of chapter 11 as "preserving going concerns and maximizing property available to satisfy creditors").

191.    But, under the objectors' view, the Debtors should be compelled to cancel all intercompany interests and re-issue separate shares of stock in sixty different entities in order to confirm their Plan.  The only effect of such a requirement would be to then oblige shareholders in the Reorganized Debtors to re-create a corporate structure from scratch.  Such a hypertechnical and formalistic reading of section 1129(b) is inappropriate and entirely unjustified, especially in light of the lack of any distributions to, or retention of value for the Intercompany Interests.  "[B]ankruptcy courts have exercised [their] equitable powers in passing on a wide range of problems arising out of the administration of bankrupt estates. . . . [S]ubstance will not give way to form . . . technical considerations will not prevent substantial justice from being done."[374]   In fact, intercompany interests are routinely preserved through confirmation of complex chapter 11 cases under section 1129(b) where, by definition, certain unsecured claims are not paid in full.[375]   Thus, the reinstatement of Intercompany Interests is no bar to confirmation of the Debtors' Plan.

### 3.    The Plan Does Not Unfairly Discriminate Against Classes 5 and 7

192.    The Plan also does not discriminate unfairly with respect to impaired Classes that have rejected the Plan.  The Plan provides that creditors with claims that relate to ongoing operations of the Debtors (Class 4) receive substantially higher recoveries than those creditors with claims in Class 5, the vast majority of which never had any business relationship with the Debtors, even though both Classes are general unsecured creditors.  Specifically, the Plan does

---

[374]   See Pepper v. Litton, 308 U.S. 295, 305 (1939) (Douglas, J.).

[375]   See, e.g., In re Movie Gallery, Inc., Case No. 07-33849 (Bankr. E.D. Va. Apr. 10, 2008) (confirming plan under section 1129(b) while reinstating intercompany interests); In re Delphi Corp., Case No. 05-44481 (Bankr. S.D.N.Y. Jan. 25, 2008) (confirming plan under section 1129(b) while leaving interests in affiliated debtors unimpaired); In re Calpine Corp., Case No. 05-60200 (Bankr. S.D.N.Y. Dec. 19, 2007) (confirming plan under section 1129(b) leaving intercompany interests unimpaired).

K&E 12473324.

not unfairly discriminate against Class 5 Claims because of two well settled legal doctrines: (a) the recoveries to Class 4 under the Plan are a "gift" from the Prepetition Lenders' recoveries under the Plan; and (b) the Debtors have a legitimate business reason to treat the Class 4 Claims differently than those held by Class 5 Claims because Class 4 claims are related to the Debtors' ongoing operations and provide value to the Debtors going concern while the Class 5 Claims would contribute nothing whatsoever to the going forward operations of the Debtors.[376]

        **a.**      **The Disparate Treatment Between Class 4 and Class 5 is not "Unfair Discrimination" Because Recoveries Received by Class 4 are a "Gift" from the Prepetition Lenders**

193.    First and foremost, the recoveries for Class 4 are provided as a "gift" from the Prepetition Lenders' collateral.[377]  Currently, the outstanding obligations under the DIP Facility exceed the maximum "unencumbered" collateral the Committee insists exists.  Further, all of the cash in the Debtors' deposit accounts has turned over repeatedly since the Petition Date in the ordinary course of business.  As a result, the Prepetition Lenders now have liens on all the Debtors' cash pursuant to the Final DIP order's adequate protection provisions.  It is clear that any distributions to Class 4 are from the Prepetition Lenders' collateral.  The Class 4 Claims are being paid in cash and the only source of cash is subject to the Prepetition Lenders' liens (the deposit accounts are subject to the Prepetition Lenders' liens under the Final DIP Order) or will be provided by the Exit Facility.  Further, providing recoveries to the Class 5 Claims would

---

[376] See Section IV.A.1.a, supra.

[377] Plan, Art. III.B.4

K&E 12473324.

require a substantial upsizing of the Exit Facility, an accommodation the Exit Facility Lenders are unwilling to make.[378]

194.    Absent the Prepetition Lenders' consent, the unsecured creditors in Class 4 and Class 5 would not be entitled to any recovery under the Bankruptcy Code.  This is because the Debtors' going concern value of $314 million is substantially less than the $514 million owed in Prepetition Facility Claims.  Additionally, the Prepetition Lenders have liens on substantially all of the Debtors' assets and equity due to prepetition security interests and adequate protection liens granted pursuant to the Final DIP Order.[379]  LaSalle National Bank also has a superpriority administrative expense claim for all amounts that were advanced to the Debtors postpetition under the LaSalle receivables program of approximately $19.5 million.[380]  This Claim would have to be paid before any recoveries could be allocated to the unsecured creditors.

195.    Bankruptcy Code section 1129(b)(2)(A) requires the Debtors, absent consent, to pay the secured Prepetition Facility Claims in full, in deferred cash payments or the indubitable equivalent, before any recovery could flow to the unsecured creditors.  Pursuant to the Plan, however, the Prepetition Lenders have agreed to fund a full recovery to those creditors in Class 4[381] and to take stock in the Debtors instead of a cash recovery.  Thus, the Plan is premised on the Prepetition Lenders "gifting" a portion of their recovery to Class 4.  This superpriority

---

[378]  Stegenga Declaration at ¶ 16.

[379]  Final Order Under 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and Fed. R. Bankr. P. 2002, 4001 and 9014 (I) Authorizing Debtors to Obtain Postpetition Financing, (II) Authorizing Debtors to Use Cash Collateral, and (III) Granting Adequate Protection to Prepetition Secured Parties [Docket No. 188].

[380]  See Order (I) Authorizing Certain Debtors to Continue Performing Under the Receivables Purchase Program and (II) Granting Related Relief dated February 5, 2008 [Docket No. 59] at ¶ 13.

[381]  The creditors in Class 4 constitute the vast majority of all unsecured creditors.

K&E 12473324.

administrative expense claim, along with all other administrative expense claims would have to be paid in full before any recovery can flow to the Class 5 Claims.

196.    Courts have recognized that "[c]reditors are generally free to do whatever they wish with the bankruptcy dividends they receive, including sharing them with other creditors, so long as recoveries received under the Plan are not impacted."[382]  Gifting is based on the concept that creditors sharing their recoveries are not distributing the Debtors' property and instead are simply engaging in transactions among themselves.[383]  Thus, those distributions do not cause the plan to "unfairly discriminate" or distribute property in violation of the Bankruptcy Code's distribution scheme because they simply reflect a creditor's decision to reallocate their property.[384]  Indeed, these payments are simply carve-outs from the senior secured lenders' liens and courts recognize that secured lenders "ha[ve] a substantive right to dispose of its property, including the right to share the proceeds subject to its lien with other classes."[385]  It is logical that the Prepetition Lenders, as owners of the reorganized Debtors, would wish to preserve valuable business relationships by providing full recoveries to creditors who likely will have a continued business relationship with the Debtors.  Further, it is also logical that the Prepetition Lenders would not wish to provide recoveries to creditors they believe, based on input received from the

---

[382]  Worldcom, 2003 WL 23861928; see also In re SPM Mfg. Corp., 984 F.2d 1305, 1313 (1st Cir. 1993); In re MCorp Fin., Inc., 160 B.R. 941 (S.D. Tex. 1993); In re Teligent, Inc., 282 B.R. 765 (Bankr. S.D.N.Y. 2002); In re Nuclear Imaging, 270 B.R. 365 (Bankr. E.D. Pa. 2001); In re Genesis Health Ventures, Inc., 266 B.R. 591 (Bankr. D. Del. 2001); In re White Glove, Inc., Case No. 98-12493, 1998 WL 731611 (Bankr. E.D. Pa. Oct. 14, 1998); In re Parke Imperial Canton, Ltd., Case No. 93-61004, 1994 WL 842777 (Bankr. N.D. Ohio Nov. 14, 1994).

[383]  Worldcom, 2003 WL 23861928, at *61.

[384]  In re Armstrong World Indus., 320 B.R. 538-39 (Bankr. D. Del. 2005).

[385]  Id.

Debtors, will not provide any value to the reorganized Debtors. Thus, it is plain why the Prepetition Lenders have decided to give a portion of their recoveries in the manner described in the Plan. Gifts need not be motivated by altruism to be gifts.

197. Here the unsecured Claims in Class 4 and Class 5 would be entitled to receive absolutely nothing due to the absolute priority rule absent the gifts from the Prepetition Lenders.[386] It is clear, therefore, that the gifts to Class 4 Claims are simply the Prepetition Lenders' allocating their dividends under the Plan as they see fit. Reallocating plan dividends through the plan of reorganization is generally accepted and does not constitute unfair discrimination because the reallocated dividends are merely a carve out of the senior secured creditors' liens and do not constitute estate property.[387] Two cases in particular, Genesis Health and Worldcom,[388] have addressed the issue of whether senior secured creditors may reallocate their dividends through a plan of reorganization to a subset or Class of unsecured creditors without violating the unfair discrimination requirements of 1129(b)(2).[389]

198. Genesis Health, a case with facts and legal issues directly addressing the issues in this case, involved a plan of reorganization where there were two separate substantively consolidated groups of debtors. The prepetition senior secured lenders were undersecured and,

---

[386] See Disclosure Statement, Exhibit B.

[387] See In re Exide Techs., 303 B.R. 48, 77-78 (Bankr. D. Del. 2003) ("Although SPM was not decided in the context of a chapter 11 plan, court subsequently have approved chapter 11 plans that included such reallocations.")

[388] See also In re MCorp Fin., Inc., 160 B.R. 941, 960 (Bankr. S.D. Tex. 1993) (holding that unsecured creditors could "gift" a portion of their recoveries to other classes through a plan of reorganization without causing unfair discrimination)00.

[389] Worldcom and Genesis Health build off of the substantial line of cases that address "gifting" in the chapter 11 context. The seminal "gifting" case is In re SPM Mfg. Corp., 984 F.2d 1305, 1313 (1st Cir. 1993).

pursuant to the absolute priority rule, were entitled to payment in full before any recoveries could flow to the unsecured creditors. However, the senior secured lenders agreed, through the plan of reorganization, to allow certain unsecured creditors a recovery of common stock and warrants.[390] Other unsecured creditors with claims that would add no value to the estate going forward (i.e., certain damage claims) would receive nothing and were deemed to reject the plan, precisely the construct embedded in the Debtors' Plan.[391] The Genesis Health court again held that the plan did not unfairly discriminate because the senior secured lender was simply sharing its recovery with the unsecured claims that were receiving distributions under the plan.[392] Indeed, the court held that "[t]he disparate treatment between Classes G4 and G7 and Classes M4 and M7 is a permissible allocation by the secured creditors of a portion of the distribution to which they would otherwise be entitled, rather than unfair discrimination against Classes G7 and M7 by the proponents of the plan."[393] This makes clear that allocations of the senior secured creditors' recovery to other classes does not constitute unfair discrimination even when it occurs through a plan of reorganization and applies to classes as a whole.

199. Genesis Health was recently reaffirmed by In re World Health Alternatives.[394] (both Genesis and World Health were somehow missed by the Committee). The World Health court approved a settlement between the senior secured lender and the Committee that carved out $1.625 million from the senior secured lenders' liens for the unsecured creditors' benefit,

---

[390] Genesis Health, 266 B.R. at 598.

[391] Id.

[392] Id. at 611-12.

[393] Id. at 299 (citation omitted).

[394] 344 B.R. 291 (Bankr. D. Del. 2006).

skipping over priority creditors. The United States Trustee objected, as does the Committee here, claiming that the settlement violated the absolute priority rule and the Bankruptcy Code's distribution scheme. The <u>World Health</u> court rejected this argument, holding that: "Such a carve out does not offend the absolute priority rule or the Bankruptcy Code's distribution scheme [<u>i.e.</u> it does not constitute unfair discrimination] because the property <u>belongs to the secured creditor-not the estate</u>."[395] Further, the <u>World Health</u> court specifically held that senior secured creditors decisions to share their distributions with certain junior creditors "are valid carve outs that allow the secured creditor to give up a portion of its lien for the benefit of junior creditors without violating the provisions of the Bankruptcy Code."[396] This makes clear that "gifting" from senior secured creditors to junior creditors violates neither the unfair discrimination requirement nor the absolute priority rule.

200.    Courts in this district followed the reasoning of <u>Genesis Health</u> in <u>Worldcom</u>. <u>Worldcom</u> approved a plan of reorganization where the senior secured lenders allocated a portion of their recoveries to members of a bondholder committee that had been active participants in the chapter 11 cases through the plan of reorganization.[397] Bondholders received a set percentage of cash and stock and were classified in Class 6. The members of an ad hoc committee of bondholders were classified in Class 6A.[398] Class 6A received a recovery that was above what the other members of the bondholder Class in Class 6 received under the plan.[399] As

---

[395]    <u>Id.</u> (citing <u>SPM</u>, 984 F.2d at 1313; <u>MCorp</u>, 160 B.R. at 960; <u>Genesis Health</u>, 266 B.R. at 602.)

[396]    <u>Id.</u>

[397]    <u>Worldcom</u>, 2003 WL 23861928, at *61.

[398]    <u>Id.</u>

[399]    <u>Id.</u>

K&E 12473324.

a result, Courts in this district <u>approved a higher recovery for a subset of a Class than the</u> <u>Class as a whole received</u>.  If a plan can discriminate within a Class without violating the Bankruptcy Code based on gifting, then it is certainly not unfair discrimination to provide one Class with a higher recovery than other through gifting.  Courts in this district have held that, because the additional recoveries came from the senior secured lenders and did not affect the recoveries of other parties under the Plan, the distributions did not violate the unfair discrimination requirement because they did not distribute estate property.[400]  Further, this Court recognized that gifts can be made either to a Class as a whole, or to a subset of a class.[401]  In other words, 100 percent of the "gift proceeds" went to a select group of creditors of equal priority.  Further, this Court specifically relied on the <u>Genesis Health</u> case, discussed above, in reaching its conclusion that the gifting of proceeds did not constitute unfair discrimination.[402]

201.    These decisions are well reasoned and are based on a simple fact: distributions under a plan of reorganization are not property of the estate and creditors are free to reallocate their dividends as they see fit, including reallocations to other creditors.  This concept benefits the reorganization process because senior secured creditors are often willing to share recoveries with other classes in order to facilitate the reorganization and preserve going concern value.  If "gifting" was prohibited, senior secured creditors would either be forced to subsidize certain unsecured creditors who would provide no further benefit to the estate after the reorganization was completed, or would be perversely incentivized to engage in extensive litigation because

---

[400] <u>Id.</u>  The <u>Worldcom</u> court also recognized that, because the distributions were not estate property, the absolute priority rule did not apply to "gifts" from other creditors.

[401] <u>Id.</u> (citing <u>White Glove</u>, 1998 WL 731611; <u>In re Parke Imperial Center</u>, 1994 WL 842777).

[402] <u>Id.</u> at *61.

K&E 12473324.

their settlement opportunities would be restricted.[403]  Either result would be contrary to the Bankruptcy Code's underlying goal of encouraging settlements and consensual plans of reorganization.

202.    The Prepetition Lenders in this case decided it was more beneficial to pay the vast majority of all unsecured creditors in these chapter 11 cases and forgo the protections of the absolute priority rule.  Although this decision was obviously intended to preserve going concern value for the Prepetition Lenders as the Debtors' stockholders after the Debtors' emerge from chapter 11, the benefits to the vast majority of the unsecured creditors should not be ignored. The end result is that the unsecured creditors in Class 4 are infinitely better off than they would have been absent the Prepetition Lender's "gift" and if a plan of reorganization had been proposed that strictly followed the absolute priority rule.

203.    The propriety of the transactions contemplated by the Plan becomes clear when they are compared to what could occur in the analogous situation of a sale of substantially all the assets of the Debtors through a plan of reorganization.  In a sale, the purchasers would be entitled to choose which liabilities to assume and which to leave behind.  The end result would be the

---

[403] Not all courts have unreservedly embraced "gifting."  See Snyders Drug, 307 B.R. at 895–96; In re Sentry Operating Co. of Tex., Inc., 264 B.R. 850 (Bankr. S.D. Tex. 2001).  Synders Drug, however, is distinguishable because it involved a situation where the "gift" to junior unsecured classes included avoidance actions, which are undeniably part of the debtors' estates.  The bankruptcy court held that where a reallocation includes avoidance actions gifting does not apply because the senior secured lenders were attempting to "gift" something that was not theirs.  This is an unexceptional position and it is factually distinct from the issues in this case where the cash distributed to the Class 4 Claims comes from the Prepetition Lenders' recovery by definition, since no preference actions have resulted in a recovery (or even been brought).  Further, to the extent these cases are not distinguishable, the Debtors aver that these courts miss the point: the entire purpose of gifting is that creditors are entitled to do what they wish with their recoveries.  Further, gifting requires the consent of the creditor Class that is giving up a portion of its recovery, which provides a substantial buffer against abuse.  This is especially true in this case, where substantially all of the Debtors' assets are encumbered and the Prepetition Lenders are undersecured, because, absent the Prepetition Lenders' consent, the unsecured creditors would not have been entitled to any recovery at all.  Hence, the Class 5 claimants' arguments about "unfair discrimination" are better labeled "misery loves company."

same as under the Plan: the Class 4 Claims holders would have their liabilities assumed and paid in full in cash, and the Class 5 Claims holders would not receive any recovery. The fact that this arrangement is structured as a recapitalization under the Plan instead of a section 363 sale taking place through a plan of reorganization does not render the difference in treatment between Class 4 and Class 5 Claims unfair discrimination. The only parties harmed by the disparate treatment, the Prepetition Lenders, have consented and are entitled to take such actions. As a result, the Plan does not unfairly discriminate against Class 5 and should be approved.

### b. There are Legitimate Business Reasons to Discriminate Between Class 4 and Class 5

204. The Bankruptcy Code does not provide a standard for determining when "unfair discrimination" exists.[404] Rather, courts typically examine the facts and circumstances of the particular case to determine whether unfair discrimination exists.[405] Generally, courts examine whether the proposed classification has a reasonable basis in determining whether a plan of reorganization "unfairly discriminates" against a Class of creditors.[406] Debtors have "significant flexibility" in classifying claims of trade creditors separately from claims of creditors who no longer have a business relationship with the Debtors as long as the separate classification is not

---

[404] See 203 N. LaSalle St. P'ship, 190 B.R. at 585 (noting "the lack of any clear standard for determining the fairness of a discrimination in the treatment of classes under a chapter 11 plan" and that "the limits of fairness in this context have not been established").

[405] See In re Johns-Manville Corp., 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986) ("The language and legislative history of the statute provides little guidance in applying the 'unfair discrimination' standard."); see, e.g., In re Freymiller Trucking, Inc., 190 B.R. 913, 916 (Bankr. W.D. Okla. 1996) (holding that a determination of unfair discrimination requires a court to "consider all aspects of the case and the totality of all the circumstances"); In re Aztec Co., 107 B.R. 585, 589 (Bankr. M.D. Tenn. 1989) (noting that courts "have recognized the need to consider the facts and circumstances of each case to give meaning to the proscription against unfair discrimination").

[406] See Adelphia, 368 B.R. at 247.

intended to gerrymander voting on the plan.[407]  Although courts have propagated a variety of tests to determine if unfair discrimination exists, courts in the Southern District of New York have consistently applied a four part test (the "Buttonwood" test): (a) is there a reasonable basis for the discrimination; (b) could the Debtor consummate the proposed plan without the discrimination; (c) is the discrimination proposed in good faith; and (d) the degree of discrimination is proportional to its rationale.[408]

205.  <u>First</u>, as discussed above, the Class 4 Claims are those that relate to the Debtors' ongoing operations, the vast majority of the Class 4 Claims are critical to the Reorganized Debtors' success because they are related to the Debtors' customers and agents.[409]  Class 5 consists of Claims that have little or no relationship to the Debtors' operations and do provide minimal net value.  It has long been recognized that the payment of higher recoveries to claims who will continue to do business with the Debtors post-emergence does constitute not unfair discrimination.[410]  Indeed, courts often approve plans of reorganization with wide disparities in

---

[407]  <u>See</u> <u>In re Quigley Co., Inc.</u>, 377 B.R. 110, 116 (Bankr. S.D.N.Y. 2007) (holding that a plan proponent has "significant flexibility" in classifying substantially similar claims separately where there is a reasonable basis behind the classification scheme) (citing <u>In re Drexel Burnham Lambert</u>, 138 B.R. at 757).

[408]  <u>In re Buttonwood Partners, Ltd.</u>, 111 B.R. 57, 63 (Bankr. S.D.N.Y. 1990); <u>In re Ambanc La Mesa Ltd. P'ship</u>, 115 F.3d 650 (9th Cir. 1997), <u>cert. denied</u>, 522 U.S. 1110 (1998), <u>In re Rochem, Ltd.</u>, 58 B.R. 641 (Bankr. D.N.J. 1985); <u>see also</u> <u>Worldcom</u>, 2003 WL 23861928, at *59.

[409]  The prime example of these creditors are the employees of the Debtors' customers.  To leave those creditors unpaid would cause a devastating loss of confidence in the Debtors' ability to carry out their obligations to their customers and probably cause a mass migration of customers to the Debtors' competitors.  Affidavit of Douglas V. Gathany, Senior Vice President and Treasurer of DJK Residential LLC, in Support of First Day Motions and Pursuant to Local Bankruptcy Rule 1007-2 [Docket No. 2] at 66–67.

[410]  <u>203 N. Lasalle St. P'ship</u>, 126 F.3d at 969 (noting differences in recoveries between trade creditors and deficiency judgment does not constitute unfair discrimination); <u>Jersey City</u>, 817 F.2d at 1062 (same); <u>U.S. Truck</u>, 800 F.2d at 587 (accepting the separate classification of creditor that had "a different stake in the future viability of the reorganized company" as supported by a legitimate business justification); <u>Snyders Drug</u>, 307 B.R. at 893-94 (classification of lease rejection claims proper where debtor was not going to have a postpetition relationship with lessors); <u>In re Graphic Commc'ns, Inc.</u>, 200 B.R. 143, 147 (Bankr. E.D. Mich. 1996) (there

(Continued…)

recovery between claims where payment would provide a benefit to the going-concern value of the reorganized entities.[411]  The rationale is that because certain creditors provide benefits to the reorganized debtors going forward, it is often necessary to provide those creditors with enhanced recoveries to preserve business relationships and goodwill.  Indeed, the Seventh Circuit held in 203 N. LaSalle St. Partnership that as long as a claim receives more under a plan of reorganization than it would in a chapter 7 liquidation, there is no unfair discrimination, even if another claim receives payment in full.[412]  Since it is clear that the Class 5 Claims would not receive any recovery in a chapter 7 liquidation, the Plan does not unfairly discriminate against Class 5 Claims.

206.  Second, it would be impossible to consummate the Plan without the proposed difference in treatment between Class 4 and Class 5.  The Prepetition Lenders, who are funding the entire recovery for Class 4, have refused to provide additional funding for creditors in Class 5, because they add nothing to the Debtors' going concern value.  Indeed, the Class 5 Claims could be in the hundreds of millions of dollars.  The Prepetition Lenders should not (and need not) be required to pay (and thereby subordinate themselves to) Claims in excess of the reorganized Debtors' value where the Debtors have determined, in the good faith exercise of their business judgment, that none of the Class 5 Claims will provide any value to the

---

was a rational business reason for separate classification of creditor's claim where it was " not necessary that the debtor remain in good standing with [the creditor] in order to continue operations")

[411]  203 N. Lasalle St. P'ship, 126 F.3d at 969 (100 percent recovery for trade claimants and 16 percent recovery for bank deficiency justified where it would be more than the bank would receive in chapter 7); Jersey Med. Ctr., 817 F.2d at 1057 (100 percent recovery for physicians and 30 percent recovery for all other claimants, including medical malpractice litigants is not unfair discrimination); In re Kliegl Bros. Univ. Elec. Stage Lighting Co. Inc., 149 B.R. 306, 307 (Bankr. E.D.N.Y. 1992) (75 percent recovery for Union creditors and 15 percent recovery for general unsecured justified).

[412]  203 N. LaSalle St. P'ship, 126 F.3d at 969 overruled on other grounds Bank of Am. Nat. Trust and Sav. Ass'n v 203 N. LaSalle St. P'ship, 119 S.Ct. 1411 (1999).

reorganized Debtors if satisfied. Thus, the difference in treatment between Class 4 and Class 5 is required for the consummation of the Plan.

207.     _Third_, the discrimination is proposed in good faith because the discrimination has a legitimate reason and is necessary to consummate the Plan. _Fourth_, the discrimination is directly related to the benefit the creditors are providing to the Debtors: those that are providing benefits are paid in full, and those that do not provide any benefit to the going concern value of the Debtors receive nothing under the Plan.

208.     Further, there has already been a "market test" of which creditors provide benefits for the Debtors: the Prepetition Lenders' decision whether to fund such creditors' recoveries under the Plan. As discussed above, the Prepetition Lenders have substantial incentive to provide those Claims that contribute value to the reorganized Debtors with recoveries; since the Prepetition Lenders have declined to fund recoveries for Class 5 Claims, it is logical that they provide no benefits to the Debtors. Since the four factors of the Buttonwood test have been met, even ignoring the fact that the recoveries for Class 4 constitutes a "gift" under the SPM lines of cases, the differing treatment between Class 4 and Class 5 does not rise to the level of unfair discrimination and satisfies the requirements of 1129(b)(1). As is the case with section 1122 the gifting doctrine renders "unfair discrimination" largely irrelevant.

K&E 12473324.

### 4. The Objections Asserting the Plan Unfairly Discriminates Should be Overruled

#### a. The Committee's Objection to Gifting is Without Merit

##### (1) The Committee Objection Fails to Address the Relevant Caselaw

209.    First and foremost, the Committee's objection does not address <u>Genesis Health</u> or <u>Worldcom</u>.[413]  Since the facts and legal issues here are identical to those addressed in <u>Genesis Health</u> and <u>Worldcom</u>, this is a omission.  This is especially confusing since the Committee cites <u>Worldcom</u> for the unfair discrimination test, but does not address the court's decision on gifting.  Additionally, despite the fact that <u>Genesis Health</u> directly addresses the "Markell Test" relied on by the Committee[414] and held it satisfied where the proposed plan contemplates "gifting,"[415] again the Committee's Objection does not address it.  Indeed, the <u>Genesis Health</u> court held that under the Markell Test:

> [T]he presumption that the plan is therefore unfairly discriminatory is rebutted. As noted above, the recovery by Classes G4 and M4 of a dividend in the form of New Common Stock and Warrants is based on the agreement of the Senior Lenders to allocate a portion of the value they would have otherwise received to Classes G4 and G5. The disparate treatment between Classes G4 and G7 and Classes M4 and M7 is a permissible allocation by the secured creditors of a portion of the distribution to which they would otherwise be entitled, rather than unfair discrimination against Classes G7 and M7 by the proponents of the plan.

The only logical conclusion can be drawn from this failure to address the relevant cases it that the Committee has no response and has conceded that <u>Genesis Health</u> and <u>Worldcom</u> are fatal to their objection.

---

[413]  Creditors' Committee Objection, at 42-47.

[414]  <u>Id.</u> at 36-37.

[415]  <u>Genesis Health</u>, 266 B.R. at 612.

210.     Instead of addressing the relevant cases, the Committee's Objection relies heavily

on: In re Armstrong World Industries,[416] in arguing that the Plan unfairly discriminates against

Class 5 Claims and that this Court should disapprove of gifting.  Even a cursory review of

Armstrong is legally and factually inapposite and does not provide a basis for holding that the

Plan unfairly discriminates against Class 5 Claims.  Further, Armstrong, on its own terms, is

irrelevant in any manner whatsoever to these proceedings.

211.     Armstrong involved a plan of reorganization that separated unsecured creditors

into two classes: (a) general unsecured claims and (b) asbestos personal injury claims.[417]  In the

event that the general unsecured claims voted against the plan, warrants to purchase stock in the

reorganized debtors granted to the asbestos personal injury claims under the plan were

transferred to the holders of equity interests.[418]  The general unsecured claims voted against the

plan of reorganization and the creditors' committee objected to the plan of reorganization

asserting the purported transfer of the warrants from the asbestos personal injury claimants to the

holders of the equity interests violated the absolute priority rule by providing a recovery to a

Class junior to the general unsecured creditors.[419]

212.     First and foremost, Armstrong is irrelevant because it does not address unfair

discrimination.    Instead, the Armstrong court analyzed whether an automatic, involuntary

transfer from a creditor Class based on another classes' voting behavior violated the absolute

---

[416]  432 F.3d 507 (3d Cir. 2005).

[417]  Id. at 509.

[418]  Id.

[419]  Id. at 510.

K&E 12473324.

<u>priority rule</u>.[420]   That issue has nothing whatsoever to do with the disparate treatment of Class 4 and Class 5 claimants who are of <u>equal</u> <u>priority</u>.   <u>Second</u>, <u>Armstrong</u> involved an involuntary transfer of an unsecured recovery from one unsecured Class to another as a consequence of how one voted, <u>i.e.</u>, a class-punishing deathtrap provision and is the polar opposite of a wholly voluntary "gift" from a senior secured creditor, as is the case in <u>Genesis Health</u>, <u>Worldcom</u> and under the Plan.[421]   Third, the <u>Armstrong</u> court itself specifically distinguished, but did not overrule, the <u>Genesis Health</u> line of cases — which the Committee inexplicably fails to mention at all — because "<u>Genesis Health</u> involved property subject to the senior creditors' liens that was "carved out" for the junior claimants."[422]   Again, this is a telling omission.

213.   The fact that <u>Armstrong</u> distinguished, instead of overruling, <u>Genesis Health</u> is especially important because <u>Genesis Health</u> approved the distribution by the senior secured lenders of warrants to holders of equity interests despite the fact that certain unsecured claims were receiving nothing under the plan, arguably a violation of the absolute priority rule.[423]   Thus, the <u>Armstrong</u> court makes clear that a senior secured creditors' "gift" of recoveries implicates neither the prohibition on unfair discrimination nor the absolute priority rule by distinguishing <u>Genesis Health</u>, instead of overruling it.   Of course, this case does not involve a class-skipping gift, and the concomitant absolute priority issues whatsoever and is therefore even further afield from Armstrong—the case in which the Committee places all of its chips.   Therefore, <u>Armstrong</u> is factually and legally irrelevant to the Plan's treatment of Class 5 Claims because the factual

---

[420]   <u>Id.</u> at 513-14.

[421]   <u>Id.</u> at 514.

[422]   <u>Id.</u>; <u>Armstrong World Indus.</u>, 320 B.R. at 539.

[423]   <u>Armstrong</u>, 320 B.R. at 539.

K&E 12473324.

and legal basis of the Plan is essentially identical to the plan of reorganized approved in <u>Genesis Health</u>.

214.    The caselaw since <u>Armstrong</u> was decided has made it clear — except to the Committee apparently — that <u>Armstrong</u> does not apply where a senior secured creditor is "gifting" a portion of its recovery.  The <u>World Health Alternatives</u> court specifically held the <u>Genesis Health</u> line of cases survived <u>Armstrong</u>:

> The Third Circuit in Armstrong characterized the <u>Genesis</u> court as allowing a secured creditor to "(1) give up a portion of their proceeds under the reorganization plan to holders of unsecured and subordinated claims, without including holders of punitive damages claims in the arrangement, and (2) allocate part of their value under the plan to the debtor's officers and directors as an employment incentive package." <u>Id.</u> Armstrong then distinguished this arrangement as an ordinary carve out of the senior creditors' liens for the junior claimants' benefit. <u>Id.</u> <u>Such a carve out does not offend the absolute priority rule or the Bankruptcy Code's distribution scheme because the property belongs to the secured creditor-not the estate</u>. <u>See</u> <u>id.</u> Likewise, the Armstrong District Court, whose reasoning the Third Circuit adopted, also acknowledged the propriety of an ordinary carve out and the correctness of <u>SPM</u>: "the secured lender in <u>SPM</u> had a substantive right to dispose of its property, including the right to share the proceeds subject to its lien with other classes." <u>In re Armstrong World Indus., Inc.</u>, 320 B.R. 523, 534 (D.Del.2005) <u>aff'd</u> 432 F.3d 507 (3d Cir.2005). Thus, <u>Armstrong</u> distinguished, <u>but did not disapprove of, SPM and the Genesis-MCorp line of authority</u>. That line of authority holds that agreements, like the one at issue here, are valid carve outs that allow the secured creditor to give up a portion of its lien for the benefit of junior creditors without violating the provisions of the Bankruptcy Code. <u>See</u> <u>In re SPM</u>, 984 F.2d at 1313; <u>In re MCorp</u>, 160 B.R. at 960; <u>In re Genesis</u>, 266 B.R. at 602.[424]

215.    Further, although the Committee asserts gifting should not apply because it alleges there is substantial unencumbered property in the estate,[425] this argument is irrelevant.

---

[424]    <u>World Health</u>, 344 B.R. at 299 (emphasis added).

[425]    Creditors' Committee Objection, at 46.

First, the amount of unencumbered property is irrelevant because the "gifts" are from the senior secured creditor, and the Committee has not argued or proven that the payments on the Class 4 Claims exceed the collateral securing the Prepetition Lenders' Claims. Additionally, a substantial portion of the purported unsecured collateral, avoidance actions and 35 percent of the capital stock of foreign subsidiaries, were also not collateral of the "gifting" secured creditors in Worldcom[426] or Genesis Health.[427] As a result, this argument is irrelevant.

216. The Committee's reliance on In re Iridium Operating LLC[428] is also misplaced. Again, like Armstrong, Iridium is simply inapposite to the facts and legal issues in this case. The Second Circuit in Iridium did not address the issue of gifting because there were substantial disputes regarding the perfection of the senior secured creditors' liens with respect to the only piece of collateral at issue.[429] In this case, although the Committee asserts that the Prepetition Lenders were not secured in certain of the Debtors' assets such as the existing home inventory,[430] the vast majority of the Prepetition Lenders' liens are undisputed.[431] Further, the Committee

---

[426] In re Worldcom, Inc., Case No. 02-13533 (Bankr. S.D.N.Y. 2002) [Docket No. 1603] (final DIP order excluding avoidance actions and 35 percent of the capital stock of first tier foreign subsidiaries from collateral).

[427] In re Genesis Health Ventures, Case No. 00-02692 (Bankr. D. Del. July 20, 2000) [Docket No. 173] (final DIP order excluding avoidance actions and 35% of the capital stock of first tier foreign subsidiaries from collateral).

[428] 478 F.3d 452 (2d Cir. 2007).

[429] Iridium, 478 F.3d at 460-61.

[430] See Motion of Official Committee of Unsecured Creditors for Order Authorizing Committee to (A) Challenge Various Stipulations, Admissions, and Provisions of the Final DIP Financing Order and (B) Prosecute Certain Avoidance Claims dated April 11, 2008 [Docket No. 415].

[431] See Stipulated Order Between Debtors, Prepetition Credit Facility Agent and the Official Committee of Creditors Holding Unsecured Claims dated March 18, 2008 [Docket No. 329]; Final Order Under 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and Fed. R. Bankr. P. 2002, 4001 and 9014 (I) Authorizing Debtors to Obtain Postpetition Financing, (II) Authorizing Debtors to Use Cash Collateral, and (III) Granting Adequate Protection to Prepetition Secured Parties dated February 29, 2008 [Docket No. 188] (the "Final DIP Order").

does not and cannot argue that the amount paid to the Class 4 Claims exceeds the Prepetition Lenders' collateral (and therefore their distribution under the Plan.)

217.     The facts and legal issues in <u>Genesis Health</u> are virtually identical to those in this Plan.  The <u>Worldcom</u> court expressly approved of <u>Genesis Health</u>, the gifting contemplated here is valid and should be approved.  Further, since the cases relied on by the Committee do not apply on their own terms, it logically follows that the Plan does not unfairly discriminate against Class 5 Claims and should be approved.

**(2)     Gifting is Consistent with the Policies of the Bankruptcy Code**

218.     Unfair discrimination cases such as <u>Genesis</u>, <u>WorldCom</u>, and others are premised on the logic that "unfair discrimination" protects unsecured creditors with equal rights to a debtor's unencumbered property from unfair, unequal treatment.  Because "gift plans"[432] by definition involve distributions to which unsecured creditors have no entitlement, the discrimination is not unfair.[433]

219.     The idea that a secured creditor can gift its recovery to selected unsecured creditors is consistent with other Code policies.  For instance, prepetition payments to some, but not all, similarly situated creditors may be recoverable as preferences in order to promote the policy of creditor equality, the same policy behind the "unfair discrimination" test.  However,

---

[432] By "gift plans" we mean the consensual give up by a secured creditor of a portion of its secured recovery to a Class of unsecured or lower priority creditors.

[433] <u>In re Union Fin. Servs. Group, Inc.</u>, 303 B.R. at 422 (the proceeds of a secured creditors' collateral "represent assets and distributions, in which the Debtors have no right, title or interest . . . and, which would otherwise be required by applicable law to be paid directly to the [secured creditors]."); <u>Worldcom</u>, 2003 WL 23861928, at *61 ("The greater value received by [a junior class] does not violate the Bankruptcy Code because [such enhanced value is] the result of [secured] creditors . . . voluntarily sharing their recoveries under the Plan [and thus] is not the result of the Debtors' distribution of estate property to such creditors.).

"the legal concern with preferences is not one creditor of the debtor gets paid while others do not, but that the payment to the creditor is to the corresponding prejudice of other creditors."[434]

220.    For instance, In re Ramba,[435] the Fifth Circuit affirmed the dismissal of a preference action against creditors whose debt had been assumed by a buyer as part of a pre bankruptcy asset sale. Because the assets sold had been pledged to an undersecured lender, Citibank, the court held that there was no preference to the assumed creditors:

> At the time of the drilling division sale, it is undisputed that Ramba's assets were fully encumbered by Citibank's liens. Ramba had no equity in the proceeds of the sale, and, therefore, the funds never would have been available to general creditors in the bankruptcy. The Trustee argues that upon Citibank's acceptance of $15.6 million from Patterson, the "assumed liability" portion of the purchase price was converted into unencumbered funds, which presumably Ramba could then distribute to creditors as it wished in the resulting bankruptcy. This theory fails because there is no evidence that Citibank agreed to create equity for the benefit of Ramba. The consideration from the sale of Citibank's collateral belonged to Citibank, the secured lender. Id. at 460

221.    Similarly, in In re Fleming Packaging Corp.,[436] the trustee brought a preference action against an insider, Goldfarb, to recover a payment Goldfarb received on a loan it extended to the debtor. The payment came from a carveout of the sale proceeds of the debtor's assets which had been pledged to the undersecured lender. The court, relying in part on SPM, dismissed the action:

> A secured creditor's agreement to transfer its collateral is not a preference because the estate is not depleted. Although the debtor by executing the fifth amendment may have consented to or even facilitated the transfer, it

---

[434] Tabb, The Law of Bankruptcy ¶ 6.11 at 360. Section 547 (c)(5)'s "improvement in position" test also makes this point by avoiding only those improvements during the preference period made "to the prejudice of other creditors holding unsecured claims."

[435] 437 F.3d 457 (5th Cir 2006).

[436] Case No. 03-82408, 2006 WL 2587916 (Bankr. C.D. Ill. Sept. 8, 2006).

was nonetheless a transfer, ultimately, of Bank One's collateral. There is no set of facts that the Trustee could prove that would permit recovery of the 3.5 percent proceeds payment to Goldfarb as a preferential transfer under Section 547(b).[437]

222.    Although decided in the context of preference actions, Ramba and Fleming illustrate that the policy of creditor equality, expressed both in the context of preference law and in prohibitions against "unfair discrimination", protects the interests of unsecured creditors only in property that could otherwise be liquated to pay unsecured claims. The policy of equal treatment of creditors is not compromised under a plan if the give up of value comes from a secured creditor's own recovery.  The very nature of the "give-up" makes this so.

223.    Cases like Genesis and Worldcom are also correct for another reason.  They implicitly recognize the secured creditor's absolute right to "indubitable equivalent"[438] treatment and the debtor's duty to insure that, absent creditor consent, the secured creditor will get the full benefit of its interest in collateral.  They do this by defining "fairness" in a manner that does not presume to surcharge the secured party with an obligation to guarantee equal recoveries for all recoveries for all unsecured creditors. [439] Cf., D&F Construction, 865 F2d 673, 676 (5th Cir. 1989) ("A plan that is not fair and equitable with respect to an impaired secured creditor cannot be confirmed on the basis that such inequity is necessary to protect junior creditors."); In re

---

[437]  In re Fleming Packaging Corp., 2006 WL 2587916, at *13.

[438]  Under section 1129 (b) of the Code, unless a secured creditor otherwise consents, a plan has to provide (1) that the secured creditor retain its lien and receive future installments, deferred cash payments, sufficient to pay the claim in full, or (2) that the property be sold free and clear of its lien . . . or (3) that it receive the "indubitable equivalent" of its claim.

[439]  Even under Section 506(c), the one place where the Code actually contemplates surcharging a creditor's collateral, the law does not go this far.  Section 506(c) has been strictly construed as requiring a creditor who seeks a surcharge to prove "in quantifiable terms that it expended funds directly to protect or preserve the collateral."  In re Jensen, 980 F.2d 1254, 1260 (9th Cir. 1992); accord, In re Flagstaff Food Serv. Corp., 762 F.2d 10, 12 (2d Cir. 1985).

K&E 12473324.

Chevy Devco, 78 B.R. 585, 589 (Bankr. C.D. Calif. 1987). (subordination of a senior creditor's interest "should not be allowed" when the "senior lienor [is] being given less than full protections so that a junior creditor or interest can benefit from it.").[440]

224. Cases that permit discrimination based on lien carveouts are distinguishable from absolute priority cases like Armstrong and Iridium[441] on several grounds. First, neither Armstrong or Iridium were lien carveout cases. In fact, both Armstrong and Iridium distinguished themselves from the lien carveout cases by each emphasizing that, in contrast to SPM, the facts in those cases did not involve proposed distributions which were carved out from third party collateral.[442]

225. Further, the absolute priority rule's focus "is on the allocation of the debtor's assets in a way that preserves non bankruptcy understandings…[that] debt comes before equity". COLLIER's 1129.04[4][a] (emphasis added). The rule was the product of early Supreme Court caselaw built on facts that gave reason for the rule: concern over collusion between senior debt

---

[440] Indeed, while courts debate what constitutes "unfair discrimination" as among unsecured creditors, the Code and cases provide crystal clarity on what the right to "indubitable equivalent" treatment requires. Section 1129 rights are built on adequate protection principles that establish that the secured creditor will get the benefit of its collateral. See, e.g., In re O.P. Held, Inc., 74 B.R. 777, 784 (Bankr. N.D.N.Y. 1987) ("a debtor must prove by clear and convincing evidence that the secured creditor will realize the value of its bargain in light of all the facts and circumstances of the case"); In re Phoenix Steel Corp., 39 B.R. 218, 224 (D. Del. 1984) ("[t]he concept of adequate protection does not envision a court stripping a secured creditor of the benefit of its bargain . . .); see also H.R. Rep. No. 595, 95th Cong. 2d Sess. 339 ("The section, and the concept of adequate protection, is based as much on policy grounds as on constitutional grounds. Secured creditors should not be deprived of the benefit of their bargain.").

[441] Armstrong World Indus., 432 F.3d 507; In re Iridium Op. LLC, 478 F.3d 452, 464 (2d Cir. 2007).

[442] Armstrong, 432 F.3d at 514 (noting that distributions in SPM and similar cases came from secured creditors who "held a perfected, first security interest in all of the debtor's assets", and thus constituted "property [that] was not subject to distribution under the Bankruptcy Code's priority scheme" because such "distribution was a 'carve-out,' a situation where a party whose claim is secured by assets in the bankruptcy estate allows a portion of its lien proceeds to be paid to others."); Iridium, 478 F.3d at 461 ("This case is quite different from SPM, where the secured creditor had an uncontested, "perfected, first security interest in all SPM's assets except certain real estate.") (internal citations omitted).

139

and junior classes, especially equity, to break this bargain and circumvent priorities established by non bankruptcy law.[443]

226.    However, as <u>Ramba</u> and <u>Fleming</u> illustrate, and as <u>SPM</u> and its progeny recognize, when it comes to a secured lender's collateral, there is no non bankruptcy understanding which would render "unfair" a plan carveout by a secured creditor for some, but not all, unsecured creditors.  In fact, the understanding in all situations is the opposite, namely that a secured party is free to do with its collateral as it wishes.[444]

###    5.    Remaining Objections Asserting the Plan Unfairly Discriminates Should Also Be Overruled

227.    In the Class 5 echo chamber, other objectors also assert the Plan unfairly discriminates against Class 5 Claims based on the traditional unfair discrimination test: (a) Objection of Landerhaven II LLC to Confirmation of Debtors' Prepackaged Joint Plan of Reorganization dated March 10, 2008 [Docket No. 252] (the "Landerhaven Objection"); (b) the Noia Objection; (c) the Beach Plaintiffs' Objection; (d) the Accretive Solutions Objection; and (e) the Committee's Objection.  These objections are without merit and should be overruled.

228.    The Committee's Objection, among others, asserts that the Plan unfairly discriminates against the Class 5 Claims because the Debtors do not advance a legitimate business reason for treating Class 5 and Class 4 creditors differently.[445]  First, this objection is

---

[443]    <u>See, e.g.</u>, <u>N. P.R. Co. v. Boyd</u>, 228 U.S. 482, 504 (1913); <u>see also</u>, <u>Iridium</u>, 478 F.3d at 464 ("Rejection of a per se rule has an unfortunate side effect: a heightened risk that the parties to a settlement may engage in improper collusion.").

[444]    Similarly, there would be nothing unfair in a foreclosure context or sale context if junior creditors were treated unequally - certain liabilities assumed and other not.  It cannot be "unfair discrimination" for a secured creditor to do with its collateral in the chapter 11 context what it could undoubtedly do in any other setting.

[445]    Landerhaven Objection, at 5.

irrelevant since the Prepetition Lenders are "gifting" all the recoveries to Class 4 and the Bankruptcy Code's distribution scheme does not apply. Further, as discussed above in section III.Q.3.b, the Debtors have a fundamental business reason to treat Class 5 differently: the claims in such Class add no net value to the reorganized Debtors. Additionally, the time constraints on separating the Claims into the relevant classes limited Class 5 to those Claims where it was readily apparent there would be no value to the Reorganized Debtors to provide distributions. Therefore, Class 5 is narrowly tailored and only includes those Claims whose lack of net value is most evident. It was the Debtors' business judgment that it would maximize the Reorganized Debtors' value to limit Class 5 to those Claims it could be confident that provided no going-concern benefit. Thus, the Debtors have a reasonable basis to separate Class 4 and Class 5 Claims.

229.     The Committee Objection, Noia Objection and the Beach Plaintiffs' Objection also assert the Plan has a rebuttable presumption of unfair discrimination due to the differential in treatment between the unsecured claims in Class 4 and Class 5 under the "Markell Test."[446] First, as the <u>Genesis Health</u> court recognized, the Markell Test is irrelevant because the Prepetition Lenders are "gifting" their recoveries to the Class 4 creditors.[447] Second, courts in this district have embraced the <u>Buttonwoods</u> test discussed above in section III.Q.3.b, which the Debtors satisfy. As a result, the Plan does not unfairly discriminate and the Committee's Objection, Landerhaven Objection, Beach Plaintiffs' Objection, and the Noia Objection should be overruled.

---

[446] Beach Plaintiffs' Objection, at 10-12 (<u>citing</u> <u>Armstrong</u>, 348 B.R. at 122; Noia Objection, at 11-13 (<u>citing</u> <u>In re Quay Corp., Inc.</u>, 372 B.R. 378, 385-86 (Bankr. N.D. Ill. 2007))).

[447] <u>See</u> <u>Genesis Health</u>, 266 B.R. at 612.

### 6. The Plan Satisfies the Fair and Equitable Requirements

230. As described above, the Plan has properly classified Claims and Equity Interests, and claimants within each Class will receive substantially similar treatment. Therefore, the Plan does not discriminate unfairly, and is fair and equitable with respect to impaired classes that have not voted to accept the Plan. The Plan satisfies the cramdown requirements of section 1129(b) of the Bankruptcy Code and may be confirmed notwithstanding the deemed rejection of Classes 5 and 7.

## IV. THE MISCELLANEOUS OBJECTIONS TO PLAN CONFIRMATION SHOULD BE OVERRULED

### A. Triple Net's Objections to the Plan's Releases Should Be Overruled.

231. Triple Net argues that the Plan's release provisions contained in Article VIII.D (the "Debtors' Releases") are non-consensual and do not meet the Second Circuit's standard for releases set forth in Metromedia.[448] Put simply, Triple Net misunderstands the difference between debtor and non-debtor releases. Here, the Debtors' Releases are entirely consistent with those debtor releases approved in other chapter 11 cases.[449] And, the non-debtor releases contained elsewhere in the Plan are entirely appropriate and consistent with Second Circuit precedent.

### 1. The Debtors' Releases Are Appropriate

232. In its objection to the Plan, Triple Net argues that because the Debtors' Releases release derivative claims automatically—i.e., whether the creditor voted in favor of the Plan or

---

[448] See In re Metromedia, 416 F.3d 136, 142 (2d Cir. 2005).

[449] See, e.g., In re Movie Gallery, Case No. 07-33849 (DOT) (Bankr. E.D. Va. Apr. 10, 2008); In re Calpine Corp., Case No. 05-60200 (BRL) (Bankr. S.D.N.Y. Dec. 19, 2005); In re Tower Auto., Inc., Case No. 05-10578 (ALG) (Bankr. S.D.N.Y. July 9, 2007).

whether a proof of claim was filed—the releases are non-consensual, irreconcilable with Article VIII.F (non-debtor releases), and violate the standard set forth <u>Metromedia</u>. These assertions are incorrect.

233. <u>First</u>, Triple Net challenges the Debtors' Releases by hanging its hat on the allegations that the Debtors are attempting to release derivative claims belonging to Triple Net and various other stakeholders, thus transforming a purported consensual release into a non consensual release. The mere inclusion, however, of the phrase "including any derivative Claims" has no effect on the consensual nature of a debtor release. Triple Net seems to believe that derivative claims belong to the creditors of a bankrupt estate. This is a fundamental misunderstanding of bankruptcy law. In fact, the derivative claims do not belong to Triple Net, or any other creditors. Rather, the derivative causes of action vested in the Debtors and became property of the estate as of the Petition Date.[450] Thus, the Debtors' Releases do not legally affect the release of any derivative claims held by creditors or interest holders because they do not actually hold derivative claims at this time. Though Triple Net argues, repeatedly, that they are involuntarily giving up "valuable rights," any valuable rights based on potential derivative claims remain or revert to the Debtors' estate upon filing of the petition and are thereafter subject to the Debtors' business judgment.[451] In sum, Triple Net cannot argue that the Debtors' Releases usurp their derivative claims because they do not have derivative claims.

234. Furthermore, the Debtors' Releases of the Released Parties are subject to approval pursuant to section 1123(b)(3) of the Bankruptcy Code, which permits a debtor to include

---

[450] <u>In re XO Commc'ns, Inc.</u>, 330 B.R. 394, 426 (Bankr. S.D.N.Y. 2005); <u>Schaffer ex rel. Lasersight, Inc. v. CC Investments, LDC</u>, 286 F. Supp. 2d 279, 283 (S.D.N.Y. 2003).

[451] <u>XO Commc'ns, Inc.</u>, 330 B.R. at 426.

settlement of the debtor's claims as a discretionary provision in a plan of reorganization.[452] Unlike non-ordinary course transactions during a bankruptcy case that are subject to judicial oversight because creditors cannot vote on them, settlements under a plan of reorganization are approved through creditor ratification. Thus, the Debtors' decision to release certain parties under their Plan is not subject to separate evaluation and potential second-guessing by each individual Creditor as part of Confirmation. If the Debtors obtain enough votes in favor of their Plan to allow Confirmation under section 1129 of the Bankruptcy Code, neither Triple Net nor any other individual creditor has standing to block confirmation by simply voicing disapproval of the Debtors' Releases. Accordingly, neither the applicable Bankruptcy Code provisions nor Triple Net's own interests in these chapter 11 cases provide it with standing to object to the Debtors' Releases.

235. Even if Triple Net did have standing to challenge the Debtors' Releases—which it does not—the Debtors have proposed the releases based on their sound business judgment, and Triple Net has made no showing—other than blanket allegations and conclusory statements—to overcome the presumptive legitimacy of the Debtors' business decision. The Debtors know of nothing that would warrant a suit against any of the Released Parties for any actions or omissions relating to these chapter 11 cases.[453] Even if a suit was warranted, however, a negligence suit (or any suit covered by the indemnity) likely would be futile because the Debtors' corporate bylaws require them to indemnify their officers and directors for liability arising from negligence (giving rise to setoff Claims against the Debtors equal to the Debtors' claims), or make available to such

---

[452] 11 U.S.C. §1123(b)(3). But see In re Coram Healthcare Corp., 315 B.R. 321, 334-36 (Bankr. D. Del. 2004) (applying Bankruptcy Rule 9019 standard to debtor releases under a plan).

[453] See Spytek Declaration, at ¶ 32.

directors and officers the Debtors' director and officer insurance policies. Furthermore, a suit based on gross negligence or willful misconduct is not prohibited by the terms of the Debtors' Releases.[454] Moreover, the costs associated with litigation, the likelihood of recovery, and the Debtors' general policy to support their directors and officers in their business related activities all militated in favor of a release. Triple Net's summary allegations are wholly insufficient to rebut the Debtors' sound business judgment.

236. Second, as discussed more fully below, Article VIII.D and VIII.F are wholly reconcilable. The releases contained in Article VIII.F are consensual as they only release those parties who voted in favor of the Plan, namely the Class 1 Claims. Thus, the carve-out contained in Article VIII.F for those creditors who voted in favor of the Plan is completely inapplicable to the Debtors' Releases contained un Article VIII.D

237. Third, confusing the Plan's Debtors' Releases with its non-debtor releases, Triple Net blindly asserts that the Debtors' Releases should be stricken because they allegedly fail to satisfy Metromedia. However, Metromedia simply does not set the standard for a plan's debtor releases and, therefore, Triple Net's objection should be overruled.

### 2. Releases By Holders Of Claims And Interests Are Consensual and Should be Approved

238. To the extent the non-debtor releases are at issue, the Plan's releases are entirely appropriate and should be approved. The releases provided for under the Plan are not only consensual—which alone allows them to pass muster under Metromedia—but also play an important role in the Debtors' Plan.

---

[454] See Plan, Art. VIII.D.

145

239.    Under <u>Metromedia</u> and its progeny, consensual non-debtor releases under a debtor's plan of reorganization are entirely appropriate.[455]  Consent undisputedly is present when a party votes in favor of the Plan.[456]  Here, the non-debtor releases under the Plan are undeniably consensual.  The Plan provides that only those creditors voting to accept the Plan will release certain "Released Parties" as defined in the Plan.[457]  In both the Plan and Disclosure Statement, the releases were conspicuously set off in **bold** font.  Moreover, in soliciting votes on the Plan, the Debtors sent ballots to all holders of Class 1 Claims unambiguously providing in **bold** or all CAPITAL letters that the party could vote for or against the Plan and if the vote was in favor of the Plan, the party granted a release.  Based on their consensual nature, the releases should be approved.

240.    While the non-debtor releases in these chapter 11 cases are clearly consensual, they are also an integral part of the Debtors' overall restructuring efforts and, therefore, further consistent with <u>Metromedia</u>.[458]  Indeed, there can be no dispute that the Released Parties have

---

[455]  <u>See</u> <u>In re Metromedia</u>, 416 F.3d 136, 142 (2d Cir. 2005) ("Nondebtor releases may [] be tolerated if the affected creditors consent."); <u>In re Specialty Equip. Cos., Inc.</u>, 3 F.3d 1043 (7th Cir. 1993) (finding that the Bankruptcy Code does not prohibit the inclusion of consensual non-debtor releases in chapter 11); <u>see also</u> <u>In re Adelphia Commc'ns Corp.</u>, 368 B.R. 140, 268 (Bankr. S.D.N.Y. 2007) (noting that "[t]he Seventh Circuit held in <u>Specialty Equipment</u> that consensual releases are permissible, and the <u>Metromedia</u> court did not quarrel with that view") (internal citation omitted); <u>In re Spiegel, Inc.</u>, No. 03-11540 (BRL), 2006 WL 2577825, at *7 (Bankr. S.D.N.Y. Aug. 16, 2006) (Lifland, J.) (citing <u>Metromedia</u> 416 at 142) (non-debtor releases are tolerated if the creditors consent).

[456]  <u>Adelphia</u>, 368 B.R. at 268 (upholding releases with respect to those who voted in favor of plan); <u>see also</u> <u>Specialty Equip</u>, 3 F.3d at 1043.

[457]  <u>See</u> Plan, Art. VIII.F.

[458]  <u>Metromedia</u>, 416 F.3d at 142 (Approval of non-debtor releases "is not a matter of factors and prongs" and non-debtor releases should be granted only in rare circumstances); <u>Adelphia</u>, 368 B.R. at 268 (recognizing that <u>Metromedia</u> did not overrule its previous decision in <u>In re Drexel Burnham Lambert</u>, 960 F.2d 285, 293 (2d Cir. 1992), but rather limited the use of nonconsensual non-debtor releases to unique situations); <u>see generally</u> <u>In re Master Mortgage Inv. Fund, Inc.</u>, 168 B.R. 930, 935 (Bankr. W.D. Mo. 1994) (setting forth factors that courts consider when determining whether to approve a nonconsensual non-debtor release:  (1) there is an identity of interest between the debtor and the third party, usually an indemnity relationship, such that a suit against the

(Continued…)

K&E 12473324.

supplied integral services without which the Debtors could not have proposed their confirmable prepackaged Plan. The parties designated as Released Parties under the Plan are all responsible for ushering SIRVA through the reorganization process quickly and, as such, are appropriate recipients of the consensual releases. For example, the Debtors' directors and officers and their professionals have worked tirelessly to restructure the Debtors' operations and capital structure since prior to the filing of these chapter 11 cases. The members of and advisors to the official committee each have played an integral role in these chapter 11 cases. The Prepetition Lenders have supplied or will supply critical financing to allow the Debtors to transition seamlessly into chapter 11 and set the stage for their emergence from chapter 11. Thus, the circumstances in these chapter 11 cases qualify as unique, making the non-debtor releases provided under the Plan fully consistent with the Metromedia decision.

### 3. The Exculpation Provision Should Be Approved

241. Triple Net also objects to the Plan's exculpation provisions, which exculpate certain "Exculpated Parties" with respect to their duties and responsibilities pursuant to the Plan, except for acts or omissions resulting from gross negligence or willful misconduct. Triple Net's objection is off the mark.

242. First, it is important to underscore the difference between the consensual non-debtor releases provided for under the Plan and the Plan's exculpation provisions. Unlike the non-debtor releases or the Debtors' Releases, the exculpation provisions do not affect the liability of third parties per se, but rather set a standard of care of gross negligence or willful

---

non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate; (2) the non-debtor has contributed substantial assets to the reorganization; (3) the injunction is essential to reorganization; (4) a substantial majority of the creditors agree to such injunction, specifically, the impacted class, or classes, has "overwhelmingly" voted to accept the proposed plan treatment; and (5) the plan provides a mechanism for the payment of all, or substantially all, of the claims of the class or classes affected by the injunction).

K&E 12473324.

misconduct in future litigation by a non-releasing party against an "Exculpated Party" for acts arising out of the Debtors' restructuring.[459]  A bankruptcy court has the power to approve an exculpation clause in a chapter 11 plan because a bankruptcy court cannot confirm the plan unless it finds that the plan has been proposed in good faith.[460]  As such, an exculpation provision represents a legal conclusion that flows inevitably from several different findings a bankruptcy court must reach in confirming a plan—an undeniably core matter.[461]  Once a good faith finding is made, it then becomes appropriate to set the standard of care of those involved in the formulation of that plan of reorganization for liability arising from the chapter 11 case.[462]  Exculpation clauses, therefore, appropriately prevent future collateral attacks against parties that have made substantial contributions to the reorganization by contributing to a debtor's reorganization.  Recognizing this difference, courts have approved exculpations customarily in large chapter 11 cases.[463]  Here, the exculpation provisions are likewise appropriate and vital because they provide protection to those parties who were essential to the restructuring process.

---

[459]  See In re PWS Holding Corp., 228 F.3d 224, 246 (3d Cir. 2000) (holding that an exculpation provision "is apparently a commonplace provision in Chapter 11 plans, [and] does not affect the liability of these parties, but rather states the standard of liability under the Code.").

[460]  See 11 U.S.C. § 1129(a)(3).

[461]  See 11 U.S.C. § 157(b)(2)(L).

[462]  See PWS, 228 F.3d at 246-47 (observing that creditors providing services to the debtors are entitled to a "limited grant of immunity . . . for actions within the scope of their duties . . . .").

[463]  See, e.g., In re Calpine Corp., Case No. 05-60200 (BRL) (Bankr. S.D.N.Y. Dec. 19, 2007); In re Source Enters., Inc., Case No. 06-11707, 2007 WL 2903954, at *13 (Bankr. S.D.N.Y. Oct. 1, 2007) (approved exculpation provision because provision in the best interests on the debtors' estates and the creditors); In re Bally Total Fitness of Greater New York, Inc., Case No. 07-12395, 2007 WL 2779438, at *8 (Bankr. S.D.N.Y. Sept. 17, 2007) (finding that the exculpation, release, and injunction provisions appropriate because they were fair and equitable, necessary to successful reorganization, and integral to the plan); In re Oneida Ltd., 351 B.R. 79, 94 n.22 (Bankr. S.D.N.Y. 2006); In re Enron Corp., 326 B.R. 497, 503 (S.D.N.Y. 2005) (finding exculpation provision necessary to effectuate the plan); In re Worldcom, Inc., Case No. 03-13533 (Bankr. S.D.N.Y. Oct. 21, 2003).

243.     The Debtors formulated the Plan after negotiating critical components with numerous parties in good faith.  Here, negotiation and compromises regarding the terms of the Plan were necessary to the formulation of a feasible Plan and could not have occurred without protection from liability for the constituents involved.  In this circumstance, it is appropriate to offer protection in the form of exculpation.[464]  Indeed, parties participated in the creation of the Plan "under the guarantee that they would receive some limited protection for participating in one of the largest and most complex bankruptcy filings in history."[465]  The Plan's exculpation clause is narrow as it only relates to acts or omissions in connection with, or arising out of the their duties and responsibilities pursuant to the Plan.  Additionally, no release is provided for gross negligence or willful misconduct.  This type of language generally follows the text that has become standard in the Southern District of New York.[466]

244.     Triple Net alleges that the exculpation provisions are illegal because they cover prepetition acts that are not limited to the restructuring of the Debtors.  Triple Net, however, is mistaken as the exculpation provisions are appropriately tailored.  First, the exculpation provisions are explicitly limited to acts or omissions taken in connection with or relating to the the in or out of court restructuring of the Debtors.  Second, courts have approved exculpation provisions relating to pre- and postpetition acts as long the acts relate to the restructuring process.[467]  Here, the exculpation covers only acts relating to the Exculpated Parties' duties and

---

[464]  See In re Worldcom, 2003 WL 23861928, at *28 (Bankr. S.D.N.Y. Oct. 31, 2003).

[465]  See Enron, 326 B.R. at 503.

[466]  See, e.g., Oneida Ltd., 351 B.R. at 94.

[467]  See, e.g., id. (finding exculpation provision including prepetition acts relating to reorganization sufficiently narrow to pass muster).

K&E 12473324.

responsibilities pursuant to the Plan; any prepetition acts covered by the exculpation would be directly related to the parties' efforts to reorganize the Debtors, whether in or out of this Bankruptcy Court. The Exculpated Parties who worked in good faith to realize the Debtors' restructuring through the culmination of the Plan before this Court should be allowed the protections of a customary exculpation for their efforts.

**B.     The Committee's Miscellaneous Objections Should Be Overruled**

**1.     The Committee's Objection to 502(d) Should Be Overruled.**

245.     The Committee's penchant for putting the cart before the horse continues in its argument that the Plan is not fair and equitable because it proposes to pay a group of creditors—here, the Prepetition Lenders—despite the Committee's allegation that such creditors received a preference and such a distribution violates section 502(d) of the Bankruptcy Code until the alleged preference issues are resolved.[468]  This argument, however, misstates the law.  A court order, or at least an initial determination by a court, disallowing a claim is required to disallow a claim under section 502(d) of the Bankruptcy Code; the bare allegation that preference issues exist is insufficient.[469]  Section 502(d) provides that "the court shall disallow a claim if it meets the requirements of the statute.  Thus, it is the court that must determine whether the claim is of the type to which disallowance is properly applied."[470]  By requiring a court order, the Bankruptcy Code anticipates and prevents the ability of one party to bar distributions on the

---

[468]  See Creditors' Committee Objection, at 58 ("The Pre-Petition Lenders cannot have such an allowed claim under § 502(d) until the preference issues concerning the Pre-Petition Lenders . . . are resolved . . .").

[469]  See In re Red Dot Scenic, Inc., 313 B.R. 181, 186 (Bankr. S.D.N.Y. 2004) ("'[T]o prevent abuse of [section 502(d)] this initial disallowance should be made by judicial determination, whether it be obtained in a claim objection or by some form of declaratory judgment action.'") (quoting 4 Collier on Bankruptcy ¶ 502.05[2][a] (15th ed. 2004)).

[470]  In re Enron Corp., 379 B.R. 425, 438 (S.D.N.Y. 2007) (internal quotation marks omitted).

K&E 12473324.

bases of the barest of allegations.  Moreover, disallowance of a claim pursuant to section 502(d) is "completely contingent on the refusal or failure to return the avoidable transfer by the recipient of that avoidable transfer" only *after* a judgment is entered.[471]  To date, the Committee has not filed a motion to disallow the Prepetition Lenders' claims, nor has the Court made a determination regarding the allowance of such claims.[472]  Instead, the Committee attempts to circumvent the Bankruptcy Code by bootstrapping alleged preference issues as an objection to Confirmation.  Because the Court has not made a determination as to the allowance of the Prepetition Lenders' claims, however, section 502(d) of the Bankruptcy Code is not operative at this time.

> **2.     The Committee's objection regarding the discharge of pricing claims is both incorrect and irrelevant to confirmation of the Plan[473]**

246.     Through their Objections, the Committee and the alleges that the Debtors' Plan cannot be confirmed because it seeks to discharge certain "Unnamed Customers" as potential parties to class action lawsuits filed against the Debtors.  In the Committee's view, the Debtors' failure to provide personal service to these "Unnamed Customers" prevents confirmation of the

---

[471]  Id.

[472]  While it is true that the Creditors' Committee filed a motion seeking authorization to prosecute avoidance actions, see Notice of Motion of Official Committee of Unsecured Creditors for Order Authorizing Committee to (A) Challenge Various Stipulations, Admissions and Provisions of the Final DIP Financial Order and (B) Prosecute Certain Avoidance Claims (Apr. 11, 2008) [Docket No. 415], the Creditors' Committee has not filed a motion seeking the disallowance of the Prepetition Lenders' claims.  In any event, the Bankruptcy Code requires something more than just filing a motion alleging a preferential transfer before a claim is disallowed pursuant to section 502(d); the Court must make at least an initial determination that the claim is disallowed. See 11 U.S.C. § 502(d).

[473]  The Beach Plaintiffs Objection raises identical notice issues through their objection.  See Beach Plaintiffs Objection, at 16–19.  The Debtors submit that their arguments set forth herein are sufficient to rebut the Beach Plaintiffs Objection to confirmation.

Debtors' plan of reorganization.[474]  The Committee's concerns are misplaced.  <u>First</u>, service by publication of the "Unnamed Customers" is sufficient notice of the Debtors' bankruptcy cases under the facts and circumstances of these chapter 11 cases.  <u>Second</u>, confirmation does not require a debtor to demonstrate the preclusive effect of discharge on each and every potential creditor.  Rather, a party in interest may separately challenge the effect of discharge through an adversarial proceeding outside the confirmation process.  The Committee's objection is irrelevant to the confirmation of the Debtors' plan.

247.    A chapter 11 debtor is not required to provide actual notice of its bankruptcy filing to unknown creditors.  "When a creditor is unknown to the debtor, publication notice of the claims bar date may satisfy the requirements of due process."[475]  A debtor has no duty to seek and every claim that may or might be asserted in order to provide such creditors with additional notice.  "A debtor does not have a duty to search out each conceivable or possible creditor and urge that person to make a claim against it."[476]  Hence, a creditor holding only "conceivable, conjectural or speculative claims" are unknown creditors for whom service by publication is sufficient.[477]

248.    Simply because the Debtors "know" the identities of their customers does not imply that all customers are "known" creditors.  "Known" creditors are only those parties

---

[474]  <u>See</u> Creditors' Committee Objection, at 59.  Given the Committee's concern for the due process rights of Unnamed Customers, the Debtors find it surprising that the Committee has waited until the eleventh hour to share these concerns with the Debtors or the Court.

[475]  <u>In re U.S.H. Corp. of N.Y.</u>, 223 B.R. 654, 658 (Bankr. S.D.N.Y. 1998); <u>see also</u> <u>DePippo v. Kmart Corp.</u>, 335 B.R. 290, 296 (S.D.N.Y. 2005).

[476]  <u>U.S.H. Corp.</u>, 223 B.R. at 659.

[477]  <u>In re Trump Taj Mahal Assocs.</u>, No. 93-3571, 1993 WL 534494, at *3 (D.N.J. Dec. 13, 1993).

K&E 12473324.

holding claims that may be identified through the exercise of reasonable diligence.[478]  A vast, open-ended investigation is not required to identify "known" creditors.[479]  Although the Debtors maintain customer records many addresses for former customers may be inaccurate or out of date—particularly for moves that happened years ago.  Nor does a class of "known" plaintiffs exist simply because a disputed class action suit has been filed.  To hold otherwise would allow plaintiffs' counsel to achieve de facto certification by virtue of filing the complaint.  Rather, a "known creditor" is one that a debtor reasonably can expect to assert a claim.[480]  The plaintiff— not the defendant—bears the burden of establishing that such a class of plaintiffs/potential claimants actually exists.  Thus, the Committee would seek to place the Debtors in an untenable Catch-22: the Debtors are obliged to effectively certify a class of plaintiffs on behalf of an opportunistic litigant, or the Debtors will be unable to exit chapter 11.

249.    Nor do the Debtors believe any such "Unnamed Customers" would seek or are seeking to file claims against their estates.[481]  Class actions are typically suits that simply would not exist but for the solicitation of class counsel.

> They are suits that would not exist if each injured person had to litigate separately. And what suits! Each starts off with complex problems about commonality of claims and adequate representation, followed by notice, opt-out, and other procedural issues unique to class actions, on top of which the substance of the case may be very difficult. Class actions consume judicial time, putting off adjudication for other deserving litigants; they impose steep costs on defendants,

---

[478]  Chemetron v. Jones, 72 F.3d 341, 347 (3d Cir. 1995).

[479]  See id.; In re Spiegel, Inc., 354 B.R. 51, 57 (Bankr. S.D.N.Y. 2006) ("Everyone who may conceivably have a claim is not entitled to actual notice, rather publication notice is sufficient for creditors who are not reasonably ascertainable.").

[480]  See In re Eagle-Picher Indus., Inc., 216 B.R. 611, 616 (Bankr. S.D. Ohio 1997).

[481]  Cf. Eagle-Picher Indus., 216 B.R. at 617.

K&E 12473324.

even those in the right. The systemic costs of class litigation should not be borne lightly.[482]

Such claims cannot be said to be held by "known" creditor. The "unnamed customers" are not "known" in two ways. The does not "know" they are creditors and it is highly unlikely the "unnamed customers" known they are creditors. "Typically, a known creditor may have engaged in some communication with a debtor concerning the existence of the creditor's claim."[483] Thus, the Committee improperly requires the Debtors to solicit wholly speculative claims against their estates as a condition of confirmation.

250. Such a requirement would also reverse the burdens of establishing a class of affected parties in class actions generally. Plaintiff's counsel is typically required to bear the cost and expense of identifying class members outside of bankruptcy.[484] The Debtors respectfully submit that it is unreasonable for the Debtors to be required to do the work of class counsel as a condition of confirmation. "The touchstone remains, as in <u>Mullane</u>, . . . and its progeny, reasonable notice under the individual circumstances of each case."[485]

251. The Committee relies on <u>In re Waterman Steamship Corp.</u>, 157 B.R. 220 (S.D.N.Y. 1993), for the proposition that the Debtors are somehow required to identify unknown, putative litigants on behalf of class counsel. <u>Waterman Steamship</u> made no such ruling. Rather, the court remanded proceedings to the bankruptcy court to determine if the class members were

---

[482] <u>In re Am. Reserve Corp.</u>, 840 F.2d 487, 490 (7th Cir. 1988 ) (Easterbrook, J.) (emphasis added).

[483] <u>In re Drexel Burnham Lambert Group Inc.</u>, 151 B.R. 674, 681 (Bankr. S.D.N.Y. 1993).

[484] <u>See</u> <u>Eisen v. Carlisle & Jacquelin</u>, 417 U.S. 156, 177 (1974).

[485] <u>Drexel Burnham Lambert Group</u>, 151 B.R. at 683

in fact readily ascertainable.[486]  Moreover, <u>Waterman Steamship</u> had nothing whatsoever to do with confirmation of a debtor's plan of reorganization under section 1129.  Rather, the case focused squarely on the effect of a bankruptcy that already confirmed <u>six years</u> before the court's opinion.[487]  If anything, <u>Waterman Steamship</u> demonstrates only that the Committee's objection is at best, premature.

252.    Even assuming certain Unnamed Customers may have been entitled to actual notice, the sufficiency of notice is not a bar to confirmation.  Rather, the effect of discharge and the relevance of notice is a matter appropriately addressed through individual, adversary proceedings separate and apart from confirmation of the Debtors' Plan.  Pursuant to Bankruptcy Rule 7001(4), disputes regarding the effect of discharge—e.g., for lack of notice—require an adversary proceeding.  However, Confirmation is at most a contested matter,[488] and only those questions that can be brought in a contested matter are properly heard at confirmation.[489]  The confirmation process should not be used to resolve issues properly addressed through adversary proceedings.[490]  If an Unnamed Customer desires to challenge the sufficiency of notice and the effect of discharge, the Unnamed Customer can institute an adversary proceeding at that time.  Until such time, however, the Committee's so-called objection to Confirmation is misplaced.

---

[486]  <u>See</u> <u>id.</u> at 222.

[487]  <u>See</u> <u>In re Waterman S.S. Corp.</u>, 141 B.R. 552, 554–55 (Bankr. S.D.N.Y.), <u>vac'd and remanded by</u> 157 B.R. 220.

[488]  <u>See</u> Fed. R. Bankr. P. 9014.

[489]  <u>See</u> <u>Whelton v. Educ. Credit Mgmt. Corp.</u>, 432 F.3d 150, 154 (2d Cir. 2005) (citation omitted).

[490]  <u>In re Beard</u>, 112 B.R. 951, 956 (Bankr. N.D. Ind. 1990) (noting that an issue is not properly considered in the confirmation process if it must be raised through adversary proceeding ).

K&E 12473324.

## Conclusion

253.     For the reasons set forth herein, the Debtors submit that the Plan fully satisfies all applicable requirements of the Bankruptcy Code and respectfully request that this Court confirm the Plan.

|  |  |
|---|---|
|  | */s/  Marc Kieselstein, P.C.* |
| Dated:  April 15, 2008 | Marc Kieselstein, P.C. (admitted *pro hac vice*) |
| New York, New York | Adam C. Paul (admitted *pro hac vice*) |
|  | Scott R. Zemnick (admitted *pro hac vice*) |
|  | Jeffrey Gettleman (admitted *pro hac vice*) |
|  | KIRKLAND & ELLIS LLP |
|  | 200 East Randolph Drive |
|  | Chicago, Illinois  60601 |
|  | Telephone:  (312) 861-2000 |
|  | Facsimile:  (312) 861-2200 |
|  |  |
|  | Counsel for the Debtors and Debtors in Possession |

K&E 12473324.